ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JONATHAN MOYNAHAN LARMORE,

Defendant.

**SEALED INDICTMENT**

24 Cr. 24 CRIM 140

**COUNT ONE**
(Fraud in Connection with a Tender Offer)

The Grand Jury charges:

**Overview of the Fraudulent Tender Offer Scheme**

1. From at least in or about October 2023 through in or about November 2023, JONATHAN MOYNAHAN LARMORE, the defendant, perpetrated a scheme to use a false and fraudulent tender offer to manipulate the stock price of WeWork, Inc. ("WeWork"), a co-working space company that was, at all times relevant to this Indictment, headquartered in New York, New York and publicly traded on the New York Stock Exchange ("NYSE").

2. JONATHAN MOYNAHAN LARMORE, the defendant, executed his scheme in three steps. First, on or about October 6, 2023, LARMORE created Cole Capital Funds LLC ("Cole Capital"), a purported real estate investment firm that was, in fact, a vehicle for his fraudulent scheme. Second, on or about November 1, 2023, and November 2, 2023, LARMORE spent more than $775,000 buying tens of thousands of cheap, short-dated, out-of-the-money WeWork call options (the vast majority of which were set to expire on November 3, 2023, at 4:00 p.m. EDT) and (because certain of LARMORE's brokerage firms did not allow him to purchase options)

hundreds of thousands of shares of WeWork common stock.[1] Third, on or about November 3, 2023, LARMORE caused a false and misleading press release to be published announcing that Cole Capital proposed to acquire 51% of all outstanding shares owned by minority shareholders of WeWork at a more-than-700% premium, in an all-cash offer worth more than $77 million. At the time, WeWork was on the verge of bankruptcy.

3. In fact, neither JONATHAN MOYNAHAN LARMORE, the defendant, nor Cole Capital had the intent or ability to execute the announced tender offer. Instead, LARMORE intended for news of the tender offer to fraudulently inflate WeWork's share price and, thereby, increase the value of LARMORE's newly acquired WeWork call options and shares.

4. On or about November 3, 2023, at approximately 5:12 p.m. EDT, the press release announcing Cole Capital's purported tender was published. Within approximately one minute of publication, in after-hours trading, WeWork's share price quickly increased more than 70% from $.85 to $1.45, and continued to rise until 5:31 p.m. EDT, when the stock reached its high of $2.14, which was a more-than-150% increase over the stock price prior to the publication of the press release. There was no other significant news related to WeWork announced between approximately 5:12 p.m. EDT and approximately 5:31 p.m. EDT on or November 3, 2023, other than the fake tender offer made by JONATHAN MOYNAHAN LARMORE, the defendant.

[1] Stock options contracts grant their owners the right—but not the obligation—to buy (for a call option) or sell (for a put option) a certain number of shares, at a particular price (the "strike price"), until or upon the expiration date of the contract. A call options contract is defined as "out of the money" if it does not hold intrinsic value—i.e., if exercised, the owner would pay more than the current market value for the stock. Accordingly, in sum and in effect, a purchaser of an out-of-the-money call option is making a bet that the stock will go up in value, exceeding the strike price, thereby allowing the owner of the option contract to realize as profit the difference in value of the stock between the strike price and the market price when the option is exercised.

5. The WeWork call options purchased by JONATHAN MOYNAHAN LARMORE, the defendant, could have made LARMORE millions of dollars if the news of LARMORE's fraudulent tender offer had caused WeWork's share price to increase significantly *before* LARMORE's options expired. But LARMORE mistimed how long it would take to properly format his press release and have it published. As a result of these delays, LARMORE's fraudulent press release was not published, and WeWork's share price did not spike as a result, until approximately 5:12 p.m. EDT on or about November 3, 2023—about an hour *after* the vast majority of LARMORE's WeWork call options had expired worthless at 4:00 p.m. EDT that day. LARMORE did not exercise or sell his small amount of remaining WeWork options (which were set to expire on or about November 10, 2023) because, while LARMORE's fraudulent conduct caused WeWork's share price to rise by close to 150%, LARMORE's scheme did not inflate WeWork's share price above the strike price of his remaining options.

