O5FKLARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          24 CR 140 (PAE)

5   JONATHAN MOYNAHAN LARMORE,

6                                          Conference
                   Defendant.
7   ------------------------------x

8
                                          New York, N.Y.
9                                         May 15, 2024
                                          11:00 a.m.
10

11  Before:

12                  HON. PAUL A. ENGELMAYER,

13                                         District Judge

14                        APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    JUSTIN RODRIGUEZ
17       Assistant United States Attorney

18  SETH BRIAN WAXMAN
         Attorney for Defendant
19

20

21

22

23

24

25

O5FKLARC

1           (Case called)

2           MR. RODRIGUEZ:  Good morning, your Honor.

3    Justin Rodriguez, for the United States.

4           THE COURT:  All right.  Good morning, Mr. Rodriguez.

5           MR. WAXMAN:  Good morning, Judge.  Seth Waxman, on

6    behalf of the defense.  And Mr. Larmore should be on the phone

7    with us.  I'd appreciate the Court's indulgence allowing him to

8    do so.

9           THE COURT:  Very good.  Good morning, Mr. Waxman.

10          And, Mr. Larmore, are you, in fact, on the phone?

11          THE DEFENDANT:  Yes.

12          THE COURT:  All right.  Good morning to you,

13   Mr. Larmore.

14          I'll ask you to mute the phone except when you are

15   called upon, which may or may not even occur.

16          But, Mr. Waxman, just for clarity's sake, you are

17   moving for your client to be permitted to participate remotely?

18          MR. WAXMAN:  Correct, your Honor.

19          THE COURT:  I'm happy to do that.  This conference is

20   really more administrative than substantive, a lot of planning

21   we need to do, but, ultimately, it's the sort of thing for

22   which the defendant's remote appearance is justified, and I'm

23   mindful of the significant cost item it would be to attend a

24   conference like this.

25          With that, I have a number of areas to take up with

O5FKLARC

1   you, and then, to the extent I've left something uncovered,

2   I'll give counsel an opportunity to raise those issues.

3          Let's just begin with discovery.

4          Mr. Rodriguez, at the initial conference, you set out

5   the areas of Rule 16 discovery that you had provided and, to

6   some degree, what remained outstanding.  Let me follow up on a

7   few specific areas, and then I'll ask you if there are other

8   items to take up.

9          One issue involved Mr. Larmore's cell phone, and you

10  indicated that there was a privilege review that was ongoing,

11  and that afterwards, a responsiveness review had to take place.

12         Where are you on that?

13  MR. RODRIGUEZ:  Yes, your Honor.

14         So, the privilege review for Mr. Larmore's phone was

15  completed around April 23rd, so about three weeks ago.  That

16  privilege review took a little longer than we would have liked,

17  for two reasons.

18         The first is, we needed a list of attorneys from

19  Mr. Waxman that Mr. Larmore was working with that we should be

20  on the lookout for, and that list was quite extensive.  And we

21  got that information on March 15th, March 20th, and on

22  April 4th.

23         Once we had all of that information, and our privilege

24  review team conducted their work, they found that there were

25  quite a few communications that needed to be marked as

O5FKLARC

1    potentially privileged.  So just to give the Court one data

2    point, approximately 5,000 emails were extracted from

3    Mr. Larmore's cell phone, and the review team marked

4    approximately 2400, so almost half, as potentially privileged.

5    So the scope of potentially privileged material made this

6    process go a little longer than we anticipated.

7              As I mentioned, that process concluded about

8    three weeks ago, and we have been working very hard on the

9    responsiveness review since then.  We expect to be finished

10   with our responsiveness review on the phone within the week.

11             THE COURT:  Okay.  Thank you.  Let me follow up on

12   that.

13             When was the phone imaged for the defense?

14             MR. RODRIGUEZ:  So the warrant was executed on

15   March 14th.  We accessed the phone pretty quickly thereafter

16   because we have the password.  We asked for a drive from the

17   defense, and we sent a copy to the defense of the entire phone

18   on March 26th.

19             THE COURT:  Got it.

20             With the privilege review, when you tagged 2400 or so

21   emails out of 5,000 as potentially privileged, does the inquiry

22   stop there, or are they simply tagged as privileged, or does

23   the privilege review team then burrow further to determine

24   whether the 2400 is, to some degree, an overdesignation?

25             MR. RODRIGUEZ:  So what happens is we get a memo from

O5FKLARC

the privilege review team that's almost akin to a privilege

log, and it will say something like, you know, an email string

with Mr. Larmore and Mr. Waxman was marked as privileged.

THE COURT:  Right.

MR. RODRIGUEZ:  Something like that, we're not going

to dig into any further because there's a very good chance

that, you know, we have reason to believe that is privileged.

There are a number of other variations of that where,

for example, there may be a third party present, and we look

into that a little bit more.  For example, Mr. Waxman also

represents Mr. Larmore's mother in the SEC case, and so we sort

of assume that there's probably a joint defense privilege there

or something like that.  So there is some additional analysis

that happens.  We haven't gone back to Mr. Waxman, for example,

and said, hey, you know, we've generally marked this category

of information as potentially privileged, you know, would you

like to explain the basis for that, or something like that.

But that could happen, your Honor.  Candidly, I don't

anticipate that that will happen, based on my review of the

privilege team's work so far.

THE COURT:  In other words, for the time being anyway,

you're going to treat the approximately 2400 that were marked

as potentially privileged, you're going to treat them as

privileged?

MR. RODRIGUEZ:  That's right, your Honor.  Unless we

O5FKLARC

1    learn something else to call into question those designations,

2    that's our plan going forward.

3            THE COURT:  Okay.

4            Switching gears, and also within discovery, you had a

5    reference in our last conference to credit card, bank, and

6    brokerage records.  Have those been produced?

7            MR. RODRIGUEZ:  So, yes, your Honor.  And what might

8    be helpful here is, after our last conference, as the Court may

9    remember, I submitted a letter on April 16th, which detailed

10   the government's productions on March 19th, 25th, 26th, and

11   April 9th.  And so there were a number of productions there

12   that were covered.

13           Since that letter, the government has made two

14   additional productions on May 8th and May 14th.  What I'm happy

15   to do is give the Court as much or as little information it

16   would like on those productions --

17           THE COURT:  How about an overview of those

18   productions?

