UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- x
                                :

UNITED STATES OF AMERICA      :
                                :

       - v. -                :                24 Cr. 140 (PAE)
                                  :

JONATHAN MOYNAHAN LARMORE,   :
                                  :
         Defendant.        :
                                  :
                                  :
----------------------------------------------------- x


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278


Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys
    -Of Counsel-

**Table of Contents**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND .................................................................................................1

    A.    The Indictment ................................................................................. 1

    B.    Overview of the Fraudulent Tender Offer Scheme.................................. 2

    C.    The Defendant Creates Cole Capital.................................................... 3

    D.    The Defendant Buys WeWork Call Options and Shares ......................... 4

    E.    The Defendant Announces a False and Fraudulent Tender Offer for WeWork Stock
......................................................................................................8

ARGUMENT....................................................................................................14

    I.    The Court Should Admit Certain Evidence as Direct Evidence of the Charged Crimes, or, in the Alternative, under Federal Rule of Evidence 404(b)................................. 14

        A.    Applicable Law................................................................................ 14

            1.    Other Acts Evidence as Intrinsic or Direct Proof.................................. 14

            2.    Other Acts Evidence Pursuant to Rule 404(b) .................................... 16

            3.    Rule 403 and Evidence of Other Bad Acts ......................................... 18

        B.    Discussion ...................................................................................... 19

            1.    The Court Should Admit Evidence that Larmore Lied to a Representative of City National Bank About His Plans to Announce a Fraudulent Tender Offer for WeWork Stock. ...................................................................................................... 19

            2.    The Court Should Admit Evidence that Larmore Lied Under Oath About Funds He Used to Purchase WeWork Securities in Furtherance of His Fraudulent Scheme.. 22

            3.    The Court Should Admit Evidence that Larmore Could Not Afford to Return the Plane Proceeds and Purge a Contempt Order Against Him As Further Proof of His Financial State...................................................................................................... 25

            4.    The Court Should Admit Evidence that Larmore Infringed Trademarks Held By the Real Cole Capital. ........................................................................................ 27

            5.    The Court Should Admit Limited Evidence of Public Allegations that, at the Time of the Fraudulent Tender Offer, Arciterra Investors Had Not Been Paid for Years and Larmore Was Under Investigation by the SEC, Not for their Truth, But As Evidence of the Defendant's State of Mind. ................................................................ 29

    II.    The Court Should Allow Cross-Examination of the Defendant, Should He Choose to Testify, About His Misappropriation of Arciterra Investor Funds under Rule 608(b)............. 31

        A.    Relevant Facts................................................................................ 31

        B.    Applicable Law................................................................................ 32

        C.    Discussion ...................................................................................... 32

III.    The Court Should Preclude Evidence or Mention of the Length of the Government's Investigation or the Timing of the Indictment in Relation to Litigation Brought by the SEC against the Defendant........................................................................................................... 33

IV.    The Court Should Preclude Evidence or Mention of Any Potential Punishment, Including References to the Defendant's "Liberty" or "Freedom" or Requests that the Jury, in Substance, Send the Defendant "Home" or "Back to His Family." ........................................ 36

V.    The Court Should Preclude Evidence or Mention of Any Irrelevant and Unfairly Prejudicial Information Surrounding the Defendant's Arrest.................................................... 38

VI.    The Court Should Preclude Evidence or Mention, Without Prior Authorization, of Any Information Relating to Any Personal Factor Unconnected to Guilt or Innocence.................. 39

**CONCLUSION** .................................................................................................................**40**

# Table of Authorities

Cases                                            Page(s)

*Costantino v. Herzog,*
  203 F.3d 164 (2d Cir. 2000) .................................................................. 17

*Parker v. Randolph,*
  442 U.S. 62 (1979) ............................................................................... 19

*Rogers v. United States,*
  422 U.S. 35 (1975) ............................................................................... 36

*Shannon v. United States,*
  512 U.S. 573 (1994) ............................................................................. 36

*United States v. Afriyie,*
  929 F.3d 63 (2d Cir. 2019) .................................................................. 21

*United States v. Araujo,*
  79 F.3d 7 (2d Cir. 1996) ...................................................................... 18

*United States v. Battaglia,*
  No. 05 Cr. 774 (KMW) ........................................................................ 39

*United States v. Brand,*
  467 F.3d 179 (2d Cir. 2006) ................................................................ 18

*United States v. Bynum,*
  3 F.3d 769 (4th Cir. 1993) ................................................................... 33

*United States v. Carboni,*
  204 F.3d 39 (2d Cir. 2000) .................................................................. 16

*United States v. Cirillo,*
  468 F.2d 1233 (2d Cir. 1972) .............................................................. 19

*United States v. Colon,*
  880 F.2d 650 (2d Cir. 1989) ................................................................ 18

*United States v. Coonan,*
  938 F.2d 1553 (2d Cir. 1991) .............................................................. 15

*United States v. Curley,*
  639 F.3d 50 (2d Cir. 2011) .................................................................. 17

*United States v. Demosthene,*
  334 F. Supp. 2d 378 (S.D.N.Y. 2004) ................................................. 36

*United States v. Estrada,*
  430 F.3d 606 (2d Cir. 2005) ................................................................ 32

*United States v. Del Rosario* ................................................................. 37

*United States v. Figueroa,*
  618 F.2d 934 (2d Cir. 1980) ................................................................ 18

*United States v. Gonzalez,*
  110 F.3d 936 (2d Cir. 1997) ................................................................ 15

*United States v. Graham,*
  51 F.4th 67 (2d Cir. 2022) ................................................................... 15

*United States v. Halak,*
  78 F. App'x 758 (2d Cir. 2003) ........................................................... 15

*United States v. Harris,*
  491 F.3d 440 (D.C. Cir. 2007) ................................................ 39
*United States v. Hsu,*
  669 F.3d 112 (2d Cir. 2012) .................................. 15, 16, 21
*United States v. Inserra,*
  34 F.3d 83 (2d Cir. 1994) ...................................................... 15
*United States v. Jackson,*
  882 F.2d 1444 (9th Cir. 1989) ............................................. 32
*United States v. Kaiser,*
  609 F.3d 556 (2d Cir. 2010) ................................................. 16
*United States v. Livoti,*
  196 F.3d 322 (2d Cir. 1999) ................................................. 19
*United States v. Masino,*
  275 F.2d 129 (2d Cir. 1960) ................................................. 33
*United States v. Moran-Toala,*
  726 F.3d 334 (2d Cir. 2013) ................................................. 17
*United States v. O'Connor,*
  580 F.2d 38 (2d Cir. 1978) ................................................... 18
*United States v. Paccione,*
  949 F.2d 1183 (2d Cir. 1991) ............................................... 39
*United States v. Pascarella,*
  84 F.3d 61 (2d Cir. 1996) ..................................................... 17
*United States v. Paulino,*
  445 F.3d 211 (2d Cir. 2006) ................................................. 17
*United States v. Peterson,*
  808 F.2d 969 (2d Cir. 1987) ................................................. 17
*United States v. Pitre,*
  960 F.2d 1112 (2d Cir. 1992) .......................................... 17, 18
*United States v. Quinones,*
  511 F.3d 289 (2d Cir. 2007) ................................................. 15
*United States v. Reed,*
  639 F.2d 896 (2d Cir. 1981) ................................................. 18
*United States v. Reese,*
  933 F. Supp. 2d 579 (S.D.N.Y. 2013) ............................... 36, 37
*United States v. Regan,*
  103 F.3d 1072 (2d Cir. 1997) ............................................... 35
*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007) ................................................. 16
*United States v. Robinson,*
  702 F.3d 22 (2d Cir. 2012) ................................................... 16
*United States v. Roldan-Zapata,*
  916 F.2d 795 (2d Cir. 1990) ...................................... 16, 17, 19
*United States v. Rosado,*
  728 F.2d 89 (2d Cir. 1984) ................................................... 35
*United States v. Scott,*
  677 F.3d 72 (2d Cir. 2012) ................................................... 17

*United States v. Stewart*,
  No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)....................................... 36
*United States v. Thomas*,
  116 F.3d 606 (2d Cir. 1997)................................................................................. 36
*United States v. Thompson*,
  359 F.3d 470 (7th Cir. 2004) .............................................................................. 19
*United States v. Tussa*,
  816 F.2d 58 (2d Cir. 1987)................................................................................. 19
*United States v. Williams*,
  205 F.3d 23 (2d Cir. 2000)................................................................................. 17
*United States v. Zackson*,
  12 F.3d 1178 (2d Cir. 1993) ............................................................................... 17

