UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
    UNITED STATES OF AMERICA

                - v. -                          24 Cr. 140 (PAE)

    JONATHAN MOYNAHAN LARMORE,

              Defendant.

------------------------------------------------------ x

# THE GOVERNMENT'S REPLY IN FURTHER SUPPORT
# OF ITS MOTIONS *IN LIMINE*

                                                    DAMIAN WILLIAMS
                                                    United States Attorney for the
                                                    Southern District of New York
                                                    26 Federal Plaza
                                                    New York, New York 10278

Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys

**PRELIMINARY STATEMENT**

The Government writes to reply to the defendant's opposition to the Government's motions *in limine* (Dkt. No. 51) ("Def. Op."). At the outset, Larmore does not contest several of the Government's motions *in limine* (Dkt. No. 43) ("Gov't Mot."). Specifically,

- The Government seeks a ruling allowing cross-examination of the defendant, should he choose to testify, about his misappropriation of Arciterra investor funds under Rule 608(b). *See* Gov't Mot. at 31-33. In response, Larmore raises no objection to this line of inquiry. He merely states, "We do not object to the proper use of bad act testimony on cross-examination." Def. Op. at 6. The Court should grant the Government's motion as unopposed.

- The Government seeks a ruling precluding evidence or mention of the length of the Government's investigation or the timing of the Indictment in relation to litigation brought by the SEC against the Defendant. Gov't Mot. 33-36. In response, Larmore makes no effort to argue that such evidence can be or should be admitted. Instead, he disclaims any intention of introducing it. Def. Op. 5. Here too, the Court should grant the Government's motion as unopposed.

- The Government seeks a ruling precluding evidence or mention of any potential punishment, including references to the defendant's "liberty" or "freedom" or requests that the jury, in substance, send the defendant "home" or "back to his family." Gov't Mot. 36-37. In response, Larmore concedes that "reference to the potential consequences of a conviction is prohibited," Def. Op. 6, and he does not take issue with any of the prohibitions the Government seeks, including preclusion of "all explicit references to potential punishment" and also "any back-door attempts to implant the prospect of punishment in the jury's mind," some of which are articulated above. Gov't Mot. 37. Accordingly, the Court should grant the Government's motion as unopposed.

- The Government seeks a ruling precluding evidence or mention of any irrelevant and unfairly prejudicial information surrounding the defendant's arrest. Gov't Mot. 38-39. Larmore does not address this motion at all in his opposition. Thus, the Court should grant the Government's motion as unopposed.

- The Government seeks a ruling precluding evidence or mention, without prior authorization from the Court, of any information relating to any personal factor unconnected to guilt or innocence. Gov't Mot. 39. In response, Larmore has not sought to offer any such evidence. Accordingly, the Court should order that Larmore must seek the Court's authorization before addressing or discussing personal factors, such as Larmore's family, health, or conditions of pretrial release.[1]

---

[1] As argued in the Government's opposition to Larmore's motion *in limine* (*see* Dkt. No. 53 at 4-5), references to Larmore's religious beliefs or faith should likewise be precluded.

1

With respect to those motions the defendant does contest, Larmore's cursory opposition misunderstands much of the Government's proffered evidence and ignores many of the Government's arguments. For the reasons set forth in the Government's motion and herein, the Government's motion should be granted in its entirety.

## ARGUMENT

I. **The Court Should Admit Evidence that Larmore Lied to a Representative of City National Bank About His Plans to Announce a Fraudulent Tender Offer for WeWork Stock.**

The Court should admit Larmore's November 2, 2023, lies to a representative of City National Bank ("City National") on recorded phone calls obfuscating his plans to announce a fraudulent tender offer for WeWork stock the following day. *See* Gov't Mot. 19-21. In his opposition, Larmore argues that the Court should preclude this evidence because its "prejudicial effect" outweighs its relevance. Def. Op. 4. But Larmore confuses the issues in several ways.

