

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

September 23, 2024

**VIA ECF AND EMAIL**
The Honorable Paul A. Engelmayer
United States District Judge
40 Foley Square
Southern District of New York
New York, New York 10007

      Re:    *United States v. Larmore*, 24 Cr. 140 (PAE)

Dear Judge Engelmayer:

      At the September 9, 2024 pretrial conference, the Court asked that by September 23, 2024, the Government provide the Court with its position regarding the attorney communications that the defendant has sought to introduce at trial (the "Defense Exhibits"). The Government had previously moved to preclude the Defense Exhibits, in part because the defendant was selectively using the privilege to shield the full scope of his attorney communications from the Government. On September 9, the Court entered an order ruling that the defendant had waived privilege over his pre-retention communications with attorneys about his tender offer for WeWork shares. Following that conference, the Government conducted additional investigation into the defendant's communications with attorneys regarding his WeWork tender offer scheme.

      The Government's investigation included interviewing the attorneys identified in the Defense Exhibits and reviewing text messages between Larmore and counsel that had previously been withheld as privileged. These interviews and documents have confirmed that no lawyers advised or assisted the defendant in carrying out his fraudulent scheme, and that none of the lawyers were fully informed about his scheme. The investigation also demonstrated that one of the attorneys who spoke with Larmore, James Siegel, Esq., was told by Larmore, in substance, that Larmore intended to fund his tender offer by selling short-dated WeWork options after Larmore had artificially boosted WeWork's price through his tender offer announcement, and Siegel informed him that this scheme was illegal market manipulation and that he should not proceed.

      In light of the facts the Government has gathered, the Government expects to offer the testimony of three of the lawyers identified in the Defense Exhibits: Siegel, Richard Silfen, and Jeremy Piccini. Of course, subject to appropriate contemporaneous objection, the Government has no objection to the defendant asking those witnesses about the relevant Defense Exhibits involving each respective witness. Particularly given the Government's findings, however, the defendant should be precluded from introducing particular communications, discussed below, that reference attorneys or are with attorneys, unless the relevance and probative value is established by a witness whose testimony can provide appropriate context. Without such testimony, these

exhibits would be misleading, would confuse the jury, and would be minimally probative and highly prejudicial under Rule 403.

**I.     Background**

The below information is based on the Government's preliminary investigation over the past two weeks. As we continue to prepare for trial, it is possible that we learn additional facts. This summary is not intended to provide a complete picture of these witnesses' likely testimony or the complete documentary record.

On October 25, 2023, the defendant contacted Siegel, an attorney based in Arizona, and texted him, "I want to make an offer for a public company and I need someone that I can trust to file it with the SEC. If this is something you can do once the transaction works. I've got a very lucrative job for you if you want one." Def. Ex. 1. Siegel responded that he would need to find outside counsel with experience in tender offers, suggested Richard Silfen, the head of M&A at Duane Morris, and set up a call with Silfen for October 26. Def. Ex. 25. The defendant's proposed evidence of communications with Siegel and Silfen stop here and fall far short of telling the full story.

We expect the trial evidence to show that Siegel and Silfen proceeded to have multiple calls with the defendant. During these calls, the defendant initially declined to provide important details, including the target company. Later, the defendant admitted that the target was WeWork, but he was either unable or unwilling to provide any information about his proposed financing. Silfen pressed the defendant about the source and size of financing, and even told the defendant that he had to know the source of financing because it had to be disclosed as part of the offer, but the defendant demurred. When Silfen asked the defendant which investment bank was acting as his financial adviser on the deal, the defendant said, in substance, that he did not have a financial adviser, which made Silfen skeptical about the legitimacy of the deal. During these conversations, Silfen was trying to get information to assess the legitimacy of the defendant's offer and whether to take on the representation. Silfen's communications with the defendant left him with serious concerns about the proposed offer. Consequently, when an initial conflict check at Duane Morris indicated a potential conflict, Silfen decided not to look further into the nature of the conflict but instead used it as an excuse to decline the representation.

