

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

October 6, 2024

**VIA ECF AND EMAIL**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
New York, New York 10007

      Re:    *United States v. Larmore*, 24 Cr. 140 (PAE)

Dear Judge Engelmayer:

      The Government writes in response to the defendant's letter of October 2, 2024 (the "October 2 Letter") regarding his noticed expert, John Nicholson, and in advance of the *Daubert* hearing the Court has scheduled for October 8, 2024. Based on the disclosures the Government has received to date, Nicholson is not qualified in the relevant areas and does not have "reliable" or "helpful" evidence on any relevant topics. The Court should therefore exercise its "gatekeeping role" and exclude Nicholson's testimony at trial under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).[1]

      **A.  Applicable Law**

      "An expert may be permitted to testify if he or she 'is qualified, reliable, and helpful.'" *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliably applied" to the case. Fed. R. Evid. 702. Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

---

[1] Even with the supplemental information the defendant provided in his October 2 Letter, the disclosure still fails to meet the expert disclosure standard under Rule 16(b)(1)(C), and Nicholson's testimony should be precluded for that reason as well. The letter not only fails to cure the many deficiencies in the defense's expert notice, but it exacerbates them, creating more confusion and uncertainty about what exactly Nicholson will be testifying to, and why that testimony is either relevant or an appropriate subject of expert testimony.

Hon. Paul A. Engelmayer                                                                                          Page 2
October 6, 2024

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual purpose. First, "[i]n requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

**B. Discussion**

Nicholson's opinions, as supplemented by the defendant's October 2 Letter, are so generic and pedestrian as to be irrelevant rather than helpful to the trier of fact. For that reason, his proposed testimony fails the first *Daubert* requirement.

The October 2 Letter states that Nicholson's testimony "will be narrowly focused on a single fact: that it is commonplace for purchasers of securities to seek to finance their purchases after they are made, and that there are financial institutions ready and willing to provide such financing." The letter further purports to answer some (but not all) of the Government's questions regarding which opinions Nicholson will advance and the bases of those opinions, but most of these answers are at a level of generality that adds more confusion than clarification. For example, to the Government's question about what kinds of acquirers Nicholson's opinion covers, the answer is, "all types of borrowers." Letter at 2. To the Government's question about what types of securities his opinion covers, the answer is, "all types of securities." *Id.* To the Government's question about what types of financing his opinion covers, the answer is that his opinion "applies generally to secured lending," *id.* at 3, a category so broad as to be practically meaningless. To the

Government's question about the time lapse between the purchase and efforts to finance, the answer is simply that the time lapse is "generally short," *id.*, with no explication of whether "short" means hours, days, weeks, or months These answers reduce Nicholson's opinion to the unremarkable observation that "banks sometimes make loans which can be used to purchase securities," a proposition so general as to be useless. Significantly, the defense does *not* intend to elicit Nicholson's opinion that financial institutions like Citibank, Barclays Capital, or Lehman Brothers would lend $77 million to Cole Capital Funds and Jonathan Larmore, neither of whom had significant assets to speak of, so that Larmore could pay a 900% premium price to purchase shares in a single company on the brink of bankruptcy. To the extent that Nicholson is limiting his opinions to broad generalities, that opinion is so basic as to be unhelpful to the jury.

Nicholson's opinion is further deficient for failing to set forth the methodology he has or will employ to arrive at his stated conclusions. For example, there is no quantification of what constitutes a "commonplace" or "common[]" transaction, and no description of Nicholson's methodology to determine what constitutes a routine transaction across lending institutions, despite the October 2 Letter's emphasis on this point.

There is substantial reason to doubt the reliability of Nicholson's methodology and opinions. Indeed, outside the limited context of pre-approved purchases on margin in a brokerage account, it would seem to be a very *uncommon* phenomenon. Certainly, the defense letter gives no additional context to understand the variety of scenarios that would give rise to such financing, let alone the rate at which such lending occurs. Nor does the defendant's October 2 Letter explain the basis for Nicholson's apparent conclusion "that it is commonplace for purchasers of equity securities to fund their purchases *after the fact*,"[2] given that most sellers expect to receive payment before selling their securities.

For similar reasons, Nicholson's testimony fails the second *Daubert* requirement because the defense has failed to show that Nicholson's expected testimony will "'fit' . . . the facts of the case." *City of Provid.*, 2022 WL 902402, at *8. Even if (as the defense states) a bank might, in some situations, lend money to effect a securities purchase after the purchase is made—for example, with a high-net-worth individual or well-capitalized company with a known track record with the bank, attractive collateral, and a convincing plan for making money from the purchased securities—those facts are far removed from the potential borrowers implicated here: Cole Capital Funds and Jonathan Larmore. A generalized opinion that a bank might lend to some individuals, without any connection to the facts of this case, will only serve to mislead and confuse the jury.

At the time the defendant made his fake tender offer, he had less than $52,000 in his CNB checking account and less than $6,000 in his Park National money market account. He had approximately $776,000 in his brokerage accounts, all of which was invested in short-dated, out-of-the-money WeWork call options and WeWork stock. The majority of those securities were funded by the sale of a private jet, which proceeds he transferred out of an Arciterra bank account and into his personal bank account in violation of an Arciterra receivership order. Larmore owed

---

[2] If this statement in the October 2 Letter was intended to refer to purchasers of equity securities "fund[ing tender offers] after the fact," the defense has conceded that Nicholson lacks the relevant expertise in tender offer financing to offer such an opinion.

over $5 million in loans to CNB bank and had fallen behind on his loan payments. He does not seem to have had any relationship at all with JP Morgan until he walked into a Chase branch a week before his tender offer to open a brokerage account. The receiver for Cole Capital Funds will testify that Cole Capital Funds had no assets, no clients, no source of income, and had been created less than a month before the fake tender offer. More to the point, there is no indication whatsoever that Larmore had (or expected) sufficient collateral to secure a $77 million loan. And of course, the assets that Larmore was proposing to purchase were not blue chip stocks with a clear track record of success—he was proposing to purchase a minority position in WeWork, a company with well-publicized financial difficulties that was on the eve of declaring bankruptcy, and whose stock price had already fallen to around $1 a share, creating the almost certain prospect of being delisted from the New York Stock Exchange and instead trading on the pink sheets. Moreover, Larmore was proposing to pay $9 a share—an *approximately 900%* premium—for no reason that would carry any weight with a creditor.

