

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

October 20, 2024

**VIA ECF AND EMAIL**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Street
New York, New York 10007

    Re:    *United States v. Larmore*, 24 Cr. 140 (PAE)

Dear Judge Engelmayer:

    The Government writes in advance of the parties' summations, which are expected to begin on Monday October 21, 2024. During his opening statement, defense counsel made several factual assertions for which there is, at this point, no evidence in the record. The defense has since made the strategic decision not to develop some of these claims and, thus, not to open the door to the Government's introduction of countervailing evidence. Mindful of both parties' interest in avoiding sustained objections during the defense closing, the Government now writes to outline those claims from the defense's opening statement that the defense should be precluded from repeating in its summation because they lack any factual basis in the record.[1] *See, e.g.*, *United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001) (affirming sustained objections to defense summation making factual assertions as to which there was no record evidence); *United States v. Saurez*, 588 F.2d 352, 354 (2d Cir. 1978) (noting that summations may not "refer to 'facts' that are not in the record, [or] misstate the evidence"); *United States v. Hollier*, 306 F. Supp. 2d 345, 345-46 (S.D.N.Y. 2004) (explaining that objections to arguments in defense closing that the defendant did not act willfully were properly sustained because "there was absolutely no evidence during the trial as to [the defendant's] beliefs").

    1.   The Defendant's "Wealth"

    In his opening statement, counsel made multiple unsupported claims about the wealth of the defendant and his family. He stated that the defendant "was not a poor man," that he "was born into a family of wealth," that "his parents were very wealthy," that the defendant's "father left him

---

[1] What follows is, of course, not an exhaustive list of all the improper and unsupported arguments that the defense should not be permitted to pursue in closing arguments. For example, any suggestion that the defendant was not "coherent" at the time of the offense would be improper for all the reasons discussed at sidebar following the cross-examination of Richard Engbrecht. Tr. 421:24-424:24.

a lot of money," "his mother was wealthy," "they invested their money," and "Mr. Larmore basically supervised a lot of those investments." Tr. 35:21-36:2.

There is no factual basis in the record for any of these claims. No evidence has been admitted establishing that, at any relevant time, the defendant was a wealthy man or had wealthy parents. In particular, there is no evidence about the wealth of the defendant's parents, about the defendant's father leaving him an inheritance, about the defendant's parents having any investments, or evidence that the defendant "basically supervised a lot of these investments."

Accordingly, the defendant should be precluded from making any arguments in summation about his purported wealth or his family's wealth.

2. The Defendant's "Success" and His Prior Real Estate Experience

Counsel made a series of unsupported claims about the defendant's prior business experience. He represented to the jury that they would hear "evidence that Jonathan Larmore was a skilled real estate investor, and he had a measure of success in that business, up and down." Tr. 35:17-20. According to counsel, the defendant "had been involved in these real estate projects before. He had some success. He had some failures. But the fact of the matter is he was experienced in managing properties." Tr. 37:6-9. Additionally, counsel claimed that the defendant had "companies that he invested in real estate that were separate entities, and they were all managed by one company that he owns exclusively, and that was a called [Arciterra]." Tr. 36:3-6. Counsel added that the pandemic "affected Mr. Larmore's real estate businesses a great deal." Tr. 36:17-18.

There is no evidence in the record to support any of these claims. That is not surprising, however, because, before the Government began its presentation of evidence, counsel acknowledged that he had "crossed the line" with these statements and that he was "not going to taunt" the Government by pursuing those claims further and that he "intend[ed] to stand clear of" these topics during the trial. Tr. 64:6; 64:15-18. Accordingly, the defendant should be precluded from making any arguments in summation about his prior real estate experience and any purported "success" he had in that area.

3. WeWork's Trading Price in August 2023

In his opening statement, defense counsel said, "Now, contrary to what you just heard from the government, WeWork in August of last year was actually selling for $11 a share at one point. $11 a share." Tr. 36:12-13; *see also* Tr. 37:2-3 ("It did hit a peak of 11 in August."). This statement was, at a minimum, mistaken. WeWork's stock price did not reach $11 in August of last year. In fact, as reflected in the chart below from GX 806, WeWork's stock was trading for less than $1 in August as it had been for months:

Hon. Paul A. Engelmayer                                                                                               Page 3
October 20, 2024



Furthermore, on August 30, 2023, Patrick Cochran sent the defendant a text message informing him that WeWork was trading around 11 cents. GX 1310. In response to later questioning from the Court, counsel acknowledged that a misrepresentation had been made to the jury. Tr. 57:13-17 ("THE COURT: And so it's not accurate to say the stock was ever trading at $11 contrary to what was said to the jury yesterday, correct? MR. ASCHE: It's not accurate to say that it was trading at $11."). Accordingly, although the Government may comment in its summation as to what the evidence does show, and the lack of evidence supporting the claim that WeWork's stock traded at $11 in August 2023, the Court should preclude the defense from making any further assertion that WeWork's stock traded at $11 in August 2023 (or at any price above what the record would support) to the jury in summation.

