UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

UNITED STATES OF AMERICA,

    v.          24 CR 140 (PAE)

JONATHAN MOYNAHAN LARMORE,

     Defendant.

------------------------------------- X

**DEFENDANT'S MEMORANDUM IN SUPPORT OF RENEWED
MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO
FED.R.CRIM.P. RULE 29; OR IN THE ALTERNATIVE, A NEW
TRIAL PURSUANT TO FED.R.CRIM.P. RULE 33**

Bruce L. Udolf, P.A.
599 SW Second Avenue
Fort Lauderdale, Florida 33031

Litman, Asche & Gioiella, LLP
350 Central Park West Suite 10F
New York, New York 10025

Table of Contents

Page

POINT I.

The Court Should Enter a Judgment of Acquittal Pursuant to Rule 29
Federal Rules of Criminal Procedure ........................................................................1

The Applicable Legal Standard… ..........................................................................1

The Government's Evidence .................................................................................. 3

The Bloomberg article ...........................................................................................4

The Cole Capital trademark claim .........................................................................4

James Siegel and Veritone .....................................................................................5

The J. Moynahan Larmore claim ........................................................................... 6

Karl Meyers and Rick Engbrecht ..........................................................................6

Mr. Larmore's home mortgages ............................................................................ 6

The Indiana lawsuit ................................................................................................ 7

The boat ride with Pat Cochran… .........................................................................7

"WeWork, God Saves" ........................................................................................... 8

Mr. Larmore's Google searches ............................................................................ 8

The value of WeWork… .......................................................................................10

Secrecy… ............................................................................................................. 11

The letter to WeWork and the November 3, 2024 press release.................................. 12

Mr. Larmore's ability to finance the tender offer ................................................ 13

Mr. Larmore's interest in WeWork ......................................................................14

<u>Page</u>

POINT II.

    In the Alternative, The Court Should Order a New Trial in the Interest of
Justice Pursuant to Rule 33 Fed.R.Crim.P ...................................................................... 15

Conclusion…................................................................................................................................17

Table of Authorities

Page

United States v. Batista,
    2009 U.S. Dist. LEXIS 87349 at *14 (E.D.N.Y. 2009) ......................................................16

United States v. Brasciano,
    2006 U.S. Dist. LEXIS 8711 at *32 (E.D.N.Y. 2006) ......................................................16

United States v. Mulheren,
    938 F.2d 364, 372 (2d Cir. 1991) .......................................................................................2

United States v. Valencia,
    1996 U.S. App. LEXIS 2101 (2d Cir. 1996) ......................................................................1

United States v. Valle,
    301 F.R.D. 53 at *76 (S.D.N.Y. 2014) ..............................................................................2

United States v. Wallach,
    935 F.2d 445, 472 (2d Cir. 1991) ......................................................................................16


Federal Rules of Criminal Procedure Rule 29…...........................................................................1

Federal Rules of Criminal Procedure Rule 33…...........................................................................1

This Memorandum is submitted in support of the motion by defendant Jonathan Moynahan

Larmore for judgment of acquittal pursuant to Fed.R.Crim.P. Rule 29, or in the alternative,

for a new trial pursuant to Fed.R.Crim.P. Rule 33.

On October 22, 2024, the jury in Mr. Larmore's prosecution returned the verdict of guilty

on both counts in the Indictment. As shown below, the verdict was based entirely on impermissible

speculation with respect to a potpourri of circumstantial evidence offered by the Government,

which, taken as a whole, was insufficient to permit a rational juror from finding guilt beyond a

reasonable doubt.

## I.

### THE COURT SHOULD ENTER A JUDGMENT OF
### ACQUITTAL PURSUANT TO RULE 29 FED. R. CRIM. P.

#### The Applicable Legal Standard

The applicable standard for a  motion pursuant to Rule 29 is set forth in <u>U.S. v. Valencia</u>,

1996 U.S. App. LEXIS 2101 (2d Cir. 1996):

> A defendant challenging a jury's guilty verdict "bears a heavy burden." *United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017)* (internal quotation marks omitted). This is because, "[i]n evaluating a sufficiency challenge, we 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" *Id.* (quoting *Coplan, 703 F.3d at 62*). ….

