UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
                                  :

UNITED STATES OF AMERICA        :

                                  :

          - v. -            :              24 Cr. 140 (PAE)

                                  :

JONATHAN MOYNAHAN LARMORE,  :

                                  :

          Defendant.        :

                                  :

-------------------------------------------------- x

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys
    -Of Counsel-

Table of Contents

**PRELIMINARY STATEMENT** ........................................................................................1

**BACKGROUND** ...........................................................................................................1

    I.    The Charges ........................................................................................... 1

    II.    The Government's Evidence at Trial ............................................................ 2

        A.    The Defendant, Jonathan Moynahan Larmore............................................ 3

        B.    WeWork ........................................................................................... 3

        C.    Larmore Creates Cole Capital Funds, LLC .............................................. 5

        D.    Larmore Buys WeWork Call Options and Shares....................................... 7

        E.    Larmore Announces a False and Fraudulent Tender Offer for WeWork Stock ........... 11

        F.    Larmore's Communications with City National Bank and JP Morgan........................ 15

        G.    Larmore's Communications with Lawyers................................................. 16

        H.    Larmore's Spending and Finances in the Summer and Fall of 2023 .......................... 17

        I.    Larmore Commits Perjury about His Use of the Plane Proceeds ................................ 19

**ARGUMENT** ...........................................................................................................**20**

    I.    Sufficient Evidence Supported the Jury's Guilty Verdict................................... 20

        A.    Applicable Law ................................................................................. 21

            1.    Sufficiency of the Evidence ........................................................ 21

            2.    Tender Offer Fraud and Securities Fraud ....................................... 22

        B.    Discussion ....................................................................................... 23

    II.    Larmore is Not Entitled to a New Trial. ...................................................... 30

        A.    Applicable Law ................................................................................. 30

        B.    Discussion ....................................................................................... 31

    **CONCLUSION** ...................................................................................................**35**

Table of Authorities

Cases                                                                                          Page(s)

*Jackson v. Virginia,*
    443 U.S. 307 (1979) ............................................................................................. 21

*S.E.C. v. Vali Mgmt. Partners,*
    No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ........................................ 24

*United States v. Aquart,*
    912 F.3d 1 (2d Cir. 2018) .............................................................................. 23, 32

*United States v. Basciano,*
    2006 U.S. Dist. LEXIS 8711 (E.D.N.Y. 2006) ......................................................... 34

*United States v. Espaillet,*
    380 F.3d 713 (2d Cir. 2004) ................................................................................. 21

*United States v. Facen,*
    812 F.3d 280 (2d Cir. 2016) ................................................................................. 21

*United States v. Figueroa,*
    618 F.2d 934 (2d Cir. 1980) ................................................................................. 35

*United States v. Gambino,*
    59 F.3d 353 (2d Cir. 1995) ................................................................................... 30

*United States v. Gatto,*
    986 F.3d 104 (2d Cir. 2021) ................................................................................. 25

*United States v. Gelzer,*
    50 F.3d 1133 (2d Cir. 1995) ................................................................................. 35

*United States v. Hassan,*
    578 F.3d 108 (2d Cir. 2008) ................................................................................. 21

*United States v. Ho,*
    984 F.3d 191 (2d Cir. 2020) ................................................................................. 21

*United States v. Landesman,*
    17 F.4th 298 (2d Cir. 2021) ................................................................................. 21

*United States v. LeRoy,*
    687 F.2d 610 (2d Cir. 1982) ................................................................................. 30

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) ........................................................................................ 24

*United States v. Napoli*,
   173 F.3d 847 (2d Cir. 1999) ........................................................................................ 34

*United States v. Persico*,
   645 F.3d 85 (2d Cir. 2011) .......................................................................................... 21

*United States v. Reed*,
   875 F.2d 107 (7th Cir. 1989) ...................................................................................... 31

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) ........................................................................................ 24

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992) ................................................................................. 30, 31

*United States v. Technodyne LLC*,
   753 F.3d 368 (2d Cir. 2014) ........................................................................................ 25

*United States v. Teman*,
   No. 19 Cr. 696 (PAE), 2023 WL 6533490 (S.D.N.Y. Oct. 6, 2023) .......................... 31

*United States v. Tussa*,
   816 F.2d 58 (2d Cir. 1987) .......................................................................................... 35

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ........................................................................................ 34

*United States v. White*,
   7 F.4th 90 (2d Cir. 2021) ............................................................................................ 23

Rules
Fed. R. Crim. P. 33(a) .................................................................................................... 30
Federal Rule of Criminal Procedure 29 .......................................................................... 1
Federal Rule of Criminal Procedure 33 .......................................................................... 1

## PRELIMINARY STATEMENT

The Government writes in opposition to the defendant's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 (the "Motion" or "Mot."). Dkt. 111.

The Motion is meritless. First, the defendant has not met his heavy burden of showing that, with all inferences drawn in the Government's favor, no rational jury could have found him guilty of the two crimes of which he was convicted. Contrary to the Motion's arguments, the Government presented overwhelming evidence of the defendant's guilt at trial, and certainly that evidence was more than sufficient to support the jury's verdict on both counts. Second, the defendant's argument that he is entitled to a new trial because of the cumulative prejudicial effect of certain evidence fails. As reflected by the Court's careful and reasoned decisions before and during trial, the evidence about which the defendant complains was highly relevant and was not substantially outweighed by any unfair prejudice. Notably, the defendant does not acknowledge the limiting instructions that the Court gave throughout the trial that mitigated any residual risks of unfair prejudice. Accordingly, the Motion should be denied.

## BACKGROUND

### I.    The Charges

On March 12, 2024, a grand jury in this District returned Indictment 24 Cr. 140, charging the defendant, Jonathan Moynahan Larmore, with one count of tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. § 240.14e-8(a), (b), & (c), and 18 U.S.C. § 2, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (the "Indictment").

II.        **The Government's Evidence at Trial**

On October 15, 2024, the parties proceeded to a jury trial. The Government's evidence at trial included the testimony of 15 witnesses and approximately 196 admitted exhibits.

The evidence showed that Larmore used a false and fraudulent tender offer to manipulate the stock price of WeWork, Inc. ("WeWork"). On November 3, 2023, Larmore issued a press release announcing that a shell company he had formed, Cole Capital Funds, LLC ("Cole Capital"), was proposing to acquire millions of WeWork shares—specifically, 51% of all minority shares—at $9 per share, for a total equity value of more than $77 million, at a time when WeWork was on the verge of bankruptcy and when its stock was trading for less than $1 per share. GX 803. Neither Larmore nor Cole Capital, however, had $77 million, and Larmore did not have the intent or the ability to carry out the tender offer on the terms he announced. Larmore announced the tender offer at an artificially inflated price to try and cause a "short squeeze" that would quickly and exponentially drive up the price of WeWork stock, because Larmore had personally purchased 72,846 short-dated, out-of-the-money, WeWork call options, which gave him the right to purchase more than 7.2 million WeWork shares if WeWork's price increased significantly in a matter of days. GX 1706.

Larmore's press release also contained numerous misrepresentations and misleading statements that were meant to make his offer look like a legitimate tender offer. For example, Larmore falsely claimed that he had "received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect[ed] to select a lender and have a financing commitment prior to execution of a definitive agreement." GX 803. He also falsely represented that Larmore had "consulted with…legal, financial and other advisors to assist [] with this transaction." GX 803.  The testimony of bankers and lawyers at trial showed that these statements

were false and misleading. In fact, Larmore never even told City National Bank or JP Morgan about "this acquisition," GX 803, and one lawyer—James Siegel—told Larmore, in response to hearing his plans, "I don't think you can do that." Tr. 532.