6. On or about November 6, 2023, WeWork filed for Chapter 11 bankruptcy protection. On or about November 10, 2023, the remaining WeWork options purchased by JONATHAN MOYNAHAN LARMORE, the defendant, expired out of the money and worthless.

**LARMORE Creates Cole Capital**

7. After the market closed on or about October 2, 2023, WeWork announced that it had declined to make more than $95 million of interest payments to noteholders that were due that day, fueling speculation that the company might be headed for bankruptcy. When trading resumed on the morning of on or about October 3, 2023, WeWork's stock plummeted more than 20%.

8. On or about October 6, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, formed and incorporated Cole Capital in the State of Arizona as a real estate and rental and leasing business. LARMORE was listed with the Arizona Corporation Commission as Cole

Capital's statutory agent, organizer, principal, and manager of the business, under the name "J. Moynahan Larmore."

9. Also on or about October 6, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, registered and launched a website for Cole Capital. According to the Cole Capital website, Cole Capital—despite having been created on the same day as the website—"charges ahead, introducing innovative investment strategies and providing access to best-of-class investments . . . . We venture into various markets across the United States, securing investments in properties and companies that are leaders in their fields." LARMORE (without his first name, as "Moynahan Larmore") was listed on the Cole Capital website as the Chief Executive Officer of Cole Capital. The website proclaimed that:

> Chief Executive Officer Moynahan Larmore is an exceptional industry leader with an unwavering commitment to excellence and a passion for innovation. He demonstrates impressive growth and a remarkable track record of large-scale deals and expanding investment portfolios.
>
> . . .
>
> Larmore is a visionary leader in real estate investments. He and his team have consistently delivered innovative and successful strategies, earning respect and accolades within the industry.

The website did not disclose, however, that "Moynahan Larmore" was, in fact, LARMORE.

**<u>LARMORE Buys WeWork Call Options and Shares</u>**

10. After establishing Cole Capital, which had no genuine business operations, JONATHAN MOYNAHAN LARMORE, the defendant, proceeded to fund multiple trading accounts so that he could acquire WeWork call options. Between on or about October 18, 2023, and on or about October 30, 2023, LARMORE opened trading accounts at five brokerages and funded each account with $75,000, for a total of $375,000 (the brokerages, "Brokerages 1-5," and the accounts, "Trading Accounts 1-5").

11. On or about October 30, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, contacted the support desk of a brokerage at which he had previously opened and funded a trading account ("Brokerage-6" and "Trading Account-6") to inquire about trading options in his accounts. In response, a representative of Brokerage-6 emailed LARMORE an options trading application and agreement and requested that LARMORE complete the agreement and return it. In the morning of on or about October 31, 2023, LARMORE emailed back a completed copy of the options trading application and agreement and asked Brokerage-6 to "expedite approval as I have a confidential trade I would like to make tomorrow."

12. After the market closed on or about October 31, 2023, a national news outlet first reported that WeWork planned to file for bankruptcy as early as the following week. WeWork's stock price plummeted on the news and, on or about November 1, 2023, it opened more than 40% lower than the previous day's closing price.

13. On or about November 1, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, funded an account at a seventh brokerage, which he had previously opened, with $75,000 ("Brokerage-7," collectively with Brokerages 1-6, the "Brokerages," and "Trading Account-7," collectively with Trading Accounts 1-6, the "Trading Accounts").

14. During recorded phone calls and email correspondence on or about November 1, 2023, and November 2, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, discussed—sometimes in aggressive or threatening terms—his pressing, urgent desire to buy options with representatives of some of the Brokerages. For example:

a. On or about November 1, 2023, a representative of Brokerage-1 called LARMORE to discuss his newly funded account. During that call, LARMORE stated, "what I would like to do is be able to buy options right now," and "I am in front of my computer, I'm ready to buy."