19           MR. RODRIGUEZ:  Very good, your Honor.

20           So, in total, in those two productions, there were

21   about 13,000 pages.  The biggest chunk of that was about -- I'm

22   sorry, there were about 14,000 pages.  The biggest chunk of

23   that was about 13,000 pages of American Express statements, so

24   those would be the credit card records that had been referenced

25   last time.  This set of documents was actually received from

O5FKLARC

```
 1   the receiver in the SEC action, which had access to those
 2   records, but that's what they are.
 3           Other categories of documents at a very high level:
 4   About a hundred pages of documents from WeWork.  Mr. Larmore
 5   had rented an office space at WeWork for the entity that is at
 6   issue here, Cole Capital Funds.  There were additional
 7   documents received from another receiver in Indiana, who was a
 8   receiver over certain entities related to Mr. Larmore, a small
 9   number of documents from the SEC that I believe Mr. Larmore
10   already had, such as their order of investigation and a
11   subpoena that was previously issued to him.
12           So those are the big categories of documents.
13           THE COURT:  Okay.
14           Do you have any outstanding Rule 16 discovery?
15           MR. RODRIGUEZ:  Yes, your Honor, a couple of items.
16           So I received a call on Monday from one of the
17   brokerage firms that we had subpoenaed who had previously told
18   us that they were unable to locate any recorded phone calls
19   with the defendant.  They have since found some recorded phone
20   calls with the defendant.  I received that call on Monday of
21   this week.  I asked that the brokerage firm, or the bank,
22   really, produce them as quickly as possible, which they told me
23   that they intended to do, but they have not yet produced them.
24   So that is one bucket of outstanding material.
25           The other bucket is, we do have a pending request to
```

O5FKLARC

1  the receiver in the SEC action.  In January of this year, the

2  receiver visited a receivership property where Mr. Larmore was

3  living, and they discovered some shredded documents, and so we

4  have subpoenaed those shreddings to see if there is anything

5  that we can do to make sense of them.  So we have not received

6  those from the receiver yet, but we do expect to receive them

7  shortly.

8          That is all in terms of pending Rule 16.  One other

9  item is:  We did receive this week additional search warrant

10  returns from Apple.  And I have requested a drive from

11  Mr. Waxman, and we expect to be able to produce the full set of

12  those returns shortly after he provides that drive.

13          We will then do the same process of conducting a

14  privilege review and a responsiveness review on that set of

15  materials.  We hope that this time around, we will be more

16  efficient because we now have a universe of known attorneys and

17  such, but we do want to reassure the Court that we are devoting

18  significant resources to this, and we're mindful of our

19  obligation to get it done as reasonably quickly as we can.

20          THE COURT:  Great.

21          Just as to the brokerage firm and recorded calls, have

22  you any sense of scale?

23          MR. RODRIGUEZ:  I don't.  I did ask that question.  My

24  sense is that the attorney, the in-house attorney, who I spoke

25  to, has not yet himself reviewed them.  He's got to get them

O5FKLARC

1    converted.  So I don't, your Honor.

2                    THE COURT:  Okay.

3            Google had, I think, said to you that they didn't have

4    any records, according to what you said last time, and you were

5    skeptical of that.  I think maybe that was in your April 16th

6    letter.

7            Any follow-up on that?

8                    MR. RODRIGUEZ:  That's correct, your Honor.

9            We were skeptical of that, and the short answer is

10   that remains the information that Google has given us, which is

11   to say that they do not have any content to provide.

12           This is a little bit of a hypothesis, but what

13   happened here is once the receivership was put in place, the

14   receiver sort of took over the email atmosphere, so to speak,

15   and perhaps that had something to do with they stopped

16   subscribing.  Because this is an enterprise account, it's an

17   @ArciTerra.com domain name, it's not an @gmail.com domain name,

18   so perhaps they stopped paying the bills or something like

19   that, but we're not quite clear.

20           A reason why we haven't pressed too hard on Google is

21   because we have subpoenaed the receiver, who has made a

22   production of emails --

23                    THE COURT:  Okay.

24                    MR. RODRIGUEZ:  -- in that regard.

25                    THE COURT:  That leads me to my next question.  Other

O5FKLARC

| | |
|---|---|
| 1 | than what you've identified — for example, the shredded |
| 2 | materials — is there any material outstanding from the receiver |
| 3 | of Cole Capital, Mr. Allen Applbaum? |
| 4 | MR. RODRIGUEZ:  No, your Honor. |
| 5 | THE COURT:  All right. |
| 6 | Anything else with respect to discovery? |
| 7 | MR. RODRIGUEZ:  I guess two minor points, your Honor: |
| 8 | One, I think I mentioned last time, which is, I've |
| 9 | identified all of the sort of things that I know to still be |
| 10 | out there.  Of course, our investigation is continuing, and so |
| 11 | to the extent that we issue additional process or come across |
| 12 | new material, we'll certainly produce that promptly. |
| 13 | The other thing that I will mention — and I'm not |
| 14 | asking the Court for any relief at this point — is, just so |
| 15 | that the record is clear, we did issue a written demand to the |
| 16 | defense for reciprocal Rule 16 discovery, and I have not |
| 17 | received any yet. |
| 18 | THE COURT:  You mentioned that in the letter. |
| 19 | Before we move on to anything else, let me just ask |
| 20 | Mr. Waxman, anything in the area of discovery? |
| 21 | MR. WAXMAN:  Yes, your Honor, just two points. |
| 22 | I hear the prosecutor talk about getting a password |
| 23 | from my client.  I'm curious -- |
| 24 | THE COURT:  Sorry, I didn't catch that. |
| 25 | MR. WAXMAN:  I'm sorry, getting a password to my |

O5FKLARC

1    client's phone that enabled him, enabled the government, to

2    move quickly with the privilege review and disclosures.  I'm

3    just curious, through the Court, if I could ask the government

4    how they obtained that password --

5            THE COURT:  I didn't even hear that being said.

6            Mr. Rodriguez, is that right?

7            MR. RODRIGUEZ:  I do believe Mr. Waxman is correct.

8            My understanding is that the FBI knew the password to

9    the phone to access it rather than using some software to

10   access it.

11           THE COURT:  You had indicated, I think, at the initial

12   conference that that familiar problem of accessing a locked

13   phone wasn't one in the case because the FBI had access.

14           I don't think you had specified at the conference how

15   the FBI got access.  I think Mr. Waxman's question presupposes

16   that it was obtained from the defendant.

17           MR. RODRIGUEZ:  Understood, your Honor.

18           And I don't have the case agent here, so I don't want

19   to venture into something that I don't know.  I think there's a

20   couple of possibilities here, and I am happy to follow up with

21   both Mr. Waxman and the Court.  For example, the phone may have

22   already been opened --

23           THE COURT:  Sorry, if you're just speculating, it's

24   not worth going there.

25           MR. RODRIGUEZ:  Very good, your Honor.

O5FKLARC

| | |
|---|---|
| 1 | THE COURT:  Mr. Waxman, I take it, to cut to the chase |
| 2 | here, you're exploring a scenario under which the phone's |
| 3 | password was given by your client to the government, and then |
| 4 | you would want to explore whether something in that receipt of |
| 5 | information breached some constitutional provision? |
| 6 | MR. WAXMAN:  Correct, your Honor. |
| 7 | THE COURT:  Okay. |
| 8 | Look, because one of the things, Mr. Rodriguez, I'm |
| 9 | about to get to with the defense will, in short order, be |
| 10 | suppression motions, that information needs to be gotten to him |
| 11 | like right away.  The answer may well be that there's no issue |
| 12 | there, but if it were to turn out that, for example, |
| 13 | questioning of the defendant revealed the password, then I |
| 14 | think the earlier representation, which is that there had been |
| 15 | no postarrest statements, would need to be corrected.  But, in |
| 16 | addition, without commenting on legal conclusions, it would be |
| 17 | the sort of thing that would be fodder for a potential motion. |
| 18 | MR. RODRIGUEZ:  Understood, your Honor.  We will get |
| 19 | on that right away. |
| 20 | THE COURT:  Okay. |
| 21 | MR. WAXMAN:  Thank you, your Honor. |
| 22 | Is the government able to provide us the name of the |
| 23 | brokerage firm or bank that found these additional recorded |
| 24 | messages? |
| 25 | MR. RODRIGUEZ:  Yes, your Honor.  It's City National |

O5FKLARC

1    Bank.

2              MR. WAXMAN:  Thank you.

3              Nothing further.

4              THE COURT:  Mr. Waxman, I take it you're not

5    experiencing any issues with respect to the discovery you've

6    received?