Rules

Fed. R. Evid. 401 .............................................................................................. 15
Fed. R. Evid. 402 .......................................................................................... 14, 17
Fed. R. Evid. 403 .............................................................................................. 18
Fed. R. Evid. 404(b)....................................................................................... 17, 18
Fed. R. Evid. 608(b)........................................................................................... 32

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings *in limine* on certain issues in advance of the trial currently scheduled for October 15, 2024. In particular, the Government seeks rulings:

1. Admitting certain evidence as direct evidence of the charged crimes, or, in the alternative, as evidence pursuant to Federal Rule of Evidence 404(b);

2. Allowing the Government to cross-examine the defendant, if he chooses to testify, about his misappropriation of tens of millions of dollars of investor funds from a prior venture through Arciterra Companies LLC and its predecessor Arciterra Group, LLC ("Arciterra") under Rule 608(b) as probative of the defendant's character for untruthfulness;

3. Precluding evidence or argument about the Government's investigation and charging decision, including the timing of the Indictment in relation to litigation brought by the Securities and Exchange Commission ("SEC") against the defendant;

4. Precluding evidence or mention of any potential punishment, including references to the defendant's "freedom" or "liberty" or requests that the jury, in substance, send the defendant "home" or "back to his family" with a verdict of not guilty;

5. Precluding evidence or mention of irrelevant and unfairly prejudicial information about the defendant's arrest, including the number of law enforcement officers present, the weapons those officers had, the fact that the defendant's fiancée was pregnant at the time, and the manner in which the defendant was summoned outside of his residence and ultimately arrested; and,

6. Precluding evidence or mention, without prior authorization by the Court, of any information relating to the defendant's family, personal background, health conditions, conditions of pretrial release, or any other personal factor unconnected to guilt or innocence.

## BACKGROUND

### A. The Indictment

On March 12, 2024, a grand jury in this District returned Indictment 24 Cr. 140, charging the defendant with one count of tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. § 240.14e-8(a), (b), & (c), and 18 U.S.C. § 2, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (the "Indictment").

**B. Overview of the Fraudulent Tender Offer Scheme**

In October and November 2023, the defendant engaged in a scheme to use a false and fraudulent tender offer to manipulate the stock price of WeWork, Inc. ("WeWork"), a New-York based co-working space company that is publicly traded on the New York Stock Exchange ("NYSE"). Indictment ¶ 1.

The defendant executed his scheme in three steps. First, on October 6, 2023, he created Cole Capital Funds LLC ("Cole Capital"), a purported real estate investment firm that was, in fact, a vehicle for his fraudulent scheme. Indictment ¶ 2. Second, on November 1 and 2, 2023, he spent more than $775,000 buying tens of thousands of cheap, short-dated, out-of-the-money WeWork call options (the vast majority of which were set to expire on November 3, 2023, at 4:00 p.m. EDT) and, because certain of the defendant's brokerage firms did not allow him to purchase options, hundreds of thousands of shares of WeWork common stock. *Id.* Third, on November 3, 2023, the defendant caused a false and misleading press release to be published announcing that Cole Capital proposed to acquire 51% of all outstanding shares owned by minority shareholders of WeWork at a more-than-700% premium, in an all-cash offer worth more than $77 million. *Id.* At the time, WeWork was on the verge of bankruptcy. *Id.*

In fact, neither the defendant nor Cole Capital had the intent or ability to execute the announced tender offer. Indictment ¶ 3. Instead, the defendant intended for news of the tender offer to fraudulently inflate WeWork's share price and, thereby, increase the value of his newly acquired WeWork call options and shares. *Id.*

On November 3, 2023, at approximately 5:12 p.m. EDT, a press release announcing Cole Capital's purported tender offer was published. Indictment ¶ 4. Within approximately one minute of publication, in after-hours trading, WeWork's share price quickly increased more than 70%

from $.85 to $1.45, and continued to rise until 5:31 p.m. EDT, when the stock reached its high of $2.14, which was a more-than-150% increase over the stock price prior to the publication of the press release. *Id.* There was no other significant news related to WeWork announced between approximately 5:12 p.m. EDT and approximately 5:31 p.m. EDT on November 3, 2023, other than the fraudulent tender offer made by the defendant. *Id.*

The WeWork call options the defendant purchased could have made him millions of dollars if the news of his fraudulent tender offer had caused WeWork's share price to increase significantly before his options expired. Indictment ¶ 5. But WeWork's share price did not spike until the press release was published at approximately 5:12 p.m. EDT on November 3, 2023—about an hour after the vast majority of the defendant's WeWork call options had expired worthless at 4:00 p.m. EDT that day. *Id.* The defendant had intended the press release to be filed prior to the market's close, and in the hours leading up to the close was pressuring a press release distribution service to expedite the release—but without success. The defendant did not exercise or sell his small amount of remaining WeWork options (which were set to expire on November 10, 2023) because, while his fraudulent conduct caused WeWork's share price to rise by close to 150%, his scheme did not inflate WeWork's share price above the strike price of his remaining options. *Id.*

On November 6, 2023, WeWork filed for Chapter 11 bankruptcy protection. Indictment ¶ 6. On November 10, 2023, the remaining WeWork options the defendant purchased expired out of the money and worthless. *Id.*

### C. The Defendant Creates Cole Capital

On October 6, 2023, the defendant formed and incorporated Cole Capital in the State of Arizona, calling it a real estate and rental and leasing business. Indictment ¶ 8. Also on that day, the defendant registered a website domain name for Cole Capital: www.colecapitalfunds.com.

*Id.* at ¶ 9.[1] According to the Cole Capital website, Cole Capital—despite having just been created on the same day the domain name was registered—"charges ahead, introducing innovative investment strategies and providing access to best-of-class investments . . . . [and] venture[s] into various markets across the United States, securing investments in properties and companies that are leaders in their fields." *Id.* The defendant was listed on the Cole Capital website as the Chief Executive Officer of Cole Capital—but without his first name, instead using the name "Moynahan Larmore." The website proclaimed that:

> Chief Executive Officer Moynahan Larmore is an exceptional industry leader with an unwavering commitment to excellence and a passion for innovation. He demonstrates impressive growth and a remarkable track record of large-scale deals and expanding investment portfolios.
> . . .
> Larmore is a visionary leader in real estate investments. He and his team have consistently delivered innovative and successful strategies, earning respect and accolades within the industry.

*Id.* The website did not disclose, however, that "Moynahan Larmore" was, in fact, the defendant. *Id.*

### D. The Defendant Buys WeWork Call Options and Shares

After establishing Cole Capital, which had no genuine business operations, the defendant, proceeded to fund multiple trading accounts so that he could acquire WeWork call options. Indictment ¶ 10. Between October 18 and October 30, 2023, the defendant opened trading accounts at five brokerages and funded each account with $75,000, for a total of $375,000. *Id.* The five brokerages were TradeStation, Fidelity, WeBull, JP Morgan, and SoFi Securities, which are identified as "Brokerages 1-5" and the accounts as "Trading Accounts 1-5" in the Indictment.

---

[1] The Government expects the proof at trial will show that, while the domain name for the website was registered on October 6, 2023, the website itself did not actually go "live" to the public with viewable content until November 2, 2023—one day before the defendant's November 3 fraudulent tender offer.

On October 30, 2023, the defendant contacted the support desk of Wintrust (Brokerage-6 in the Indictment), a brokerage at which he had previously opened and funded a trading account (Trading Account-6 in the Indictment) to inquire about trading options in his accounts. *Id.* at ¶ 11. In response, a Wintrust representative emailed the defendant an options trading application and agreement and requested that the defendant complete the agreement and return it. In the morning of October 31, 2023, the defendant emailed back a completed copy of the options trading application and agreement and asked Wintrust to "expedite approval as I have a confidential trade I would like to make tomorrow." *Id.* On November 1, 2023, the defendant funded an account ("Trading Account-7") at a seventh brokerage, TDAmeritrade ("Brokerage-7"), which he had previously opened, with $75,000. *Id.* at ¶ 13.

During recorded phone calls and email correspondence on or about November 1 and 2, 2023, the defendant discussed with representatives of some of the Brokerages—sometimes in aggressive or threatening terms—his pressing, urgent desire to buy options. Indictment ¶ 14.