First, Larmore argues that his calls with the City National representative are irrelevant because he "did not borrow funds from" City National, and how he "went about seeking funds to purchase his options is irrelevant." Def. Op. 4. Larmore misunderstands the substance of the recorded phone calls. The calls have nothing to do with the manner in which Larmore funded his purchase of options. Instead, the calls capture Larmore's statements when City National was unable to fulfill Larmore's options order. The representative apologized to Larmore for the inconvenience of not being able to fill his options order and, in response, Larmore stated, "Well it's more than an inconvenience, it's a huge, huge loss." The representative then asked, "I mean, did you have any insider information on that?" and Larmore responded, "No." The representative then stated, "It sounds like you have some information that we're not privy to," to which, Larmore responded, "I do not." Larmore's opposition elides the Government's core points about these denials. Contrary to Larmore's characterizations, his statements to the City National

2

representative show that Larmore was extremely focused on obtaining these options, believed that the value of the options would increase as a result of his conduct, and that Larmore knew his purchases of WeWork securities were improper and in furtherance of a fraudulent scheme; for that reason, Larmore sought to forestall scrutiny and mislead the City National representative regarding his intentions. *See* Gov't Mot. 21.

Second, Larmore's argument that he was not an "insider" at WeWork (and thus did not have inside information) is beside the point. As noted in the Government's motion, it is irrelevant whether Larmore's trading would have qualified as insider trading in violation of SEC Rule 10b-5. Gov't Mot. 20 n.6. The relevant fact is that when the City National representative asked Larmore a factual question – whether he had "some information that [the bank was not] privy to" – Larmore responded falsely that he did not, when in fact, Larmore knew that he was planning to publicly announce a tender offer the very next day. And the context underscores the importance of this point: the City National representative was reacting to Larmore's statements indicating that Larmore knew the options would gain value, causing the City National representative to inquire, not whether Larmore was an insider, but, rather, what information Larmore had that could make Larmore so confident about future market events. Larmore's blanket denial is relevant whether or not Larmore was a so-called "insider" of WeWork.

Moreover, Larmore cites no law in support of his apparent premise that dishonest conduct undertaken in furtherance of the charged scheme is not relevant unless there is a specific charge directed at that dishonest conduct alone. *See* Def. Op. 4 ("But Mr. Larmore is not charged with lying to the Bank, or of possessing inside information."). Larmore is certainly entitled to present evidence or argument that he did not lie to the City National representative, but he is not entitled to preclude evidence of the manner in which he undertook the charged conduct simply because that conduct, taken alone, does not constitute a charged offense.

3

At bottom, while the recorded calls may be compelling proof of Larmore's guilt, Larmore has not identified any *unfair* prejudice that would substantially outweigh their clear probative value relating to his consciousness of guilt, his intent to defraud, and his lack of good faith. All evidence of guilt is prejudicial to some extent, but preclusion under Rule 403 demands that proof be "*unfairly*" prejudicial. *Costantino v. Herzog*, 203 F.3d 164, 175 (2d Cir. 2000); *see United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence"). And even if Larmore's misleading of the City National representative were considered a separate bad act, such evidence is still not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]"). Here, the substance of the phone calls is direct proof of Larmore's state of mind and is not unfairly prejudicial.

**II.     The Court Should Admit Evidence that Larmore Lied Under Oath About Funds He Used to Purchase WeWork Securities in Furtherance of His Fraudulent Scheme.**

The Court should admit evidence that Larmore lied under oath about his use of the Plane Proceeds ($1,237,112.88), with which he purchased (among other things) 72,846 WeWork call options and 65,789 WeWork shares on November 1 and 2, 2023, in furtherance of his fraudulent scheme. Gov't Mot. 23. Each of Larmore's objections to this evidence misses the mark.