At one point, Silfen appears to have told the defendant about a failed tender offer that Apis Capital made for Veritone. On October 27, 2023, Siegel texted the defendant, "The TO [*i.e.*, Tender Offer] Rich mentioned yesterday was for a co called Veritone." The SEC ultimately filed an enforcement action against Apis Capital alleging that its tender offer was fraudulent and manipulative because its description of its financing was misleading. The defendant replied to Siegel by sending a link to Apis Capital's press release announcing its offer and a screenshot of one sentence of the Apis Capital press release, which read, in part, "We have held discussions with our financing sources and would expect to have a fully executed, underwritten financing commitment prior to execution of a definitive merger agreement." Siegel replied, "Yep that's the case. That's the statement that was insufficient/false. There was some other BS going on as well besides the TO issue." The defendant then said, "Yes I read that. But I have had discussions. I

Hon. Paul A. Engelmayer                                                                                               Page 3
September 23, 2024

think his real problem was he dumped and withdrew the offer. That is not my game plan."[1] Siegel then emphasized the importance of having firm financing in place for an offer to be legitimate, telling the defendant, "I think you will need to have the funds locked down before the TO." Siegel and Silfen each therefore put the defendant on notice that any description of tender offer financing needed to be accurate and not misleading, but the defendant nonetheless disregarded their advice and proceeded with his misleading press release. In fact, he appears to have used the Apis Capital press release as a template for his own press release.

Siegel also recalls that at one point he had a one-on-one call with Larmore during which the defendant admitted that his plan was to purchase out-of-the-money short-term call options, then announce his tender offer, which would cause the stock price to soar and make his options incredibly valuable. In other words, the defendant admitted to the exact market manipulation scheme he is alleged to have committed in the Indictment. The defendant told Siegel that he could then use the proceeds from his options to consummate the tender offer. After hearing the defendant's plan, Siegel told the defendant that this plan was illegal market manipulation. The defendant responded that it was okay because he was "not licensed." Siegel told him that that made no difference, the plan was still market manipulation and still illegal. Shortly after this conversation, Siegel decided to have nothing more to do with the defendant's purported tender offer and cut ties with the defendant.

Shortly after Larmore learned that Silfen would not represent him on the tender offer, Larmore met Jeremy Piccini. Piccini, who is a New Jersey-based attorney, was vacationing with his family in Fort Lauderdale when he met Larmore in a hotel hot tub. After learning that Piccini was an attorney, Larmore asked for Piccini's contact information, and reached out to Piccini the following Monday. Def. Ex. 31. As discussed in more detail in the Government's August 23 motion, Piccini ultimately entered into an engagement letter with Cole Capital Funds, the company Larmore had set up to carry out his tender offer. Def. Ex. 33. But prior to entering into this engagement letter, Piccini made clear to Larmore that Piccini was not able to provide legal advice on a tender offer: "Public company offers are probably not my specialty so wouldn't be so helpful there." Not surprisingly given Piccini's expertise, Piccini did not subsequently provide Larmore with any legal advice about Larmore's tender offer. But, as Piccini has now explained to the Government, despite Piccini repeatedly telling Larmore that he was not able to advise him on a tender offer, Larmore told Piccini that Larmore intended to put Piccini's name on the documents announcing his tender offer, clearly to try and give them a false air of legitimacy. It was only when Piccini once again demanded that his name be removed from the documents—documents that he

---

[1] The defendant's statement to Siegel that he had "had discussions" with banks about financing is hearsay. It is also false, as there is no evidence that the defendant had *any* discussions with financial institutions about funding his tender offer. The only communications the defendant had with a bank about a loan of any kind took place a few hours *after* this text message, when the defendant appears to have tried to create a paper trail by emailing two retail bankers who had helped set up brokerage accounts for the defendant and asked them whether their banks offered loans using securities as collateral. These two emails said nothing about the securities the defendant proposed to put up as collateral (he had none), and nothing about using the proceeds to fund a $77 million tender offer. If the Government introduces the defendant's text messages with Siegel, it will likely propose appropriate redactions.

did not draft, did not approve, had not even read, and that Larmore sent to him in the early morning hours of November 3, just before he planned to file them—that Larmore removed Piccini's name from the filing. In a response email that morning, Piccini told Larmore, "I literally know nothing about this world," and, "it would make more sense for us to pause on our engagement." In other words, even though the lawyer Larmore had engaged for Cole Capital Funds had not provided a single bit of legal advice on the offer and had even paused the engagement based on Larmore's conduct, Larmore still emailed documents announcing his tender offer to the Board of Directors of WeWork and the SEC a few hours later, misleadingly claiming that he had "consulted with" legal advisors about his transaction.