Much remains unclear about Nicholson's experience, including what precisely his "equity financing" experience involved, but the defense's letter clarifies that he lacks experience in areas that are critical to his ability to offer relevant opinions given the facts of this case. For example, the defense letter concedes that Nicholson lacks any experience in underwriting, and that Nicholson "is not an expert in, and will not testify about credit checks undertaken by lenders, only that such due diligence exists at a stage in the process of making a loan before he is involved in approving the loan." October 2 Letter at 4. In other words, Nicholson has no experience in evaluating whether someone is eligible to receive a loan—his only purported experience is in extending loans to entities or individuals whom others have deemed qualified. But the question is not whether *someone* might have received financing for a loan under *some* set of circumstances—it is whether *the defendant*, either personally or through his corporate shell, might have received or believed and intended that he would receive financing for a loan under his specific financial circumstances in order to pay a 900% premium price for shares of a beleaguered company that was on the eve of filing for bankruptcy. The defense's letter concedes that Nicholson lacks the requisite experience to opine on the threshold question of whether Larmore would even advance past the due diligence phase before someone in Nicholson's position would have the opportunity to make a lending decision.

Nicholson also has no experience in financing tender offers. The defendant contends this omission is irrelevant, because "the purchase of a security entails the exact same mechanism regardless of whether the purchaser is making the purchase for the purpose of gaining control of a company." Letter at 5. But the size, complexity, and purpose of tender offers, in addition to the regulatory framework, distinguish tender offer financing from a lender attempting to "purchas[e] 100 shares of XYZ for investment." *Id.* By way of example, Larmore's purported tender offer for 8.5 million shares at a price of $77 million reflected a significant 900% premium on the WeWork share price, which is meaningfully distinct from funding a borrower's purchase of "100 shares" at market value. Given the premium set forth in most tender offers, any lender would have to assess the value of those shares and determine whether the premium Larmore ascribed to those shares was justified. Valuations like these typically require banks to perform advanced financial analyses, looking at the company's internal projections and conducting a discounted cash flow analysis.

Moreover, unlike routine purchases of stock through brokerage accounts, tender offers are highly regulated transactions, and the regulatory regime governing those transactions has

implications that would be relevant to a lender. The tender offer rules impose certain conditions on tender offers, including keeping the offer open for at least 20 days, not changing the consideration without sufficient notice, and not changing the offering period with sufficient notice. *See* 17 C.F.R. § 240.14e-1. Each of these complications could reasonably affect a lender's analysis of the risk of the transaction. The tender offer rules also require the subject company to provide its position on the tender offer, which could in turn reasonably affect a lender's analysis of the transaction. *See* 17 C.F.R. § 240.14e-2. And Schedule TO requires extensive disclosures about the financing, including the source and amount of funds and the financial statements of the offeror. Launching a tender offer for a public company is thus an extremely complicated transaction, and not one that any bank is likely to finance without fully analyzing the transaction. Nicholson will not and cannot opine on tender offer financing, notwithstanding that tender offer financing is obviously more germane to this trial than a general view that people buying securities can obtain financing for that purpose.

In addition, Nicholson's proffered testimony is unnecessary and is likely to confuse the jury in light of the actual facts that will be elicited at trial. In his press release announcing his fake tender offer, the defendant expressly stated that he had spoken with two specific banks about financing his tender offer. He stated, "We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement." Indictment ¶ 19. Expert testimony about what *some* banks might do is therefore not relevant; perhaps relevant is the question of whether *these banks* would have lent $77 million to Larmore to finance his tender offer. At trial, the Government will present the testimony of witnesses from both City National Bank and JP Morgan, as well as Larmore's communications with them. There is therefore no need for hypothetical expert testimony about what some other financial institution might have done if consulted by Larmore. Employees from these institutions will be able to describe the process used to evaluate loans. We expect that they will also testify that Larmore never asked them about financing a tender offer, and that they never provided him with feedback on financing his WeWork tender offer.

Finally, Nicholson's testimony should also be precluded to the extent he intends to opine that it was reasonable for Larmore to believe that he could finance his tender offer. *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony."); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("Additionally, an expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses."). For this reason, the proffered testimony is of little if any relevance at all—whether a bank might generally lend money on a stock transaction cannot and does not shed any light whether the defendant intended to seek such financing and carry through with a tender offer.

Hon. Paul A. Engelmayer                                                                                                   Page 6
October 6, 2024

      Nicholson's proffered testimony is wholly unnecessary and is likely to confuse the jury in light of the evidence they will see, particularly when such expert testimony is being proffered as a substitute for the defendant's testimony regarding his own state of mind.

                                          Respectfully submitted,

                                          DAMIAN WILLIAMS
                                          United States Attorney

                              by:    /s/
                                          Justin V. Rodriguez
                                          Adam S. Hobson
                                          Sarah Mortazavi
                                          Assistant United States Attorneys
                                          (212) 637-2591

Cc:     Defense Counsel (via ECF)