Furthermore, the Court should preclude the defense from making the highly misleading argument that the defendant's $9 per share tender office price in November 2023 should be assessed in the context of WeWork's sub-one-dollar trading prices in August 2023 multiplied by 40, based on the 1-for-40 reverse stock split that WeWork undertook, effective September 1, 2023, to maintain its listing on the New York Stock Exchange. *See* GX 805. The Court sustained multiple objections to questions that tried to develop evidence along these lines during the cross-examination of Thomas Carocci. Tr. 207:8-209:8. Defense counsel has stated, however, that it intends to "argue to the jury that it [i.e., WeWork's actual trading price in August 2023] was the equivalent of $9 a share," and that the defendant "did know post-split that it was—if he did the math, it was $9." Tr. 58:18-23. It should not be permitted to do so. To start, there is no evidence in the record at all about what the defendant knew, "post-split," about these issues and what "the math" would be. More fundamentally, there is no basis in the evidence for the defense to argue that there is a fair, non-misleading comparison to be made here. In fact, the defendant himself invited a much different comparison. In his press release, the defendant said, "[O]ur proposed price of $9.00 per share, representing a $7.89 per share premium over WeWork's last closing price of $1.11 per share as of November 2, 2023, is generous." GX 803. The defense's hypothetical also does only half the math—it assumes the higher stock price, but ignores the fact that there were 40-times more shares in August, meaning that Larmore would have had to purchase 40-times as many shares to reach his desired 16% of the company. In other words, the defendant's $9 per share offer should be compared to WeWork's actual closing price from the day before. Any comparison to some hypothetically converted price from months before is misleading, confusing, and irrelevant, and should be precluded.

Hon. Paul A. Engelmayer                                                                                                    Page 4
October 20, 2024

    4. The Defendant's Ideas to "Reinvent" WeWork

In his opening statement, counsel laid out the defendant's supposed vision for a "reinvented" WeWork:

> [T]o have people living in the same building as the offices were so they might be working remotely, but they still could have a separate office. And they would have fitness centers there so people could interact with each other and go work out and not have to take a bus across town or a subway across town or uptown or downtown, but they could all do it in one place. That was his idea to reinvent WeWork.

Tr. 37:17-23. There is, to this point, no evidence in the record about this vision either broadly speaking or as to any of its specifics. Accordingly, the defense should be precluded from arguing that the defendant had an idea to reinvent WeWork, including that any such idea involved people living in the same building where they worked with fitness centers and without the need to commute.

    5. The Defendant's Plans to Finance His Tender Offer

Defense counsel claimed that the defendant would finance some of his tender offer "through friends, family, and yes, through the purchase of options." Tr. 37:24-38:1. There has been no evidence that the defendant intended to finance his tender offer "through friends, [and] family," or that any friends or family stood ready to do so. Thus, the defense should be precluded from making this argument to the jury.

Elsewhere in his opening statement, counsel said, "We will show you that he had a plan to get the funds." Tr. 43:6. As a matter of fact, there has been no evidence placed in the record from which the defense could argue that the defendant had any plan to obtain funds through friends or family or in any other way, other than, perhaps, by selling his options at prices inflated by the announcement of his purported tender offer, as the defense has previously contended. Of course, as the Government argued in response to the defendant's Rule 29 motion, insofar as a plan to sell WeWork options included an intent to sell them at artificially inflated prices, such a scheme itself would constitute market manipulation and tender offer fraud, regardless of whether the defendant intended to use the proceeds of the scheme to purchase WeWork stock. In any event, the defense should be precluded from arguing that there is any evidence that the defendant "had a plan to get the funds" from friends or family or in any other way not supported by any record evidence.

    6. Why the Defendant Named his Company "Cole Capital"

According to counsel, the defendant named his shell company Cole Capital Funds, LLC, because "he very much admired the individual [Christopher Cole] who ran" the real Cole Capital. Tr. 41:9-10. There is no evidence in the record that the defendant admired Christopher Cole, and the defense should be precluded from making these claims in summation.

Hon. Paul A. Engelmayer  Page 5
October 20, 2024

7. <u>The Defendant's Attempt to Solicit Adam Neumann</u>

Counsel stated in opening that the defendant "was going to park his boat outside of" the home of Adam Neumann, the founder of WeWork, "because he wanted to get him on board and get him involved and get his support, solicit his support for this takeover." Tr. 42:15-20. There is no record support for these factual assertions—indeed, defense counsel withdrew his questions to James Siegel that attempted to elicit these facts. Tr. 540:15-543:15. Counsel should likewise be precluded from making any statements to this effect relying on facts not in evidence.

8. <u>The Defendant's Experience with Options Trading</u>

Counsel told the jury that the defendant "didn't know squat about option trading." Tr. 38:5-8. There is no evidence to support that claim. To the contrary, the defendant purchased more than 70,000 WeWork call options and he spoke fluently and intelligently (though, at times, aggressively) about options trading, including a smart and sophisticated strategy of purchasing call options in small increments and moving up the strike price "ladder" to avoid price impact. *See, e.g.*, GX 301, 303. He also had to seek and receive approval from the brokerage firms before he was allowed to trade options, which approval process required him to fill out paperwork attesting to his sophistication in investments. Unless the defense can point to specific evidence from which one could infer that the defendant had a lack of knowledge regarding options trading, any argument that the defendant did not know how options trading worked lacks a basis in the record and should be precluded.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: *[signature]*
Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2591

Cc: Defense Counsel (via ECF)