> "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Siewe v. Gonzales, 480 F.3d 160, 168 (2d Cir. 2007)* (alterations omitted) (quoting *Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999))*. Impermissible speculation, on the other hand, is "a complete absence of probative facts to support the conclusion reached." *Lavender v. Kurn, 327 U.S. 645, 653, 66 S. Ct. 740, 90 L. Ed. 916 (1946)*. While we must defer to a jury's reasonable inferences, we give no deference to impermissible speculation. *United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994)*.

The line between permissible inference and impermissible speculation "is drawn by the laws of logic" and not "judicial idiosyncrasies." *Tose v. First Pa. Bank, N.A., 648 F.2d 879, 895 (3d Cir. 1981), abrogated on other grounds by Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 103 S. Ct. 400, 74 L. Ed. 2d225 (1982)*. As the Supreme Court has instructed, "the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." *Galloway v. United States, 319 U.S. 372, 395, 63 S. Ct. 1077, 87 L.Ed. 1458 (1943)*. Thus, in a criminal case, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *D'Amato, 39 F.3d at 1256* (quoting *United States v. Mulheren, 938 F.2d 364, 372 (2d Cir. 1991))*. [emphasis supplied]

As the Second Circuit stated in U.S. v. Mulheren, 938 F.2d 364, 372 (2 Cir. 1991):

On this appeal,… we are reminded that "in America we still respect the dignity of the individual, and [a defendant] . . . is not to be imprisoned except on definite proof of a specific crime." *United States v. Bufalino, 285 F.2d 408, 420 (2d Cir. 1960)* (Clark, J., concurring). To that end, it is "imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court 'must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference.'" *United States v. Redwine, 715 F.2d 315, 319 (7th Cir. 1983)* (quoting *United States v. Kwitek, 467 F.2d 1222, 1226* (7th Cir.), *cert. denied, 409 U.S. 1079, 93 S. Ct. 702, 34 L. Ed. 2d 668 (1972)), cert. denied, 467 U.S. 1216, 81 L. Ed. 2d 367, 104 S. Ct. 2661 (1984)*.

The Circuit Court in Mulheren reversed the defendant's conviction holding that the Government had not proven beyond a reasonable doubt that the defendant's sole purpose was to manipulate the price of stock rather than for investment.

And see, United States v. Valle, 301 F.R.D. 53, at *76 (S.D.N.Y. 2014):

…, the Second Circuit has made clear that "'[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" *Coplan, 703 F.3d at 69* (quoting *United States v. Huezo, 546 F.3d 174, 193 (2d Cir. 2008))* (alteration in original); see also *D'Amato, 39 F.3d at 1256* ("[T]he government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" (quoting *United States v. Mulheren, 938 F.2d 364, 372 (2d Cir. 1991)))*.

2

> Accordingly, a district court must grant a defendant's *Rule 29* motion where the evidence "viewed in the light most favorable to the government, remains, at best, in equipoise." *Coplan, 703 F.3d at 69.*

At bar, the inferences (if any) to be drawn from the Government's circumstantial evidence are at least as consistent with innocence as with guilt. The Government's evidence did nothing more than invite the jury to speculate as to the state of mind of Mr. Larmore.

The indictment alleged that Mr. Larmore issued a press release announcing a prospective tender offer to purchase a majority of the minority shares of WeWork stock at $9.00 a share, but that Mr. Larmore had neither the intent nor the ability to follow through on the tender offer. Rather, according to the Government, Mr. Larmore announced the tender offer solely to be able to cash in his options to purchase WeWork stock at inflated market prices. Unlike most cases involving alleged "pump and dump schemes" where the intention of the defendant can easily be inferred by the defendant's trading activity in cashing in on the pumped up stock, Mr. Larmore never cashed in, and lost several hundreds of thousands of dollars measured by the purchase price of his options. It thus fell to the Government to prove Mr. Larmore's intent by other means.