**A. The Defendant, Jonathan Moynahan Larmore**

In 2005, Larmore founded and became the chief executive officer of Arciterra Group, LLC, also known as Arciterra, a real estate and management company headquartered in Phoenix, Arizona, which was the predecessor to Arciterra Companies, LLC, formed in 2007. Tr. 262; GX 1012. Arciterra created investment offerings, raised money from investors, and owned and managed properties for the benefit of investors. *Id.*

On May 30, 2023, *Bloomberg News*, a national financial news outlet, published an online article reporting that, according to a lawsuit brought against Arciterra and Jonathan Larmore, none of the more than 2,000 investors in Arciterra offerings have received payments since 2019. Tr. 262; GX 1012. The article stated that there appeared to be an SEC investigation in process against Arciterra and Jonathan Larmore. *Id.* The article referred to "Jonathan Larmore," but not "Jonathan Moynahan Larmore" or "Moynahan Larmore." *Id.* This evidence was presented at trial in the form of a stipulation between the parties setting forth certain facts reported in the *Bloomberg News* article (the "Bloomberg Article").

**B. WeWork**

WeWork was an office space company that was headquartered in New York, New York and publicly traded on the New York Stock Exchange ("NYSE"). Tr. 71-72. WeWork's business model was to lease office space from building owners, subdivide that space, and then lease it out to users at a profit. Tr. 72. Softbank Group owned approximately 68% of WeWork and controlled the company. Tr. 74-75, 78-79; GX 404.

In the summer of 2023, WeWork's financial condition was deteriorating. Tr. 79. It had a low occupancy rate for its working spaces, and was spending more cash than it was taking in. *Id.* On August 8, 2023, WeWork announced, "As a result of the company's losses and projected cash needs, combined with increased member churn and current liquidity levels, substantial doubt exists about the company's ability to continue as a going concern." Tr. 80; GX 405.

WeWork's stock was also trading for less than $1 per share from March 2023 through August 2023 and, as a result, WeWork was in danger of being delisted from the NYSE. Tr. 82-83; GX 806. To avoid delisting, on August 18, 2023, when WeWork's stock was trading for approximately $0.12 per share, WeWork announced a 1-for-40 reverse stock split, effective September 1, 2023, which would consolidate the number of existing shares into fewer shares, to help the company regain compliance with the $1 per share minimum closing price required for continued listing on the NYSE. Tr. 83, GX 805. After the September 1, 2023, reverse stock split, WeWork's share price briefly spiked, but never reached $6 per share. Tr. 86, GX 806.

By October 2023, WeWork was not paying significant obligations. On October 2, 2023, WeWork announced that it had elected to withhold more $95 million in interest payments to bondholders. Tr. 86-88; GX 402. WeWork's stock price declined after the news from a closing price of $2.95 on October 2, 2023, to a closing price of $2.54 on October 3, 2023. GX 1706 at 2. On October 31, 2023, WeWork announced that it had entered into an agreement with its bondholders to provide the company with an additional seven days to make interest payments. Tr. 88-89; GX 403. In addition, on October 31, 2023, at approximately 5:19 p.m., the *Wall Street Journal* published an article titled, "WeWork Plans to File for Bankruptcy as Early as Next Week." GX 802. WeWork's stock price declined after the news from a closing price of $2.28 on October

31, 2023, to a closing price of $1.22 on November 1, 2023, and $1.11 on November 2, 2023. GX 1706 at 2.

### C.  Larmore Creates Cole Capital Funds, LLC

On October 6, 2023, Larmore filed Articles of Organization for Cole Capital Funds, LLC, with the Arizona Corporation Commission. GX 401. Larmore listed the character of the business as "Real Estate and Rental and Leasing," and listed himself (using the name "J. Moynahan Larmore") as the statutory agent, principal, and organizer of Cole Capital Funds, LLC. GX 401.

Cole Capital was a shell company. Trial testimony by a court-appointed receiver overseeing Cole Capital established that at no time did Cole Capital ever have any assets, cash, bank accounts, brokerage accounts, real estate, investments, securities, property of any kind, employees, investors, lenders, or customers. Tr. 120-121. Nor did it ever engage in the business of "Real Estate and Rental and Leasing," as described in its Articles of Organization, or any other type of business. Tr. 121.

Nonetheless, Larmore took steps to make it look like Cole Capital was a legitimate, well-established investment company. On October 6, 2023, Larmore created and registered with GoDaddy, the domain name www.ColeCapitalFunds.com (the "Website"). Tr. 290; GX 701, 1007. On October 16, 2023, Larmore, on behalf of Cole Capital, entered into a one-month (but only one month) membership agreement with WeWork for a one-person office at 2425 East Camelback Road in Phoenix, Arizona. Tr. 104; GX 901. This office space was within blocks of a legitimate and established company that was not connected to Larmore but was also called Cole Capital (the "Real Cole Capital"), discussed below, and renting this space was one of many steps Larmore took to trick investors into thinking that Cole Capital was, in fact, associated with the Real Cole Capital, a company that would have actually been able to fund an acquisition of WeWork. On October 18,

2023, Larmore spoke to Justin Kerbo, a web designer, about designing the Website. Tr. 296-297; GX 1201. Larmore provided Kerbo with all the content for the Website. Tr. 297, 299-303. On November 2, 2023, the Website went live, *i.e.*, was accessible to the public. Tr. 301-302, 306-307. According to the Website, Cole Capital "charges ahead, introducing innovative investment strategies and providing access to best-of-class investments . . . . We venture into various markets across the United States, securing investments in properties and companies that are leaders in their fields." GX 801. Cole Capital, however, did not have any investment strategies or investments. Tr. 122. At Larmore's request, the Website also included the logos for Whole Foods Market, Amazon, Chick-fil-A, Verizon, Oracle, T-Mobile, and CVS Pharmacy. Tr. 304; GX 801. Cole Capital, however, had no affiliation or connection whatsoever to any of those companies. Tr. 123.

The Website identified "Moynahan Larmore" as the CEO of Cole Capital. GX 801. Justin Kerbo originally understood "Moynahan Larmore" to be someone other than the defendant, until the defendant corrected him and indicated that he was "Moynahan Larmore." Tr. 303.

On November 29, 2023, Larmore received a cease-and-desist letter from legal counsel to the successor to the Cole Companies, CCO Group, LLC—i.e., the Real Cole Capital—an affiliate of a well-established real estate investment company that had acquired in 2018 a group of companies referred to as Cole Capital (after their founder Christopher Cole). Tr. 502; GX 1317. The letter informed the defendant that he was infringing the Real Cole Capital's registered trademark on the name "Cole Capital" and its registered trademark on a logo with the same name. GX 1317. Larmore's infringing logo (which he included on the Website) and the Real Cole Capital's protected trademark are included below:

| Larmore's Infringing Logo | Real Cole Capital's Protected Trademark |
|---|---|
|  |  |

The letter made clear that the Real Cole Capital was not associated with Cole Capital and did not endorse Cole Capital or Cole Capital's use of its protected trademarks in any way. *Id*. Larmore did not respond to the cease-and-desist letter. Tr. 510.

### D.  Larmore Buys WeWork Call Options and Shares

On November 1 and 2, 2023, using five different trading accounts, Larmore spent $389,657.73 buying 72,846 short-dated, out-of-the-money WeWork call options: more than 70,000 of which were set to expire on November 3, 2023, at 4:00 p.m. EDT, and all of which had strike prices between $2 and $5.[1] Tr. 178-186; GX 1706 at 6. On November 2, 2023, Larmore also spent $387,133.95 purchasing 343,641 shares of WeWork common stock, because two of Larmore's brokerage firms, JP Morgan and Wintrust, did not allow him to purchase options. Tr. 196-197; GX 1706 at 7.

By buying these options, Larmore was effectively betting that WeWork's stock price would increase significantly in the very near term. For example, on November 2, 2023, Larmore spent $121,809.02 purchasing 22,815 WeWork call options with a strike price of $3 that expired the next

---

[1] A call option contract grants its owner the right—but not the obligation—to buy 100 shares of stock, at a particular price (the "strike price"), until or upon the expiration date of the contract. *See generally* Tr. 141-151. A call option contract is "out of the money" if the current market value of the underlying stock is less than the strike price. In effect, a purchaser of an out-of-the-money call option is making a bet that the underlying stock will go up in value, exceeding the strike price, thereby allowing the owner of the option contract to realize as profit the difference in value of the stock between the strike price and the market price when the option is exercised or sold.

day, November 3, 2023. GX 1706 at 6. The closing price of WeWork stock on November 1, 2023—the day after the *Wall Street Journal* published an article about its impending bankruptcy—was $1.22. GX 1706 at 2. Accordingly, by buying these options on November 2, 2023, Larmore was betting that WeWork's stock price would more than double by the next day.