LARMORE noted that his attempts to buy options had been rejected, and he demanded that Brokerage-1 either return the money in his trading account or approve him to buy options. When told that it would take several days to return his money, LARMORE complained "that doesn't do me any good for this week" and threatened the representative by saying, "I don't think you want to be on the bad side of you improperly holding my money." When asked if he had access to the necessary options agreement, LARMORE retorted, "No, I'm on my yacht and don't have a printer."

b. Later on the November 1, 2023 recorded call with the Brokerage-1 representative, LARMORE accused Brokerage-1 of "hijacking and stealing" his money and threatened to sue Brokerage-1. Eventually, LARMORE agreed to complete the options agreement while on the phone with the representative. While doing so, LARMORE asked, "Do you have any other stupid rules like you can only have so many contracts or you can only buy 20 at a time or anything else that I'm not aware of?" In response, the Brokerage-1 representative stated that the largest single order quantity was 2,000 contracts. LARMORE then asked, "But I can do several 2,000s?" and was told that he could.

c. After completing the options agreement and emailing it to the Brokerage-1 representative, on or about November 1, 2023, LARMORE placed an order for 2,000 WeWork call options while the Brokerage-1 representative was still on the phone. The next day, on or about November 2, 2023, LARMORE purchased another 11,376 WeWork call options using Trading Account-1 at Brokerage-1 in five increments of 2,000 contracts each and in three smaller increments.

d. On or about November 2, 2023, LARMORE called a trading desk of Brokerage-2. During the call, LARMORE told the trader, "I want you to buy a bunch of options for me," but

was advised that his account had not yet been approved for options trading. LARMORE complained that, "It's 1:42 and the options expire tomorrow." Frustrated with his inability to buy options, LARMORE directed the trader to buy $75,000 worth of WeWork stock instead. LARMORE then explained, "What I had wanted to buy was $75,000 worth of options that are expiring tomorrow that are trading at five cents per contract per share." LARMORE then claimed that was "the cost" of Brokerage-2's "screwup" in not approving him for options trading.

e. Later during the November 2, 2023 recorded call between LARMORE and the Brokerage-2 trader, the trader purchased 65,789 shares of WeWork stock for LARMORE, at LARMORE's direction. After the trade was placed, LARMORE continued to complain about his account not having been approved to trade options. LARMORE stated: "When this stock goes through the roof the liability of your back office for this mistake is huge." LARMORE did, in fact, believe that the price of WeWork's stock would "go through the roof," notwithstanding the stock's recent poor performance and reports that WeWork was nearing bankruptcy, because LARMORE had intended to announce the next day a false and fraudulent tender offer for WeStock stock that was designed to fraudulently inflate WeWork's share price.

f. In the early morning hours of on or about November 2, 2023, LARMORE emailed a compliance officer at Brokerage-6, which still had not approved LARMORE for options trading in Trading Account-6, and stated:

> I must have access to my funds to either trade them, or to place them in another institution to trade. I am in the middle of a very important acquisition, you withholding my funds, and my ability to trade them is going to have significant consequences.
>
> I must hear back from you this morning, long before opening bell of the exchanges, so that this can be rectified immediately[.]
>
> Much damage has already been done. Need to buy options FIRST THING THIS MORNING[.]

In response, LARMORE received an automatic, out-of-office reply from the compliance officer, indicating that the officer would be returning to the office on Monday November 6, 2023. LARMORE forwarded that response to a support team email address at Brokerage-6, stating: "THIS NEEDS IMMEDIATE ATTENTION[.] MUST BE RECTIFIED BEFORE OPENING BELL OF NYSE." The compliance officer responded, in substance, that, because the funds in Trading Account-6 were serving as collateral for a loan, LARMORE could not use the funds to trade options without the lender's consent. LARMORE fired back, "you must allow me to trade. What you are doing is criminal[.]" LARMORE was then told by a Brokerage-6 representative that "Option trading is a privilege, not a right, and option trading is a privilege we typically do not grant accounts that are being used for collateral." Unable to use Trading Account-6 to buy options, LARMORE instead used Trading Account-6 to buy 277,852 shares of WeWork stock for more than $311,000.