7              MR. WAXMAN:  None thus far, your Honor.

8              THE COURT:  Is the scale about what had been

9    described --

10             MR. WAXMAN:  Correct.

11             THE COURT:  Okay.

12             The next issue is the SEC action in Arizona involving,

13   as I understand it, two buckets of claims, one being the

14   alleged investment fraud involving ArciTerra and the other

15   being the WeWork stock manipulation alleged here.

16             What's the status of that case, Mr. Rodriguez?

17             MR. RODRIGUEZ:  Your Honor, on April 22nd, the

18   district court in Arizona granted the government's motion to

19   stay discovery in that action pending the completion of this

20   case.  That was done with the consent of the SEC and with

21   Mr. Larmore.

22             My understanding is that Mr. Larmore also largely

23   consented to the entry of a preliminary injunction order and to

24   the continuation of the receivership and asset freeze that is

25   in place in Arizona.  I think there is a pending motion by

O5FKLARC

1    Mr. Larmore to remove and replace the current receiver in

2    Arizona, but seeking to replace him with a new one and not

3    objecting to the existence of the receiver.  So I think that's

4    the only action going on in the SEC matter.

5        THE COURT:  Did that action proceed to discovery at

6    all before discovery was stayed?

7        MR. RODRIGUEZ:  I think there was a small amount of

8    discovery that was provided.  So, for example, my understanding

9    is, if I have this right — and Mr. Waxman can correct me — that

10   Mr. Larmore produced some American Express statements as part

11   of discovery, and I believe that the SEC also produced some

12   discovery as well.

13       THE COURT:  And I know that you've taken the position

14   that the SEC is not part of the investigative team, but do you

15   know whether such discovery, as was presented, produced in that

16   case, has that become part of the discovery in this case by

17   some means?

18       MR. RODRIGUEZ:  Yes, your Honor.  So I did ask –- I

19   essentially got from the SEC those materials and produced them

20   as part of the discovery in this case.

21       THE COURT:  Okay.

22       Any reason to think any of that is outstanding?

23       MR. RODRIGUEZ:  No, your Honor.

24       THE COURT:  Okay.

25       Next question — I raised this last time:  Are there

O5FKLARC

1   any non-SEC civil lawsuits out there that bear in any way on

2   Mr. Larmore, whether it's ArciTerra or this case?

3        MR. RODRIGUEZ:  Your Honor, there were a number of

4   civil lawsuits that preceded the SEC case, which were stayed.

5        THE COURT:  Dealing with ArciTerra, not WeWork?

6        MR. RODRIGUEZ:  Correct, your Honor.

7        I'm aware of none dealing with WeWork.  Simply in the

8   ArciTerra bucket.

9        THE COURT:  Nobody has brought a civil lawsuit

10  claiming any harm based on the conduct alleged in this case

11  involving, you know, this fake tender offer or allegedly fake

12  tender offer?

13       MR. RODRIGUEZ:  Not that I am aware of, your Honor.

14       THE COURT:  All right.

15       Let's turn, then, Mr. Waxman, to the issue of the

16  suppression motions, and I asked you to be prepared to tell me

17  at this conference whether you had anything you were moving to

18  suppress.

19       MR. WAXMAN:  Yes, your Honor.

20       I think there is a potential to suppress the phone,

21  cell phone, and your Honor has already touched on some of the

22  key factors that would go into that.  That is the only

23  suppression motion that we view at this time.

24       THE COURT:  Mr. Waxman, does whether you make that

25  motion turn on the means by which the passcode, if it was even

O5FKLARC

1   made available to the government at all, was made available?

2   It may have come in unlocked form or something, but --

3           MR. WAXMAN:  Correct.

4           I don't think there's a basis to challenge the

5   issuance of the search warrant.  I believe it's the events that

6   took place during the execution of that search warrant that may

7   be contested or at issue.  In other words, my understanding is

8   there were no *Miranda* rights given, and as your Honor

9   intimated, if there was an interrogation that elicited an

10  incriminating response, such as the password, that that would,

11  in our belief, be a basis to potentially suppress.

12          THE COURT:  Right.  And the government has represented

13  to us so far that there was no postarrest statement, and I

14  assumed at the time implicitly that that meant no statement at

15  all, not a statement that you regarded as just a passcode.

16          You're going to find out, Mr. Rodriguez, whether

17  that's wrong.

18          Mr. Rodriguez, I assume you can figure that out within

19  a matter of days, right, if not a day?

20          MR. RODRIGUEZ:  Exactly, your Honor.  It's going to be

21  the first phone call I make after this conference.

22          THE COURT:  So, look, Mr. Waxman, let's just, for

23  argument's sake, assume that you get an answer that leads to a

24  motion.  Articulate for me what the motion might be.

25          MR. WAXMAN:  Yes.  It would be --

O5FKLARC

| | |
|---|---|
| 1 | THE COURT:  Is it that there would be a *Miranda* or |
| 2 | some other Fifth Amendment violation in the receipt of that |
| 3 | information? |
| 4 | MR. WAXMAN:  Correct.  Your Honor, there might be a |
| 5 | Fourth and a Fifth Amendment violation in that regard.  Most |
| 6 | obviously, if there was an incriminating response that was |
| 7 | given in response to an interrogation, it's plainly stated that |
| 8 | an agent said, give me your password, and my client said, here |
| 9 | it is, and then gave him the four or five numbers, it's our |
| 10 | position that that would be an interrogation that was required |
| 11 | to comply with Fifth Amendment standards, and, as a result, if |
| 12 | not, then the cell phone would be suppressed. |
| 13 | THE COURT:  But the theory is a *Miranda* theory? |
| 14 | MR. WAXMAN:  *Miranda* and a potentially |
| 15 | Fourth Amendment seizure issue as well.  I'd have to think that |
| 16 | through a bit more, but it would be based on the same operative |
| 17 | facts. |
| 18 | THE COURT:  If there was -- again, we're just |
| 19 | hypothesizing.  But assuming a fully compliant *Miranda* warning |
| 20 | that preceded it, does the issue go away?  Does everything turn |
| 21 | on the absence of a *Miranda* warning? |
| 22 | MR. WAXMAN:  Potentially, your Honor. |
| 23 | THE COURT:  Okay. |
| 24 | So let's assume, for argument's sake, that you get |
| 25 | information -- let me actually interrupt myself. |

O5FKLARC

1           I don't want you to communicate for me verbatim

2     anything your client has said, but do you have a reason to

3     think that your client might have given that information?

4           MR. WAXMAN:  I do, your Honor.  And the more facts and

5     circumstances that the government gives us, I think it will

6     facilitate a well-crafted motion, to the extent there is one

7     that should be submitted to the Court, and assist the Court in

8     its analysis.