For example, on November 1, 2023, the defendant told a TradeStation representative on a recorded call, "what I would like to do is be able to buy options right now," and "I am in front of my computer, I'm ready to buy." Indictment ¶ 14(a). The defendant noted that his attempts to buy options had been rejected, and he demanded that TradeStation either return the money in his trading account or authorize his account to buy options. *Id.* When told that it would take several days to return his money, the defendant complained: "that doesn't do me any good for this week" and threatened the representative, stating, "I don't think you want to be on the bad side of you improperly holding my money." *Id.* When asked if he had access to the necessary options agreement, the defendant retorted, "No, I'm on my yacht and don't have a printer." *Id.* Later on that same call, the defendant accused TradeStation of "hijacking and stealing" his money and threatened to sue TradeStation. Indictment ¶ 14(b). Eventually, the defendant agreed to complete

the options agreement while on the phone with the representative. *Id.* After completing the agreement and emailing it to the TradeStation representative, the defendant placed an order for 2,000 WeWork call options while the TradeStation representative was still on the phone. *Id.* at ¶ 14(c). The next day, November 2, 2023, the defendant purchased another 11,376 WeWork call options using his TradeStation account. *Id.*

On November 2, 2023, the defendant called a trading desk at JP Morgan. Indictment ¶ 14(d). During the call, which was likewise recorded, the defendant told the trader, "I want you to buy a bunch of options for me," but was advised that his account had not yet been approved for options trading. *Id.* The defendant complained that, "It's 1:42 and the options expire tomorrow." *Id.* Frustrated with his inability to buy options, the defendant directed the trader to buy $75,000 worth of WeWork stock instead. *Id.* The defendant then explained, "What I had wanted to buy was $75,000 worth of options that are expiring tomorrow that are trading at five cents per contract per share." *Id.* The defendant then complained about "the cost" of JP Morgan's "screwup" in not approving him for options trading. *Id.* The trader purchased 65,789 shares of WeWork stock for the defendant, at his direction. Indictment ¶ 14(e). After the trade was placed, the defendant continued to complain about his account not having been approved to trade options. *Id.* The defendant stated: "When this stock goes through the roof the liability of your back office for this mistake is huge." *Id.* The defendant did, in fact, believe that the price of WeWork's stock would "go through the roof," notwithstanding the stock's recent poor performance and reports that WeWork was nearing bankruptcy, because the defendant intended to announce the very next day a bogus tender offer for WeWork stock that was designed to fraudulently inflate WeWork's share price. *Id.*

In the early morning hours of November 2, 2023, the defendant emailed a compliance officer at Wintrust, which still had not approved the defendant for options trading in his Wintrust trading account, and stated:

> I must have access to my funds to either trade them, or to place them in another institution to trade. I am in the middle of a very important acquisition, you withholding my funds, and my ability to trade them is going to have significant consequences.
>
> I must hear back from you this morning, long before opening bell of the exchanges, so that this can be rectified immediately[.]
>
> Much damage has already been done. Need to buy options FIRST THING THIS MORNING[.]

Indictment ¶ 14(f). In response, the defendant received an automatic, out-of-office reply from the compliance officer, indicating that the officer would be returning to the office on Monday November 6, 2023. *Id.* The defendant forwarded that response to a support team email address at Wintrust, stating: "THIS NEEDS IMMEDIATE ATTENTION[.] MUST BE RECTIFIED BEFORE OPENING BELL OF NYSE." *Id.* The compliance officer responded, in substance, that, because the funds in the defendant's Wintrust trading account were serving as collateral for a loan, the defendant could not use the funds to trade options without the lender's consent. *Id.* The defendant fired back, "you must allow me to trade. What you are doing is criminal[.]" *Id.* The defendant was then told by a Wintrust representative that "Option trading is a privilege, not a right, and option trading is a privilege we typically do not grant accounts that are being used for collateral." *Id.* Unable to use the Wintrust account to buy options, the defendant instead used his Wintrust trading account to buy 277,852 shares of WeWork stock for more than $311,000. *Id.*

Despite the difficulties described above, on November 1 and 2, 2023, the defendant was able to use five of his trading accounts to purchase 72,846 cheap, short-dated, out-of-the money WeWork call option contracts, which gave him the right to purchase 7,284,600 shares of WeWork

common stock. Indictment ¶ 15. Most of these options (more than 70,000) were set to expire on November 3, 2023, at 4:00 p.m. EDT. *Id.* The small number of remaining options were set to expire on November 10, 2023, at 4:00 p.m. EDT. *Id.* The options cost between 3 and 15 cents per contract share, had strike prices between $2 and $5, and were all "out of the money" when the defendant purchased them.[2] *Id.* By buying these options, the defendant was betting that WeWork's share price would increase significantly within as soon as one day. *Id.* The defendant placed that bet because he was planning to announce a fake tender offer for WeWork shares the next day, which, he intended, would fraudulently inflate WeWork's share price. *Id.*

In addition to buying WeWork call options, because two of the brokerages (JP Morgan and Wintrust) did not authorize him to buy options, the defendant purchased a total of 343,641 shares of WeWork stock. Indictment ¶ 16. In total, on November 1 and 2, 2023, the defendant spent more than $775,000 buying WeWork call options and shares. *Id.*

### E. The Defendant Announces a False and Fraudulent Tender Offer for WeWork Stock

After amassing a huge amount of WeWork securities in just two days, the defendant announced on November 3, 2023, a false and fraudulent tender offer by Cole Capital to acquire 51% of all outstanding shares owned by minority shareholders of WeWork at a massive premium, a transaction which neither the defendant nor Cole Capital had the intent or ability to consummate. Indictment ¶ 17. Instead, the defendant intended for his false and misleading November 3, 2023, announcement to manipulate the price of WeWork stock and to fraudulently drive up the value of the WeWork call options and shares that the defendant had purchased in the two days before the fraudulent announcement. *Id.*

---

[2] On or about November 1, 2023, WeWork shares opened at $1.28, their highest price of the day, and closed at $1.22. On or about November 2, 2023, WeWork shares opened at $1.23, hit a high of $1.28, and closed at $1.11.

On November 3, 2023, the defendant created an account with a press release distribution service, EIN PressWire (the "Wire Service" in the Indictment), paid EIN PressWire $999 with his credit card for press release distribution services, and shortly thereafter created a draft press release. Indictment ¶ 18.

On the morning of November 3, 2023, the defendant sent an email to a WeWork investor relations email address and to a Manhattan-based WeWork investor relations employee. Indictment ¶ 19. The subject line of the email was "Letter to the Board," and the body of the email stated, "Please see attached I look forward to hearing from you." *Id.* Attached was a two-page letter addressed to the WeWork Board of Directors and Chief Executive Officer at WeWork's Manhattan headquarters signed by "Moynahan Larmore, CEO, Cole Capital Funds, LLC" (the "Letter to the Board of Directors"). *Id.* The Letter to the Board of Directors began:

> Dear [CEO of WeWork],
>
> > We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
> >
> > We have received feedback from [Bank-1] and [Brokerage-2] regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
> >
> > We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.

*Id.*

The $9.00 per share price contained in the Letter to the Board of Directors represented a premium of more than $7.89 (more than 700%) over WeWork's closing price of $1.11 per share on November 2, 2023. Indictment ¶ 20. At $9.00 per share price, it would have cost approximately

$77 million to acquire 51% of all the outstanding shares owned by minority shareholders of WeWork. *Id.*[3]

After sending the Letter to the Board of Directors, on November 3, 2023, the defendant sent an email to an SEC email address with the subject line "WeWork Schedule TO."[4] Indictment ¶ 21. In the document identified as a Schedule TO attached to the email, the defendant included a press release titled "Cole Capital Funds, LLC Proposes to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per Share in Cash." *Id.*[5] The press release in the purported WeWork Schedule TO included the text of the Letter to the Board of Directors. *Id.*

Thereafter, on November 3, the defendant submitted a draft press release to the EIN PressWire. Indictment ¶ 22. While on the call, which was recorded, the defendant received an email from EIN PressWire stating that his draft press release was not in the proper format and that the defendant needed to reformat and re-submit the press release for editorial approval. *Id.* The defendant then told the EIN PressWire representative on the phone, "since it is a legal document it has to go out in a certain form" and that "due to the nature of it being a tender offer it needs to go in the form that I sent it." *Id.* The EIN PressWire representative advised the defendant to reach out directly to the editorial department to discuss the format. *Id.* The defendant then asked to be

---

[3] According to a Schedule 13D filed on November 1, 2023, WeWork had approximately 52,758,760 shares of Class A Common Stock outstanding and affiliates of SoftBank, a Japanese investment holding company, were holders of record of approximately 35,931,215 shares (or approximately 68.1 %), as of October 30, 2023. Accordingly, there were approximately 16,827,545 minority shares as of October 30, 2023. At $9 per share, it would have cost the defendant approximately $77 million to acquire 51% of all the outstanding shares owned by minority shareholders (8,582,048 shares).

[4] A Schedule TO is a form required to be filed with the SEC by a person who intends to make a tender offer for the purchase of securities of a public company, where the tender offer would result in the purchaser acquiring more than 5% of a class of securities issued by that public company. *See* 17 C.F.R. § 240.14d-100.