Larmore's first objection seems to stem from his mistaken belief that the Government intends to prove his perjury through Judge Brown's comments about Larmore's credibility. Def. Op. 2. The Government will do no such thing. The Government's evidence of Larmore's perjury

4

will consist of (1) Larmore's own statements, as reflected in his affidavit and in his hearing testimony, that he spent the Plane Proceeds on "living expenses" or "debt," contrasted with (2) bank records which show how Larmore actually spent the Plane Proceeds—funding investment accounts to purchase tens of thousands of WeWork securities and buying (or chartering) yachts, private planes, and cars. The Government is not seeking to put Judge Brown's comments before the jury.

Next, Larmore objects to the relevance of the evidence without grappling with the Government's actual reasons for offering it. The Government is not offering this evidence to show that Larmore "improperly transferred funds from one of his companies to his personal accounts." Def. Op. 1. Rather, the Government is offering this evidence to show that Larmore lied about how he spent the Plane Proceeds, which is relevant to his intent to defraud, lack of good faith, and consciousness of guilt with respect to his purchase of WeWork securities. Gov't Mot. 24-25. In other words, Larmore lied about his use of the Plane Proceeds because he knew that his use of a sizeable portion of the Plane Proceeds to buy WeWork securities was improper and done in furtherance of a fraudulent scheme. For that reason, Larmore lied when questioned under oath regarding his use of the Plane Proceeds. Gov't Mot. 25. If Larmore honestly believed that using the Plane Proceeds to purchase WeWork securities was proper, he would have truthfully answered the questions about the Plane Proceeds at the hearing, rather than perjuring himself. In short, Larmore's false statements regarding his use of the Plane Proceeds reflect an effort to hide the conduct that is at issue here and are, therefore, probative of his intent.

Larmore does not address these arguments at all in his opposition. Instead, Larmore summarily (and incorrectly) declares that the proffered evidence "can serve no purpose other than to inflame the jury and convince the jurors that Mr. Larmore is a dishonest person." Def. Op. 3. For the reasons discussed above, Larmore is wrong.

5

### III. The Court Should Admit Evidence that Larmore Could Not Afford to Return the Plane Proceeds and Purge a Contempt Order Against Him as Further Proof of His Financial State.

The Court should admit evidence that the defendant was not in a financial position to fund his fraudulent $77 million tender offer, including proof that the defendant had to borrow money from his mother to purge the contempt order relating to his use of the Plane Proceeds and was effectively living off his Arciterra corporate credit card.

It bears emphasizing that, with respect to Count One, the Indictment alleges—and the Government will pursue at trial—four bases for Larmore's guilt: (1) Larmore "made an untrue statement of a material fact [or] omitted a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," "in connection with a tender offer;" (2) "Larmore made the announcement of the potential tender offer without the intention to commence the offer within a reasonable time and complete the offer;" (3) Larmore "intended, directly [or] indirectly, for the announcement to manipulate the market price of the stock of the subject company [i.e., WeWork];" and (4) Larmore "did not have the reasonable belief that he would have the means to purchase securities to complete the offer." Indictment ¶ 31 (charging 15 U.S.C. §§ 78n(e) and 78ff & 17 C.F.R. § 240.14e-8(a), (b), and (c)). By suggesting that the only "real issue" in the case is "whether Mr. Larmore intended to go through with his tender offer," Def. Op. at 3, Larmore fails to appreciate not only the issues that will be contested at trial, but also the many ways in which his financial condition on November 3, 2023, is relevant to those issues.

As but one example, Larmore's financial condition is directly relevant to his motive "for the announcement to manipulate the market price of the stock of" WeWork. At the time of his announcement, Larmore was in financial trouble. *See* Gov't Mot. 26-27. His bank account was plummeting toward zero, he was charging his living expenses (and extravagant

6

purchases) to a corporate credit card, and he was in desperate need of a cash infusion. As a result, Larmore needed his fraudulent tender offer to drive up the price of WeWork stock and increase the value of his newly acquired (but undisclosed) cheap, short-dated, out-of-the-money WeWork call options. If it didn't work, his call options for over 7 million shares of WeWork would expire worthless, which is, in fact, what happened. Thus, not only is evidence that the defendant lacked the financial means to fund his tender offer proof of that offer's falsity (as well as proof of the defendant's intent to defraud and his lack of good faith), it also establishes "his motive to make money from his fraudulent market manipulation scheme." Gov't Mot. 25-27 (discussing anticipated evidence of Larmore's financial condition). Larmore does not respond to the Government's motive argument at all, implicitly conceding its merit.