As for the other lawyers whose communications are being offered by the defense—Robert Tannous, Adam Brandt, Roger Lautzenhiser, and Kenneth Zinghini—our investigation has shown that none of these attorneys had substantive conversations with the defendant about his proposed tender offer or WeWork.

## II. The Defendant's Proposed Standalone Exhibits Would Be Likely to Mislead the Jury and Are Unduly Prejudicial.

### A. Applicable Law

Even where—as here—a defendant has not asserted an advice-of-counsel defense, defendants have sometimes sought to offer evidence of lawyers' involvement in allegedly inculpatory events to support an argument that the defendant lacked intent to defraud. As judges have observed however, such evidence "can pose a substantial risk of misleading the jury." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024). A "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such a misunderstanding would unfairly prejudice the Government because it would "give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *Id.*

Accordingly, consistent with Rules 401 and 403, courts have carefully policed references to counsel in testimony and argument to ensure that the defendant does not unfairly hide behind the attorney-client privilege or attempt to mount a "disguised reliance argument." *S.E.C. v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 23, 2012), Trial Tr. at 973.

The decision in *S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), illustrates the limited relevance of evidence of attorney involvement absent a showing of each of the elements of advice of counsel. In that case, which was brought by the SEC against a Goldman Sachs employee alleged to have violated securities laws in the offer and sale of a synthetic collateralized debt obligation, the defendant disclaimed any advice-of-counsel defense, but sought to introduce evidence that in-house counsel had reviewed various documents, reviewed disclosure language, was copied on communications, and in some instances assisted in drafting documents. *Id.* at 682-83. The court, however, held that Rules 401 and 403 precluded evidence and references to counsel, explaining:

> a lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as 'blessing' the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

*Id.* at 684. Accordingly, in *Tourre*, the court precluded as irrelevant and prejudicial (1) evidence used solely to show lawyers attended or set up meetings, (2) evidence that lawyers approved of certain documents or disclosures, and (3) the placing by the defendant of undue focus on the fact that a lawyer was present at meetings or reviewed documents or disclosures. *Id.* at 685. Although the defendant was allowed to present evidence of the attendees of meetings and to include professional descriptions for those participants, defense counsel could not mention the presence of lawyers in their opening statements or arguments. The court emphasized that this was not an inclusive list of inadmissible references to counsel and that other references may similarly be inadmissible. *Id.*

Similarly, in *S.E.C. v. Stoker*, another civil securities fraud action in which the defendant did not intend to assert an advice-of-counsel defense, but rather sought to elicit testimony about whether lawyers had reviewed certain transactions, Judge Rakoff took issue with defense counsel's efforts to highlight, through questioning, the fact that attorneys had reviewed certain offering materials. *See* 11 Civ. 7388 (S.D.N.Y. July 23, 2012), Trial Tr. at 895-96. The court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, at least from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] totally irrelevant." *Id.* And, although the defendant proffered an alternative reason for the questioning, the court recognized that counsel's tactic was a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the dangers of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981.

Likewise, in *S.E.C. v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019), Judge Cote precluded "references to counsel's communications" because, among other things, they were "not relevant in the absence of an advice-of-counsel defense." As the court explained, "the intimation that counsel has blessed a transaction or practice without waiver of the attorney-client privilege" is improper. *Id.* Furthermore, "any probative value of such references is substantially outweighed" by, among other things, "the risk that such references will sow confusion and mislead the jury by suggesting that counsel … fully informed … approved" a transaction. *Id.*

Even those courts that have permitted some limited testimony regarding the presence or involvement of counsel have required fulsome pretrial disclosures and have carefully policed the scope of such testimony. *See, e.g., Bankman-Fried*, 2024 WL 477043, at *2 (permitting certain lines of evidence and argument and precluding others after hearing testimony outside the presence

Hon. Paul A. Engelmayer                                                                                          Page 6
September 23, 2024

of the jury); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr. (Dkt 63), at 83-85 (limiting defendant's testimony regarding the presence of counsel to avoid the "misleading impression" that the defendant relied upon the advice of counsel).