As shown below, the circumstantial evidence offered by the Government was insufficient to allow a rational jury to find beyond a reasonable doubt that Mr. Larmore had the requisite criminal intent.

<u>The Government's Evidence</u>

The Government introduced a number of miscellaneous snippets of evidence with which it sought to substitute for any direct evidence of Mr. Larmore's state of mind. These will be discussed *seriatim* below (in no particular order):

The Bloomberg article (Exhibit 1012; Tr. 262):

The Government introduced a stipulation setting out  excerpts from an  article published in Bloomberg News on May 30, 2023 (five months before the tender offer)  which reported that Mr. Larmore had been the subject of an investor lawsuit claiming that none of Mr. Larmore's 2,000 investors had been paid since 1999, and that, there "appear[ed]" to be an SEC investigation of Mr. Larmore or Arciterra. The Government sought to draw the inference that Mr. Larmore would have known that no reasonable investor would invest with him after the publication of this article and that, therefore, he would be unable to raise sufficient funds to carry out the tender offer. Significantly, the Government did not see fit to call as a witness a single one of the 2,000 investors. And, of course, there was no way of knowing how many, if any, of the investors had seen the article. There was no evidence in the record that any of the investors were aware of the article. Further  (as Mr. Larmore informed one of his bankers), the investor's lawsuit had been withdrawn prior to the tender offer (Exhibit 1176). Nor did any of the witnesses who interacted with Mr. Larmore after May 2024 testify that they were aware of the Bloomberg article.

Mr. Larmore was in the commercial real estate business, an industry hard hit by the COVID pandemic in 2020-2022, and it is far from clear that any of his investors-  had they read the article- would hold it against him if their investments were not profitable during this fraught period.

The Cole Capital trademark claim

The Government introduced evidence that CCO Advisors, LLC, a company which had acquired a trademark for Cole Capital LLC, for which Mr. Larmore had previously worked,  had sent a cease and desist letter to Mr. Larmore, alleging that Mr. Larmore was infringing on a trademark with respect to his newly formed entity, Cole Capital Funds LLC (see generally Tr. 510-11;Exhibit 801). The Government sought to show that Mr. Larmore was attempting to create the impression that he was at the head of a long-established business. The Government's twist on this

evidence was that shareholders of WeWork would look at Cole Capital Funds LLC and be convinced that it was a legitimate company, and that therefore the tender offer was legitimate. The Government offered no evidence that any WeWork shareholder was actually confused by Mr. Larmore use of the Cole name. Assuming *arguendo* that Mr. Larmore was attempting to piggyback on the reputation of Cole Capital, this fact says nothing about whether Mr. Larmore intended to pump and dump or whether he intended to go through with the tender offer. It is at least as plausible that Mr. Larmore created the new Cole Capital Funds LLC, intending to use it as a vehicle for raising funds to pay for the tender offer and that the website created for Cole Capital was intended to attract investors, not deceive WeWork shareholders.

<u>James Siegel and Veritone</u>

The Government introduced evidence in the form of testimony and emails from James Siegel, a lawyer who was never retained by Mr. Larmore and expressly disclaimed any expertise with respect to tender offers (Tr. 518), in which Mr. Siegel advised Mr. Larmore that "I think you will need to have funds locked down before the [form] TO…" (Tr. 626). No inference whatsoever can be drawn from this advice, since it is undisputed that no form TO was ever docketed at the SEC and no formal tender offer was ever made or that Mr. Siegel's advice was accurate.

Mr. Siegel mentioned to Mr. Larmore a case involving a company identified as Veritone. There was no evidence at trial as to what happened in the Veritone case except that the company was investigated by the SEC. Upon reading about Veritone, Mr. Larmore distinguished his situation, telling Mr. Siegel that "the real problem is he dumped and he withdrew his offer. This is not in my game plan." (Exhibit 1309, Tr. 626). It is simply illogical to draw any conclusion from this evidence consistent with the Government's claim that Mr. Larmore knew he was breaking the law. Indeed, if Mr. Larmore intended to break the law, there would have been no need to read up on Veritone.