Patrick Cochran was with Larmore aboard a 76-foot yacht called the *Quarentena*, which Larmore chartered for $85,250, when Larmore purchased these WeWork securities. Tr. 376-380; GX 1367. Larmore told Cochran, "you don't want to be involved in the trading, the SEC is not going to be happy about this." Tr. 383. When on the *Quarentena*, Cochran also heard Larmore tell the captain that he "wanted to go to international waters" because "[t]here was some type of trading he wanted to do that he had to be in international waters for." Tr. 377.

During recorded phone calls and email correspondence on November 1 and 2, 2023, Larmore discussed—sometimes in aggressive or threatening terms—his pressing, urgent desire to buy options with representatives of some of his brokerages.

For example, on November 1, 2023, a representative from TradeStation called Larmore to discuss his newly funded account. During that call, Larmore stated, "what I would like to do is be able to buy options right now," and "I am in front of my computer, I'm ready to buy." GX 321. Larmore noted that his attempts to buy options had been rejected, and he demanded that the representative either return the money in his trading account or approve him to buy options. GX 321. When told that it would take several days to return his money, Larmore complained "that doesn't do me any good for this week," and threatened the representative by saying, "I don't think you want to be on the bad side of you improperly holding my money." GX 321. When asked if he had access to the necessary options agreement, Larmore retorted, "No, I'm on my yacht and don't have a printer." GX 321.

Later, on the same November 1, 2023, recorded call with the TradeStation representative, Larmore accused TradeStation of "hijacking and stealing" his money and threatened to sue TradeStation. GX 321. Eventually, Larmore agreed to complete the options agreement while on the phone with the representative. GX 321. While doing so, Larmore asked, "Do you have any other stupid rules like you can only have so many contracts or you can only buy 20 at a time or anything else that I'm not aware of?" GX 321. In response, the TradeStation representative stated that the largest single order quantity was 2,000 contracts. GX 321. Larmore then asked, "But I can do several 2,000s?" and was told that he could. GX 321.

After completing the options agreement and emailing it to the TradeStation representative, on November 1, 2023, Larmore placed an order for 2,000 WeWork call options while the TradeStation representative was still on the phone. GX 321. The next day, on November 2, 2023, Larmore purchased another 11,376 WeWork call options using his TradeStation account in five increments of 2,000 contracts each and in three smaller increments. GX 321.

On November 2, 2023, Larmore also called a trading desk at JP Morgan. During the call, Larmore told the trader, "I want you to buy a bunch of options for me," but Larmore was advised that his account had not yet been approved for options trading. GX 311. Larmore complained, "It's 1:42 and the options" Larmore intended to purchase "expire tomorrow." GX 311. Frustrated with his inability to buy options, Larmore directed the trader to buy $75,000 worth of WeWork stock instead. GX 311. Larmore then explained, "What I had wanted to buy was $75,000 worth of options that are expiring tomorrow that are trading at five cents per contract per share." GX 311. Larmore then claimed that was "the cost" of JP Morgan's "screwup" in not approving him for options trading. GX 311.

Later during the November 2, 2023 recorded call between Larmore and the JP Morgan trader, the trader purchased 65,789 shares of WeWork stock for Larmore, at Larmore's direction. After the trade was placed, Larmore continued to complain about his account not having been approved to trade options. Larmore stated: "When this stock goes through the roof the liability of your back office for this mistake is huge." GX 313. Larmore did, in fact, believe that the price of WeWork's stock would "go through the roof," notwithstanding the stock's recent poor performance and reports that WeWork was nearing bankruptcy, because Larmore, as summarized below, had intended to announce the next day a false and fraudulent tender offer for WeStock stock that was designed to inflate WeWork's share price.

Also on November 2, 2023, Larmore directed a City National Bank representative, Destin Thomas, to purchase on his behalf $50,000 worth of WeWork call options with November 3, 2023 expiration dates. *See* Tr. 429-440; GX 301-304. Thomas, however, was not able to fulfill Larmore's order. Thomas apologized to Larmore for the inconvenience and, in response, Larmore stated, "Well it's more than an inconvenience, it's a huge, huge loss." GX 303. Thomas then asked, "I mean, did you have any insider information on that?" and Larmore responded, "No." GX 303.Thomas then stated, "It sounds like you have some information that we're not privy to," to which, Larmore responded, "I do not." GX 303.

In total, on November 1and 2, 2023, Larmore spent more than $775,000 buying 72,846 WeWork call options and shares a total of 343,641 shares of WeWork stock. GX 1706.

**E.  Larmore Announces a False and Fraudulent Tender Offer for WeWork Stock**

On November 3, 2023, at approximately 2:16 a.m. EDT, Larmore created an account with EIN Presswire, a press release distribution platform that focuses on smaller-to-midsize businesses, in contrast to *Business Wire*, which is a press release distribution service that focuses on press releases for large publicly traded companies. Tr. 273-275; GX 1405.

At approximately 9:12 a.m. EDT, Larmore sent an email to Kevin Berry and another WeWork investor relations email address. Tr. 91-93; GX 1163. Attached to the email was a two-page letter addressed to the WeWork Board of Directors and Chief Executive Officer at WeWork's Manhattan headquarters and signed by "Moynahan Larmore, CEO, Cole Capital Funds, LLC" (the "Letter to the Board of Directors"). GX 1163. The address listed for Cole Capital was 2425 East Camelback Road, the same address as the one-person WeWork office Larmore rented for Cole Capital on October 16, 2023. GX 901, 1163. The Letter to the Board of Directors began:

> Dear [CEO of WeWork],
>
>> We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
>>
>> We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
>>
>> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.

GX 1163. Neither Larmore, Cole Capital, City National Bank, JP Morgan, nor any legal or financial advisors contacted WeWork about a potential share purchase or transaction before Larmore sent this letter. Tr. 93-94; 96-97. After Larmore sent the letter, he did not reach out to anyone at WeWork on or after November 3, 2023. Tr. 99.

The $9.00 per share price contained in the Letter to the Board of Directors represented a premium of more than $7.89 (more than 700%) over WeWork's closing price of $1.11 per share on November 2, 2023. Tr. 98. At $9.00 per share price, it would have cost approximately $77 million to acquire 51% of all the outstanding shares owned by minority shareholders of WeWork. Tr. 95-96.

At approximately 9:37 a.m. EDT, Larmore received an email from EIN Presswire about his recently submitted press release titled, "Cole Capital Funds Proposes to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per Share in Cash." GX 1406. EIN Presswire informed Larmore that he was using an email address not associated with Cole Capital and was told to change his email address and re-submit his draft press release, which Larmore did several minutes later. GX 1406.

At approximately 10:56 a.m., Larmore called the EIN Presswire customer service to inquire about the status of his press release. GX 331. While on the call, which was recorded, Larmore received an email at approximately 10:57 a.m., from EIN Presswire, stating that his draft press release was not in the proper format and that Larmore needed to reformat and re-submit the press release for editorial approval. GX 1141. Larmore then told the EIN Presswire representative on the phone, "since it is a legal document it has to go out in a certain form," and "due to the nature of it being a tender offer it needs to go in the form that I sent it." GX 331. The EIN Presswire representative advised Larmore to reach out directly to the editorial department to discuss the format. *Id.* Larmore then asked to be transferred to someone in that department "because this is very time sensitive." *Id.* When told that he should contact the editorial department by email, Larmore reiterated that "this is very time sensitive such that it has to do with the stock." *Id.* The EIN Presswire representative then agreed to escalate the matter to a supervisor. *Id.*

At approximately 11:16 a.m., Larmore reached out to Justin Kerbo to seek his assistance in having a press release published. Tr. 308; GX 1307. Larmore made clear that he wanted the press release published that day. Tr. 309. In fact, at one point, Larmore told Kerbo by text message, "it is imperative that it goes today before closing bell. Please, whatever it takes." GX 1307; Tr. 354. Kerbo agreed to help Larmore and contacted *Business Wire* on his behalf. Tr. 308-309. That afternoon, Larmore sent Kerbo a draft press release titled, "Cole Capital Funds Propose to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash." GX 1207.