15. Despite the difficulties described above, on or about November 1, 2023, and November 2, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, was able to use five of the Trading Accounts to purchase 72,846 cheap, short-dated, out-of-the money WeWork call option contracts, which gave him the right to purchase 7,284,600 shares of WeWork common stock. Most of these options (more than 70,000) were set to expire on November 3, 2023, at 4:00 p.m. EDT. The small number of remaining options were set to expire on November 10, 2023, at 4:00 p.m. EDT. The options cost between 3 and 15 cents per contract share, had strike prices between $2 and $5, and were all "out of the money" when LARMORE purchased them.[2] By buying these options, LARMORE was betting that WeWork's share price would increase significantly

[2] On or about November 1, 2023, WeWork shares opened at $1.28, hit a high of $1.28, and closed at $1.22. On or about November 2, 2023, WeWork shares opened at $1.23, hit a high of $1.28, and closed at $1.11.

within as soon as one day. LARMORE placed that bet because he intended to announce a fake tender offer for WeWork shares the next day, which, he intended, would fraudulently inflate WeWork's share price.

16. In addition to buying WeWork call options, because two of the Brokerages did not authorize him to buy options, JONATHAN MOYNAHAN LARMORE, the defendant, purchased a total of 343,641 shares of WeWork stock. In total, on or about November 1, 2023, and November 2, 2023, LARMORE spent more than $775,000 buying WeWork call options and shares.

**LARMORE Announces a False and Fraudulent Tender Offer for WeWork Stock**

17. After amassing a huge amount of WeWork securities in just two days, JONATHAN MOYNAHAN LARMORE, the defendant, announced, on or about November 3, 2023, a false and fraudulent tender offer by Cole Capital to acquire 51% of all outstanding shares owned by minority shareholders of WeWork at a massive premium, a transaction which neither LARMORE nor Cole Capital had the intent or ability to consummate. Instead, LARMORE intended for his false and misleading November 3, 2023, announcement to manipulate the price of WeWork stock and to fraudulently drive up the value of the WeWork call options and shares that LARMORE had purchased in the two days before the fraudulent announcement.

18. On or about November 3, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, created an account with a press release distribution service (the "Wire Service"), paid the Wire Service $999 with his credit card for press release distribution services, and shortly thereafter created a draft press release.

19. On the morning of on or about November 3, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, sent an email to a WeWork investor relations email address and to a New York, New York-based WeWork investor relations employee. The subject line of the email

was "Letter to the Board" and the body of the email said, "Please see attached I look forward to hearing from you." Attached was a two-page letter addressed to the WeWork Board of Directors and Chief Executive Officer at WeWork's Manhattan headquarters and signed by "Moynahan Larmore, CEO, Cole Capital Funds, LLC" (the "Letter to the Board of Directors"). The Letter to the Board of Directors began:

Dear [CEO of WeWork],

> We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
>
> We have received feedback from [Bank-1] and [Brokerage-2] regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.

20. The $9.00 per share price contained in the Letter to the Board of Directors represented a premium of more than $7.89 (more than 700%) over WeWork's closing price of $1.11 per share on or about November 2, 2023. At $9.00 per share price, it would have cost approximately $77 million to acquire 51% of all the outstanding shares owned by minority shareholders of WeWork.

21. After sending the Letter to the Board of Directors, on or about November 3, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, sent an email to a Securities and Exchange Commission ("SEC") email address with the subject line "WeWork Schedule TO."[3] In

---

[3] A Schedule TO is a form required to be filed with the SEC by a person who intends to make a tender offer for the purchase of securities of a public company, where the tender offer would result in the purchaser acquiring more than 5% of a class of securities issued by that public company. *See* 17 C.F.R. § 240.14d-100.

the document identified as a Schedule TO attached to the email, LARMORE included a press release titled "Cole Capital Funds, LLC Proposes to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per Share in Cash." The press release in the purported WeWork Schedule TO included the text of the Letter to the Board of Directors.