9           THE COURT:  All right.

10          MR. WAXMAN:  Of course, my client, as you can probably

11    imagine, there were many, many SWAT members with machine guns,

12    and he had a pregnant fiancee standing next to him, so the

13    circumstances of that were jarring, to say the least, so his

14    memory of exactly what transpired and what happened first,

15    second, and third, I think, might not be as strong as a

16    professional law enforcement officer who does this for their

17    job.

18          THE COURT:  One of the questions will be if you get a

19    memo that says there was a *Miranda* warning, and he said the

20    password is 1234, whether your client is in a factual position

21    to create a factual dispute about that point?

22          MR. WAXMAN:  That's a possibility, your Honor.  I'm

23    pretty clear that there wasn't a *Miranda* warning given,

24    although I wasn't there, of course, so I'll have to wait to see

25    what the government produces.

O5FKLARC

1          THE COURT:  Right.

2          MR. WAXMAN:  But I'll just share this with the Court

3    for the benefit of the prosecutor:  As I understand it, my

4    client's fiancee was also present, and there may have been

5    interactions with her with law enforcement, so to the extent we

6    can get any facts and circumstances that relate to either of

7    those individuals, that would be helpful.

8          THE COURT:  Okay.  Yes.

9          So, Mr. Rodriguez, this is a developing little

10   subcorner of Fifth Amendment law anyway, but maybe there's a

11   Fourth Amendment dimension involving locked -- entering cell

12   phones.  The more detail you can give Mr. Waxman, the sooner he

13   can figure out if he's got a viable motion.

14         Mr. Waxman, assuming you're given a proffer by

15   Mr. Rodriguez in the next couple of days, how soon can you file

16   a motion, if there was one to be filed?

17         MR. WAXMAN:  Your Honor, we had proposed amongst the

18   parties a schedule.  We had suggested July 14th, and then

19   there's an entire schedule that we, myself or the prosecutor,

20   can certainly lay forward for the Court.

21         THE COURT:  Sure.

22         I take it you're envisioning more than suppression

23   motions, but other motions as well?

24         MR. WAXMAN:  Correct.

25         THE COURT:  What do you have in mind before we talk

O5FKLARC

1    about the schedule?

2            MR. WAXMAN:  Oh, I'm sorry.

3            Government 404(b) notice is something that's

4    important.  Also, the government's asked us to make our

5    insanity disclosure, to the extent there is going to be one.  I

6    can tell the Court I don't believe there is.  But those three

7    items would track the three dates and a hearing proposed

8    hearing date that the government and I have discussed.

9            THE COURT:  All right.

10           Before I get the schedule, I appreciate that there's

11   likely to be motions along the familiar lines of following a

12   404(b) notice motions in limine filed by one or both sides, but

13   other than that, and other than the possible phone suppression

14   motion, is there thinking else?  There's no facial attack on

15   the indictment, anything like that?

16           MR. WAXMAN:  No, your Honor.

17           THE COURT:  All right.

18           Why don't you tell me what the schedule that you had

19   jointly agreed on was.

20           MR. WAXMAN:  Well, we had talked about dates, I don't

21   want to presume that we've agreed, but, in any event, the dates

22   we propose are July 14th for any defense motions, including a

23   defense motion to suppress and any insanity defense notice.  I

24   don't believe there's going to be, but we certainly are able to

25   make that disclosure by the 14th of July.

O5FKLARC

1          In addition, on that same date, the government would

2    provide us 404(b) notice.

3          On July 28th, responses --

4          THE COURT:  I think, by the way, my deputy,

5    Mr. Smallman, tells me the 14th is a Sunday.

6          MR. WAXMAN:  I apologize.

7          THE COURT:  I assume you want to push all those days

8    one day forward, to the 15th, right?

9          MR. WAXMAN:  Correct.

10         THE COURT:  So, the 15th for the defense motions and

11   the 404(b) notice.

12         And then on the 29th, what do you have in mind?

13         MR. WAXMAN:  The 29th would be responses, in other

14   words, the government's opposition to any motion and any motion

15   that we would like to file in response to the 404(b) notice.

16         THE COURT:  Okay.

17         MR. WAXMAN:  And then on August 5th, if I haven't

18   picked another weekend — that's a Monday — would be replies

19   from both sides to those substantive motions and notices.

20         THE COURT:  Right.  These are effectively motions in

21   limine, right?

22         MR. WAXMAN:  The suppression, suppression, but, yes,

23   motions in limine with regard to 404(b).

24         THE COURT:  Right.

25         MR. RODRIGUEZ:  Your Honor, I apologize.  I just

O5FKLARC

1    wanted -- before we got too far down the road, this was not the

2    government's proposal with respect to 404(b).  We're tracking

3    so far in terms of defense pretrial motions under 12.2, but the

4    government has a different proposal with respect to 404(b).

5              THE COURT:  Yes.

6         And what's a little confusing here is that,

7    ordinarily, I'd have a schedule for motions in limine in which

8    each side would be making its motion and the other side would

9    respond.  I think your schedule here doesn't provide for the

10   government's making motions in limine, and usually both sides

11   have something to initiate.

12             MR. WAXMAN:  Yes, your Honor.  And the reason for

13   that, and why we've carved out 404(b) in our minds, is that the

14   question of whether ArciTerra evidence is going to come in or

15   the government's going to seek to have that kind of evidence

16   moved in really changes the entire dynamic of this case.  In

17   other words, the WeWork allegations are a fairly constrained

18   amount of facts to a fairly discrete period of time, all

19   probably taking place within a couple of months of September to

20   November 2023.  ArciTerra spans decades and involves a

21   receivership that's overseeing hundreds of entities.

22             So to facilitate a trial date that I know your Honor

23   has set and not to run into any massive issues, if the

24   government is really intending to say that a lot of ArciTerra

25   evidence should come in, we thought it would be better to get

O5FKLARC

1    that sifted out early, ask the Court to rule on it early, and

2    see how that plays.

3          Of course, I think, not surprising to the Court, the

4    defense is going to suggest to the Court, ultimately, that it

5    should be a very limited set of evidence, if any at all, but,

6    of course, we don't know how the Court will rule --

7          THE COURT:  Yes.  But regardless, you have in mind

8    that essentially as to the, quote-unquote, ArciTerra evidence,

9    if the government is pursuing any of it at all, that issue

10   would be litigated on a defense motion which was catalyzed by a

11   404(b) notice as opposed to a government motion to admit

12   ArciTerra.

13         MR. WAXMAN:  Correct.  I guess I can file a motion in

14   limine now just saying we want to keep it out, but --

15         THE COURT:  No, it's better for the government to

16   think on this and formulate what concretely, if anything, it

17   has in mind.

18         The only issue is -- well, let me ask you:  Is there

19   more to the schedule that you were going to propose?