[5] The defendant's Schedule TO acknowledged the value of his purported tender offer: "This proposal represents a $7.89 per share premium over the closing price of WeWork Common Stock on November 2, 2023, the last trading day prior to this announcement, with a total equity value of approximately $77.25 million."

transferred to someone in that department "because this is very time sensitive." *Id.* When told that he should contact the editorial department by email, the defendant reiterated that "this is very time sensitive such that it has to do with the stock." *Id.* The EIN PressWire representative then agreed to escalate the matter to a supervisor. *Id.*

About an hour later, on November 3, 2023, a supervisor at EIN PressWire called the defendant. Indictment ¶ 23. During the call, which was recorded, the defendant reiterated that the press release "needs to get out right now." *Id.* The supervisor then instructed the defendant to rework the draft in a typical press release format. *Id.* The defendant reiterated again: "This is time sensitive." *Id.*

On November 3, 2023, at approximately 12:00 p.m. EDT, the defendant resubmitted another draft press release to EIN PressWire, which was approved by EIN PressWire and distributed to various outlets about 25 minutes later. Indictment ¶ 24. The press release issued by EIN Press Wire, however, failed to gain sufficient traction. Accordingly, the defendant took steps to have another press release dissemination service—Business Wire—distribute the press release, which occurred at approximately 5:12 p.m., after the market had closed.

In the meantime, on November 3, 2023, at approximately 4:00 p.m. EDT, WeWork's share price closed at $0.83 per share. Indictment ¶ 25. At that point, the options purchased by the defendant with a November 3, 2023 expiration date (more than 70,000 of his 72,846 options), on which he had spent approximately $375,000 for the ability to purchase more than 7 million shares of WeWork stock, expired, still out of the money and worthless. *Id.*

On November 3, 2023, at approximately 5:12 p.m. EDT, outlets began publishing a press release distributed by Business Wire titled, "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash" (the "Press Release"). Indictment ¶ 26. The Press Release stated, among other things:

> Cole Capital Funds sent the following letter to the Board of
> Directors of WeWork, Inc.
>
> We believe that it is in the best interest of WeWork to support our
> acquisition of 51% of all the outstanding shares owned by minority
> shareholders at a price of $9.00 per share and provide Cole with
> proper representation on the company board.
>
> We have received feedback from City National Bank and JP Morgan
> regarding the financing for this acquisition and expect to select a
> lender and have a financing commitment prior to execution of a
> definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to
> assist us with this transaction. We stand ready to proceed timely.
>
> . . .
>
> Cole Capital Funds, LLC www.colecapitalfunds.com is an
> investment company headquartered in Phoenix Arizona. Cole
> focuses on investing in, and acquiring companies and properties
> where significant shareholder value can be realized due to
> undervalued share price as a result of slow development progress,
> management issues, or outside share pressure . . . .

*Id.* The Press Release did not disclose that neither Cole Capital nor the defendant had the intent or ability to consummate the announced tender offer, that Cole Capital was a company with no business operations that the defendant had created only four weeks before the publication of the Press Release, that the defendant was the CEO and principal of Cole Capital, or that the defendant had purchased a significant block of WeWork securities in the two days before the publication of the Press Release. *Id.*

The Press Release contained false and misleading statements. Indictment ¶ 27. For example, the statement in the Press Release, "We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement," was false and misleading. *Id.* In fact, the defendant had received no such "feedback" and did not expect to have a financing

commitment prior to execution of a definitive agreement for the $77 million transaction announced in the Press Release. *Id.*

As to City National Bank, the defendant was a delinquent lending customer. Indictment ¶ 27(a). As of October 15, 2023, the defendant owed City National Bank more than $5.2 million in outstanding principal on two loans and owed City National Bank overdue payments on both. *Id.*

As to JP Morgan, the defendant communicated with an investment advisor at a JP Morgan Chase retail branch (the "Retail Advisor") in connection with the defendant's opening of his JP Morgan trading account. Indictment ¶ 27(b). On October 27, 2023, the defendant emailed the Retail Advisor and asked, "If I have $100 Million of NYSE traded stock in the account how much can you lend on it?" *Id* In response on October 30 and 31, 2023, the Retail Advisor responded, in substance, that JP Morgan could lend at 50% of NYSE-listed securities at a specified rate, but that JP Morgan would need to examine a list of the defendant's proposed assets. *Id*. The defendant never provided such a list and never mentioned to the Retail Advisor that either he or Cole Capital were planning any kind of tender offer for WeWork stock, let alone the $77 million transaction contemplated by the Press Release. *Id.*

Within one minute of the Press Release's publication on November 3, 2023, at approximately 5:12 p.m. EDT, WeWork's stock price jumped in after-hours trading from $.85 to $1.45 and continued to rise, reaching a high of $2.14 at approximately 5:31 p.m. EDT on November 3, 2023. Indictment ¶ 28. Later that evening, outlets began rescinding the Press Release. WeWork's stock price declined and closed at $1.18 at the end of after-hours trading at 8:00 p.m. EDT on November 3, 2023. *Id.*

On November 6, 2023, WeWork filed for Chapter 11 bankruptcy protection and the trading of its shares was suspended on the NYSE. Indictment ¶ 29. On November 10, 2023, the defendant's remaining WeWork call options expired out of the money and worthless. Indictment ¶ 30.

13

# ARGUMENT

**I.  The Court Should Admit Certain Evidence as Direct Evidence of the Charged Crimes, or, in the Alternative, under Federal Rule of Evidence 404(b).**

On July 15, 2024, the Government sent defense counsel a detailed, seven-page notice of certain evidence that it may introduce at trial as direct evidence of the charged crimes or, alternatively, as evidence pursuant to Federal Rule of Evidence 404(b). The Government's notice indicated its intent to introduce at trial:

1. Evidence that the defendant lied to a representative of City National Bank on November 2, 2023 about his plans to announce a fraudulent tender offer for WeWork stock on November 3, 2023.

2. Evidence that the defendant lied under oath about funds he received from the sale of a plane and then used to purchase WeWork securities in furtherance of his fraudulent scheme.

3. Evidence that the defendant did not have the ability to purchase the $77 million of WeWork shares contemplated by his fraudulent tender offer on November 3, 2023 when he did not have $1.2 million to purge a contempt finding on November 17, 2023.

4.  Evidence that the defendant infringed the real Cole Capital's trademarks.

5. Evidence that the defendant could not reasonably have believed that banks or other legitimate sources of financing would have lent him $77 million to buy WeWork stock when there were publicly accessible allegations at the time of his fraudulent offer that investors from his prior venture, Arciterra, had not been paid for years and that he was under investigation by the SEC.

In response, on July 19, 2024, the defendant informed the Government he "object[ed] to the entirety of the evidence identified in" the Government's July 15, 2023 notice.

## A.  Applicable Law

### 1.  Other Acts Evidence as Intrinsic or Direct Proof

If evidence is relevant to a charged offense, it is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it

would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

If evidence is admissible as direct evidence, it is not "subject to consideration under Rule 404(b) at all." *United States v. Halak*, 78 F. App'x 758, 760 (2d Cir. 2003). Evidence of uncharged bad acts is admissible as direct evidence "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (citation and internal quotation marks omitted); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Even if the evidence does not directly establish an element of the offense charged, it can be admitted "in order to provide background for the events alleged in the indictment." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation omitted). "In particular, evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (citations omitted); *see also United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.").

The Second Circuit has repeatedly affirmed the admissibility of similar act evidence as direct proof of a charged offense. *See, e.g.*, *United States v. Graham*, 51 F.4th 67, 82-83 (2d Cir. 2022) (following mortgage discharge fraud scheme conviction, affirming district court's admission, as direct evidence, of subsequent credit repair scheme defendant engaged in with a victim because it tended to show conduct that was intertwined with the charged fraud), *cert. pet.*

*docketed on other grounds* (U.S. Mar. 8, 2023); *Hsu*, 669 F.3d at 118-19 (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence and necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous with the charged conduct, in which he discussed uncharged crimes related to prostitution and trafficking); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct); *United States v. Kaiser*, 609 F.3d 556, 571 (2d Cir. 2010) (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had carry-over effects during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *Roldan-Zapata*, 916 F.2d at 804 (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).

## 2. Other Acts Evidence Pursuant to Rule 404(b)

The Federal Rules of Evidence provide, in relevant part, that: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular

occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Evidence of uncharged crimes, wrongs, or other acts is admissible under Rule 404(b) as long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) if requested, is admitted with limiting instructions to the jury. *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992).