Furthermore, evidence of Larmore's financial condition on November 3, 2023, is relevant to whether Larmore had the reasonable belief that he could obtain in the future the means to purchase the WeWork stock contemplated by his offer.[2] It is common sense that banks do not just hand out $77 million to "penniless" individuals. Def. Op. 2. It is also axiomatic that a borrower's financial condition would be relevant to any rational lender. Thus, Larmore's financial condition on November 3, 2023, is relevant to whether he could have reasonably believed that a lender would have lent him $77 million to fund his tender offer.

---

[2] When enacting Rule 14e-8 (the rule at issue here), the SEC recognized that a bidder's present financial condition is relevant to the reasonableness of the bidder's belief that it can purchase the securities at issue. *See* Regulation of Takeovers and Security Holder Communications, Release No. 7760 (1999), 1999 WL 969596 at *17, n. 93 ("Although not required, a commitment letter or other evidence of financing ability (e.g., funds on hand or an existing credit facility) would in most cases be adequate to satisfy the rule's requirement that the bidder have a reasonable belief that it can purchase the securities sought….. Bidders may have sufficient funds on hand to complete the offer or they may arrange to borrow funds from an outside source. In most cases when the bidder expects to obtain funds from another source, financing is arranged in advance or immediately after announcing an offer. Bidders typically get a commitment letter from their lenders.").

Finally, there is nothing unfairly prejudicial about the Government's proposed evidence, for the reasons articulated above. Nevertheless, in the interest of compromise, the Government has taken the defense up on its invitation to "stipulate that [Larmore] lacked the personal funds to effectuate the tender offer." Def. Op. at 8. On August 24, 2024, the Government sent counsel a stipulation that made the key points sufficiently clear and indicated its willingness to discuss the issue further. As of the time of this filing, however, defense counsel was not in a position to discuss the proposal, but expressed a willingness to engage in such discussions promptly.

### IV. The Court Should Admit Evidence that Larmore Infringed Trademarks Held by the Real Cole Capital.

The Court should admit evidence that Larmore derived the Cole Capital Funds, LLC ("Cole Capital") name and logo from Cole Companies, CCO Group, LLC (the "Real Cole Capital") to make Cole Capital—which was nothing more than a shell company and a vehicle for Larmore's fraud—appear legitimate. Larmore's response to this evidence in his opposition once again fails to appreciate important issues that will be contested at trial. As noted, one issue will be whether Larmore "made an untrue statement of a material fact [or] omitted a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," "in connection with a tender offer." Indictment ¶ 31. The Government's proof will include evidence that Larmore made multiple untrue and misleading statements about Cole Capital. His highly misleading statements on the Cole Capital website portrayed Cole Capital as a legitimate, well-established investment company with connections to some of the most well-known companies in the world like Amazon, Verizon, and Oracle (even though it had no such connections). For example, the "Who We Are" section of the Cole Capital website, created at

Larmore's direction, included logos of well-established corporations and included the following narrative:



Elsewhere on the Cole Capital website, Larmore made highly misleading statements, suggesting that his company was endorsed by, associated with, or was the successor to, the Real Cole Capital. For example, the Cole Capital website stated: "Cole Capital Funds' roots trace back to the high standards established in 1979 when Christopher H. Cole founded Cole Companies. Larmore joined the organization in 1996 acquiring multiple assets as the organization evolved and expanded." The complete text of this section reads as follows:



9

Larmore made these false and misleading statements about Cole Capital to make it (and its announced tender offer for WeWork stock) appear more legitimate and, therefore, to increase his fraudulent scheme's chance of success.