Moreover, because of the risks associated with shadow advice-of-counsel defenses, courts have not only precluded evidence and argument about the presence of attorneys, but also given limiting instructions during trial and/or instructions to the jury in the final charge where there is a risk of confusing or misleading the jury. *See United States v. Milton*, No. 21 Cr. 478 (S.D.N.Y. Sept. 12, 2022) (instructing the jury that presence or involvement by an attorney is not a defense); *United States v. Shea*, No. 20 Cr. 412 (S.D.N.Y. May 23, 2022) (same); *United States v. Petit*, No. 19 Cr. 580 (S.D.N.Y. Oct. 26, 2020) (instructing the jury that there was no reliance on advice of counsel defense, that there was "no suggestion that [an attorney] was opining on the legality or illegality of anything," and that her documents were admitted for a different purpose).

**B. Discussion**

The defendant has not yet stated with precision the relevance of the evidence relating to his text messages with attorneys, but the evidence appears to be aimed at showing that because the defendant spoke with lawyers in advance of his fraudulent tender offer, he must have been acting in good faith. This is precisely the impermissible purpose that the court warned about in *Tourre*, where a "jury could easily believe that the fact that a lawyer is present . . . means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction," giving the defendant "all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *Tourre*, 950 F. Supp. 2d at 684.

This risk has been made manifest here, where the investigation has shown that the defendant's attorney communications were quite minimal, and the defendant expressly did *not* rely on the advice received. Most of the attorneys with whom the defendant texted or emailed had no substantive communications with him at all. And even with Siegel and Silfen, the two attorneys with whom he had somewhat (but only somewhat) more detailed conversations, the defendant still withheld key aspects of his plan, including his source of financing. In fact, he provided them with so little information that neither of them was comfortable having further involvement, and neither entered into engagement letters.

For this reason, Defense Exhibits 21, 24, and 29 each should be precluded as irrelevant and unfairly prejudicial and misleading—at least absent testimony from an appropriate witness such as Brandt, Zinghini, Lautzenhiser, and Tannous that could lay a proper foundation or testimony sufficient to prevent misleading the jury. For example, Defense Exhibit 21 contains a text message exchange between the defendant and Robert Crook, in which the defendant asks about whether a lawyer can assist him "on a hostile tender offer." Without evidence demonstrating that Larmore never, in fact, spoke to the lawyer in question about the tender offer, Defense Exhibit 21 would only serve to confuse and mislead the jury by suggesting that a lawyer might have been involved or provided some advice. And Defense Exhibits 24 and 29 present much the same risks: they have

been selected to leave the impression—entirely inaccurate—that Larmore sought and received at least the tacit blessing of a lawyer.[2]

Finally, Defense Exhibit 14, which is a text message between Siegel and Larmore about purely personal topics, including Larmore expecting a child, is irrelevant and should be excluded even if Siegel testifies.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2591

Cc:   Defense Counsel (via ECF)

---

[2] Although the Government intends to call Silfen and/or Siegel, and communications between them and the defendant may well be admissible, the defendant's proposed exhibits with respect to those lawyers, in the absence of their testimony would be similarly inadmissible. Indeed, without the testimony of these attorneys themselves, the selected text messages that the defendant seeks to introduce would be highly misleading and would leave the jury with the misimpression that the defendant did, in fact, have experienced counsel advising him on his plan. *See* Def. Ex. 25 (Siegel: "Texted back and forth w Rich Silfen at Duane Morris. Heads their M&A practice. Said he'll call me today …. Had a great convo w my guy at Duane Morris. He has done a bunch of tenders. Just buzz me when you have a min. Calling you now w rich. Buzz me if can and I'll conf him in."). Standing alone, this text message would raise the highly misleading specter that the defendant received legal advice from a leading lawyer in the field about his tender offer, which is not the case. In fact, Siegel told the defendant that his plan was unlawful.