5

<u>The J. Moynahan Larmore claim</u>

In another example of the Government making a mountain out of a molehill, the Government claimed at trial that Mr. Larmore's use of the name J. Moynahan Larmore was an attempt to conceal his true identity from WeWork shareholders. No such inference can be drawn. Any shareholder who bothered to search on Google the name "J. Moynahan Larmore" would obviously be directed to the defendant. Any shareholder already aware of Mr. Larmore would easily conclude that Jonathan M. Larmore and J. Moynahan Larmore were one and the same person. It is inconceivable that Mr. Larmore could have believed that using his middle name and first initial could have fooled anyone.

<u>Karl Meyers and Rick Engbrecht</u>

The Government introduced evidence of an email from Mr. Larmore to Karl Meyers, an investment advisor at JP. Morgan, (Exhibit 1403) in which Mr. Larmore asked "If I have $100 million of NYSE traded stock in the account, how much can you lend on it?" Mr. Meyers responded that his bank, could lend 50% against the stock. To the same effect, Mr. Larmore, in an email to Rick Engbrecht of City National Bank, asked "I have formed a new company, and I am preparing to start sourcing deals. If I were able to purchase $100 million of NYSE securities, would you be able to help finance…a $85 million acquisition, assuming everything else in my world is cleared up?" (Exhibit 1308). Mr. Engbrecht's response was "More than likely…" (<u>Id</u>).

If any inference could be drawn from these emails, they represent an intent by Mr. Larmore to attempt to fund the tender offer, and his belief that he could do so. The Government's spin on these emails – that Mr. Larmore was seeking to create a phony paper trail to falsely create the impression that he was serious about the tender offer- was far less likely and invited the jury to speculate.

<u>Mr. Larmore's home mortgages</u>:

The Government introduced evidence that Mr. Larmore had failed for a period of 60 days in the spring of 2023 to keep current on roughly $5 million of home mortgages. Mr. Larmore explained

to his banker,  Mr. Engbrecht, that a refinancing deal he had been working on had fallen through. (Tr. 410). There was no evidence that by November 2023 the bank had taken any steps to foreclose on the mortgages.

This evidence is not inconsistent with Mr. Larmore's defense. He did not contest at trial that he lacked personal cash resources sufficient to fund the tender offer, and therefore, his inability to do so using his own personal funds proved nothing.

The Indiana lawsuit

The Government offered evidence that as a result of an unrelated lawsuit in Indiana, Mr. Larmore was obligated to pay more than $1.2 million to the Trustee for Arciterra, and that he needed to borrow funds from his mother to make the repayment. (Exhibit 1013, Tr. 263). This evidence, showing that Mr. Larmore lacked cash in late November 2023, was irrelevant for the same reason that evidence on arrearages on his home mortgages was irrelevant. Mr. Larmore never claimed that he intended to pay for the tender offer out of pocket.

The boat ride with Pat Cochran

The Government introduced evidence in the form of testimony by Mr. Larmore's fiancée's brother, Pat Cochran, about a ride on a yacht Mr. Larmore had chartered on November 3, 2023, during which Mr. Larmore placed his orders for the WeWork options.

Mr. Cochran testified that Mr. Larmore wanted to go into "international waters" to effectuate a trade. However, as Mr. Cochran admitted, the trade that Mr. Larmore had in mind had nothing to do with WeWork, but related to Forex (foreign exchange) (Tr. 377, 402). The Government submitted no evidence, nor asked for instructions, that trading Forex in international waters violated any United States laws. Any such evidence would have been inadmissible as other crimes evidence. And, it is undisputed that Mr. Larmore made all of his WeWork trades while in U.S. waters.

Mr. Cochran also testified that on the same day, while Mr. Larmore was effectuating his options purchases, he told Mr. Cochran that the SEC would not be happy with what he was doing "or something along those lines." (Tr. 382-3). The evidence is undisputed that Mr. Larmore's purchases of WeWork options were made in the context of a predictable "short squeeze" which, had it occurred, would have seen the price of WeWork stock skyrocket. Given the expected jump in WeWork stock, it would be natural that Mr. Larmore believed that an SEC investigation was possible, even though, a short squeeze without more has never been held to violate the securities laws.