At approximately 11:55 a.m. EDT, a supervisor at EIN Presswire called the defendant. GX 332. During the call, which was recorded, Larmore reiterated that the press release "needs to get out right now." *Id.* The supervisor then instructed Larmore to rework the draft in a typical press release format. *Id.* Larmore reiterated again: "This is time sensitive." *Id.*

At approximately 12:20 p.m. EDT, EIN Presswire approved a revised Cole Capital press release for distribution to its publication channels. Tr. 281. EIN Presswire, however, did not distribute the press release to *Bloomberg* or *Yahoo Finance*, which are platforms that publicly traded companies use to try and reach financial media. Tr. 281-282.

At approximately 1:42 p.m., *Business Wire* informed Kerbo that it would be changing the headline of the press release to "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash" to avoid having the same headline as the EIN Presswire press release. Tr. 344-345; GX 1208.

On November 3, 2023, at 4:00 p.m. EDT, WeWork's stock price closed at $0.84. GX 1706 at 2. At that point, the WeWork options Larmore purchased with a November 3, 2023 expiration date (more than 70,000 of his 72,846 options), on which he had spent approximately $375,000 for

the ability to purchase more than 7 million shares of WeWork stock, expired, still out of the money and worthless. Tr. 198.

If WeWork's stock had reached $7 per share before Larmore's options expired, his WeWork stock and options would have had a value of $31,058,687; if $8 per share, a value of $38,686,928; and if $9 per share, a value of $46,315,169. Tr. 202-204; GX 1706 at 9.[2]

On November 3, 2023, at approximately 5:12 p.m. EDT, *Business Wire* ultimately published the press release Larmore wanted released before market close, with the revised title, "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash" (the "Press Release"). GX 803. The Press Release stated, among other things:

> Cole Capital Funds sent the following letter to the Board of Directors of WeWork, Inc.
>
> We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
>
> We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.
>
> . . .
>
> Cole Capital Funds, LLC www.colecapitalfunds.com is an investment company headquartered in Phoenix Arizona. Cole

---

[2] At trial, and again in his Motion (Mot. at 13), Lamore's counsel argued that Larmore could have intended to fund his tender offer with the proceeds of his options sales. The Government argued that, even if true, this would still constitute market manipulation, because he was trying to obtain that money by manipulating the price of WeWork stock. But it also could not be true as a factual matter, because the highest potential value of the options (i.e., $46,315,169) would still be tens of millions of dollars short of the $77 million needed to consummate his purported tender offer.

> focuses on investing in, and acquiring companies and properties where significant shareholder value can be realized due to undervalued share price as a result of slow development progress, management issues, or outside share pressure . . . .

GX 803.

Within one minute of the Press Release's publication on November 3, 2023, at approximately 5:12 p.m. EDT, WeWork's stock price jumped in after-hours trading from $0.85 to between $1.40 and $1.50 and continued to rise, reaching a high of $2.14 at approximately 5:31 p.m. EDT on November 3, 2023. Tr. 174; GX 1706 at 4. At approximately 6:12 p.m. EDT, *Business Wire* rescinded the Press Release, at which time WeWork's stock price was approximately $1.67. GX 804, 1706 at 4. Between 5:12 p.m. and 6:12 p.m., approximately 5,607,149 WeWork shares were traded. Tr. 175; GX 1706 at 4.

On November 6, 2023, WeWork filed for bankruptcy. Tr. 102-103. Cole Capital never contacted WeWork about buying the company when it was in bankruptcy and it never offered to purchase WeWork shares while the company was in bankruptcy. Tr. 103. In fact, after November 3, 2023, WeWork did not hear anything more from Cole Capital or Larmore. Tr. 102.

### F.  Larmore's Communications with City National Bank and JP Morgan

Larmore's statement in the press release, "We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement," was false. On October 27, 2023, Larmore exchanged perfunctory text messages with a representative at City National Bank, Richard Engbrecht, writing, "I have formed a new company and am preparing to start sourcing deals. If I were able to pledge $100 million of NYSE securities, would you be able to help finance an $85 million acquisition? Assuming everything else in my world was cleaned up." Tr. 413; GX 1308. Larmore, however, never told Engbrecht about his plans to announce a tender

offer for WeWork, never mentioned WeWork at all, and never gave any indication that he actually had "$100 million of NYSE securities." Tr. 413-416. On October 27, 2023, Larmore also emailed Karl Meyer, who worked at a retail Chase banking branch in Jackson Hole, Wyoming, and asked, "If I have $100 Million of NYSE traded stock in the account how much can you lend on it?" Tr. 469, 471; GX 1122.  In response, on October 30 and 31, 2023, Meyer responded, in substance, that JP Morgan could lend at 50% of NYSE-listed securities at a specified rate, but that JP Morgan would need to examine a list of Larmore's proposed assets. GX 1123, 1126.  Larmore never provided such a list and never mentioned to Meyer that either he or Cole Capital were planning any kind of tender offer for WeWork stock, let alone a $77 million transaction. Tr. 480-481, 484, 487-490, 492, 495-496.

### G.  Larmore's Communications with Lawyers

The evidence at trial showed that, while Larmore communicated with certain lawyers before announcing his tender offer, Larmore announced his tender offer without the assistance of an attorney, was not following any legal advice, and in fact, he was acting *against* advice he had received. Larmore confirmed to Jeremy Piccini, a lawyer, days before his announcement, that he was not launching his tender offer with the assistance of legal counsel, writing: "I plan to make the offer on my own." Tr. 550; GX 1325. Larmore also told James Siegel, a lawyer, that he intended for his tender offer announcement to cause a "GameStop-like reaction to WeWork stock," *i.e.*, a short-squeeze that would cause WeWork's stock price to "increase quickly and exponentially." Tr. 530-531. That, in turn, would cause the value of Larmore's own WeWork securities to "increase exponentially" and "financing" for Larmore's tender offer "would be less of an issue." Tr. 530.  In other words, Larmore sought to manipulate the price of WeWork's stock through a tender offer announcement designed to increase the value of his own securities. Siegel told Larmore, "I don't

think you can do that." Tr. 532. Larmore responded by saying "he thought he could do that because he did not hold any securities licenses," to which Siegel said, "I don't think it works that way." Tr. 532. Siegel informed Larmore that neither he, nor another attorney who had spoken with Larmore, Richard Silfen, would assist with the tender offer. GX 1309. Siegel likewise notified Larmore of a prior tender offer for a company called Veritone that was found to be "insufficient/false," and in that context told Larmore: "I think you will need to have the funds locked down before the" tender offer. *Id.* During the text exchange with Siegel, Larmore distinguished his plan from the fraudulent tender offer Siegel had raised by falsely stating that he had "had discussions" around financing. *Id.* Only after sending that message did Larmore contact Engbrecht and Meyer to ask about hypothetical lending against $100 million of NYSE-listed securities, as discussed above.

**H. Larmore's Spending and Finances in the Summer and Fall of 2023**

In the Summer and Fall of 2023, Larmore was spending lavishly. On August 18, 2023, Larmore sold a Gulfstream G400 airplane that he owned through an entity called JML BC G400, LLC for a purchase price of $10.2 million. *See* Tr. 240-241; GX 501; 502. The net proceeds from the sale due to Larmore—after accounting for amounts due to creditors and others with interests in the sale proceeds—were $1,237,112.88 ("the Plane Proceeds"). On August 18, 2023, the Plane Proceeds were wired to a bank account in the name of Arciterra Companies, LLC (the "Arciterra Account"). Then, on August 21, 2023, every penny of the Plane Proceeds were wired, at Larmore's direction, from the Arciterra Account to a bank account that Larmore controlled in the name of JMMAL Investment, LLC, and further wired later that day to a bank account in Larmore's own name at Park National Bank (the "Larmore Bank Account"), which, at that time, had a balance of only $52,555.52. GX 1901 at 4.