22. Thereafter, on or about November 3, 2023, JONATHAN MOYNAHAN LARMORE, the defendant, submitted a draft press release to the Wire Service. That morning, LARMORE called the Wire Service to inquire about the status of his press release. While on the call, which was recorded, LARMORE received an email from the Wire Service, stating that his draft press release was not in the proper format and that LARMORE needed to reformat and re-submit the press release for editorial approval. LARMORE then told the Wire Service representative on the phone, "since it is a legal document it has to go out in a certain form" and that "due to the nature of it being a tender offer it needs to go in the form that I sent it." The Wire Service representative advised LARMORE to reach out directly to the editorial department to discuss the format. LARMORE then asked to be transferred to someone in that department "because this is very time sensitive." When told that he should contact the editorial department by email, LARMORE reiterated that "this is very time sensitive such that it has to do with the stock." The Wire Service representative then agreed to escalate the matter to a supervisor.

23. About an hour later, on or about November 3, 2023, a supervisor at the Wire Service called JONATHAN MOYNAHAN LARMORE, the defendant. During the call, which was recorded, LARMORE reiterated that the press release "needs to get out right now." The supervisor then instructed LARMORE to rework the draft in a typical press release format. LARMORE reiterated again: "This is time sensitive."

24. On or about November 3, 2023, at approximately 12:00 p.m. EDT, JONATHAN MOYNAHAN LARMORE, the defendant, resubmitted another draft press release to the Wire Service, which was approved by the Wire Service and distributed to various outlets about 25 minutes later. News outlets did not begin publishing the press release, however, for several hours.

25. In the meantime, on or about November 3, 2023, at approximately 4:00 p.m. EDT, WeWork's share price closed at $0.83 per share. At that point, the options purchased by JONATHAN MOYNAHAN LARMORE, the defendant, with a November 3, 2023 expiration date (more than 70,000 of his 72,846 options), on which he had spent approximately $375,000 for the ability to purchase more than 7 million shares of WeWork stock, expired, still out of the money and worthless.

26. On or about November 3, 2023, at approximately 5:12 p.m. EDT, outlets began publishing a press release distributed by the Wire Service titled, "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash" (the "Press Release"). The Press Release stated, among other things:

> Cole Capital Funds sent the following letter to the Board of Directors of WeWork, Inc.
>
> We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
>
> We have received feedback from [Bank-1] and [Brokerage-2] regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.
>
> . . .

> Cole Capital Funds, LLC www.colecapitalfunds.com is an investment company headquartered in Phoenix Arizona. Cole focuses on investing in, and acquiring companies and properties where significant shareholder value can be realized due to undervalued share price as a result of slow development progress, management issues, or outside share pressure . . . .

The Press Release did not disclose that neither Cole Capital nor JONATHAN MOYNAHAN LARMORE, the defendant, had the intent or ability to consummate the announced tender offer, that Cole Capital was a company with no business operations that LARMORE had created only four weeks before the publication of the Press Release, that LARMORE was the CEO and principal of Cole Capital, or that LARMORE had purchased a significant block of WeWork securities in the two days before the publication of the Press Release.