20         MR. WAXMAN:  And then a hearing date of the week of

21   August 12th on these issues.

22         And then there are two other dates --

23         THE COURT:  And the hearing date, I don't know what

24   you mean by "these issues."  If it's something like ArciTerra,

25   it's likely to be resolvable on the papers.  If it's a

O5FKLARC

```
1    suppression motion, there may well be an evidentiary dispute.

2              MR. WAXMAN:  Yes, my apologies.  The suppression

3    motion hearing.

4              THE COURT:  All right.

5              Do you have any other dates before I hear from

6    Mr. Rodriguez?

7              MR. WAXMAN:  August 18th -- I'm sorry, August 16th,

8    the government's expert disclosure and any advice-of-counsel

9    defense that the defense intends to employ at trial.  That

10   would be August 16th.

11             And then September 16th would be the defense expert

12   disclosure.

13             THE COURT:  Okay.

14             Is that it from you?

15             MR. WAXMAN:  And then the final issues are:  Witness

16   lists, exhibit lists, and Rule 3500 disclosures.  Again, this

17   case does have a fairly narrow set of facts, given the kinds of

18   cases this Court hears.  I will note that ArciTerra obviously

19   makes this much more complicated if there is evidence that is

20   sought to be admitted in that regard.  All that put together,

21   we would suggest a disclosure date of witness lists and

22   exhibits and Rule 3500 statements fairly early in this matter.

23   I had suggested to the prosecutor August 1st.  I know that the

24   government feels that that's far too early, but we would ask

25   the Court to impose a deadline maybe somewhat atypical,
```

O5FKLARC

1    especially given that the summer months are sometimes easier

2    for us to dig in, and when we turn to that post Labor Day time

3    frame, courts have set a lot of things for me, it just becomes

4    a much more hectic time frame.  So to the extent the Court

5    could give me some of that period in August, that would be

6    helpful.

7            THE COURT:  There is nothing in your schedule, though,

8    that anticipates other motions in limine.  In other words, the

9    premise of your motion, really, is that the only evidentiary

10   motions, if you will, that might be litigated are the ones that

11   trip off the government's 404(b) notice, which may or may not

12   include ArciTerra, it may include other things, but there are

13   usually a bunch of other issues.

14           When did you have in mind litigating those?

15           MR. WAXMAN:  Candidly, we have not discussed a

16   secondary motion in limine schedule.  I think the government

17   has in mind all one together, and I have, obviously, taken a

18   different view.

19           There are other substantial motions in limine that I

20   can see coming down the pike.  One I'll just give an example of

21   is short selling.  We believe short selling is a -- naked short

22   selling is a significant factor in the WeWork analysis, and I

23   think the government's at least intimated in at least one email

24   to me that they don't believe that's relevant.

25           THE COURT:  You need to unpack that.  I don't

O5FKLARC

1    understand what you're referring to.

2            MR. WAXMAN:  Yes, I'm still working with experts to

3    get my arms all the way around it, but there is substantial

4    evidence of naked short selling that went into this.  We have a

5    significant --

6            THE COURT:  By other people?

7            MR. WAXMAN:  By other people, correct.

8            And that impacts some of the incentives and issues and

9    actions that took place during the relevant time period.  So we

10   would, in all likelihood --

11           THE COURT:  Supposing that were established, what

12   element does it tend to negate or respond to?

13           MR. WAXMAN:  So, your Honor, we haven't fully

14   developed that at this stage.  We're also waiting to digest the

15   government's discovery, which has been voluminous.  So I really

16   raise that issue just to give the Court an example of something

17   that's potentially out there that I suspect will be subject to

18   motions in limine.  There may be others.  We just have not, at

19   this point, digested entirely the government's discovery.  We

20   certainly have spent a lot of time dealing with the SEC's case

21   out in Phoenix, and that case only having been recently stayed,

22   and we have a substantial challenge to the receiver out there,

23   and so we are, candidly, really turning to this case in full

24   very recently.  But I didn't want to make it sound like the

25   404(b) notice as to ArciTerra is really the only substantive

O5FKLARC

1    motion in limine that we forecast.  I think there might be a

2    host of motions in limine that the Court certainly can

3    entertain and decide.

4           THE COURT:  Yes, no, I just want to make sure we have

5    a rational schedule which isn't cluttered with too many

6    different dates.

7           Let me ask you, Mr. Rodriguez, do you have a proposal?

8           MR. RODRIGUEZ:  Yes, your Honor.

9           I guess let me start with where I think we're on

10   common ground, which is:  The government does agree that for

11   the defense motions other than 404(b), sort of the suppression

12   motion that was contemplated, the July 15th, July 28th,

13   August 5th schedule is agreeable to --

14          THE COURT:  So for any suppression motion, July 15,

15   July 29, August 5th, for opening by the defense, opposition by

16   the government, and reply by the defense?

17          MR. RODRIGUEZ:  That's correct.

18          THE COURT:  For suppression?

19          MR. RODRIGUEZ:  For suppression motions.

20          And to the extent between now and then, there are

21   other pretrial motions, such as an attack on the indictment --

22          THE COURT:  He's foresworn that, I think.

23          MR. RODRIGUEZ:  Understood, your Honor.

24          MR. WAXMAN:  Correct, your Honor.

25          MR. RODRIGUEZ:  So the other -- I think we agree

O5FKLARC

```
1    July 15th should be the date for Rule 12.2 notice.

2              THE COURT:  One second.

3              (Pause)

4              THE COURT:  July 15th?  Okay.

5              MR. RODRIGUEZ:  And, again, that's a little broader

6    than insanity defense, but any and all 12.2 notice.

7              Again, just continuing with agreed-upon dates here,

8    for August 16th, so two months in advance of trial, the

9    government's expert disclosures, as well as the defense

10   advice-of-counsel disclosures.  I don't think there's much of a

11   dispute here, but just to put a finer point on it, because at

12   least I'm very sensitive to the issues this can raise, we've

13   asked the defense for a pretty fulsome disclosure here on who

14   the attorneys would be, you know, what advice, and if there's

15   any and all documents that they would rely upon.  And I am

16   happy to explain to the Court the relevance of this particular

17   case.

18             THE COURT:  Let me just ask, Mr. Waxman, just to avoid

19   an issue:  Is there any chance that such an attorney is you?

20             MR. WAXMAN:  Is me?  No.

21             THE COURT:  Okay.

22             MR. RODRIGUEZ:  So that we're asking for robust

23   advice-of-counsel disclosures on the 16th of August.

24             And then September 16th for defense expert

25   disclosures.
```

O5FKLARC

1      THE COURT:  All right.  So far, I take it those are

2  all agreed upon?

3      MR. RODRIGUEZ:  That's my understanding.

4      MR. WAXMAN:  Correct.

5      THE COURT:  Okay.

6      And now what is not agreed upon?

7      MR. RODRIGUEZ:  Now, in terms of motions in limine, I

8  was prepared to defer to the Court and the Court's preference

9  about how far in advance of, let's say, the final pretrial

10  conference the Court would like motions in limine.  My proposal

11  is whatever schedule the Court sets for that, that the

12  government would provide written 404(b) notice three weeks in

13  advance of motions in limine.  That would then give the defense

14  an ample opportunity to decide should we move to exclude

15  something so that the parties can discuss, and issues around

16  404(b) can be litigated on the same schedule as other motions

17  in limine.  And I am prepared today to discuss with the Court,

18  in considerable detail if the Court would like, what the

19  government's thinking is on both ArciTerra, as well as other

20  potential motions in limine.

21      THE COURT:  Give me an overview of what you have in

22  mind.  You're not binding yourself, but it would be helpful.