The Second Circuit "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (quoting *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996)); *see also United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013). Any "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

Prior conduct offered on the issue of the defendant's knowledge and intent is relevant and admissible when there is similarity between the prior conduct and the charged conduct. *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987) (holding that a prior act is probative of knowledge if it is sufficiently similar "to permit the jury reasonably to draw from that act the knowledge inference advocated by the

proponent of the evidence"). "Where only knowledge or intent is in issue, the similarity requirement is simply a rule of relevance." *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996); *see also United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) (citing Federal Rule of Evidence 401 as test for similarity where other acts evidence is used to prove knowledge and intent). A defendant's knowledge and intent are at issue unless the defendant has expressed with sufficient clarity a decision not to dispute that element of the offense. *See United States v. Colon*, 880 F.2d 650, 656–57 (2d Cir. 1989); *Pitre*, 960 F.2d at 1119.

Finally, it is proper for a trial court to admit "other crimes, wrongs, or acts" evidence if it helps to prove the existence of a common scheme or plan. *See* Fed. R. Evid. 404(b) (establishing that "[e]vidence of any other crime, wrong, or act . . . may be admissible" to prove a "plan"); *United States v. Reed*, 639 F.2d 896, 906 (2d Cir. 1981) ("[E]vidence of the [other] transactions was . . . admissible to show a common scheme or plan."); *see also United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir. 1978) ("The rubric of scheme or plan has been used to cover a multitude of particular situations, which do not fall into simple categories.").

### 3. Rule 403 and Evidence of Other Bad Acts

Regardless of whether the evidence is admitted as direct evidence or as other acts evidence under Rule 404(b), the evidence is, like all other evidence, admissible under Federal Rule of Evidence 403 if its probative value is not substantially outweighed by the danger of unfair prejudice. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Other

crimes evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *Roldan-Zapata*, 916 F.2d at 804; *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]"); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." (citation and internal quotation marks omitted)). The fact that evidence may be "damning" does not render it inadmissible. *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972).

To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crime charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions.").

### B. Discussion

#### 1. The Court Should Admit Evidence that Larmore Lied to a Representative of City National Bank About His Plans to Announce a Fraudulent Tender Offer for WeWork Stock.

On November 2, 2023, Larmore lied to a representative of City National Bank on recorded phone calls about his plans to announce a fraudulent tender offer for WeWork stock the following day. On November 2, 2023, Larmore directed the representative to purchase on his behalf $50,000 worth of WeWork call options with November 3, 2023 expiration dates—precisely the

type of WeWork securities that Larmore was able to successfully purchase through five other brokerages in furtherance of his fraudulent scheme. *See* Indictment ¶ 15. The City National Bank representative, however, was not able to fulfill Larmore's order. The representative apologized to Larmore for the inconvenience and, in response, Larmore stated, "Well it's more than an inconvenience, it's a huge, huge loss." The representative then asked, "I mean, did you have any insider information on that?" and Larmore responded, "No." The representative then stated, "It sounds like you have some information that we're not privy to," to which, Larmore responded, "I do not."[6]

Larmore's denials to the City National Bank representative were fabricated. Contrary to his representations, Larmore had information that City National Bank was "not privy to" regarding anticipated movements in WeWork's share price the following day, namely, that he would be announcing a fraudulent tender offer by Cole Capital for WeWork stock that was intended to drive up the price of WeWork shares. He had precisely the kind of "insider information" and "information that [City National Bank was] not privy to" that the City National Bank representative was asking about. Indeed, Larmore's suggestion that he was somehow going to suffer a "huge, huge loss" because of his inability to purchase a significant block of out-of-the-money WeWork call options that were set to expire the following day would make sense only if Larmore expected WeWork's share price to dramatically increase in the next day based on information that the market lacked.

The Court should admit evidence of Larmore's statements to the City National Bank representative, including recordings of Larmore's calls with the representative, as direct

---

[6] For the purposes of this analysis, it does not matter whether Larmore's trading would have qualified as insider trading in violation of SEC Rule 10b-5. The relevant fact is that the City National Bank representative asked Larmore a factual question – whether he had "some information that [the bank was not] privy to," and Larmore responded falsely that he did not.

evidence of the charged offenses. To start, Larmore made the statements during and in furtherance of the charged scheme to defraud—i.e., during his efforts to amass out-of-the-money WeWork call options that he hoped would skyrocket in value after he announced his fraudulent tender offer the next day. Accordingly, Larmore's statements to the City National Bank representative "arose out of the same transaction or series of transactions as the charged offense" and are "inextricably intertwined with the evidence regarding the charged offense." *Hsu*, 669 F.3d at 118. The evidence is also relevant to Larmore's intent to defraud, an element of criminal violations of the securities laws, *see United States v. Afriyie*, 929 F.3d 63, 68 (2d Cir. 2019), including on the basis that Larmore's false and misleading statements provide proof of Larmore's consciousness of guilt with respect to the charged offenses. The evidence shows that Larmore knew that his purchases of WeWork securities were improper and in furtherance of a fraudulent scheme and, for that reason, he sought to conceal them from scrutiny. Finally, the evidence undermines any suggestion that Larmore's purported tender offer was made in "good faith" – that is, that Larmore "held an honest belief that his acts were proper and not in furtherance of any unlawful scheme." *Afriyie*, 929 F.3d at 68. Put simply, if Larmore "held an honest belief" that his plans to launch a tender offer "were proper and not in furtherance of any unlawful scheme," he would not have concealed that information from the City National Bank representative when asked if he had any "insider information" or "information that [City National Bank was] not privy to."

Alternatively, and for similar reasons, this evidence is admissible under Rule 404(b) as evidence of Larmore's intent, knowledge, and plan. As discussed, it is probative of Larmore's intent to defraud through his fraudulent tender offer, his knowledge that his efforts were not proper and in furtherance of a scheme to defraud, and his plan to accumulate as many WeWork call options as possible in advance of his fraudulent tender offer.

**2. The Court Should Admit Evidence that Larmore Lied Under Oath About Funds He Used to Purchase WeWork Securities in Furtherance of His Fraudulent Scheme.**

In 2005, Larmore founded and became the Chief Executive Officer of Arciterra Group, LLC, a real estate and management company headquartered in Phoenix, Arizona, which was the predecessor to Arciterra Companies LLC, formed in 2007. According to its LinkedIn page, Arciterra has "created 19 investment offerings, raised approximately $187 million in capital and owns approximately 83 properties in 26 states."

On August 18, 2023, Larmore sold a Gulfstream G400 airplane that he owned through an entity called JML BC G400, LLC for a purchase price of $10.2 million. The net proceeds from the sale due to Larmore—after accounting for amounts due to creditors and others with interests in the sale proceeds—were $1,237,112.88 ("the Plane Proceeds"). On August 18, 2023, the closing agent for the sale wired the Plane Proceeds to a bank account in the name of Arciterra Companies, LLC (the "Arciterra Account"). Then, on August 21, 2023, every penny of the Plane Proceeds were wired, at Larmore's direction, from the Arciterra Account to a bank account that Larmore controlled in the name of JMMAL Investment, LLC, and further wired later that day to a bank account in Larmore's own name at Park National Bank (the "Larmore Bank Account"), which, at that time, had a balance of only $52,555.52.

Records from the Larmore Bank Account indicate that, from August 21, 2023 through November 1, 2023, Larmore spent all the Plane Proceeds and other funds, as follows:

- $620,000 wired to trading accounts in Larmore's name at seven brokerage firms (TDAmeritrade, JP Morgan, Apex, WeBull, TradeStation, Fidelity, and City National Bank), from September 12, 2023 to November 1, 2023.[7] This money was then used by Larmore to purchase WeWork stock and options.

---

[7] Larmore also wired an additional $75,000 to an eighth brokerage firm (InterActive Brokers) on October 27, 2023, but it was returned on November 1, 2023.

- $200,000 wired to a bank account in the name of Arciterra Companies, LLC, on August 25, 2023.

- $180,000 wired to a bank account in the name of Kevin P. Cochran (the father of Larmore's fiancée), on August 21, 2023.[8]

- $100,00 wired to a bank account in the name of B. Lane Halser, on August 25, 2023.

- $75,000 lost as a deposit to Pier One Yacht Sales, in connection with Larmore's offer to buy a 44-foot Inter Marine yacht called the "Princess Anna" for more than $5 million.

- $55,000 to charter a 76-foot San Lorenzo yacht called the "Quarentena," on October 31, 2023. Larmore was on this yacht on November 1 through November 3, when he purchased his WeWork options and shares and when he launched the fraudulent tender offer.

- $50,000 to a private charter jet company, on September 7, 2023.

- $18,435 in college tuition for Larmore's son, on September 8, 2023.

- $500 in incoming and outgoing wire fees.