In truth, Cole Capital was a one-month-old shell company with no assets or investors of any kind. The Government expects that a witness from the Real Cole Capital will testify that the Real Cole Capital in no way endorsed or was associated with Larmore's Cole Capital. To corroborate that testimony, as set forth in the Government's motion, the Government will offer evidence that the Real Cole Capital enforced its trademarks against Larmore and Cole Capital, and Larmore did not even bother to contest the claims. Gov't Mot. 27-29. The totality of this evidence tends to prove Larmore's intent to deceive others in the market regarding the viability of his fake tender offer, which in turn establishes Larmore's intent to profit from his short-dated, out-of-the-money call options through the manipulation of WeWork's stock price. Even though Larmore failed to defend himself in the prior trademark action, at trial, Larmore is free to challenge the Government's interpretation of the trademark infringement claim. Def. Op. 4-5. His recasting of the prior trademark action, however, should not preclude the Government from offering relevant evidence which shows that Larmore intended to defraud WeWork investors into believing that Cole Capital was a legitimate real estate investment company associated with Christopher H. Cole and the Real Cole Capital, when, in fact, Cole Capital "had no genuine business operations," Indictment ¶ 10, and was merely a sham company that Larmore used as a vehicle for his fraud.

> **V.     The Court Should Admit Limited Evidence of Public Allegations that, at the Time of the Fraudulent Tender Offer, Arciterra Investors Had Not Been Paid for Years and Larmore Was Under Investigation by the SEC, Not For Their Truth, But As Evidence of the Defendant's State of Mind.**

Larmore similarly misconstrues the Government's reasons for offering evidence from the Bloomberg article reporting on Larmore's financial state. To start, Larmore objects that it is "obviously hearsay." Def. Opp. 5. But the Government has explained that it "does not seek to offer the allegations [in the Bloomberg article] for their truth." Gov't Mot. 30. Rather, it seeks to offer them for their effect on the defendant and the reasonableness of his beliefs about financing. More specifically, at the time of his fraudulent tender offer, Larmore could not have reasonably believed that banks or other legitimate sources of financing would have lent him $77 million to buy WeWork stock when there were publicly accessible allegations of (1) investors from Larmore's prior venture, Arciterra, not being paid since 2019 and suffering losses, and (2) an SEC investigation into Larmore.

The Government has no interest in litigating the Arciterra fraud allegations or putting the details of that fraud before the jury during its case-in-chief; the import of the article rests on the public allegations that Larmore had not paid his former investors. Larmore wrongly assumes that the Government is seeking to offer these allegations for their effect on investors. *See* Def. Opp. 5 (claiming the jury would "speculate as to how many, if any, of Mr. Larmore's potential investors were aware of the article, and whether they would have been influenced by it"). But whether any potential investors were actually aware of the article and/or whether they were influenced by it is not the point. The issue is whether *Larmore* was aware of the article (he was) and whether he could have reasonably believed that he could raise $77 million with those allegations against him in the public sphere.   The fact of public reports indicating that Larmore had not paid investors demonstrates that Larmore could not have reasonably believed he could successfully solicit funds

from new investors for his purported WeWork takeover, and is thus highly relevant to the Government's case.

With respect to this issue, the Government has proposed a stipulation to the defense that would streamline this evidence and mitigate the risk of any unfair prejudice. As noted above, however, the defense has not yet provided their position on the Government's proposal but expressed a desire to engage in good-faith discussions.

## CONCLUSION

For the reasons set forth herein, the Court should grant the relief described herein.

Dated:     New York, New York
           August 30, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                                    By: _____
                                        Justin V. Rodriguez
                                        Adam S. Hobson
                                        Sarah Mortazavi
                                        Assistant United States Attorneys
                                        Southern District of New York