<u>"WeWork, God Saves"</u>

The Government introduced evidence that Mr. Larmore hired planes to drag banners in Miami, New York and Chicago with the caption "WeWork, God Saves" (Tr. 614). It is not clear what inference the Government seeks to draw from this. If Mr. Larmore wanted to call attention to WeWork in order to increase its market price, there is nothing illegal about that. Moreover, this would be consistent with an intent to save WeWork as a going concern, not to "pump and dump" its stock, as the Government claimed.

<u>Mr. Larmore's Google searches</u>

The Government offered evidence of Google searches by Mr. Larmore in the period October 27, 2023 going forward:

--    One of Mr. Larmore's searches contained the caption "SEC finds short squeeze tender" (Exhibit 1601; Tr. 604): There was no evidence as to what was contained in the article Mr. Larmore searched, but a logical inference was that he looked at the Veritone case which had been disclosed to him by Mr. Siegel. The only logical inference to be drawn from this search was that Mr. Larmore wanted to make sure that he was not violating federal securities laws.

-- Mr. Larmore also Googled "is it illegal to advertise stock pickers on billboards/social platforms, etc.?" (Tr. 605). Here, again, Mr. Larmore was seeking to learn what is permissible and what is not permissible, something he would not do if he intended to violate the law.

-- In a similar vein, Mr. Larmore queried "Are options markets unregulated?" (Exhibit 1601, Tr. 606). Again, if Mr. Larmore intended to violate the law, he would not have needed to pose this question.

-- Mr. Larmore's also Googled "SEC rules for a tender offer." (Exhibit 1302, Tr, 608) The only logical inference to be drawn from this search was that Mr. Larmore was attempting to educate himself with regard to SEC rules, so that he could comply with them.

-- Mr. Larmore also Googled "What day of the week is best to start short squeeze?" (Exhibit 1302, Tr. 608). However, there was no evidence in the record and no instruction to the jury that in any way indicated that a short squeeze is illegal.

The next series of searches offered in evidence are undated. However, the context clearly shows that they are subsequent to Mr. Larmore's arrest, and can have no bearing on his state of mind prior thereto. For example:

-- In an undated query Mr. Larmore Googled "perjury consequences" (Tr. 608). No inference can be drawn from this that Mr. Larmore was considering perjuring himself. It is equally plausible that Mr. Larmore was worried about some other person perjuring statements against Mr. Larmore, or that the search was made after the Government suggested that he had perjured himself in the Indiana lawsuit.

--      In an undated search Mr. Larmore queried "WeWork scandal." This message
        obviously could not have been written before the SEC and/or the Government's
        investigation and/or Mr. Larmore's arrest.

--      Similarly, Mr. Larmore's query "life imprisonment for dummies" was undated and
        most likely written after he was arrested and Mr. Larmore was understandably
        concerned with the penalties he was facing if convicted.

The value of WeWork

The Government claimed at trial that WeWork was in such poor financial condition that no
reasonable person would have paid nine dollars a share at a time when the stock was trading for less
than a dollar. There was evidence, however, that WeWork's financial woes were temporary and that
the company was potentially a worthwhile investment, or that Mr. Larmore could reasonably have
believed it to be so.

Kevin Berry, formerly WeWork's Shareholders Relations Officer, testified that in 2019,
WeWork was worth $47 billion dollars (Tr. 73). In late 2021, the stock sold for $13 a share (the
equivalent of $520 if adjusted for the subsequent 40/1 reverse stock split in September 2023 (Tr.
82). It is a logical inference that the stock started to decrease in 2021 as a result of the COVID
pandemic, but that it had not lost its intrinsic value. Mr. Larmore could easily have believed that
WeWork was significantly undervalued, and could have decided to gamble on its prospects.