From August 21, 2023 through November 1, 2023, Larmore spent all the Plane Proceeds and other funds, as follows:

- $620,000 wired to trading accounts in Larmore's name at seven brokerage firms (TDAmeritrade, JP Morgan, Apex, WeBull, TradeStation, Fidelity, and City National Bank), from September 12, 2023 to November 1, 2023. This money was then used by Larmore to purchase WeWork stock and options. All 72,846 of the WeWork call options and 65,789 of the 343,641 WeWork shares that Larmore purchased on November 1 and 2, 2023, in furtherance of his fraudulent scheme were purchased with these funds. GX 212, 213, 1901.

- $575,000 as a deposit to Pier One Yacht Sales ($500,000 was eventually returned), in connection with Larmore's offer to buy a 44-foot Inter Marine yacht called the "Princess Anna" for more than $5 million. GX 212, 213, 1369, 1901.

- $55,000 to charter a 76-foot San Lorenzo yacht called the "Quarentena," on October 31, 2023. Larmore was on this yacht on November 1 through November 3, 2023, when he purchased his WeWork options and shares and when he launched the fraudulent tender offer. GXs 212, 213, 1367, 1901.

- $50,000 to a private charter jet company, on September 7, 2023. GX 212, 213, 1901.

Larmore also used his Arciterra American Express card to incur significant expenditures, including:

- $100,000 charged to Pier One Yacht Sales on November 2, 2023. GXs 1335, 1901.

- More than $35,000 charged to a private charter jet company in September and October 2023. GXs 601, 602, and 1901.

By the Fall of 2023, Larmore had significant financial liabilities and only modest assets. By October 2023, he owed City National Bank more than $5.2 million on mortgage loans for his home, including more than $18,000 in overdue payments. GX 1901 at 7-8; *see also* Tr. 406-407. By the end of October 2023, Larmore had only $51,583.22 in a checking account. GX 1901 at 9.

On November 15, 2023, Larmore lacked the necessary funds to cover a payment that he owed of approximately $1.2 million. Tr. 263; GX 1013. On November 16, 2023, Larmore borrowed the money from his mother to make the payment. *Id.*

18

### I.   Larmore Commits Perjury about His Use of the Plane Proceeds

On November 13, 2023, a hearing was held in Indiana state court about the Plane Proceeds.

*See* GXs 502, 1005. At the hearing, Larmore lied under oath about how he spent the Plane

Proceeds. He testified on cross-examination, in relevant part, as follows:

> Q. With respect to the money that was transferred from Arciterra
> Companies, LLC to JMMAL Investment, LLC [i.e., the Plane
> Proceeds], where is that money currently?
>
> A. It has been spent.
>
> Q. Okay. What was it spent on?
>
> A. Living expenses and providing money to the company for hiring
> attorneys and operating expenses.
>
> Q. Okay. What company were the funds provided to?
>
> A. I provided them to Dan DeCarlo. He—you would have to—he
> handled it from there.
>
> ….
>
> Q. How much of the 1.2 and change was given to Dan DeCarlo as
> opposed to you for living expenses?
>
> A. My recollection is $250,000.
>
> Q. 250,000 was given to Dan DeCarlo, and the remaining
> approximately million dollars went to living expenses?
>
> A. Correct.
>
> ….
>
> Q. So the remainder that didn't go back to the business, that million
> dollars was spent on living expenses. It's November now, so from
> August, September, October, into November, maybe three and a half
> months or so, you spent a million dollars on living expenses?
>
> A. Living expenses, perhaps debt. I have not reconciled or looked at
> an accounting of what the money was spent on.

GX 502.

Larmore did not spend the Plane Proceeds on "living expenses" or "debt." As set forth above, Larmore spent half of the Plane Proceeds funding investment accounts to purchase tens of thousands of WeWork securities, which he had done just days before the hearing in which he testified. In addition, he also spent hundreds of thousands of dollars on family members, yachts, and private planes. GX 1901.

## ARGUMENT

### I.  Sufficient Evidence Supported the Jury's Guilty Verdict.

In the Motion, Larmore challenges only the sufficiency of the evidence with respect to his intent. Mot. at 3 ("The Government's evidence did nothing more than invite the jury to speculate as to the state of mind of Mr. Larmore. … As shown below, the circumstantial evidence offered by the Government was insufficient to allow a rational jury to find beyond a reasonable doubt that Mr. Larmore had the requisite criminal intent."). This is an about-face from the Rule 29 motion Larmore made at the close of the Government's case, which, as the Court pointed out at the time, understandably did not challenge the sufficiency of the evidence with respect to intent. Tr. 649 (THE COURT: "I note the absence of any Rule 29 argument as to state of mind. I'm unsurprised there's no argument about that. The case has overwhelming evidence of intent to defraud and to deceive."). In any event, Larmore fails to meet the heavy burden he bears on a sufficiency challenge. Instead, he merely invites this Court to usurp the role of the jury and draw his preferred inferences from certain evidence, while ignoring several, independent ways the Government established his guilt at trial.

### A. Applicable Law

#### 1. Sufficiency of the Evidence

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021), because the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The evidence must be viewed in the light most favorable to the Government, with all permissible inferences drawn in the Government's favor, and the sufficiency test must be applied to the "totality" of the Government's case and not to each element, "as each fact may gain color from others." *Landesman*, 17 F.4th at 319. Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2862 (2021).

A "court may enter a judgment of acquittal only if the evidence" of guilt "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Landesman*, 17 F.4th at 319. For that reason, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

"These standards apply whether the evidence being reviewed is direct or circumstantial." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011).

### 2.   Tender Offer Fraud and Securities Fraud

With respect to Count One, tender offer fraud, the Government was required to prove two elements beyond a reasonable doubt. Tr. 875. With respect to the first element, the Government was required to prove that the defendant, in connection with a tender offer, either, (1) "made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading;" *or* (2) "engaged in a fraudulent, deceptive, or manipulative act or practice." *Id.* (emphasis added). A "fraudulent, deceptive, or manipulative act or practice" in this context includes circumstances where (a) "the defendant made the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer;" (b) "the defendant intended, directly or indirectly, for the announcement to manipulate the market price of the stock of WeWork;" or (c) "the defendant did not have the reasonable belief that he would have the means to purchase securities to complete the offer." Tr. 878-879. Thus, the Government had four independent ways of satisfying the first element of Count One. Tr. 879.

The second element of Count One that the Government was required to prove was that "the defendant acted knowingly, willfully, and with the intent to defraud." Tr. 875.

To prove securities fraud under Count Two, the Government was required to prove three elements beyond a reasonable doubt: First, that in connection with the purchase or sale of securities, the defendant did one or more of the following: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller of the securities; Secondly, that when he engaged in this scheme, the defendant acted

knowingly, willfully, and with an intent to defraud; And, third, that in furtherance of the fraudulent conduct, there occurred at least one use of any means or instrument of transportation or communication in interstate or foreign commerce, or the use of the mails, or the use of any facility of any national securities exchange. Tr. 884-885.

### B. Discussion

As an initial matter, the Motion misstates the law in, at least, two ways.

First, the Motion misstates the standard that applies to Larmore's sufficiency challenge. Larmore suggests that if the evidence could support an inference of innocence or guilt, then a judgment of acquittal is appropriate. (Mot. 2-3). But as the Second Circuit has clarified, "the equipoise rule 'is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences.'" *United States v. White*, 7 F.4th 90, 103 (2d Cir. 2021) (quoting *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018)). Thus, the equipoise rule "applies 'only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government.'" *Id.* (quoting *Aquart*, 912 F.3d at 44-45). The few cases that the Motion cites all pre-date *White* and *Aquart*.

Next, Larmore misstates the law that applies to manipulative intent. The Court instructed the jury—without any objection from Larmore—that "a defendant's intent to manipulate a stock price, is all that distinguishes legitimate trading from manipulative trading," and that "[i]f the trading is done solely for legitimate purposes, such as building a position, that is not manipulation. However, if, in addition to any legitimate purposes the defendant might have had for the trading, he intended to artificially affect the price of a security or market activity, that trading does constitute manipulation." Tr. 880. In other words, to prove manipulative intent, the Government does not have to prove that it was the defendant's sole intent to manipulate the price of a stock.