27. The Press Release contained false and misleading statements. For example, the statement in the Press Release, "We have received feedback from [Bank-1] and [Brokerage-2] regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement," was false and misleading. In fact, JONATHAN MOYNAHAN LARMORE, the defendant, had received no such "feedback" and did not expect to have a financing commitment prior to execution of a definitive agreement for the $77 million transaction announced in the Press Release.

a. As to Bank-1, LARMORE was a delinquent lending customer. As of on or about October 15, 2023, LARMORE owed Bank-1 more than $5.2 million in outstanding principal on two loans and owed Bank-1 overdue payments on both.

b. As to Brokerage-2, LARMORE communicated with an investment advisor at a Brokerage-2 retail branch (the "Retail Advisor") in connection with LARMORE's opening of Trading Account-2. On or about October 27, 2023, LARMORE emailed the Retail Advisor and asked, "If I have $100 Million of NYSE traded stock in the account how much can you lend on

it?" In responses on or about October 30, 2023, and October 31, 2023, the Retail Advisor responded, in substance, that Brokerage-2 could lend at 50% of NYSE-listed securities at a specified rate, but that Brokerage-2 would need to examine a list of LARMORE's proposed assets. LARMORE never provided such a list and never mentioned to the Retail Advisor that either he or Cole Capital were planning any kind of tender offer for WeWork stock, let alone the $77 million transaction contemplated by the Press Release.

28. Within one minute of the Press Release's publication on or about November 3, 2023, at approximately 5:12 p.m. EDT, WeWork's stock price jumped in after-hours trading from $.85 to $1.45 and continued to rise, reaching a high of $2.14 at approximately 5:31 p.m. EDT on or about November 3, 2023. Later that evening, outlets began rescinding the Press Release. WeWork's stock price declined and closed at $1.18 at the end of after-hours trading at 8:00 p.m. EDT on or about November 3, 2023.

29. On or about November 6, 2023, WeWork filed for Chapter 11 bankruptcy protection and the trading of its shares was suspended on the NYSE.

30. On or about November 10, 2023, the remaining WeWork call options purchased by JONATHAN MOYNAHAN LARMORE, the defendant, expired out of the money and worthless.

**Statutory Allegations**

31. From at least in or about October 2023 through in or about November 2023, in the Southern District of New York and elsewhere, JONATHAN MOYNAHAN LARMORE, the defendant, willfully and knowingly, directly and indirectly, made an untrue statement of a material fact and omitted a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in a fraudulent, deceptive, and manipulative act and practice, in connection with a tender offer and request and

invitation for tenders, in violation of Title 17, Code of Federal Regulations, Section 240.14e-8, by publicly announcing that LARMORE and a party on whose behalf he was acting planned to make a tender offer that had not yet been commenced and (a) made the announcement of the potential tender offer without the intention to commence the offer within a reasonable time and complete the offer; (b) intended, directly and indirectly, for the announcement to manipulate the market price of the stock of the subject company; and (c) did not have the reasonable belief that he would have the means to purchase securities to complete the offer, to wit, LARMORE caused a press release to be published and distributed by the Wire Service in which LARMORE falsely stated that Cole Capital was making a tender offer for WeWork stock, when, in truth and in fact, LARMORE knew that Cole Capital could not and did not intend to complete the tender offer and instead intended for the announcement to manipulate the market price of the stock of WeWork and, thereby, increase the value of WeWork securities that LARMORE had acquired.

(Title 15, United States Code, Sections 78n(e) and 78ff; Title 17, Code of Federal Regulations, Section 240.14e-8(a), (b), (c), and Title 18, United States Code, Section 2.)

**COUNT TWO**
**(Securities Fraud)**

The Grand Jury further charges:

32. The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

33. From at least in or about October 2023 through in or about November 2023, in the Southern District of New York and elsewhere, JONATHAN MOYNAHAN LARMORE, the defendant, willfully and knowingly, directly and indirectly, by use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a

manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, LARMORE engaged in a scheme to announce a false and fraudulent tender offer for WeWork securities in order to cause others to purchase WeWork securities and to sell his own WeWork shares and options at inflated prices.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

**FORFEITURE ALLEGATIONS**

34. As a result of committing the offenses alleged in Counts One and Two of this Indictment, JONATHAN MOYNAHAN LARMORE, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

35. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

(DFP)
FOREPERSON

DAMIAN WILLIAMS
United States Attorney