23      MR. RODRIGUEZ:  So big picture, your Honor, it is not

24  the government's intention to fully prove up what Mr. Waxman, I

25  think correctly, describes as a more than a decade-long course

O5FKLARC

of activity at ArciTerra.  In other words, it's not the

government's intention to prove up the truth of the

misappropriation and commingling allegations that the SEC has

sued Mr. Larmore on.

However, there are various ways in which those

allegations and ArciTerra would fit into the trial, and I'm

happy to go through a few of those.

So, number one is, at the time of the WeWork scheme,

there was significant negative publicity about the allegations

against Mr. Larmore of misappropriation.  He had been sued by

prior investors in ArciTerra, investors who had not been paid

for something like four years.  There was publicity in

Bloomberg and an article published on The Real Deal.

The government would seek to admit the existence of

those allegations — not their truth, but the existence of those

allegations — because it's relevant to whether or not it was

reasonable for Mr. Larmore to believe that he could go get

$77 million worth of financing for the WeWork transaction when

those allegations would be out there and available to any

prospective lender.

THE COURT:  Sorry, in other words, it assists your

case to show that, in light of those allegations, Mr. Larmore

was effectively not going to be able to amass money in the

traditional way?

MR. RODRIGUEZ:  Yes, your Honor.  Regardless of

O5FKLARC

1    whether they're true or not, they're out there, and they're

2    something that a reasonable lender could rely upon in deciding

3    whether to loan Mr. Larmore $77 million to make a significant

4    WeWork tender offer.  So that's one way we think ArciTerra

5    comes in.

6            THE COURT:  Look, we'll litigate all of this if it's

7    going to be an issue, but I take it one of the issues that

8    would be presented by any such offer of proof would be the

9    level of generality or specificity at which the existence of

10   some unresolved allegation is put?

11           MR. RODRIGUEZ:  Absolutely, your Honor, yes.  I'll be

12   the first to admit that there are certain details in the press

13   that the government will not seek to admit or that, on balance,

14   the Court would be well within its discretion to exclude, yes.

15           THE COURT:  Were there pending regulatory charges or

16   just civil litigation charges at the time coming out of

17   ArciTerra?

18           MR. RODRIGUEZ:  Just civil.  The SEC was

19   investigating, but had not filed, and no other regulatory

20   filings at the time of the WeWork scheme.

21           THE COURT:  Would the SEC investigation have been

22   known to a potential lender or only the existence of pending

23   civil lawsuits?

24           MR. RODRIGUEZ:  I can't think of why it would be known

25   to a lender.

O5FKLARC

1          THE COURT:  So the issue — again, we'll see how it

2     presents once you've all dug into this — but the issue might be

3     an effort by you to admit the fact that there were civil

4     lawsuits pending that made certain claims as a drag on his

5     ability to obtain financing?

6          MR. RODRIGUEZ:  Yes, your Honor.

7          THE COURT:  All right.

8          MR. RODRIGUEZ:  Another way ArciTerra could come up:

9     Before the WeWork scheme, there was a separate receivership in

10    the State of Indiana over certain ArciTerra entities.  In the

11    summer of last year, Mr. Larmore sold a Gulfstream plane of his

12    and received about $1.2 million in proceeds.  He used a lot of

13    those proceeds to buy the WeWork securities in this case.

14         At the time, however, the receiver in Indiana took the

15    position that that $1.2 million belonged to the Indiana

16    receivership, and filed a motion to hold Mr. Larmore in

17    contempt.  There was a contempt hearing in November at which

18    Mr. Larmore testified about the use of those proceeds and was

19    cross-examined.  It will be the government's submission that

20    Mr. Larmore provided untruthful testimony about what he did

21    with those proceeds, and that that's comparable to a false

22    exculpatory statement that should come in.

23         THE COURT:  But did the false statement in some way

24    bear on this case?

25         MR. RODRIGUEZ:  Yes, because the question was what did

O5FKLARC

1   you do, in substance, with the $1.2 million?  A truthful answer

2   would have been, well, I used them to buy these WeWork

3   securities as part of a market manipulation scheme.  Instead,

4   Mr. Larmore said, you know, he used them for, quote-unquote,

5   living expenses and that he hadn't taken the time to reconcile

6   them.

7          THE COURT:  So it's being offered as consciousness of

8   guilt?

9          MR. RODRIGUEZ:  Yes, your Honor.

10         Here's another way, again, because a key issue is what

11  was Mr. Larmore's financial condition at the time of this

12  scheme.  The judge in Indiana found Mr. Larmore not credible

13  and granted the receiver's motion for contempt, and ordered him

14  to return the $1.2 million.  Mr. Larmore, however, at that

15  time — and this is November 15th, so it's only a few days after

16  the WeWork scheme — did not have the money to purge his own

17  contempt.  So he had to borrow $1.2 million from his mother,

18  again, showing his financial condition at the time and his

19  inability to actually reasonably expect that he would have or

20  be lent $77 million for the WeWork scheme.

21         I've also mentioned that there's been a number of

22  documents we've received from the receiver in the SEC action.

23  Right now, the receiver is the corporate custodian of Cole

24  Capital Funds, which is the entity that Mr. Larmore used for

25  the WeWork scheme.  So to the extent I had to call a corporate

O5FKLARC

1    custodian of this entity to talk about — and I expect I would —

2    that this was really a sham entity with no employees, no

3    assets, nothing like that, it would be a member of the SEC

4    receivership team, and I think we would have to explain, so

5    that's --

6          THE COURT:  Look, this gives me enough of an idea.  I

7    get the gist of it.

8          Putting aside motions in limine that deal with

9    ArciTerra, including, but not limited to, the examples you've

10   given, are there other categories that you can, right now,

11   foresee of motions-in-limine litigation?

12         MR. RODRIGUEZ:  Yes, your Honor.  So one would be a

13   motion by the government to preclude anything from the defense

14   about the length of the government's investigation or the

15   timing of its charges, especially as they relate to the timing

16   of the SEC case.

17         Mr. Larmore has made allegations in the SEC case,

18   which he has repeated here, but, in substance, that the SEC,

19   quote-unquote, contacted my office and, quote-unquote,

20   manipulated us into bringing the indictment when we did.  And

21   we think, in addition to being completely untrue, it's totally

22   irrelevant to any issue that would be presented at trial.

23         We would also move to preclude any irrelevant or

24   prejudicial information about the circumstances of

25   Mr. Larmore's arrest — the number of agents, the fact that he

O5FKLARC

1    was with his pregnant partner at the time, the fact that they

2    were ordered to come out with their hands up, things like that.

3    I know Mr. Larmore has recently welcomed a new child to the

4    world, and that was the person who was pregnant with him.  We

5    think any mention of that is irrelevant and prejudicial.

6         So there are motions like that that I anticipate.

7         THE COURT:  Let me just throw out the following:

8    Putting aside what the dates are, it sounds rather clear to me

9    there is going to be beefy motion-in-limine litigation here and

10   a good chance that each side will have motions in limine to

11   bring.

12        My own instinct, just based on experience, is that

13   it's simply easier to dole all these together rather than have

14   an ArciTerra schedule and then another schedule.  So whatever

15   the dates are, my instinct would be that the right sequence

16   here is to start off with a 404(b) notice from the government,

17   and then have, two to three weeks after it, motion in limine

18   opening brief deadlines that apply to both of you, and

19   opposition deadlines that apply to both of you if we're going

20   to have a reply that would follow as well, and then to ask you

21   to confer so that we don't needlessly have mirror image

22   motions, that if you both intend to litigate the same thing,

23   just discuss amongst yourselves who's going to be the movant

24   and who's going to be the respondent.