All 72,846 of the WeWork call options and 65,789 of the 343,641 WeWork shares that Larmore purchased on November 1 and 2, 2023, in furtherance of his fraudulent scheme, *see* Indictment ¶¶ 10-16, were purchased with funds identified in the first bullet above.

On October 10, 2023, a receiver for Arciterra Companies, LLC filed a motion for contempt and return of the Plane Proceeds to Arciterra Companies, LLC in Indiana state court. A hearing on the receiver's contempt motion was held on November 13, 2023.

At the contempt hearing, Larmore lied under oath about how he spent the Plane Proceeds. He testified on cross-examination, in relevant part, as follows:

> Q. With respect to the money that was transferred from Arciterra Companies, LLC to JMMAL Investment, LLC [i.e., the Plane Proceeds], where is that money currently?
>
> A. It has been spent.

---

[8] According to Larmore's fiancée, Larmore purchased a used 2021 Cadillac Escalade from her father, and this $180,000 was payment for that used vehicle.

Q. Okay. What was it spent on?

A. Living expenses and providing money to the company for hiring attorneys and operating expenses.

Q. Okay. What company were the funds provided to?

A. I provided them to Dan DeCarlo. He—you would have to—he handled it from there.

….

Q. How much of the 1.2 and change was given to Dan DeCarlo as opposed to you for living expenses?

A. My recollection is $250,000.

Q. 250,000 was given to Dan DeCarlo, and the remaining approximately million dollars went to living expenses?

A. Correct.
….

Q. So the remainder that didn't go back to the business, that million dollars was spent on living expenses. It's November now, so from August, September, October, into November, maybe three and a half months or so, you spent a million dollars on living expenses?

A. Living expenses, perhaps debt. I have not reconciled or looked at an accounting of what the money was spent on.

Larmore did not spend the Plane Proceeds on "living expenses" or "debt." As set forth above, the defendant spent half of the Plane Proceeds funding investment accounts to purchase tens of thousands of WeWork securities just days before the contempt hearing. In addition, he also spent hundreds of thousands of dollars on family members, yachts, and private planes.

The Court should admit evidence of: i) Larmore's sworn statements about the Plane Proceeds, including excerpts from the transcript of his contempt hearing testimony; ii) an affidavit that Larmore submitted in advance of the hearing; and iii) bank records which contradict his testimony, as direct evidence of the charged offenses. Like Larmore's lies to the City National

24

representative, his statements about the Plane Proceeds are relevant to his intent to defraud and to his lack of good faith, including on the basis that Larmore's false and misleading statements provide proof of Larmore's consciousness of guilt with respect to the charged offenses. Larmore lied about his use of the Plane Proceeds because he knew the truth—that he used a sizeable chunk of the Plane Proceeds to buy WeWork securities—was improper and in furtherance of a fraudulent scheme and, for that reason, sought to conceal them from scrutiny. If he honestly believed that his purchases of WeWork securities with the Plane Proceeds were proper, he would have truthfully answered the questions about the Plane Proceeds at the hearing, rather than perjuring himself.

Alternatively, and for similar reasons, this evidence is admissible under Rule 404(b) as evidence of Larmore's intent and knowledge. As discussed, it is probative of Larmore's intent to defraud through his fraudulent tender offer, and his knowledge that his efforts were not proper and in furtherance of a scheme to defraud.

### 3. The Court Should Admit Evidence that Larmore Could Not Afford to Return the Plane Proceeds and Purge a Contempt Order Against Him As Further Proof of His Financial State.

The Government intends to offer at trial proof that the defendant was not in a financial position to fund his fraudulent $77 million tender offer. As further proof of the defendant's meagre assets, the Government asks the Court to admit at trial proof that at the conclusion of the contempt hearing described above, the defendant was held in contempt and had to borrow money from his mother to purge the contempt order.

The defendant's financial condition and, more specifically, whether he had the means to purchase the $77 million of WeWork shares contemplated by his fraudulent tender offer, will be an important issue at trial. The Government expects to present evidence that the defendant did not have the financial means to fund the tender offer he had extended as proof of that offer's falsity, as well as proof of the defendant's intent to defraud, his lack of good

faith, and his motive to make money from his fraudulent market manipulation scheme. For example, Cole Capital—the entity Larmore created as the vehicle for his fraudulent tender offer—is now in receivership, and the Government expects that a witness involved in that receivership will testify that Cole Capital had no assets, no bank accounts, no employees, no investors, and no genuine business operations at all. As for Larmore's personal assets, he had less than $6,000 in the Larmore Bank Account, described above, on November 3, 2023, the day of his fraudulent tender offer. He had also been charging most of his living expenses to his Arciterra corporate American Express card, racking up close to $200,000 in charges in the month leading up to the fraudulent tender offer. In addition, Larmore fell behind on repayments for multiple loans. As noted above, as of October 15, 2023, Larmore owed City National Bank more than $5.2 million in outstanding principal on two loans and owed City National Bank overdue payments on both. Indictment ¶ 27(a). Furthermore, as Larmore admitted in a text message on October 16, 2023, "2023 ha[d] been a crazy year" for him as he was, among other things, "getting divorced" and "losing most of [his] assets."

Moreover, at the conclusion of the November 13, 2023 contempt hearing described above, the Honorable Jonathan M. Brown of the Superior Court of Hamilton County granted the receiver's motion for contempt and ordered the defendant to return the Plane Proceeds to the receiver. Judge Brown did so after advising Larmore while he was still on the witness stand, "I'm having trouble believing you right now" and the "Court of Appeals is going to know that I have trouble right now with your credibility."

On November 15, 2023, Judge Brown issued a written order giving Larmore until November 17, 2023, to purge his contempt by returning the Plane Proceeds. Larmore, however, did not have sufficient funds to return the Plane Proceeds. Consequently, he

borrowed the money from his mother to do so, as reflected in a November 16, 2023 letter that Larmore forwarded to counsel for the Indiana receiver.

Accordingly, evidence that Larmore lacked the financial means to return the Plane Proceeds and purge the contempt order on his own is direct evidence of Larmore's motive to manipulate the stock price of WeWork through his fraudulent tender offer and drive up the value of his newly acquired WeWork securities—*i.e.*, to remedy his dire financial situation. It is also direct evidence of Larmore's inability to purchase the $77 million of WeWork shares contemplated by his fraudulent tender offer, which itself shows that Larmore's offer was not made in good faith but rather was made with the intent to defraud. For similar reasons, this evidence is admissible as evidence of intent, knowledge, and plan pursuant to Rule 404(b).

### 4. The Court Should Admit Evidence that Larmore Infringed Trademarks Held By the Real Cole Capital.

As part of his fraudulent scheme, Larmore hired a designer to create a website for Cole Capital: www.colecapitalfunds.com ("the Domain Name"). *See* Indictment ¶ 9. On the Cole Capital website, Larmore touted his connections to Christopher H. Cole, a real estate investor, and his companies, Cole Companies, where Larmore previously worked. For example, the Cole Capital website created at Larmore's direction stated: "Cole Capital Funds' roots trace back to the high standards established in 1979 when Christopher H. Cole founded Cole Companies. Larmore joined the organization in 1996 acquiring multiple assets as the organization evolved and expanded." The website also included the following logo for Cole Capital:



On November 29, 2023, Larmore received a cease-and-desist letter from legal counsel to the successor to the Cole Companies, CCO Group, LLC (the "Real Cole Capital"). The letter informed the defendant that he was infringing the Real Cole Capital's registered trademark on the name "Cole Capital" and its registered trademark on a logo with the same name. Larmore's infringing logo and the Real Cole Capital's protected trademark are included below:

| Larmore's Infringing Logo | Real Cole Capital's Protected Trademark |
| --- | --- |
|  |  |

The letter made clear that the Real Cole Capital is not associated with Cole Capital and does not endorse Cole Capital or Cole Capital's use of its protected trademarks in any way. Larmore did not contest or respond to the cease-and-desist letter.