The Government introduced evidence that a form 8K filed by WeWork with the SEC on
August 8, 2023 contained a going concern warning to investors (Exhibit 405, Tr. 80). However, the
very same form 8K contained an optimistic assessment by WeWork management. Mr. Berry
acknowledged that the Form 8K contained a representation by management that "WeWork reported
an improvement year over year and $280 million for the first half of 2023 year over year…"
(Tr. 109). Mr. Berry also acknowledged that, according to the 8K, WeWork reported a $98 million

improvement in EBITDA for the first half of 2023, as compared to the same period in 2022. The Company also reported that it had experienced an increase from 70 – 72% of physical occupancy (Tr. 110). Similarly, the August 8K contained a representation by management that "we are confident in our ability to meet the evolving workplace needs of businesses of all sizes across all sectors and geographies and long term company vision remains unchanged." (Exhibit 405, Tr. 110).  And WeWork's CEO was quoted as saying: "In a difficult year we have delivered solid year-over-year revenue growth and dramatic profitability improvements. (id.) The form 8K also set forth steps WeWork intended to take to reduce its deficit and become profitable in the future (Tr. 110).

There was considerable back and forth colloquy at the trial as to how to evaluate the share price of WeWork pre-reverse stock split as compared with post-stock split. According to a chart it produced through Mr. Berry (Exhibit 806), while not precise, it appears that in August of 2023, a share of WeWork stock was valued at approximately 20-25 cents. If adjusted for the subsequent stock split, the shares would have been worth $8-10. Mr. Larmore could easily have concluded, based in part on management's optimistic assessments contained in its August 8, 2024 8K (Exhibit 405) that WeWork was a company on the rebound with good prospects for growth.

Secrecy

The Government argued that Mr. Larmore must have had a criminal intent because, in discussion with  a CNB trader whom he had never met,  he denied having inside information or knowing something the broker did not know (Tr. 438; Exhibit 303). There was no claim by the Government, and no request for instructions, identifying Mr. Larmore as an insider, which he clearly was not. In any event, Mr. Larmore was about to invest a substantial sum in WeWork options, and it is not unreasonable to assume that he did not want to risk having the broker "front

11

run" his trades, i.e. purchase before Mr. Larmore could do so. (Mr. Larmore attempted to introduce evidence describing front-running to the jury, but the Court sustained an objection to the proffered testimony [Tr. 440-441]).

The letter to WeWork and the November 3, 2024 press release

The Government introduced a letter from Mr. Larmore to WeWork dated November 3, 2024, which was incorporated in a press release the same day. The letter (Exhibit 1163) read, in part:

> We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement. We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely. (emphasis supplied)

The Government claimed at trial that this letter contained two material misstatements or omissions. The Government claimed that Mr. Larmore had not consulted with City National Bank or with JP Morgan. However, as shown above, Mr. Larmore did in fact query both banks as to the availability of loans against stock (an indication that he intended to complete his tender offer), and did receive "feedback", in the form of positive responses from each bank. The Government offered testimony from a JP Morgan witness, that the bank had received no request for a conflict of interest check regarding the transaction; however this testimony did not erase the fact that Mr. Larmore made the inquiry and received a response. In any event, in view of the fact that the letter also disclosed that Mr. Larmore had not yet selected a lender but "expected" to have one prior to a definitive agreement the statements lacked materiality.

As to Mr. Larmore's statement that he had consulted with God and legal advisors, the Government never explained why this representation was material or false. Why would an investor want to know that Mr. Larmore had consulted with lawyers? Moreover, the statement (with the possible exception of his reference to God) was true. Indeed, the Government attempted to use aspects of his consultation with attorneys Siegel and Silfen to show that they had given him advice

12

on the proposed turnover, but were unwilling to represent him. And, of course, the Government presented no evidence that Mr. Larmore had not, in fact, consulted with other lawyers.