Although he does not meaningfully develop the argument, Larmore now seems to argue, citing *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991), that the Government must prove that "the defendant's sole purpose was to manipulate the price of stock rather than for investment." Mot. at 2. That is not the law.

*Mulheren* does not support the notion that an innocent purpose provides a defense even where the evidence proves that the defendant also had a manipulative intent, and even if it did, it has clearly been abrogated. *First*, the language in *Mulheren* upon which the defendant seems to rely simply parrots the description of government's case; it does not purport to make any rule about the required intent at all. 938 F.2d at 368.

*Second*, and perhaps more importantly, in the time since *Mulheren* was decided, the Second Circuit has made clear that proof of a manipulative intent is sufficient, even if the defendant also had other, lawful purposes. Indeed, the Second Circuit has twice affirmed jury instructions—first in *United States v. Royer*, 549 F.3d 886, 899-900 (2d Cir. 2008), and second in *S.E.C. v. Vali Mgmt. Partners,* No. 21-453, 2022 WL 2155094, at *1-2 (2d Cir. June 15, 2022)—that did not include any requirement that the defendant's criminal intent be his or her only or sole intent. *See Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *1-2 (affirming instructions in *S.E.C. v. Lek Securities Corp.*, No. 17 Civ. 1789 (DLC) (S.D.N.Y.), Dkt. No. 556, at Tr. 2586-88); *Royer*, 549 F.3d at 899-900 (affirming instructions in *United States v. Elgindy*, No. 02 Cr. 589 (RJD) (E.D.N.Y.) at Tr. 8844-8849). As the Second Circuit observed with respect to the jury instructions in *Lek Securities*, "[t]he district court's instruction was . . . consistent with our articulation of market manipulation, and accurately informed the jury on the law." *Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *1.

And importantly, in 2014, the Second Circuit stated clearly that, "when Congress has meant to impose a sole-intent limitation, it has done so expressly," and that when a statute "does not contain a sole-intent limitation," the court will not "engraft one." *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014). "It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose." *Id.* at 385 (collecting cases); *see also United States v. Gatto*, 986 F.3d 104, 129 n.12 (2d Cir. 2021) ("We are also unpersuaded by Defendants' dual intent argument, as it is commonplace for individuals to have more than one motive for acting."). Neither Section 10(b) nor 14(e) has a sole-intent limitation. Accordingly, the law is clear that, if the Government sustains its burden of proving that the defendant acted with a manipulative purpose, it has met its burden, even if the defendant had other goals or purposes as well.

The Motion largely repeats the main theme of Larmore's defense at trial: that he sincerely intended to carry out his announced tender offer. The totality of the evidence viewed in the light most favorable to the Government, with all permissible inferences drawn in the Government's favor, not only permitted a rational jury to find otherwise, but it also permitted the jury to find the defendant guilty of the charged crimes *even if* Larmore sincerely intended to carry out his tender offer. For example, a rational jury could have found that Larmore unlawfully manipulated the price of WeWork stock. A rational jury could have found that Larmore intended to send a false price signal into the market with his $9 per share tender offer—made at a time when WeWork was on the verge of bankruptcy and trading for less than $1 per share—in the hope of quickly and significantly inflating WeWork's stock price to the point where his newly acquired WeWork stock options would be in the money, even if it was not his sole intent. A rational jury could have also found that, even if Larmore *wished* he could go through with the tender offer, at the time he

announced the offer he did not have a reasonable belief that he would in fact be able to obtain the funds to consummate the offer. In addition, a rational jury could have found that Larmore made material misrepresentations, half-truths, or misleading statements about Cole Capital Funds and its *bona fides*, his communications with City National Bank and JP Morgan, and his "consultation" with lawyers, any one of which would be sufficient to sustain the jury's guilty verdicts.

Larmore's complaints about certain evidence, which he discusses "in no particular order," largely boil down to competing inferences that he would have liked the jury to have drawn from the evidence in his favor. Mot. at 3. The jury, however, was free to reject these arguments and draw the inferences for which the Government advocated instead. Nonetheless, the Government briefly addresses Larmore's complaints in turn:

- The *Bloomberg* Article. As the Court instructed the jury in its limiting instruction, the jury was permitted to use the *Bloomberg* Article "[f]or the purpose of evaluating Mr. Larmore's state of mind and intentions with respect to his stated plan to fund a tender offer for WeWork." Tr. 265. Larmore was free to—and, in fact, did—invite the jury to reject the Government's arguments about whether, in light of the article, Larmore reasonably believed that he would have the means to purchase the securities needed to complete the offer. It was, however, the jury's choice to make.

- Larmore's Infringement of the Real Cole Capital Trademark. Consistent with the Court's instructions, the jury was free to consider evidence that Larmore copied the Real Cole Capital's trademarks "in evaluating Mr. Larmore's intentions and state of mind in naming the entity Cole Capital Funds." Tr. 510. The Government argued that Larmore copied the Real Cole Capital's trademarks to trick investors into thinking that a well-established, reputable company was making a genuine tender offer that it had the ability to carry out. Tr. 837. It was for the jury to accept or reject that inference.

- James Siegel and Veritone. As stated above, Larmore told James Siegel that he intended for his tender offer announcement to cause a "GameStop-like reaction to WeWork stock," *i.e.*, a short-squeeze that would cause WeWork's stock price to "increase quickly and exponentially." Tr. 530-531. That, in turn, would cause the value of Larmore's own WeWork securities to "increase exponentially" and "financing" for Larmore's tender offer "would be less of an issue." Tr. 530. In other words, Larmore sought to manipulate the price of WeWork's stock through a tender offer announcement designed to increase the value of his own securities. Siegel told Larmore, "I don't think you can do that." Tr. 532. Larmore responded by saying "he thought he could do that because he did not hold any securities licenses," to which Siegel said, "I don't think it works that way." Tr. 532.

Larmore does not address this compelling evidence of his intent to defraud and lack of good faith. Instead, he argues that "[n]o inference whatsoever can be drawn" from another piece of advice from Siegel: "I think you will need to have funds locked down before the TO," *i.e.*, the tender offer. Mot.at 5. Not so. This evidence shows that Larmore's statement in the Press Release that he "consulted with…legal…and other advisors to assist [] with this transaction" was highly misleading, given that he ignored Siegel's advice that he secure financing before the tender offer. Furthermore, Larmore claims the evidence of the fraudulent tender offer for Veritone was not consistent with the claim that "Mr. Larmore knew he was breaking the law." Mot. at 5. The jury could have found otherwise. They were free to conclude that Larmore knew that his plans, based on what he was told, were problematic, given that he was notified of a prior, "insufficient/false" tender offer where the offeror did not have the funds to complete the tender offer at the time of the announcement.

- Larmore's Use of the Name "J. Moynahan Larmore." Larmore's argument that anyone "who bothered to search on Google the name "J. Moynahan Larmore" would obviously be directed to the defendant," and thus would not be misled by Larmore's use of his middle name, Moynahan Larmore, lacks any evidentiary basis in the record and is entirely beside the point. The defendant used the name "J. Moynahan Larmore" as part of his efforts to lie about who was behind the tender offer announcement. Larmore did not, and does not, dispute that, apart from the tender offer, he was called "Jon" or "Jonathan" by those who knew him. Shannon Bane, Patrick Cochran, and Justin Kerbo, all knew him as "Jon" or "Jonathan." The jury could reasonably have inferred that Larmore used the name "J. Moynahan Larmore" to distance himself from the bad press (the *Bloomberg* Article) that existed about him at the time of the tender offer. Whether he succeeded in his efforts to deceive or not is irrelevant.

- Karl Meyers and Rick Engbrecht. Larmore claims his communications with Meyers and Engbrecht "represent an intent by Mr. Larmore to attempt to fund the tender offer, and his belief that he could do so." Mot. at 6. Larmore does not address, however, that he never told Meyers or Engbrecht about his tender offer, nor does he address that he did not have (and had no way of obtaining) the "$100 million of NYSE" securities referenced in his communications. There was no evidence at trial of Larmore's access to such securities; to the contrary, the evidence showed that he did *not* have $100 million of securities. Accordingly, the communications were probative and showed that the statement in his press release about City National Bank and JP Morgan was false and misleading.