25        With that in mind, and also understanding, from your

O5FKLARC

| | |
|---|---|
| 1 | perspective, Mr. Waxman, that the resolution of the ArciTerra |
| 2 | matters a lot here, there's a value in getting this and |
| 3 | front-loading all this.  So, right now, I think the notion had |
| 4 | been, as proposed by the defense, a 404(b) notice on July 15, |
| 5 | so if one were to do that, just thinking out loud here, you |
| 6 | could have opening motions in limine two weeks after that, like |
| 7 | July 29th, oppositions two weeks after that, which would be |
| 8 | August 12th, and replies, which would be August 19th.  I'm just |
| 9 | spitballing.  That also gets you all done before those last |
| 10 | two weeks in August. |
| 11 | Mr. Waxman, is that a rational schedule? |
| 12 | MR. WAXMAN:  It is, your Honor. |
| 13 | THE COURT:  Mr. Rodriguez? |
| 14 | MR. RODRIGUEZ:  Yes, your Honor.  I just want to make |
| 15 | sure I caught it correctly. |
| 16 | So July 15th for the government's notice? |
| 17 | THE COURT:  For the government's 404(b) notice, and |
| 18 | then July 29, August 12, and August 19 for opening motions in |
| 19 | limine, oppositions, and replies successively. |
| 20 | MR. RODRIGUEZ:  Very good, your Honor.  That makes |
| 21 | sense. |
| 22 | And one further thing is:  The government will put |
| 23 | this in its notice.  I think most, if not all, of the items |
| 24 | that I just described, the government is going to take the |
| 25 | position that they're not 404(b), that they're direct evidence, |

O5FKLARC

1    but, nonetheless, in the alternative, 404(b), so we will take

2    that approach when crafting the notice.

3             THE COURT:  I'll make the following record:  We all,

4    in this district, use 404(b) notices as one of several

5    different jargon for basically bad or questionable acts or

6    disputable evidence type of letter.  It's sometimes referred to

7    in racketeering cases as an enterprise letter, but it's the

8    same thing.  It's basically a fulsome document that sets out

9    all of the stuff that logically ought to be in play on motions

10   in limine.  And so the denotation of it as 404(b) oughtn't

11   limit what you include.

12            MR. RODRIGUEZ:  Very good, your Honor.

13            THE COURT:  That all sounds rational.

14            I'm disinclined, Mr. Waxman, right now to set a

15   hearing date, and here's why:  A big issue here is going to be

16   whether there's a need for an evidentiary hearing.  Until we

17   know whether there is going to be a suppression motion, I don't

18   know whether there's going to be a need for such a hearing on

19   what's been previewed to me.  It sounds like there's going to

20   be a lot going on here.  It may or may not be that, putting

21   aside the suppression motions, I need an oral argument or I can

22   resolve it on the basis of the submissions.

23            If, however, there is an evidentiary hearing, we need

24   to gather.  So my inclination would be to ask just for a prompt

25   letter from you, Mr. Waxman, as to whether the suppression

O5FKLARC

| | |
|---|---|
| 1 | motions are going to be made at all.  I'm happy to adopt the |
| 2 | schedule you all set with respect to that, but if that goes |
| 3 | away, then the only motions practice we have, barring something |
| 4 | unexpected, is the motions in limine. |
| 5 | MR. WAXMAN:  Correct, your Honor.  I think that's |
| 6 | fine. |
| 7 | THE COURT:  Okay. |
| 8 | So, look, I think I've got all this.  Mr. Waxman, I'm |
| 9 | inclined to adopt all the dates that Mr. Rodriguez represented |
| 10 | as being undisputed — agreed to — and then put in place the |
| 11 | additional dates of the 404(b) and the motion in limine |
| 12 | briefing that I just covered. |
| 13 | Is that okay with you? |
| 14 | MR. WAXMAN:  It is, your Honor. |
| 15 | THE COURT:  All right. |
| 16 | Are there any other dates I need to set right now? |
| 17 | MR. WAXMAN:  Not in my mind, your Honor.  I do want to |
| 18 | just raise the issue of my client's testimony in Indiana.  If |
| 19 | the government has a copy of that transcript, we would request |
| 20 | that. |
| 21 | MR. RODRIGUEZ:  It's been produced already, your |
| 22 | Honor.  I'm happy to point Mr. Waxman to the Bates number and |
| 23 | such. |
| 24 | THE COURT:  Look, I realize there is actually one |
| 25 | other outstanding request, which is the government witness |

O5FKLARC

1    list, exhibit list, and 3500 disclosure.

2              MR. WAXMAN:  Correct, your Honor.

3              THE COURT:  Mr. Rodriguez, as you know, under

4    Rule 3500, I literally don't have the authority to compel the

5    government to provide 3500 early.  The other end, as you also

6    know, in practice in this district, it is provided early with

7    the timing turning on whether the volume, turning on whether

8    it's likely to stir up additional evidentiary issues, and

9    whether or not there are safety risks and so forth, and where

10   that's the case, it's usually an argument that's directed to a

11   small subset of the 3500.  Have you given thought to when, in

12   advance of trial, you're prepared to provide the 3500 material?

13             MR. RODRIGUEZ:  Yes, your Honor, I have discussed that

14   with defense counsel, and I mentioned that it's fully my

15   expectation that we will be complying with our usual practice

16   of producing 3500 in advance of trial.  I think that that

17   practice -- excuse me, that process will start about two weeks

18   before trial.  I do think that there are ways in which the

19   parties can work things out so that it begins even earlier.

20   For example, if we can eliminate the need for certain

21   unnecessary witnesses and custodial witnesses and reach

22   stipulations, we're happy to begin that process earlier.

23             THE COURT:  Look, how voluminous is the 3500 material

24   likely to be?

25             MR. RODRIGUEZ:  I do not think that it is likely to be

O5FKLARC

| | |
|---|---|
| 1 | voluminous, your Honor.  For example, this is not a case with, |
| 2 | at least as of right now — and certainly things could change — |
| 3 | multiple cooperating witnesses or immunized witnesses or things |
| 4 | like that. |
| 5 | THE COURT:  May I ask whether you're prepared to state |
| 6 | whether there are any? |
| 7 | MR. RODRIGUEZ:  At this time, right now, there are not |
| 8 | any witnesses in those buckets.  That could change, but, right |
| 9 | now, there's not. |
| 10 | THE COURT:  Those are usually the big sources of 3500. |
| 11 | And are there witnesses who have, like, large amounts |
| 12 | of prior testimony or things of that ilk? |
| 13 | MR. RODRIGUEZ:  There are not any witnesses that have |
| 14 | any prior testimony that I'm aware of.  I think, as the Court |
| 15 | will see, a lot of this is going to be records-based. |
| 16 | THE COURT:  Right. |
| 17 | Look, your language is a little bit on the fuzzy side |
| 18 | as to what you meant by the two weeks.  I would certainly, at a |
| 19 | minimum, appreciate, but that's all I can say, that you set a |
| 20 | hard-and-fast deadline before the trial.  The trial is |
| 21 | October 15th.  It seems to me that, at a minimum, you ought to |
| 22 | be at least committing that all 3500 is produced two weeks |
| 23 | before trial.  I'd welcome it being earlier, but I think |
| 24 | two weeks, given the absence of special factors here, makes |
| 25 | that well within the band of ordinary practice. |

O5FKLARC

1              MR. RODRIGUEZ:  Understood, your Honor.

2              THE COURT:  Are you comfortable committing to that?

3              MR. RODRIGUEZ:  I am, your Honor, yes.

4              THE COURT:  Now, witness list and exhibit lists, look,

5    those are obviously changeable things, but in a heavy document

6    case, Mr. Rodriguez, there is a real value for everybody

7    getting those out there, not the least of which is that

8    somebody's going to have issues about redactions, and there's

9    going to be completeness and stuff like that.  Is there a

10   reason why you can't get, subject to your right to amend, a

11   witness and exhibit list also two weeks before trial?