On January 8, 2024, the Real Cole Capital initiated arbitration proceedings against the defendant to have the Domain Name transferred from Larmore to the Real Cole Capital. Larmore was served with the Real Cole Capital's complaint, but did not respond or otherwise participate in the arbitration proceedings. On January 30, 2024, an arbitration panel found that: (1) the Domain Name is confusingly similar to the Real Cole Capital's protected trademark; (2) Larmore lacked

rights or legitimate interests in the Domain Name; and (3) Larmore registered and used the Domain Name in bad faith.[9]

The Court should admit evidence relating to Larmore's misuse of the Real Cole Capital's trademarks as direct evidence of the falsity of Larmore's representations about Cole Capital, his intent to defraud, and his lack of good faith, or, alternatively, as evidence of his intent, knowledge, and plan pursuant to Rule 404(b). Such evidence will include images of and testimony about the Real Cole Capital's trademarks and the Cole Capital logo, testimony and records about the Real Cole Capital's lack of association with and endorsement of Cole Capital, as well as the cease-and-desist letter and arbitration decision described above. Such evidence tends to show that Larmore intended to defraud investors into buying WeWork shares in response to Cole Capital's fraudulent tender offer by, in part, defrauding them into believing that Cole Capital was a legitimate real estate investment company associated with Christopher H. Cole and the Cole Companies. In addition, evidence that Larmore made no effort to defend the legitimacy of Cole Capital in response to the Real Cole Capital's cease-and-desist letter or in the resulting arbitration proceedings also tends to show that Cole Capital "had no genuine business operations," Indictment ¶ 10, and was merely a sham company that Larmore used as a vehicle for his fraud.

### 5. The Court Should Admit Limited Evidence of Public Allegations that, at the Time of the Fraudulent Tender Offer, Arciterra Investors Had Not Been Paid for Years and Larmore Was Under Investigation by the SEC, Not for their Truth, But As Evidence of the Defendant's State of Mind.

On May 30, 2023, Bloomberg published an article about Larmore titled, "Strip Mall Owner Accused of Using Investor Cash for Private Jets." The Bloomberg article describes

---

[9] The arbitration panel's decision is publicly available. *See* CCO Group, LLC v. J.Moynahan Larmore / Cole Capital, Claim No. FA2401002078079, Jan. 30, 2024 https://www.adrforum.com/DomainDecisions/2078079.htm (last visited August 13, 2024).

a lawsuit that certain Arciterra investors filed against Larmore in Illinois federal court. As relevant here, the article notes that, according to the allegations in the Illinois lawsuit as well as filings in Larmore's divorce proceedings, (1) "none of the more than 2,000 investors in Arciterra offerings have received payments since 2019," and (2) "there appears to be some sort of SEC investigation in process, potentially against the entities or Jon."[10]

As noted above, an important issue at trial will be whether Larmore had the means to buy the $77 million worth of WeWork stock contemplated by his purported tender offer. An important related issue will be whether Larmore had the reasonable belief that he could obtain the means to purchase the WeWork stock contemplated by his offer in the future, for example, by borrowing the money or raising it from outside investors. *See* Indictment ¶ 31; *see also* 17 C.F.R. § 240.14e-8(c) (one prong of Count One requires proof that the defendant did "not have the reasonable belief that [he would] have the means to purchase securities to complete the offer"). With respect to that issue, the Government intends to introduce the public allegations described above about Larmore as direct evidence of Larmore's state of mind or, alternatively, as evidence of his intent, knowledge, and plan pursuant to Rule 404(b). To be clear, the Government does not seek to offer the allegations for their truth. Rather, the Government intends to offer the allegations for the fact that they were public at the time of Larmore's fraudulent scheme. More specifically, at the time of his fraudulent tender offer, Larmore could not have reasonably believed that banks or other legitimate sources of financing would have lent him $77 million to buy WeWork stock when there were publicly accessible allegations of (1) investors from

---

[10] Other news outlets also published stories about the lawsuit and the Bloomberg article. See, e.g., the Real Deal, "Arciterra Head Accused on Mismanaging Investor Money," June 4, 2023, *available at* https://therealdeal.com/national/2023/06/04/arciterra-head-accused-of-mismanaging-investor-money/.

On October 3, 2023, after Larmore and the other defendants moved to dismiss for lack of personal jurisdiction, the plaintiffs in the Illinois lawsuit voluntarily dismissed their claims without prejudice.

Larmore's prior venture, Arciterra, not being paid since 2019 and suffering losses, and (2) an SEC investigation into Larmore.

To mitigate the risk of any unfair prejudice, the Government would agree to a stipulation or redactions that remove some of the more sensational details in the public reporting, such as claims that Larmore spent extravagant amounts of money on a birthday party for his dog, Spike. The key public allegations that go to the reasonableness of Larmore's belief that he could raise $77 million from lenders and/or investors are (1) that "none of the more than 2,000 investors in Arciterra offerings have received payments since 2019," and (2) there appeared to be an SEC investigation into Larmore (which there was) at the time of his fraudulent tender offer. To further mitigate any perceived risk of unfair prejudice, Larmore may ask the Court (with no objection from the Government) for a limiting instruction that makes clear to the jury the limited purpose for which they may consider this evidence, and that further reminds the jury that the defendant is only on trial for the crimes alleged in the Indictment and no others.

II.     **The Court Should Allow Cross-Examination of the Defendant, Should He Choose to Testify, About His Misappropriation of Arciterra Investor Funds under Rule 608(b).**

A.  **Relevant Facts**

On November 28, 2023, the SEC filed a civil complaint against Larmore in the District of Arizona. *See* Complaint, *SEC v. Larmore et al.*, 23 Civ. 2470 (DWL) (D. Ariz.) (Doc No. 1) (the "SEC Complaint"). The SEC Complaint includes claims against Larmore for investment adviser fraud, securities fraud, and tender offer fraud related to his misappropriation of Arciterra investor funds and the fraudulent tender offer scheme that later became the basis for the charges in the Indictment. *Id.*

According to the SEC's complaint, over the years, Arciterra has managed over a hundred related entities. Two entities Arciterra managed are private real estate investment funds called

ArciTerra Note Fund II, LLC ("Fund II") and ArciTerra Note Fund III, LLC ("Fund III"). From 2006 to 2009, the defendant and Arciterra raised approximately $45 million from approximately 1,045 investors for these two private funds, to which Larmore owed fiduciary duties as an investment adviser. SEC Complaint ¶ 2. Larmore, through his control of Arciterra, made the ultimate decisions regarding the use of the amounts raised from both investor funds, including the acquisition and sale of real properties, investments in securities, and use of tenant proceeds.

The SEC alleges that, from at least 2017 through 2023, Larmore was engaged in a scheme by which he misappropriated approximately $17 million from the funds' holdings to pay for other cash needs of his businesses, and to fund his lavish lifestyle of private jets, yachts, and expensive residences. Larmore siphoned money from the funds by transferring the money in those funds to accounts of various Arciterra entities, then commingling the money with proceeds from other businesses, and finally funneling the money to his own accounts or using it for his own personal expenses. *See* SEC Complaint ¶¶ 3, 37, 40, 44

### B. Applicable Law

Federal Rule of Evidence 608(b) prohibits the admission of extrinsic evidence to "prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of" the witness. Fed. R. Evid. 608(b). "[T]heft crimes, and other crimes involving stealth" do "bear on a witness's propensity to testify truthfully." *United States v. Estrada*, 430 F.3d 606, 621 (2d Cir. 2005).

### C. Discussion

If Larmore chooses to testify, the Court should permit the Government to inquire into Larmore's misappropriation of Arciterra funds because such misappropriation goes directly to his "character for truthfulness or untruthfulness." *See United States v. Jackson*, 882 F.2d 1444, 1448

(9th Cir. 1989) (permitting prosecution to ask defendant, a disbarred attorney, on cross-examination about his misappropriation of client funds under Rule 608(b)). Larmore's theft involved the stealthy diversion of Arciterra assets to a host of entities and accounts that Larmore controlled in violation of his fiduciary duties. This kind of misconduct falls in the heartland of acts that are probative of character for untruthfulness.

The Government's request is a narrow one. It is not seeking to affirmatively admit evidence of Larmore's Arciterra fraud as direct evidence of the charged crimes or as other acts evidence under Rule 404(b). It is merely seeking to inquire about the fraud, if Larmore chooses to testify, on cross-examination under Rule 608(b). As a result, the Government will be subject to Rule 608(b)'s restriction on the use of extrinsic evidence. *See United States v. Masino*, 275 F.2d 129, 133 (2d Cir. 1960) ("When a witness is cross-examined for the purpose of destroying his credibility by proof of specific acts of misconduct not the subject of a conviction, the examiner must be content with the answer. The examiner may not, over objection, produce independent proof to show the falsity of such an answer."). This limitation will "prohibit things from getting too far afield—to prevent the proverbial trial within a trial." *United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993). Furthermore, here too the defendant may ask for a limiting instruction that makes clear to the jury the limited purpose for which they may consider this testimony, and that the defendant is not on trial for the Arciterra fraud.

## III.   The Court Should Preclude Evidence or Mention of the Length of the Government's Investigation or the Timing of the Indictment in Relation to Litigation Brought by the SEC against the Defendant.

In the SEC action, Larmore has made baseless claims about the timing of and motives behind the Government's charging decision in this case. Such claims are categorically false and, more to the point, have no place before the jury.