<u>Mr. Larmore's ability to finance the tender offer</u>

The Government claimed at trial that Mr. Larmore could not have raised the funds necessary to finance the tender offer. The Government's evidence in support of this claim consisted almost entirely of demonstrating a fact that was never in dispute: Mr. Larmore surely did not have the funds on hand on November 3 to pay to exercise the options he had purchased or to fully finance the tender offer. Very few individuals have that kind of cash on hand. However, the Government failed to address other methods by which Mr. Larmore could have believed (perhaps naively) he would be able to execute his tender offer. Specifically, Mr. Larmore had purchased his options with a strike price of $2-5 per share. Had the market price of WeWork increased, as Mr. Larmore hoped, to a price more than double his average strike price, he could have borrowed against the increased value of the shares in order exercise the options. Similarly, Mr. Larmore could have borrowed against the increased market price of WeWork to complete the tender offer or found third party investors willing to post stock collateral with CNB or JP Morgan.[1]

Moreover, even without borrowing against his shares—as two banker witnesses acknowledged was possible-- Mr. Larmore was not entirely without resources. When he filled out a financial statement for City National Bank, in connection with opening an options account he represented that his net worth exceeded $10 million. (Tr. 621, Exhibit 1172) And when he provided

---

[1] As of October 30, 2023, there were 52,758,760 shares of WeWork outstanding. (Exh. 404). Softbank owned approximately 68% (Exh. 1706) or approximately 36,000,000 shares, leaving approximately 16,758,760 shares owned by minority shareholders, of which 51% or approximately 8,546,967 shares was the subject of the tender offer. Had Mr. Larmore been able to exercise his options, he would have acquired 7,284,600 shares which, together with 343,641 shares he owned outright (Exh. 1706) would total approximately 7,628,241. Thus, to acquire 51% of the minority shares, Mr. Larmore would have needed to purchase 918,726 shares. At nine dollars a share, his cost would come to 8,268,534.

information to Mr. Meyer at JP Morgan, he told the banker that he had liabilities of $280 million, and net worth of $10 million. (Exhibit 121). This meant that Mr. Larmore had assets of at least $290 million. There was no evidence submitted by the government respecting the status of these assets and whether or not they were subject to liens. The Government failed to exclude—even circumstantially—that Mr. Larmore could have liquidated assets to fund the tender offer, given sufficient time.

Further, there was evidence that Mr. Larmore had enjoyed a career as a real estate syndicator. The Bloomberg article reported that, according to the investor who sued him, he had 2,000 investors. The parties stipulated to the following:

> In 2005, the defendant founded and became the chief executive officer of Arciterra Group, LLC also known as Arciterra, a real estate and management company headquartered in Phoenix, Arizona, which was the predecessor to Arciterra Companies, LLC, formed in 2007. Arciterra created investment offerings, raised money from investors, and owned and managed properties for the benefit of investors (emphasis supplied).

And Mr. Siegel testified (Tr. 514) that he briefly worked for Mr. Larmore and was asked to create financial products to syndicate some of his real estate properties.

The Government failed to offer any evidence that Mr. Larmore could not have believed, given his track record of raising money that, notwithstanding the Bloomberg article (even assuming that some of his investors had read it), he could have raised sufficient capital to pay WeWork shareholders tendering their stock.

Mr. Larmore's interest in WeWork

There was evidence at trial that Mr. Larmore was interested in acquiring WeWork because he believed that the company could be transformed into a profitable enterprise. Shannon Bane, an investment banker specializing in financing apartment developments (Tr. 736), including creating mixed use (residential and office) projects, was asked by Mr. Larmore to do research into WeWork

buildings with a view to converting unused space in the buildings into residences. (Tr. 738). As Mr. Bane testified, after the COVID pandemic, everyone was working from home. (Tr. 739). Mr. Bane looked at several properties and sent an extensive report to Mr. Larmore (Exhibits C-1 and C-2). Mr. Bane testified that Mr. Larmore told him that, instead of buying buildings, one option was to control WeWork in bankruptcy and renegotiate the company's debt. (Tr. 749).

And  Pat Cochran testified that while he was working for Mr. Larmore he was asked to call WeWork and ask for a job, and tell WeWork that he could produce 5,000 new members. (Tr. 369). Although Mr. Cochran did not know the purpose of this request, the inference is inescapable that Mr. Larmore had an interest in WeWork as an investment.