- Larmore's Delinquent Mortgages and the $1.2 Million Loan from Larmore's Mother. Larmore's delinquency on his mortgages by October 2023 and the $1.2 million loan from his mother in November 2023 were relevant to (i) his motive to make money from his fraudulent scheme, and (ii) his inability to fund his announced tender offer. Larmore does not contest the first point and acknowledges that he did not have the ability to fund his announced tender offer, which the Government was entitled to prove, regardless of whether it was "not inconsistent" with Larmore's defense. Mot. at 7.

- Patrick Cochran. Patrick Cochran testified that Larmore "told the captain he wanted to go to international waters" because "[t]here was some type of trading he wanted to do that he had to be in international waters for." Tr. 377 (Cochran). Although Larmore, at trial and in his motion, cites to a desire to conduct "Forex" trading, it was undisputed that the only trading Larmore conducted while on his chartered yacht was for options and shares of WeWork, not any trading on foreign exchanges. Tr. 402-403. Nor was there any evidence about what exactly a "forex" trade might have been, or why it would have been unrelated to Larmore's fraudulent scheme involving WeWork. Thus, a rational jury could have found that Larmore wanted to go to international waters for his WeWork trading, and not for any other purpose.[3] With respect to the WeWork trading that Larmore actually did, Larmore told Cochran, "you don't want to be involved in the trading, the SEC is not going to be happy about this." Tr. 383. While Larmore claims in his briefing that he was referring to the short squeeze that was likely to result from his tender offer announcement, the Government was permitted to argue that he was referring to the fraudulent nature of his tender offer announcement—*i.e.*, that the SEC would not be happy that he made a false and fraudulent tender offer announcement designed to manipulate the price of WeWork stock and increase the value of his own WeWork securities.

- The "WeWork, God Saves" Banner. A rational jury could have found that Larmore's flying of the "WeWork, God Saves" banner was part of his scheme to generate interest in WeWork, drive up its stock price, and, thereby, drive up the value of his WeWork securities.

- Larmore's Google Searches. The Motion seeks to offer various innocent explanations for Larmore's incriminating Google searches, but the jury was free to agree with the Government that Larmore was looking up his own crimes and potential consequences, and that those searches were evidence of a guilty mind.

- The Value of WeWork. The Motion regurgitates the argument Larmore made at trial that "WeWork's financial woes were temporary and that the company was potentially a worthwhile investment, or that Mr. Larmore could reasonably have believed it to be so." Mot. at 10-11. The Motion fails to appreciate, however, that a rational jury could have rejected that argument and found Larmore's $9 per share offer—at a time when WeWork's stock was trading around $1 and when the company was on the verge of bankruptcy—was fraudulent.

---

[3] Cochran did not testify that Larmore intended to go to international waters to conduct foreign exchange or "forex" trades. Defense counsel attempted to introduce that concept during cross-examination, but the Government's objections to that line of questioning were largely sustained. Defense counsel on cross-examination asked Cochran, following a sustained objection to a question that introduced the concept of "forex" trading, "Did Mr. Larmore tell you that that's the kind of trades that he wanted *you* to do in international waters?" (Tr. 402:2-11 (emphasis added)). Cochran responded "Yes." That question-and-answer, at most, established the type of trading Larmore intended Cochran to undertake, not the trading that Larmore believed he needed to undertake in international waters.

- <u>Larmore's Lies to Destin Thomas at City National Bank</u>. Larmore offers the fanciful explanation, for which there was no evidence admitted at trial, that he lied to Destin Thomas at City National Bank for fear that Thomas would "front run" Larmore's WeWork trades. A rational jury, however, could have concluded that he lied to Thomas to conceal his fraudulent scheme.

- <u>Larmore's Misrepresentations about Legal Advisors, City National Bank, and JP Morgan</u>. Contrary to his arguments to the jury, Larmore now claims that a jury could not have found that his statements in the press release about consulting legal advisors, City National Bank, and JP Morgan were false or misleading. Mot. at 12-13. Yet Larmore, at the time of his tender offer, informed Piccini that he was not working with any lawyers in submitting his tender offer. Tr. 550; GX 1325 ("I plan to make the offer on my own."). Consistent with that contemporaneous declaration, in his opening statement, Larmore's counsel reiterated that Larmore did not consult with attorneys: "They say, well, he didn't consult with any attorneys. Yeah, he didn't consult with any attorneys because he had no idea what he was doing." Tr. 40. Larmore's counsel made a similar argument in summation. Tr. 815. He stated: "Did he say, we have consulted with people at JP Morgan and CNB? Yes, he did say that. Is that misleading? You know, I'll leave it to you. He did consult with those people, but they told him they couldn't finance his transactions for him. But he didn't say that they're going to be financing; he says we expect to get financing soon. Is that misleading? You know, I'm not going to sit here and make that argument to you, but I submit to you it's not a significant misrepresentation." Tr. 816. In summation, Larmore's counsel thus drew the reasonable conclusion that the jury was unlikely to conclude that Larmore's statements were true, and thus the better course would be to argue about whether the statements were material.  The Motion, in contrast, does not seriously engage with the overwhelming trial evidence that the statements were false and misleading. As to materiality, the jury was free to find that Larmore's statements about legal advisors and financing were important indicia of legitimacy.

- <u>Larmore's Ability to Finance the Offer</u>. Larmore contends that "the Government failed to address other methods by which Mr. Larmore could have believed" that he might raise the funds necessary to consummate his tender offer, Mot. at 13, and then gives a list of fanciful potential options. These purported options included executing his options after triggering the strike price, and then borrowing on the value of those options. But the record showed that Larmore spent all the money in his brokerage accounts on the options, and thus did not have the funds that would be required to execute the options by the end of the day on November 2. And if he had sold the options—which had to have been his plan, since he did not have the funds available to execute—the evidence at trial showed that at most he would make $46,315,169, far short of the $77 million he required. Tr. 202-204; GX 1706 at 9. In addition, Larmore's claim that he had $290 million worth of assets which he could have liquidated to fund the tender offer (Mot at 13) is contradicted by the very exhibit he cites for the proposition. Government Exhibit 121, which is the JP Morgan questionnaire Larmore filled out to open his brokerage account, states that his total net worth is $10 million, his total debt $2 million, and his total cash and cash equivalents only $1 million— far short of what would be needed to consummate a $77 million tender offer. And while it is correct that, prior to completing this application, Larmore told Meyer he actually had

$280 million of liabilities rather than $2 million, a reasonable jury could have concluded that such a high amount of debt would make it far *less* likely that Larmore could raise the necessary finds, not *more* likely. There was sufficient evidence in the record for the jury to reject defense counsel's arguments about proposed alternatives for raising the money and instead conclude that Larmore did not reasonably believe he could consummate the offer.

- <u>Larmore's Interest in WeWork</u>.  Larmore also argues, as he did at trial, that he was genuinely interested in WeWork as a company.  (Mot. at 14-15).  The primary evidence of this purported interest was a handful of conversations about WeWork's business and a potential plan with a business colleague, Shannon Bane, to purchase some of the buildings in which WeWork had office space.  A jury could reasonably have concluded that this level of "interest" in WeWork was far short of the level of interest that would be expected of someone actually intending to acquire a $77 million stake in the company.  Moreover, even if Larmore had a genuine interest in WeWork, the jury could still have reasonably concluded that he made materially false statements in connection with his tender offer, that he did not have a reasonable probability of consummating his tender offer, and that he was manipulating the stock price of WeWork in order to trigger his short-dated call options, any one of which would be sufficient to find him guilty on both counts.

## II.    Larmore is Not Entitled to a New Trial.

The defendant, in the alternative, requests a new trial on the basis that "the cumulative prejudicial effect" of certain evidence violated Federal Rule of Evidence 403. Mot. at 16. Larmore's argument has no merit.