12             MR. RODRIGUEZ:  We're happy to do so, your Honor.

13             THE COURT:  All right.

14             So that's October 1.  All right.

15             MR. WAXMAN:  Your Honor, one point on prior

16   testimony — and this goes, again, to ArciTerra — while there

17   may not be prior testimony in connection with WeWork witnesses,

18   there are a significant number of individuals who were former

19   ArciTerra employees who have given depositions, and so this

20   kind of ties in with 404(b).

21             THE COURT:  Right.

22             No, look, I appreciate that, that depending on what

23   comes out of all this, there might be witnesses who testify who

24   have given prior statements that are within the government's

25   possession and control or testimony of that ilk, or there might

O5FKLARC

```
 1    not be.  I mean, Mr. Rodriguez, at least in the proffer that he
 2    gave me up to the point I interrupted him, had discrete
 3    pointers for ArciTerra that wasn't obvious to me required, for
 4    example, a participant's testimony; e.g., the presence of civil
 5    lawsuits, for example, might not require the testimony of such
 6    a human being, or the Indiana developments vis-a-vis the
 7    receivership also might not be of that nature.
 8              So understanding the theoretical potential, it's, by
 9    no means, clear that it's going to be realized.
10              MR. WAXMAN:  Yes, your Honor.
11              And I know the Court's not taking my silence on the
12    government's proffer on -- but we certainly contest --
13              THE COURT:  You oppose everything?
14              MR. WAXMAN:  Yes.
15              THE COURT:  Right, got it.  I appreciate it, but I
16    assumed as much.
17              I want to set a next conference date in the case
18    because there's a lot going on here, but my inclination is not
19    to do it until early September.
20              Does anybody see a need — putting aside what the date
21    will be — does anybody see a need, except if there's an
22    evidentiary hearing generated by a suppression motion, for us
23    to gather before then?
24              MR. RODRIGUEZ:  No, your Honor.
25              MR. WAXMAN:  None.
```

O5FKLARC

1          THE COURT:  All right.

2          Then, look, if the motion-in-limine briefing is

3   destined to be done by August 19th, my inclination would be to

4   meet with you very soon after Labor Day, for example, Monday,

5   September the 9th, at 10:30 a.m.  And my hope would be that I

6   would be in a position, if I haven't written an opinion

7   resolving the various motions, to have a bench ruling that does

8   that.

9          But, that way, at least you're getting an answer from

10  me by that date, which is usefully some five weeks before

11  trial.  And I assume Mr. Rodriguez is aware of this from the

12  U.S. Attorney's Office, but my practice as a judge is to really

13  try to resolve things as clearly as possible and as much in

14  advance as possible so that I can be active behind the scenes

15  and be more of a church mouse during trial with you all having

16  guardrails and clear rules and you can prepare well.

17         So, my hope would be, in part, in setting the

18  schedule, to put myself in a position to rule so you know, for

19  better or worse, what the ground rules are.

20         Are you free September the 9th?

21         MR. WAXMAN:  I am, your Honor.

22         MR. RODRIGUEZ:  Yes, your Honor.

23         THE COURT:  All right.  So September the 9th, at 9:30.

24         Look, once I see whether there's a suppression --

25  10:30, sorry.  I assume that doesn't change your answers.

O5FKLARC

```
 1              Okay, one moment.

 2              (Pause)

 3              THE COURT:  Government, Mr. Smallman wisely suggests,

 4    just to protect our calendar, that I set a final pretrial

 5    conference with you for Monday, October the 7th, at 10:30.

 6              MR. WAXMAN:  That's also fine for the defense.

 7              THE COURT:  I would need proposed voir dire and

 8    requests to charge from you.  Why don't I get those from you

 9    two weeks before trial, let's say -- well, hold one moment.

10              Why don't we say on October the 1st, voir dire,

11    requests to charge.

12              MR. WAXMAN:  That's fine for the defense.

13              THE COURT:  Just one other item I have for you.

14              Mr. Rodriguez, is there any chance of a superseder

15    here?

16              MR. RODRIGUEZ:  I have no reason to believe that there

17    will be a superseding indictment from my office before

18    October 15th.  Obviously, I can't speak for other U.S.

19    Attorney's Offices, but I have no reason to believe that there

20    would be, unless your Honor's rulings change something, and we

21    have to clean up the indictment, but it would be in the nature

22    of, like, a cleaned-up trial indictment, not one adding new

23    charges.

24              THE COURT:  You're not going to add ArciTerra?

25              MR. RODRIGUEZ:  That's the message I'm trying to send,
```

O5FKLARC

1    yes.

2                THE COURT:  Okay.

3                I've now exhausted all the stuff I came here to raise

4    with you.  This has been very productive.

5                Mr. Rodriguez, is there anything else, any other way I

6    can be helpful?

7                MR. RODRIGUEZ:  Excuse me just one moment, your Honor?

8                THE COURT:  We've already excluded time through the

9    trial date, so I don't need to do that.

10               MR. RODRIGUEZ:  We have.

11               Nothing further from the government.

12               THE COURT:  Mr. Waxman?

13               MR. WAXMAN:  Nothing from the defense.

14               THE COURT:  All right.  I will issue an order more

15   likely tomorrow, just given the pace of my day, that clarifies

16   all these dates.

17               Mr. Waxman, can we say that by the end of next week, I

18   will get a letter from you as to your intentions vis-a-vis

19   suppression?

20               MR. WAXMAN:  Yes.

21               THE COURT:  And if you are intending to move to

22   suppress, please confer with Mr. Rodriguez so that the letter I

23   get, which should have been reviewed by the government in

24   advance, sets out, if you're intending to move to suppress,

25   what each side's view is of what an evidentiary hearing would

O5FKLARC

1    likely cover.  I'm trying to get a sense of, you know, one day

2    or more, that kind of thing.

3            MR. WAXMAN:  Correct.  Yes, I certainly can do that,

4    your Honor.

5            THE COURT:  Very good.

6            So that's due a week from Friday.

7            MR. WAXMAN:  Correct.

8            THE COURT:  Very good.

9            We stand adjourned.  Have a good summer, everyone.

10            Mr. Larmore, we stand adjourned.  I hope you also have

11    a good summer, and congratulations on the birth of your child.

12            THE DEFENDANT:  Thank you, your Honor.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25