As discussed above, on November 28, 2023, the SEC filed a civil complaint against Larmore in the District of Arizona. SEC Dkt. 1. On December 21, 2023, the Honorable Douglas L. Rayes of the District of Arizona entered orders—with Larmore's consent—appointing a temporary receiver—Allen D. Applbaum— for various Arciterra entities as well as Cole Capital (the "Receiver") and temporarily freezing Larmore's assets. SEC Dkt. 77 & 78. A preliminary injunction hearing was scheduled for February 27, 2024 and later adjourned to May 5, 2024. SEC Dkt. 75 & 94.

On March 8, 2024, Larmore filed an "emergency" motion to partially modify the temporary receivership order and asset freeze. SEC Dkt. 99. In his motion, Larmore argued, among things, that the temporary pretrial restraints to which he had previously consented were, in fact, "overbroad" and should be lifted. *Id.* That same day, Judge Rayes ordered the SEC to respond to Larmore's motion by March 13, 2024 and scheduled a telephonic conference on the motion for March 11, 2024 "to discuss a hearing date and the parameters of the hearing (i.e., whether the hearing will be an evidentiary hearing or solely oral argument)." SEC Dkt. 99.

On March 12, 2024, the grand jury returned the Indictment in this case.

On March 19, 2024, Larmore filed a status report about his ongoing efforts to obtain living expenses and attorneys' fees from the Receiver. SEC Dkt. 112.[11] In his status report, Larmore stated, with respect to Judge Rayes' March 8, 2024 scheduling order: "Upon reviewing the Court's Order, the Defense was under the strong impression that the Court intended to directly consider the well-founded argument that the SEC had improperly sought and obtained a grossly overbroad Receivership and asset freeze." SEC Dkt. 112 at 3. The status report continued:

> The Defense submits that the SEC also saw the writing on the wall the same way, meaning the SEC also thought the Court was on the precipice of unwinding the Receivership and asset freeze to one

---

[11] The defendant's counsel in this case also represents him in the SEC litigation.

degree or another. In order to minimize that damage and attempt to steer the Court back in the SEC's direction through external, unrelated factors, the Defense believes the SEC contacted SDNY, which resulted in the Indictment being issued before a hearing could be held on the Defendant's Emergency Motion. This is not mere conjecture; the Defense team is comprised of former federal prosecutors and a former SEC Enforcement lawyer who recognize how easily the SEC could manipulate the process. It simply cannot be a coincidence that the SEC's case proceeded for almost three months without any mention of DOJ, but then, within days of J. Larmore's Emergency Motion being filed, SDNY miraculously and suddenly indicted J. Larmore.

SEC Dkt. 112 at 4.

The next day, on March 20, 2024, one of the undersigned attorneys for the Government spoke to defense counsel and made clear that the accusations of collusion and "manipulat[ion]" in the status report described above were demonstrably false. On April 12, 2024, Judge Rayes denied the defendant's "emergency" motion. SEC Dkt. 133.

Larmore's outlandish conspiracy theory about the timing of the Indictment and motives of the Government in this case is completely baseless and Larmore has (wisely) refrained from pursuing it before this Court. Regardless, it is well established that the Government's motives or conduct during the prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury. *See United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (finding that defendant's trial arguments involving, inter alia, "invit[ation of] jury nullification by questioning the Government's motives in subpoenaing appellants and prosecuting them for contempt" functioned as a defense "ploy for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial").

Accordingly, any evidence or argument concerning the reasons for, or timing of, Larmore's prosecution is irrelevant to the issues for the jury at trial, and would serve no purpose other than to distract the jury from evidence of Larmore's guilt, or to encourage jury nullification. It therefore should be precluded. *See United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *see generally United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to jurors in the federal courts, to 'render a true verdict *according to the law and the evidence*.' We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." (emphasis in original)); *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the Government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).

## IV. The Court Should Preclude Evidence or Mention of Any Potential Punishment, Including References to the Defendant's "Liberty" or "Freedom" or Requests that the Jury, in Substance, Send the Defendant "Home" or "Back to His Family."

Larmore should be precluded from offering evidence or argument, or otherwise mentioning in any way, any potential punishment he faces if convicted. Where the jury has no role at sentencing—as in this case—the jury "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is for good reason: Argument concerning

punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* As a result, "'[c]ourts have routinely precluded evidence of possible punishment,'" *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (quoting *United States v. Del Rosario*, No. 12 Cr. 81 (KBF), 2012 WL 2354245, at *2 (S.D.N.Y. June 14, 2012)), as well as other "arguments aimed at jury nullification," *Reese*, 933 F. Supp. 2d at 583. Accordingly, in the interest of permitting the jury to reach a verdict untainted by improper considerations, this Court should preclude the defendant from any mention of potential punishment.

The Court should also preclude any attempt to circumvent and undermine this well-settled law through thinly veiled references to potential punishment. For example, the Court should not allow any argument that the defendant's "freedom" or "liberty" is at stake in this case, or that the Government has not produced sufficient evidence to "take away" the defendant's freedom or liberty. Such arguments, to which enterprising defense attorneys sometimes resort, would cause the jury to contemplate the potential punishment of imprisonment. Furthermore, the Court should preclude any suggestion by the defendant that the jury should, in substance, send him "home" or "back to his family" with a verdict of not guilty. Such an argument would wrongfully imply that the defendant is now in custody and would also impermissibly imply that, if the jury returns a verdict of guilty, Larmore will not return home or to his family, but, rather, will be incarcerated. To ensure the integrity of the jury's process, the Court should not only preclude all explicit references to potential punishment, but also any back-door attempts to implant the prospect of punishment in the jury's mind.

**V.    The Court Should Preclude Evidence or Mention of Any Irrelevant and Unfairly Prejudicial Information Surrounding the Defendant's Arrest.**

Larmore should be precluded from putting before the jury any irrelevant and unfairly prejudicial details surrounding his arrest. In his March 19, 2024 status report in the SEC action, Larmore said the following about his arrest:

> J. Larmore's arrest in Florida on the Indictment also raises concerns of abuse, intimidation and excess. In the early morning hours, more than 20 federal law enforcement agents, some of whom were wielding AK-47-like automatic weapons, awakened J. Larmore to arrest him. J. Larmore had complied with all Court Orders, had not missed a single court appearance, or taken any other action to indicate that such a show of force was necessary. Even more telling is the fact that neither the U.S. Attorney's Office in Florida nor SDNY asked for J. Larmore to be held at his initial presentment in Florida.
>
> Rather, J. Larmore was taken from his house in handcuffs with his pregnant fiancée, who is due to give birth on April 18, 2024, standing nearby and driven to a Florida courthouse only to be released a short time later to voluntarily appear in New York on March 18, 2024. A simple phone call from anyone in law enforcement to defense counsel would have avoided this entirely unnecessary set of events and resulted in J. Larmore voluntarily appearing in SDNY to answer the Indictment – as he did on March 18, 2024.

SEC Dkt. 112 at 4.

Evidence of these details about Larmore's arrest would not have "any tendency" to make "a fact of consequence in determining the action" "more or less probable than it would be without the evidence" and, therefore, is not admissible under Rules 401 and 402. For its part, the Government does not intend to elicit any evidence of the defendant's arrest, including any evidence of statements the defendant made to law enforcement after his arrest, in its case-in-chief. Absent a chain-of-custody stipulation with defense counsel, the Government expects to elicit limited testimony about law enforcement's recovery of the defendant's cellphone pursuant to a search

warrant, which occurred shortly after the defendant's arrest, but without mentioning the defendant's arrest itself.

In addition, any probative value of the details of Larmore's arrest (and there is none) would be substantially outweighed by a danger of unfair prejudice under Rule 403. The entirely predictable and impermissible consequence of this evidence would be to inflame the passions of the jury. For that reason as well, the Court should preclude it.

## VI. The Court Should Preclude Evidence or Mention, Without Prior Authorization, of Any Information Relating to Any Personal Factor Unconnected to Guilt or Innocence.

Additionally, the Court should preclude Larmore from offering evidence or argument concerning, or addressing or discussing, his family, health, or conditions of pretrial release. The Government is unaware of any lawful basis for such evidence, and its predictable purpose would be to engender sympathy for the defendant and thereby to encourage a verdict based on irrelevant and impermissible considerations. Larmore should be precluded from mentioning such subjects including in his opening statement, absent a showing, outside the presence of the jury, that such a factor bears on his guilt or innocence. *See, e.g., United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence relating to the defendant's family); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

## <u>CONCLUSION</u>

For the reasons set forth herein, the Court should grant the relief described herein.

Dated:       New York, New York
              August 16, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By: _____
Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys
Southern District of New York