Further, Mr. Siegel testified that Mr. Larmore told him he wanted to contact Masayoshi Son ( Masa San, in the transcript)  the head of SoftBank, which owned 68% of WeWork common stock. Mr. Larmore's interest in speaking with Mr. San is further evidence that he was interested in WeWork as a company, not in pumping and dumping its stock. Had Mr. Larmore intended to dump WeWork stock, he would have had no need to speak with Mr. San.

## II.

### IN THE ALTERNATIVE, THE COURT SHOULD ORDER A NEW TRIAL IN THE INTEREST OF JUSTICE PURSUANT TO RULE 33 FED. R. CRIM P.

Over the Defendant's objection, the Court ruled pre-trial that the evidence summarized in the prior section was admissible on the grounds, inter alia, that they demonstrated Mr. Larmore's "state of mind" and/or consciousness of guilt. Even assuming that the Court's rulings were within its discretion as to individual items of evidence, now that the trial has been conducted, it is clear that the cumulative effect of this evidence deprived Mr. Larmore of a fair trial, and that the prejudice of allowing the jury to consider this evidence—taken as a whole--outweighed its relevance. During the course of a relatively short trial during which the Government presented no direct evidence, the

jury was bombarded with evidence that Mr. Larmore had been sued by an investor who alleged that none of his investors had been paid in five years, that Mr. Larmore was being investigated by the SEC, that Mr. Larmore allegedly violated Federal Trademark laws, that Mr. Larmore spent prodigious sums which he charged to an Arciterra credit card, that Mr. Larmore had allegedly committed perjury in the Indiana proceeding, and that he allegedly attempted to skirt U.S. law by trading Forex in international waters.

In United States v. Wallach, 935 F.2d 445, 472 (2d Cir. 1991) the Court of Appeals observed:

> Although we have adopted an "inclusionary approach" to the introduction of similar act evidence as long as the evidence is not being introduced to show propensity, *United States v. Brennan, 798 F.2d 581, 589 (2d Cir. 1986)*, a district court must be careful to consider the cumulative impact of such evidence on the jury **[**82]** and to avoid the potential prejudice that might flow from its admission. *See United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987)* (probative value must exceed potential for prejudice); 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, para. 404[08] (1990).

See also United States v. Batista, 2009 U.S. Dist. LEXIS 87349, at * 14 (E.D.N.Y. 2009). And see, United States v. Brasciano, 2006 U.S. Dist. LEXIS 8711, * 32 (E.D.N.Y.), wherein the Court cautioned the prosecution to weigh the cumulative effect of evidence, otherwise separately admissible:

> Notwithstanding this ruling, the court hereby alerts the Government of its concern over the *cumulative effect* of admitting so much testimony on murder-related acts. The *prejudice* that may result from presenting all of this evidence may be unfair in the context of the trial and may substantially outweigh the probative value of its admission in completing the story, establishing relationships of trust, and corroborating testimony of witnesses (emphasis supplied).

At bar, we submit, the cumulative prejudicial effect of the Government's evidence of unrelated acts, outweighed its evidentiary value and thereby violated Section 403 of the Federal Rules of Evidence.

16

<u>Conclusion</u>

Defendant's motion for a judgment of acquittal should be granted, or in the alternative, the Court should order a new trial.

Dated:    New York, New York
          November 5, 2024

                                    Respectfully submitted,

                                    Bruce L. Udolf, P.A.
                                    599 SW Second Avenue
                                    Fort Lauderdale, Florida 33031
                                    954- 415-2260
                                    budolf@bruceudolf.com


                                    By:/s/ Bruce L. Udolf_____
                                          Bruce L. Udolf


                                    Litman, Asche & Gioiella, LLP
                                    350 Central Park West Suite 10F
                                    New York, New York 10025
                                    917-417-6951
                                    richardasche@lagnyc.com


                                    By:/s/ Richard M. Asche_____
                                          Richard M. Asche


                                    Attorneys for Defendant

17