### A.  Applicable Law

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). As the Second Circuit has recognized, "motions for a new trial are disfavored in this Circuit[.]" *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). "Trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'" *Sanchez*, 969 F.2d at 1414 (quoting *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir. 1982), *cert. denied,* 459 U.S. 1174 (1983)). And as this Court has found, "[i]n exercising its discretion, the court must be careful not

to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless 'exceptional circumstances can be demonstrated.'" *United States v. Teman*, No. 19 Cr. 696 (PAE), 2023 WL 6533490, at *3 (S.D.N.Y. Oct. 6, 2023) (quoting *Sanchez*, 969 F.2d at 1414). "The test is whether 'it would be a manifest injustice to let the guilty verdict stand.'" *Sanchez*, 969 F.2d at 1414 (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

### B. Discussion

Larmore's motion—for the first time—takes issue with the aggregate prejudicial impact of certain evidence, notwithstanding that this Court already ruled on Larmore's Rule 403 objections and, in many instances, tailored the Government's proof and offered limiting instructions in response to such objections. The defendant takes issue with evidence that he "had been sued by an investor who alleged that none of his investors had been paid in five years, that Mr. Larmore was being investigated by the SEC, that Mr. Larmore allegedly violated Federal Trademark laws, that Mr. Larmore spent prodigious sums which he charged to an Arciterra credit card, that Mr. Larmore had allegedly committed perjury in the Indiana proceeding, and that he allegedly attempted to skirt U.S. law by trading Forex in international waters." Mot. at 16. The defendant makes no attempt, apart from *ipse dixit*, to argue precisely how that combination of challenged evidence violates Rule 403, nor does he parse the evidence and propose an alternative subset of this evidence that would *not* violate Rule 403 were he to receive a new trial. Nevertheless, Larmore's arguments are meritless.

As a threshold matter, the Court already considered, and ruled on, Larmore's objections to the admission of each respective exhibit. In the defendant's opposition to the Government's motion *in limine*, Larmore opposed the Government's introduction of: (1) a *Bloomberg* article stating "that

investors in one of Mr. Larmore's companies had not been paid since 2019 and that Mr. Larmore was being sued"; (2) any evidence that Larmore infringed Cole Capital's trademark; (3) evidence that Larmore "lied to the Court during the contempt hearing" in Indiana regarding his use of proceeds from the sale of a private plane; and (4) proof that Larmore "charg[ed] his living expenses on his credit card[.]" Dkt. 51 (Def. Opp'n) at 2-3, 4, 5. During trial, Larmore renewed his objection to the introduction of Larmore's credit card expenses on the basis that the credit card statements listed the account holders as both the defendant and "Arciterra Companies." Tr. 187-193.[4] And although Larmore now objects to the introduction of evidence that Larmore "skirt[ed] U.S. law by trading Forex in international waters," he did not so object at trial. Tr. 377-378 (Cochran testifying on direct examination that Larmore "told the captain he wanted to go to international waters . . . . [because] [t]here was some type of trading he wanted to do that he had to be in international waters for," without objection); Tr. 397-390, Tr. 402, 403 (cross-examination and recross-examination of Cochran regarding "forex" trading).

This Court ruled on each raised objection. *See* Sept. 9, 2024 Pretrial Conf. Tr. at 26-28 (granting defendant's objection to introduction of *Bloomberg* Article but ruling that the Government may admit certain facts from the article in a "tightly restricted" manner); *id.* at 22-26 (admitting evidence of Larmore's infringement of Cole Capital's trademark but precluding evidence that Larmore had as a matter of law infringed Cole Capital's trademark); *id.* at 16-18: (overruling objection to introduction of Larmore's perjured testimony regarding plane proceeds), *id.* at 19-20 (ruling, in the context of Larmore's bank statements, that Rule 403 permitted the Government to admit evidence of "lavish lifestyle expenses").

---

[4] This Court offered the defendant the opportunity to propose a limiting instruction to the jury, Tr. 193:9-20, which the defendant declined to do, Tr. 195:4-8.

In some instances, the Court *sua sponte* tailored the Government's presentation of its proffered proof at trial with respect to this evidence. As to the *Bloomberg* Article which stated that Arciterra had not been paid by its investors and that Larmore was being investigated by the SEC, the Court found that the article in its totality was too prejudicial for admission, but that the Court was "open to permitting a tightly restricted means of putting before the jury the limited fact that, as of early November 2023, it had been publicly reported that Mr. Larmore was the subject of an SEC investigation involving the handling of investor funds" that would be introduced "ideally by means of a negotiated stipulation." Sept. 9, 2024 Pretrial Conf. Tr. 28. After numerous conferrals between the parties and extensive argument to the Court, *see* Oct. 7, 2024 Pretrial Conf. Tr. 59-72, ECF No. 91; Oct. 8, 2024 Pretrial Conf. 11-13, the parties agreed to an acceptable stipulation consistent with this Court's ruling, which was ultimately admitted at trial, GX 1012. At trial, the Court delivered a limiting instruction regarding this proof after the stipulation was entered into evidence. Tr. 265.

With respect to Larmore's infringement of Cole Capital's trademark, the Court permitted the Government to "offer evidence of any technique that Mr. Larmore used to make his company look like the real Cole Capital" but not evidence of any arbitration decision or finding that Larmore had as a matter of law "infringed a trademark of the real Cole Capital." Sept. 9, 2024 Pretrial Conf. Tr. 25-26. The Court likewise delivered a limiting instruction regarding this proof. Tr. 510-511.

With respect to Larmore's false testimony regarding the Plane Proceeds, the Court ruled that the Government could not refer to the hearing in which Larmore lied as a "contempt proceeding" and that there "is not to be any reference to contempt" at trial "in any way, shape or form." Sept. 9, 2024 Pretrial Conf. Tr. 18. When the Government presented this proof at trial by

stipulation omitting any reference to "contempt," GX 1005, the Court also delivered a limiting instruction on the appropriate purpose of such evidence. Tr. 264-265.

"Under the balancing test of Rule 403, a district court is granted broad discretion." *United States v. Napoli*, 173 F.3d 847 (2d Cir. 1999) (citation omitted). Given the careful consideration the Court gave to balancing the relevant Rule 403 considerations as to each piece of evidence, and the curtailments to the Government's proffered proof to further address any conceivable unfair prejudice, this Court was undoubtedly mindful of the collective effect of the proof the Government intended to offer at trial, and did not conclude that this altered the Rule 403 balancing. Indeed, in the cases Larmore cites for support, the "cumulative" effect that was at issue involved the emphasis placed on a particular category of 404(b) evidence and not, as was the case at trial, an amalgam of exhibits and testimony, whose connective strand is merely that they tended to establish the defendant's guilt. *United States v. Wallach*, 935 F.2d 445, 472 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023) (finding that a line of cross-examination regarding the defendant's settlement of a personal injury case involving two young children over the parents' objection as "technically admissible" but was made unduly prejudicial based on "the manner in which the prosecution argued this evidence to the jury" through "overzealous advocacy" by "inviting the jurors to stand in the shoes of the parents of the children involved in the case" and inviting "vengeance" against the defendant); *United States v. Basciano*, 2006 U.S. Dist. LEXIS 8711, *31-32 (E.D.N.Y. 2006) (District Court permitted Government to offer evidence at murder trial of two separate murders and six separate conspiracies to murder other individuals, but cautioned Government "to be proportional in introducing uncharged acts of misconduct in all categories" and not to "overwhelm[] the jury to a level of substantially unfair prejudice").

The concerns surrounding the "cumulative effect" of the evidence in those two cases are a far cry from the facts at trial. Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). And any risk of unfair prejudice as to this evidence was conclusively mitigated by the Court's limiting instructions. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant).

Accordingly, the defendant's motion in the alternative for a new trial should be denied.

## CONCLUSION

For the reasons set forth herein, the Court should deny the Motion.

Dated:        New York, New York
              November 19, 2024

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney
                            Southern District of New York

                    By: _____
                            Justin V. Rodriguez
                            Adam S. Hobson
                            Sarah Mortazavi
                            Assistant United States Attorneys
                            Southern District of New York