**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| V. | ) | 24 Cr. 140 (PAE) |
| | ) | |
| | ) | Hon. Paul A. Engelmayer |
| | ) | |
| JONATHAN MOYNAHAN LARMORE, | ) | |
| | ) | |
| Defendant | ) | |

<u>**DEFENDANT LARMORE'S PRE-SENTENCING MEMORANDUM**</u>

Bruce L. Udolf, P.A.
599 SW Second Avenue
Fort Lauderdale, Florida 33031
954- 415-2260
budolf@bruceudolf.com

Litman, Asche & Gioiella, LLP
350 Central Park West Suite 10F
New York, New York 10025
917-417-6951
richardasche@lagnyc.com

Attorneys for Defendant

Table of Contents

Page

I.    Introduction/Procedural Background. ................................................................. 1

II.   Impact of the Guidelines ................................................................................... 2

      A.    The Court should reject the 18-Level Enhancement recommended
            By the Probation Department                                            3

      B.    The Court should downwardly depart from the Guidelines level
            for loss as calculated by both the Probation Department and the
            defense expert because the offense level reached under either
            calculus overstates the seriousness of Mr. Larmore's offense        5

The Proposed Enhancement for Obstruction of Justice is Inappropriate .................................7

III.  Analysis of the Statutory Sentencing Factors ............................................. 10

      A.    Post Booker Sentencing Considerations                                 10

      B.    Sentencing Policy as provided in 18 U.S.C. §3553(a)                   12

      C.    Application of the 3553(a) factors to Mr. Larmore                     13

            (1)   History and Characteristics of the Defendant                   13

            (2)   Offense Characteristics                                        26

            (3)   Deterrence (General and Individual)                            27

            (4)   Disparity                                                      28

            (5)   Need to Provide Restitution                                    29

            (6)   The Kings of Sentences Available                              29

            (7)   Parsimony Provision                                           32

Conclusion.......................................................................................................32

<u>Table of Authorities</u>

<u>Page</u>

<u>Cases</u>

*Gall v. United States*, 552 US 38, 49-50, 128 S. Ct. 586, 596 (2007)....................................10, 27

*Kimbrough v. United States*, 552 US 85, 101 (2007) ................................................... 11

*Nelson v. United States,* 555 US 350, 352, 129 S. Ct. 890, 892 (2009) ........................ 10

*Sarvestani v. United States* 2015 US Dist. LEXIS 159491 (SDNY Nov. 25, 2015) .................... 29

*Smirlock v. United States*, 2005 US Dist. LEXIS 7321, **6-7 (S.D.N.Y. 2005) ........................... 4

*United States v Agudelo*, 414 F3d 345, 349 (2d Cir. 2005)........................................................7

*United States v. Alpert,* 28 F3d 1104  (11th Cir. 1994) ................................................................7

*United States v. Bliss*, 430 F3d 640, 647 (2d Cir. 2005) ...............................................................7

*United States v. Booker,* 543 US 220 (2005) ............................................................. 10

*United States v. Carty,* 264 F3d 191,194 (2d Cir. 2001*)* ...........................................................7

*United States v. Cavera*, 550 F3d 180, 191 (2d Cir. 2008)........................................ 11, 13

*United States v. Cernik*, No. 07-20215, 2008 US Dist. LEXIS 56462, at *25
    (E.D. Mich. July 25, 2008)..............................................................................................27

*United States v Corsey,* 723 F3d 366, 376 (2d Cir. 2013) ........................................ 12, 13

*United States v. Gaind*, 829 F Supp 669, 671 (S.D.N.Y. 1993) ...............................................28

*United States v. Grams*, 566 F3d 683, 686–87 (6th Cir. 2009) ............................................. 10

*United States v. Grober*, 624 F3d 592, 608-09 (3d Cir. 2010) ........................................... 12

*United States v. K,* 160 F Supp. 2d 421, 429 (EDNY 2001) ........................................... 30

*United States v. Martinez*, 584 F3d 1022, 1027 (11th Cir. 2009).........................................7

*United States v. Ontiveros*, 07-CR-333, 2008 US Dist. LEXIS 58774, at *6
    (E.D. Wis. July 24, 2008)................................................................................................ 27

*United States v. Pauley*, 511 F3d 468, 476 (4th Cir. 2007)........................................... 11

*United States. v. Pizano-Rico*, 255 Fed. Appx. 483 (11th Cir. 2007 unpublished.).....................32

*United States v. Polanco*, 37 F Supp. 2d 262, 266 (S.D.N.Y. 1999) ........................................7

Page

*United States v. Pugh,* 945 F3d 9, 24 (2d Cir 2019 ....................................................12

*United States v. Rivera*, 439 F3d 446, 448 (8th Cir. 2006) ........................................11

*United States v. Samaras*, 390 F Supp. 805, 809 (E.D. Wis. 2005) ...........................28

*United States v. Sepulveda*, 850 Fed. Appx. 98, 99 (2d Cir. 2021*)* ...........................13

*United States v. Stroud*, 893 F3d 504, 507 (2d Cir. 1989)...........................................7

*United States v. Zavala*, No. 07-14851, 2008 US App. LEXIS 24168, at *8-9
        (11th Cir. Nov. 25, 2008).............................................................................27

Statutes

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 10-13, 28-29, 32, 33

Model Penal Code § 7.02. ...............................................................................31

United States Sentencing Commission Guidelines § 1B1..............................................3

United States Sentencing Commission Guidelines § 2B1.............................2, 5, 6, 10

United States Sentencing Commission Guidelines § 3C1..............................................2, 8

United States Sentencing Commission Guidelines § 4C1..............................................3

Legislative Materials and Reports

S. Rep. No. 98-225, 98 Cong. at 58- 9 (1983) ...........................................................31

*Recidivism and the First Offender*, United States Sentencing Commission (May 2004) ..........29

Publications

Kate Stith & José A. Cabranes
        *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998).......................30

Articles

D.G. Parent, *What Did the United States Sentencing Commission Miss?*
        101 Yale L.J. 1773, 1773 (1992) .................................................................31

## DEFENDANT LARMORE'S SENTENCING MEMORANDUM

Defendant Jonathan Moynahan Larmore respectfully submits this Sentencing Memorandum to provide information to assist the Court in fashioning a sentence that is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a)(2).

### I.    INTRODUCTION/PROCEDURAL BACKGROUND

On March 12, 2024, a Grand Jury sitting in the Southern District of New York returned a two-count Indictment charging Mr. Larmore, with fraud in connection with a tender offer and securities fraud. In sum and substance, the Indictment alleges that between October and November, 2023, Mr. Larmore purchased significant amounts options and stock in WeWork corporation with the intent to drive up the value of that stock by announcing a tender offer by an entity he controlled in an effort to drive up the value of his  stock and options he had bought so that he could sell those shares and options at a significant profit. The government contends that Mr. Larmore had neither the intent, nor the financial wherewithal to complete that tender offer and that his sole intent was to profit himself by pumping up the value of WeWork with an alleged false press release and then dumping his shares and options once the value of those securities had jumped pursuant to the scheme alleged.

Most of the evidence adduced at trial was undisputed. Instead, Mr. Larmore's defense was based on his assertion that, at the time of the alleged offenses, as he had the intent to go forward with the tender offer and that he had the means to accomplish his plan. He contended that his motive throughout the period alleged was to gain "a place at the table" at WeWork and not to make a quick buck at the expense of unsuspecting investors. Thus, this case comes down to the contested issue of *scienter*. Believing in his innocence, Mr. Larmore exercised his right under the Sixth

Amendment and proceeded to a trial by jury. The trial began on October 15, 2024. On October 22, 2022, the jury returned guilty verdicts as to Counts 1 and 2.

This is a somber and humbling time for Mr. Larmore, but he is heartened by the support of dozens of family members, friends, and colleagues, who know his true character and continue to stand behind him. Many of these people have written letters to the Court, which we have attached as exhibits to this Memorandum.

## II.    IMPACT OF THE GUIDELINES

On December 12, 2024, the Probation Office filed its initial Pre-Sentence Investigation Report ("PSR"). On January 10, 2025, the Defendant, through counsel, made certain objections and suggestions for corrections to the PSR. No substantive changes have been made to that report by Probation Department in response thereto and those objections have been preserved for this Court to resolve at the sentencing hearing.

In its report, the Probation Department computes the offense level for the two counts of conviction as follows:

a. Base offense level pursuant to USSG § 2B1.1                                      7

b. Specific Offense Characteristics pursuant to USSG § 2B1.1(b)(1)(J)         +18
   (amount of loss)

c. Specific Offense Characteristics pursuant to USSG § 2B1.1(b)(2)(A)(i)       +2
   (number of victims)

d. Specific Offense Characteristics pursuant to USSG §2B1.1(b)(10)(C)         +2
   (sophisticated means)

e. Adjustment for Obstruction of Justice pursuant to USSG § 3C1.1.            +2

f. Adjusted Offense Level    (Subtotal)                                      31

2

g.   Adjustment as Zero Point Offender pursuant to USSG § 4C1.1          -2

h.   Total Offense Level                                                  29

The Advisory Guideline Level thus proposed by the Probation Department provides for a Guideline range of 87 to 108 months of incarceration.  However, for several reasons, further discussed below, the defendant objects to the above calculation.

A.  **The Court should reject the 18-Level Enhancement recommended by the Probation Department:**

The Guidelines provide an example of a method for calculating loss in securities fraud cases, as follows [Guidelines Section 1-B.1, application note 3E(ix)]:

> (ix)   Fraudulent Inflation or Deflation in Value of Securities or Commodities.—In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—
>
> (I)   calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II)  multiplying the difference in average price by the number of shares outstanding.

In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (*e.g.,* changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

3

.*See also, Smirlock v. U.S.*, 04 Civ. 9670 (GEL) (S.D.N.Y. Apr. 20, 2005), wherein the Court, reviewing a previously imposed sentence, noted that the guidelines require "'calculations that are on the one hand very difficult to make and on the other may not be that important to make[,]" emphasizing again that "the amount of loss that actually winds up resulting from a person's conduct . . . can be arbitrary and can result from any number of factors in the market," and may not "reflect[] with precision the seriousness of misconduct." (*Id.* at 42-43.)

Here, the Presentence Report asserts that a literal application of the method suggested by the application note would yield an unrealistic result because shortly after the fraud period WeWork filed for bankruptcy Instead, rather than shortening the post-fraud comparison period to a reasonable number of days to take the bankruptcy into account, the Presentence Report eliminated any post-fraud period, ignored the prefraud period and opted to compare the average price during the fraud period with the price, at a single moment in time, at the close of after-hours trading on November 3.

Attached hereto as Exhibit A is the expert report of Ilhan K. Geckil, Managing Director of EconOne Research, Inc., applying alternative methods of calculating loss which are far more accurate than the alternative chosen by the Probation Department. In essence the Report suggests adhering to the Guidelines methodology, but shortening the comparison period from 90 days to 10 days before the period of the fraud. Using this method Mr. Geckil opines that the loss is $919,842. calculated as follows: the weighted average price difference between the price from 5:12pm through the conclusion of after-hours trading and the weighted average price during the 10-day period between October 23 and November 3, multiplied by the number of shares traded between 5:12 and the conclusion of after-hours trading. (Econ One concluded that the volume reflected on the Blue Sheets was significantly greater that the volume reflected in the PSR. To resolve the

discrepancy, Econ One calculated the average between the two bottom-line numbers. (See Exhibit 28 to EconOne Report).

Indeed, even if loss were calculated using the method suggested by the Guidelines (90-day average going forward), the total loss would be between $998, 538 and $1,302,1292 (see Exhibit 28 to Exhibit A hereto

The PSR notes that the method it advocates has been used <u>once</u> before, in *United States v Murray,* 1:17cr452. It is worth noting that in *Murray* the Court (Forrest, J.) concluded that if the Guidelines were followed, the minimum sentence would be 63 months.  The Court, however, departed sharply downward and imposed a sentence of 24 months. (Sentencing transcript, docket No. 25, p.38).

Where the loss is between $550,000 and $1,500,000, the Guidelines provide an enhancement—<u>before any downward departure or variance</u> -- of 14 levels, rather than 18 levels as recommended by the Presentence Report.

**B. The Court should downwardly depart from the Guidelines level for loss as calculated by both the Probation Department and the defense expert because the offense level reached under either calculus overstates the serious of Mr. Larmore's offense:**

USSG 2B1.1, Application Note 21(C),  provides as follows:

> **(C)** Downward Departure Consideration. There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.
>
> For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that <u>is substantial but diffuse</u>, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted. (emphasis supplied)

Here, the Government has provided no information concerning losses incurred by any individual investor. However, trading records reflect that, while Mr. Larmore's press release was in circulation, approximately 87% of the trades by volume were conducted by 100 investors, almost all of whom were large, sophisticated hedge funds, banks and other institutional investors. (see Exhibit 28 to the accompanying expert report). Most of these institutions engaged in multiple purchases and sales, including large numbers of short sales, and may well have resulted in overall profits.  To the extent there were individual non-institutional investors in WeWork it is likely that their trades involved small lots and resulted in small profits or losses.

Indeed, it is likely that the investor most adversely affected by Mr. Larmore's activity was Mr. Larmore, himself, whose options, purchased for more than $300,000, expired worthless.

At bottom, any calculation of loss by any method is purely hypothetical. As noted in the accompanying Econ One report, the price of WeWork stock actually increased in the twenty days following November 3. Even if some investors purchased during the fraud period at inflated prices, these investors could have sold their share at a substantial profit following discovery of the alleged fraud. This may account for the Government's inability to identify a single investor who lost any substantial sum as a result of Mr. Larmore's activity.

Additionally, USSG 2B1.1, Application Note 2 (C) suggests that a departure from loss enhancement as well as a departure from a victim enhancement may both be appropriate as these two factors in combination may overstate the seriousness of the offense. Given these factors, 1) the hypothetical nature of the Guidelines loss calculation; 2) the overwhelming prevalence of sophisticated investors during the period of the alleged fraud; 3) the diffusion of loss among hundreds of investors; 4) Mr. Larmore's loss of his own investment; 5) the fact that Mr. Larmore was not  a professional trader, broker or dealer, we respectfully suggest that the Court depart significantly downward from the Guidelines range suggested by the PSR and the defense expert

report.

**The Proposed Enhancement for Obstruction of Justice is Inappropriate:**

The PSR recommends that the Court apply a two-level upward adjustment for Mr. Larmore's alleged obstruction of justice based on Mr. Larmore's alleged perjury on November 13, 2023 in an unrelated Indiana state court case related to Mr. Larmore's matrimonial litigation. The Probation Department's theory, apparently, is that Mr. Larmore intended to conceal from the Government his purchase of WeWork options.

The obstruction Guidelines enhancement requires a finding of *mens rea*, *i.e.* a specific intent to obstruct justice. See e.g. *United States v Carty,* 264 F.3d 191,194 (2d Cir. 2001*); United States v Bliss*, 430 F.3d 640,647 (2d Cir. 2005); *United States v Stroud*, 893 F.3d 504,507 (2d Cir. 1990). See also *United States v Polanco*, 37 F. Supp. 2d 262, 266 (S.D.N.Y. 1999) where the Court (Rakoff, J.) declined to impose an obstruction enhancement, where the Government failed to show that the defendant's arguably false affidavit was made "willfully, with the specific intent to obstruct justice."

As the Court of Appeals noted in *United States v Agudelo*, 414 F.3d 345, 349 (2d Cir. 2005):

> "[b]efore imposing the adjustment, the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice." *Lincecum*, 220 F.3d at 80 (quoting *United States v. Case*, 180 F.3d 464, 467 (2d Cir. 1999)).

The Government has the burden of proof by a preponderance of the evidence that this adjustment is applicable. *United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009).

In *United States v. Alpert,* 28 F.3d 1104 (11th Cir. 1994) (*en banc*), the Court explained that meaningful appellate review requires a sentencing court applying an enhancement for obstruction of justice to explain what the defendant did, "why that conduct warrant[ed] the

enhancement," and "how that conduct actually hindered the investigation or prosecution of the offense." *Id.* at 1107–08 (11th Cir. 1994).

At bar, the Government has failed to satisfy its burden of demonstrating a *mens rea* to obstruct justice:

1.      As of the date of his testimony in Indiana Mr. Larmore had already notified the SEC that he had purchased WeWork options. By email, dated November 7, 2023, Mr. Larmore's accountant, Robert Crook notified Blake Grady of the SEC that

> "my client purchased stock options for up to 7 million shares of Common Stock and some of these options have now expired."(See attached exhibit B).

Having already disclosed to the SEC that he had purchased the options, it would make little sense for Mr. Larmore to have perjured himself in the Indiana state court proceeding in order to obstruct the Government's investigation of the charges in the instant case.

2.      Mr. Larmore's alleged perjury was not given "with respect to the [Government's] investigation":

> USSG §3C1.1 provides in pertinent part as follows:
>
> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels. (emphasis added)

The conduct for which Mr. Larmore was convicted occurred principally on November 3, 2021. Mr. Larmore's testimony in the state court proceeding was given on November 13, 2021, only  10 days later. We are not privy to the date of commencement of DOJ's investigation, but it is highly unlikely that the investigation was commenced prior to the date of his testimony. Certainly, Mr. Larmore was not aware of an investigation. Indeed, Mr. Larmore was

not indicted until March 2024, some four months later. In the absence of evidence that, to Mr. Larmore knowledge, an investigation was pending at the time of his allegedly perjured testimony, the testimony cannot have been given "with respect to the investigation, prosecution or sentencing of the instant offense."

3.    Mr. Larmore's testimony was not material to the Government's investigation:

Mr. Larmore testified in the Indiana state court proceeding that he used the proceeds from the sale of an airplane for personal expenses, whereas, in fact, the proceeds were used, in part, to purchase options in WeWork stock. This testimony was immaterial to the Government's investigation because, as noted above, the SEC was already aware of his purchase of the WeWork options. Any further disclosure by Mr. Larmore would have been superfluous.

Indeed, Mr. Larmore's testimony was not even material to the Indiana State Court proceeding. The issue presented in that proceeding was what happened to the proceeds of the airplane sale and Mr. Larmore truthfully testified that he had spent it. For purposes of the Indiana proceeding, it made no difference whether he spent the proceeds on personal expenses, as he testified, or on his investment in We Work. Either way, if was not entitled to receive the money it made no difference what he spent it on.

4.    Mr. Larmore did not act "willfully" to obstruct the investigation:

Quite apart from the fact that Mr. Larmore was unaware of any investigation at the time of his testimony, it is crystal clear that Mr. Larmore's alleged perjury was given in the context of a matrimonial proceeding. He could have had no reason to believe that the testimony would ever be seen by the Government.

Here, the Government has failed to satisfy its burden of showing by a preponderance of the evidence that by testifying in the Indiana proceeding, Mr. Larmore had a specific intent to obstruct any federal investigation which might have existed. The two-level

enhancement based on his Indiana testimony is, therefore, unwarranted.

        <u>Summary of Guidelines calculation</u>: Eliminating the enhancement for obstruction, reducing the enhancement for loss from level 18 to level 14, and eliminating the victim enhancement would result in a Guidelines level of 21, <u>before any downward departure pursuant to Guidelines Section 2B1.1, Application Note 21(C) as discussed above, and before any variances pursuant to an application of the 18 U.S.C. 3553(a) factors discussed below</u>.

### III.    ANALYSIS OF THE STATUTORY SENTENCING FACTORS

### A. Post Booker Sentencing Considerations

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court made it clear that United States district courts are no longer bound or restricted by a mandatory and unwavering application of the United States Sentencing Guidelines. While a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50, 128 S. Ct. 586, 596 (2007).

The Guidelines are  not to be presumed reasonable by sentencing courts. *Nelson v. United States,* 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) (citations omitted).

Here, consideration of the 3553(a) factors warrant a significant downward variance in addition to the departures urged above. The distinction between a departure and a variance was articulated in  *United States v. Grams*, 566 F.3d 683, 686–87 (6th Cir. 2009) (*per curiam*):

> "'Departure' is a  [***6]  term of art under the Guidelines and is distinct from 'variance.'" *Blackie*, 548 F.3d at 403 (quoting *Irizarry v. United States*, 128 S. Ct. 2198, 2202, 171 L. Ed. 2d 28 (2008)). A Guidelines "departure" refers to the imposition of a sentence outside the advisory range or an assignment of a criminal history category different than the otherwise applicable category made to affect a sentence outside the range. U.S.S.G. § 1B1.1(E). Importantly, a departure results from the district court's application of a

> particular Guidelines provision, such as § 4A1.3 or § 5, Part K. *United States v. Smith*, 474 F.3d 888, 896 n.3 (6th Cir. 2007) (Gibbons, J., concurring). A "variance" refers to the [*687] selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of § 3553(a). *Id*. While the same facts and analyses can, at [**11] times, be used to justify both a Guidelines departure and a variance, the concepts are distinct.

As noted above, the Court should **depart** from the applicable Guidelines range because the loss amount, however calculated, overstates the seriousness of the actual loss sustained by his unidentified victims.

District courts may "**vary** from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (*en banc*) ("As the Supreme Court strongly suggested in *Kimbrough*, a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."). Rather, a district court's mandate is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2.)

"First, the district court should determine the [g]uidelines sentencing range. Second, the district court should determine whether any traditional departures are appropriate. Third, the district court should apply all other section 3553(a) factors in determining whether to impose a [g]uidelines or non-[g]uidelines sentence." *United States v. Rivera*, 439 F.3d 446, 448 (8th Cir. 2006).

Judges may vary from the guidelines by according significant weight to a single sentencing factor in fashioning a sentence, *United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007). The Court may also vary if it finds that a particular guideline was not the product of empirical data, national experience, or independent expertise and thus did not satisfy § 3553(a)'s objectives.

11

*United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010).

**B. Sentencing Policy as provided in 18 U.S.C. §3553(a)**

Title 18 U.S.C. § 3553(a) provides that the primary goal for the sentencing court is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that those purposes are to:

(A) Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) Afford adequate deterrence to criminal conduct;
(C) Protect the public from further crimes of the defendant; and
(D) Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) directs sentencing courts to consider several factors in addition to the sentencing range under the advisory guidelines, among them:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;…
(3) the kinds of sentences available;…
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

In *United States v Pugh,* 945 F.3d 9, 24 (2d Cir 2019) the Second Circuit emphasized the requirement that a sentencing judge must consider all of the 3553(a) factors before imposing sentence:

…before imposing a sentence, the district court has an obligation to weigh all the factors listed in section 3553(a). *See United States v. Fernandez*, 443 F.3d 19, 26, 29 (2d Cir. 2006), *abrogated on other grounds by Rita*, 551 U.S. at 346- 47, 127 S.Ct. 2456; *see also United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) (*per curiam*).

In determining the "particular sentence to be imposed," the sentencing judge must consider: "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the kinds of sentences available," *id.* § 3553(a)(3); the range set out in the Sentencing Guidelines, *id.* § 3553(a)(4); "any pertinent policy statement,"

*id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6); and "the need to provide restitution to any victims of the offense," *id.* § 3553(a)(7).

Another section 3553(a) factor requires the judge to consider the various purposes of sentencing, which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further [**27] crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2). Having considered all of the section 3553(a) factors, the district court must reach "an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)).

See also *United States v Sepulveda*, 850 Fed. Appx. 98,99 (2d Cir. 2021*); United States v.* 723 F.3d 366, 376 (2d Cir. 2013).

### C. **Application of the 3553(a) factors to Mr. Larmore**:

### (1)    **History and Characteristics of the Defendant**

Jonathan Moynahan Larmore was born on September 16, 1973 in Indianapolis, Indiana to Robert and Marcia (nee Moynahan) Larmore. Prior to his retirement, Robert was an ophthalmologist. He died of heart disease in 2022 at the age of 76. Marcia worked as a special education teacher until her retirement. She currently resides in Syracuse, Indiana. Robert and Marcia were married and lived together until Robert's death. Jon Larmore has a sister, Cynthia. She is 52 years old and lives in Marion, Indiana.

Jon and Cynthia were raised in Fort Wayne, Indiana by both their parents. Jon grew up in a loving home and was raised in the Christian faith. Jon remains very close to his mother.

He is also particularly close with his sister and the two are devoted to one another.

13

After graduation from Indiana University, Jon moved to Phoenix, Arizona, where he lived from 1996 to 2022. In 1998 he married Michelle (nee Hausken) Larmore. The two had known each other since high school. Prior to Michelle's retirement she worked as a pharmaceutical representative. Jon and Michelle have two children together - Bridget, 19, and Jonathan Robert, 21. Both children attend college. Jon and Michelle's marriage was troubled for several years and was aggravated by alcohol abuse admittedly by both spouses. They finally separated in January 2023 and have been going through a bitter divorce since. Indeed, they have barely spoken to one another since their separation. Unfortunately, the breakup caused Jon to become estranged from his children as well. Nevertheless, Jon continued to provide financial assistance to them for college, prior to the freezing of his assets.

During the time his marriage was falling apart, and prior to his father's death, tragedy struck the family when the plane his brother-in law, Eric Falbe, an attorney and private pilot, was flying crashed in Payson, Arizona killing all on board. Jon's two nieces, Victoria, age 14 and Skylar, age 12, were killed. Losing the nieces he loved so much was difficult enough, but seeing his sister devastated by the loss of her family was almost more than he and his family could bear. Eventually, his father's heart gave out. By then, Jon's life had begun to unravel in a precipitous slide. He drank to excess, and, though wealthy by most standards, spent profligately. He neglected his business affairs, entrusting them to others he should not have. Then, in the fall of 2023, he found himself targeted by the SEC and, in March, 2024, by prosecutors in New York.

Amid these troubles, Jon began a relationship with Anna Cochran, who had been a family friend for several years. They became engaged and have a child together, Joseph, who is nine months old. Jon is devoted to Anna and is a doting father to their son.

A review of the many character letters submitted to the court, provides a glimpse into Mr. Larmore's true character, and the willingness of those who have known him for years to vouch for his decency and generosity, despite their knowledge of his conviction:

**Annaliese Cochran (Anna):**

Jon's fiancé, Annaliese Cochran, has provided her insight into Jon's character (Exhibit C hereto):

> Jon and I now have the sweetest 9-month-old son together, who adores and is obsessed with his father. Jon is a thoughtful, patient, loving father who tremendously helps me through the tough times and sleepless nights of being a new mother. Joseph is constantly giving Jon cuddles, climbing all over him, giving high fives and lots of attention. Jon helps take amazing care of Joseph daily during all the big and small moments like when Joseph tries to roll over and crawl away while trying to change a messy diaper. I hope for Joseph to grow up learning from and becoming a beautiful person just like his father. Jon has learned a lot throughout his life and is a great example and teacher for Joseph.
>
> Through my years of knowing Jon, I have witnessed the love and generosity he gives to anyone around him. I can attest to his loving, fragile, kind, and honest character. His selflessness and caring heart are on display each time I have witnessed Jon going out of his way to help others and he has taught me the importance of tithing even during this period when it feels like so much has been taken from us.
>
> He has guided many people to have a relationship with God, sometimes just by praying with and showing his own love for God. Which has even saved some of their lives. He will often notice a stranger going through tough times and kindly say a prayer with them. They usually leave that conversation with a pleasantly surprised demeanor and joyful tears. His kind actions show in large and small ways. I've seen him create jobs for people struggling financially and even develop a business plan that would create opportunities for people to make their dreams come true especially those who would otherwise not usually have the resources to do so. Additionally, I witness minor acts, like Jon noticing an elderly stranger struggling to get out of a car and running over to help. I watched him even risk his life by running over to help a stranger whose anchor broke and was crashing his large sailboat into the cement shore during dangerously high winds. He doesn't think twice when it comes to helping people. I always pay attention to how people treat their waiters when going out to restaurants as I believe that shows your true personality and I am always impressed with how gracious, patient and kind Jon is to our waiters. Jon always

treats them as a friend even if they were noticeably struggling he treats them with much respect and often leaves big tips that caused a few of them to run out of the restaurant to catch us as we were leaving to thank him with a hug to some, breaking down in joyful tears thankful for how much they needed it.

***

He has already grown many communities that have expanded jobs and opportunities for many people in various areas. One of them being Fishermen's Village in Punta Gorda, Florida, which has given the town of Punta Gorda one of their only unique places for anyone to enjoy shopping, restaurants, marina, charities, Sunday church services and much more.

Throughout our engagement, he has been devoted to helping others find their faith, as he noticed that people typically lose it during their adolescent years experiencing that himself. One of his aspirations in life is to start Christian communities like Fishermen's Village (which he acquired in 2012 from Brookfield Office Properties). In the spring of 2023, Jon executed his idea for a church on the beach at Fishermen's Village by donating the space and equipment. Sermon on the Sand continues to grow its worship each season.

He is a brilliant man who pushes people to be their best. I witnessed him treating his employees like family, helping them in any way he could. Giving the time out of his day to listen and laugh, taking some with him on vacations, helping with their living situations, and helping some start-up their own businesses.

Another example of the many selfless acts I have witnessed was when I had the privilege of experiencing Jon on a potential real estate deal he was looking into in Jackson Hole Wyoming. After speaking with the seller of the property, he learned they really wanted to keep it in the family but thought they had no other option but to sell. Instead of Jon taking advantage of this dynamic, he devised a solution to help the family re-develop the parcel and keep their business without selling. He is not one to take advantage of people or try to do things to make fast money. He enjoys working hard and doing everything by the rules. He has been lost and punished this past year without the privilege of being able to use his entrepreneurial skills.

Jon has been through a lot of trauma throughout his life and is still healing from it. Some of that trauma includes the tragic loss of his nieces Skylar and Victoria. Watching Cynthia Jon's sister break down in tears the second she sees Jon while trying to celebrate her daughters during their beloved birthday celebration, shows the bond they have and how he is the only one that can truly comfort her through those hard times. He also recently lost his father that he was very close to which has been very difficult for their whole family. Along with healing from these difficulties, he dealt with a manipulative, (toxic)

16

emotional relationship with his wife, which led him to substance abuse to get through the day. I witnessed this firsthand for years and saw how broken Jon was. He made a choice two years ago to get sober and has been doing very well. He has grown so much in the past two years and I hope he is given the opportunity to continue his generosity and kindness as he still maintains a positive outlook on life and continually gives and forgives.

**Jon's Family members**:

Emily Moynahan, John's first cousin writes (Exhibit D hereto):

Jon is my only male first cousin, eight years my senior. He held me as a baby, loved and cared for me. When I had chickenpox he stayed with me so that my parents could go to work. He made sure that every Christmas was magical, telling me stories of Santa and the reindeer to help me sleep. I watched him go to college and work hard, I spent time with him while he was building his life in Phoenix when he just about lost it all and how he was able to rebuild. When I got married he recorded our wedding for us. When my first child was born and we both almost died while being 1,200 miles from home, he found a way to get my father and grandmother down to be with us. He has been there for my children, loving and caring for them, making them feel important, safe and loved. Every Holiday memory and life milestone includes Jon.

Our family has gone through many life changing tragic events in recent years. The loss of Jon's only nieces at the hands of their father was devastating. They were his children's best friends and his sister's only children. This was a pivotal point and Jon was a rock for our family and for his only sister. It was hard for him, he did a lot of masking to hide his pain and his own immediate family suffered. His marriage was strained prior to this but he was committed to his family and tried to provide for them. He was there for his wife while she battled breast cancer….

Jon's marriage was not able to be saved. He found comfort in turning to his faith and found Anna. Together, they find strength in the love they have for each other and their faith. They have a baby who at the time of sentencing will be 11 months old, Joseph. He has had the same loving, caring father that I have described above. He deserves to be able to grow up with a father who is present in his life and not someone he gets to see in a frightening environment every once in a while, …

Marcia, my aunt, a recent widow, is approaching 80. She has a heart condition and Jon has been a caretaker for her. The thought of one more loss in her life is heartbreaking. I feel this loss would be the most difficult for her. Knowing that her son could be in danger and the fear she would live every day. He would not be able to be with her as she ages and care for her like everyone in our family has historically done for each other. This has been difficult on our whole family. The embarrassment and fear that we have all experienced over the last year has been a punishment for not only Jon, but for the entire family. …

17

He has made poor choices which have left him with only his immediate family. He has lost his identity, profession, business, friends, contact with his college age children, his home, and so much more. In my time spent with Jon, I have witnessed him making positive choices. I have seen how he is trying to find a way to stay positive and hopeful for a future with his family and life.

Tracy Cochran, Anna's mother, writes (Exhibit E hereto):

Jonathan has been a very devoted father to his two children from a previous relationship, and, most importantly, to my grandson Joseph. Jonathan has always been trustworthy and loving person that people would seek out for advice. He also often offers to help with the tour around the house and shows his devoted love every day to my daughter, Anna, and grandson, Joseph. He is a strong believer in God. His commitment to God in his family is a testament to his character.

I recall this past fall Jonathan noticed seeing our neighbor having trouble taking a boat lift out of the water. Jonathan immediately changed his clothes and went down to assist the neighbor in moving the boatlift from the water and then to storage.

Roger Moynahan, Jon's uncle, writes (Exhibit F Hereto):

I have had the opportunity to see Jon help friends financially and spiritually. We had many discussions about handling business ethically and never did he give me the impression that he had a desire to take advantage of others in an illegal manner. Jon is and always has been a good person. He has been and continues to be an emotional rock for his sister and his mother as they have dealt with personal tragedies. Those tragedies weighed heavily upon Jon too, but he never talked about his frustrations.

David Bernendorfer, Jon's cousin, writes Exhibit G hereto):

In 2014, my wife's undiagnosed preeclampsia… while in Florida during the second trimester of her pregnancy with our first son. We ended up …at Tampa General Hospital for 43 days and stranded away from home for nearly 3 months. Jon found a way to get my wife's parents and 90 year-old grandmother to … Tampa, Florida so that they could be present for the birth of their first (great) grandson. This is a trip that they would not have been able to make on their own.

Jon has endured and supported his family through more tragedy than he should have. In 2017, Jon lost his only two nieces (his sister's daughters) in a plane crash in the northern Arizona mountains while their estranged father was pilot in charge. Jon was the rock for his sister, parents, family, and friends while almost half of our next generation was wiped Just in a moment. In 201 2, Jon and his sister lost their father, and he became his sister and mother's <u>emotional</u> support…

Cathy Blakely, Anna's grandmother, writes (Exhibit H hereto):

In the years that I have known Jon, he has always been the first to open a door, help anyone in need, and someone who puts family first. He is an active member of his community and has a very strong faith in God. One example of Jon's amazing love for his family was when he had to go to New York for this case and had to leave Joseph with my daughter and son-in-law. He explained to Joseph, who hung on to every word, that he was going to stay with grandma and it will be so much fun, because he will have someone else to play with and she'll play with you differently and you'll love that and then you'll realize mommy and daddy are back and you'll be happy to see us. He kissed him goodbye and told him he loved him and then said a prayer asking for God to take care of him. He holds his family very close to his heart.

Dr. Kevin Cochran, Anna's father, writes (Exhibit I hereto):

The main concern I have is the welfare of their nine month old baby, Joseph, my first grandchild. My parents divorced when I was young and having a loving father in the home is essential for a young man's development. Jon is much older and I don't understand the age difference but my daughter is completely in love with him and he asked and received my blessing for their pending marriage. Everyone in the family will be devastated if Jon were to be incarcerated. They rely on each other and make a great parenting team.

Cynthia Larmore, Jon's sister, writes (Exhibit J hereto):

Jon is a loving and generous father. He attended all of his son's and daughter's activities. There were countless swimming, diving, basketball, gymnastics, fencing, chess tournaments, school plays, concerts, and award ceremonies that he loved to engage in and he took great pride in his children's accomplishments. Jon instilled a great study and work ethic in both of his children. His son, Jonathan, is a junior at College of the Mines in Denver, and his daughter, Bridget, is a freshman at Indiana University in Bloomington.

Jon and his fiancée, Anna, welcomed a son into the world on April 20, 2024. I am thrilled to have a new nephew, and both Jon and Anna are so excited about baby Joseph. I met Joseph when he was 3 days old, and the smile on Jon's face when he introduced me to him will forever be imprinted in my mind. It has been such an honor to watch Jon have the opportunity to be a father again. I love watching him sit on the floor and engage and play with Joseph as Joseph crawls all over the place. He and Anna are deeply in love with each other and with their new baby.

My brother is also a wonderful son to our parents. When our father's back condition started incapacitating his ability to walk or even stand, Jon installed handicap rails for him in the bathrooms and showers. There were countless times when Jon dropped everything to assist my mother when my dad fell and my mom couldn't get him off the floor. When our father passed away in Jon's arms, almost 3 years ago, Jon drove my mother and me as we followed the ambulance to the hospital. Jon held us all tightly, as we all cried and prayed together. Jon is deeply concerned, as am I, about our mother's health conditions. My mother is handicap due to her severe hearing deficit. She depends on Jon and me to help her with so many things due to her debilitating conditions. She relies on us to be "her ears" when talking on the phone or talking to someone in person. Her hearing aids do not aid her very well. My mother also has A-Fib, so she has a pacemaker. This current legal situation is so destressing resulting in her blood pressure often being uncontrollable. We fear that she will have a stroke when it spikes to extremely dangerous levels, which is daily. Jon and I share the responsibility of being her primary care-taker. We both take her health very seriously. We love our mom!

Jon's generosity toward his family also extends to his community. Year after year, Jon's donations to the "PANDA" fundraiser, which helps fund medical research for children with rare diseases, contributed to epic financial funding for the Steele Children's Research Center at the University of Arizona. Jon also has been very generous with his donations to the schools that the children attended, as well as tithing to his Christ Lutheran Church. As a member of the Scottsdale YPO (Young President's Organization), Jon also worked with other members to facilitate better business leadership, idea exchange, and produce programs for the education of others related to business management and leadership.

**Jon as mentor**:

**Jon has served as mentor or older brother to several young men:**

Tyler Freeland, a long-time friend, writes (Exhibit K hereto):

I was raised by my grandparents from the age of five, as my mother battled alcoholism, drug addiction, and mental health challenges. My grandparents lived next door to Jon's parents, and through that proximity, Jon became a constant presence in my life. During my middle and high school years, he spent several days a week with me, offering stability, wisdom, and care that I deeply needed. He welcomed me into his home, even inviting me to his lake house when I was still in lower and middle school, ensuring I had positive experiences and a role model to look up to.

As I grew older, Jon became even more instrumental in shaping my path. He mentored me through high school and college, offering guidance on life, business, and faith. When I began taking on greater responsibility in my family's business, Jon was the mentor I needed to understand valuations, navigate real estate transactions, and make informed decisions about our leased locations. His insights and business acumen were invaluable in my professional development.

Beyond business, Jon also played a significant role in my spiritual journey, helping me grow closer to Jesus and strengthen my relationship with God. His influence contributed to the values and principles I uphold today, both personally and professionally.

Jon has had a profound impact on my life in ways I never expected. He not only guided me professionally but also helped reshape my personal values and beliefs. He reintroduced me to Christ, strengthening my faith when I needed it most. Jon has always led by example, showing me what it means to be a man of integrity, a dedicated businessman, a loving family man, and a true friend.

Wesley Koelsch, a former employee of Jon, also considered Jon his mentor. He writes

(Exhibit L hereto):

One of the things that stands out most about Jon is his generosity. He has never hesitated to extend kindness and support, not just to me but also to my friends. His thoughtfulness and care always caught me by surprise—he didn't just tolerate the presence of my friends; he welcomed them, encouraged me to bring them around, and treated them as if they were his own. That level of selflessness is rare, and it speaks volumes about his character.

Beyond his generosity, Jon has been a pillar of optimism. I had the opportunity to live with Jon and Anna, for two years, during which I saw firsthand the strength of their relationship. No matter what challenges they faced, their unwavering love and faith in each other never faltered. Their ability to find light in every situation was something I deeply admired and aspired to emulate.

Stephen DeLoach writes (Exhibit M hereto):

Jon tends to have a way of making the people around him better. I have seen that first hand. He has personally helped me on my journey with faith and just being someone I could count on over the years. Whether that has been for advice, or an ear to listen.

Benton Bolles, who has known John for 40 years, writes (Exhibit N hereto):

21

Growing up, I considered Jon to be the brother I never had. He was the best man in my wedding, as I was for him.

Through the years of our friendship, I have witnessed numerous acts of compassion, kindness and generosity from Jon towards others. As a good friend does, Jon was there for me when my father passed away, providing me with emotional support and a place to stay while I tended to my father's affairs in Indiana. Likewise, I witnessed first-hand Jon's compassion, support and kindness towards his sister, Cynthia, when she went through the unfathomable tragedy of losing her two young daughters in a plane crash. Jon has a generous heart and shares his time and resources with those he cares about.

**Employees:**

Robert Crook, an accountant who worked for both Fisherman's Village and Arciterra

writes (Exhibit O hereto):

During the time that I worked for Jon, I found him to be humble, hardworking, dependable and highly intelligent and skilled in the field of Commercial Property Investments. I was hired by the General Manager of Fishville to be the Director of Finance and Accounting. I met Jon on a construction site in Florida. Jon had rolled up his sleeves and was assisting the staff performing construction and repairs to the facility that were sustained from Hurricane Ian. I had no idea that Jon was the manager of Arciterra, a 60 plus commercial property company that extended across the US. I have worked for billionaires and historical figures in New York City for over 30 years; none of them helped or cared about their employees like Jon did. I found it refreshing and out of the ordinary to meet Jon in this manner. His Midwest sensibility, hard work and humility shown through. He is a down-to-earth kind of boss that cares deeply about his employees and was willing to do whatever it took to get the essential operations repaired.

Gabe King, who worked with Jon for four years at Fisherman's Village, writes (Exhibit P

hereto):

During my time working with Jon Larmore, he has proven to be a hardworking, dependable, creative and honest professional. He consistently demonstrated a strong work ethic contributing positively to team goals. He would personally tell me how much he valued mentoring me in my personal early financial adventures.

I have never had reason to question his integrity or commitment to the organization's values. Jon also kept in contact with me after a bad hurricane and helped me survive with the little I had. Even though I worked for Jon, he would take time to help me get more jobs for my personal welding company that didn't

benefit himself whatsoever. I believe that Jon has already been seriously punished by his humiliation.

Based on my experience working closely with Jon Larmore, I believe this incident does not reflect his overall character.

Loreen Zink, a business owner at Fisherman's Village, writes (Exhibit Q hereto):

I have known Jon Larmore since 2012, when his family came to Florida to purchase Fishermen's Village. My husband and I, with our two young children, opened our store, Beneath the Sea, in 1999. The last 26 years I have observed Jon's dedication to Fisherman's Village. Jon has always been hard working with his # 1 goal being to aid and lead all the store owners towards personal success. He <u>has</u> been successful in making the Village a beautiful place where families all over the USA come to enjoy the stores, restaurants, and overall atmosphere. He has always cared about our small <u>community</u> and is a huge part of what Punta Gorda Isles is today.

Our family has also had a personal relationship with Jon Larmore for the last 13 years. He attended our son's wedding and several family gatherings, he helped my son take over running our family business when my husband passed two years ago, and has since been supportive every way possible.

Personally, I have been thankful for his friendship since I was diagnosed with cancer over a year ago. Even through all his troubles, he called, emailed, or texted me nearly every week to ask how I am doing, to tell me he is praying for me, and asking me to please let him know if I need anything.

John has always taken care of his Mother- since his father's death. He would take her traveling on his business trips. Even now he is living close by … in Indiana and keeps a close eye on her. He is a wonderful son.

**Long-time friends:**

Jenny Gianfrancesco, who has known Jon for 20 years and considers herself part of the

Larmore family, writes (Exhibit R hereto):

….I have come to deeply admire John's character, kindness, and unwavering commitment to those he loves. One of my fondest memories of John is watching him on Christmas morning, surrounded by his children and nieces, opening presents with as much excitement as the kids themselves. He would eagerly set up toys, play alongside them for hours, and bring joy to everyone in the room. His enthusiasm and warmth are a testament to the kind of person he is—someone who values family above all else and finds true happiness in the company of loved ones. Beyond joyful occasions, John has demonstrated immense strength and reliability in difficult

23

times. When his sister tragically lost her daughters in a devastating plane accident eight years ago, John became her rock. He stepped in without hesitation, handling every detail necessary to bring the girls home and ensure the family could give them a proper farewell. His ability to take charge with compassion and grace during such an unimaginable tragedy speaks volumes about his character.

Jenny's husband, Pasquale Gianfrancesco, who met Jon through his wife, writes (Exhibit S hereto):

I got to know Jon as dedicated to his children and his nieces, always making time to be present in their lives. Jon's priority has always been to provide them with love, guidance, and stability. Beyond his role as a father, Jon has been a pillar of strength for his family, particularly in times of hardship. When his sister experienced the unimaginable loss of her daughters in a tragic plane accident, Jon was her rock. He took on the painful yet necessary responsibilities of bringing the girls home and making sure his sister could give them a proper farewell. In moments of crisis, Jon does not hesitate—he steps up with compassion, leadership, and an unshakable sense of duty. Additionally, Jon remained devoted to his aging mother and father before he passed away 2 years ago, taking care of their needs and ensuring they receive the love and support they deserve. He has always been the person his family can rely on, demonstrating a level of selflessness that is rare and commendable.

Paul Decker, a friend, writes (Exhibit T hereto):

I have been a close friend of Mr. Lamore's for the past two years, having originally been hired to perform music at a function for family and friends.

From my very first introduction to Jon there was a warm and heartfelt feeling of integrity and kindness emitted from him to me. I interacted with him, and Anna (whom he truly shows a huge amount of love and verbal respect for), and his close family and friends that entire day. His actions and words to all were truly kind and respectful. When he talks of his son, Joseph, he seems to verbally "glow", and shows true love for him.

David Lindsey, a neighbor of Jon and a friend for 15 years, writes (Exhibit U hereto):

These past few years have been some of the most challenging of his life, but I've seen him embrace personal growth in a way I never had before. He made the decision to stay sober through this entire process, knowing he needed a clear mind. He and I have had deep conversations about faith, Jesus, and books that have shaped my own life – things like The Untethered Soul and other works by Michael Singer. Jon hasn't just been reading – he's been absorbing, questioning, and actively seeking to grow as a person.

When my girlfriend and I visited him and his partner, Anna, after the birth of their son, Joseph, we saw something truly special: a fresh start. Despite all the uncertainty, Jno and Anna were in great spirits, fully present in the joy of becoming parents. I believe Jon is in the middle of a transformation, and I hope this sentencing allows him to continue in that growth. He is not someone who takes this lightly. He understands the weight of this moment, and he is actively working to become a better man, partner and father.

Ryan Hasbrook, a long-time friend, writes:

For the last 10 years, I have had the pleasure of spending time with Jon and his "first family", ex-wife Michelle, son Jonathan, and daughter Bridget. We spent countless hours pulling toddlers and then adolescent children and friends' children around the late skiing and tubing. It was then I realized his overall love for his family and all of the friends that they hosted for many years. His generosity for not only hosting families, but especially doing the unconditional things that make parenting hard were acts of love that are uncommon in many parents.

John Goan writes (Exhibit V hereto):

I met Jon a few years back in Big Sky Montana while he was on vacation with his family. Having mutual faith in Christ brought us together. I have been a real estate broker for 22 years. That is how the relationship started. Sense (*sic*) then we have been talking on a regular basis. Being a realtor one has learned to judge character in clients very fast. One can spot insincerity and dishonesty very fast. I can attest to his faith, his dedication to being a better man, husband and father.

Through his life has being totally upended, relationship lost and financial devastation Jon has managed to grow a relationship with Anna and have a beautiful new son. Even though he has suffered his life being destroyed he has worked very hard in moving forward to rebuild his life. I know his dedication to grow is very sincere. His choice of actions to work through this is very admirable.

His punishment for what has happened started a long time ago from humiliation, lost friends and financial devastation he has paid a huge price already. I think he realizes that he will be paying in some form the rest of his life.

Erik Stevens writes (Exhibit W hereto):

Jon has always been a deeply religious man and very family-oriented, sharing, and caring person. I personally went through a very tumultuous custody case for my son, and at the time the uncertainly and stress of the ongoing trial taxed me to my emotional and financial limit. Jon was always there to let me know that everything that I was doing, was always to make a better life for my son, and that being there to spend quality time with my son would be what will reward me most and always prove valuable in the end. I was able to build on Jon's advice and ultimately gain custody of my son.

I was there to experience the pain first hand that his family suffered when his sister lost her young daughters in a terrible plane accident. Jon was the rock for his family to lean on during this awful time that wore heavily on all those affected. Without his strong faith and belief in family bonds, I do not know how his family would have begun to heal.

*See also*, attached as exhibits, letters from Patricia Bell (Exhibit X hereto), Phil and Betsy Roby (Exhibit Y hereto), Tade Powell (Exhibit Z hereto), Carson Chafee (Exhibit AA hereto), and Randall Spruill (Exhibit BB hereto),  Mary Lou Stark (Exhibit CC hereto)., and Josh Milberg (Exhibit DD hereto).

The theme that stands out in all of these letters is that Jon Larmore is a devoted friend and family member, generous, religious, willing to mentor young men, a comforter, and, above all, a devoted father to his son, Joseph and companion to his finance, Anna.

It is submitted that his heretofore unblemished record, his family ties and his lifetime of caring and kindness to his community, his faithful caretaking for his elderly mother and his constant devotion to his 9-month-old son warrant a significant variance from whatever guideline range is determined by the Court.

**(2)      Offense Characteristics**

Mr. Larmore does not  seek to downplay the nature, severity and gravity of the types of offenses for which he now stands convicted. In view of the likelihood of an appeal, Mr. Larmore will not seek to relitigate his trial or provide any excuses for his behavior except, perhaps, naivete. However, it bears repeating that the Government has not  identified a single investor—other than Mr. Larmore-- who actually lost money as a result of Mr. Larmore's activities. We also note that, unlike in many cases involving securities fraud, Mr. Larmore was not a professional trader, a broker, dealer or salesman. Indeed, his tender offer for WeWork appears to have been his first

significant foray into investing in publicly held securities. In short, he was a rank amateur, and his awkward scheme was doomed from the start.

Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake. *United States v. Cernik*, No. 07-20215, 2008 U.S. Dist. LEXIS 56462, at *25 (E.D. Mich. July 25, 2008) ("[A] sentence of *imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing*." (citing *Gall,* 128 S. Ct. at 599)) (Emphasis added). There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist. *See United States v. Zavala*, No. 07-14851, 2008 U.S. App. LEXIS 24168, at *8-9 (11th Cir. Nov. 25, 2008) ("[A]ny higher sentence would promote disrespect for the law.") (quoting the district court); *United States v. Ontiveros*, 07-CR-333, 2008 U.S. Dist. LEXIS 58774, at *6 (E.D. Wis. July 24, 2008) A just punishment for Mr. Larmore is one that balances the severity of his crime with his individual characteristics. That balance counsels in favor of leniency.

### (3)        Deterrence (General and Individual)

*General deterrence:*  No would-be offender with knowledge of what Mr. Larmore has already endured, and what he is likely to endure in the future, regardless of his sentence, would fail to be deterred. To date, Mr. Larmore's conviction has  been (and will be) well-publicized and will certainly be noted in the national press. The details of the matter have already been disseminated throughout print and electronic media nationally.  Mr. Larmore has already been subjected to the ostracism of friends, family, former co-workers and associates.   These are

collateral consequences of a felony conviction that he will continue to suffer, regardless of any additional penalties that may be imposed by the Court. By this conviction, his ability to earn a living has been impaired. Numerous courts have recognized that the collateral consequences of a conviction can be nearly as harsh and far more permanent than even a short term of imprisonment. *See e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Samaras*, 390 F. Supp 2d. 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job because of his conviction).

*Individual deterrence:* The judicial system is well equipped to provide adequate means of individual deterrence for future criminal conduct by the imposition of a term of supervised release with special conditions. The imposition of detailed special conditions, including *e.g.,* a ban on trading in stock of publicly held securities, can certainly ensure a sentence with adequate safeguards that would deter any chance of his reoffending. Incarceration of this defendant is simply not necessary to ensure individual deterrence. It can hardly be suggested that Mr. Larmore is a hardened criminal with a long past of endangering public safety and others at risk. He is a 51-year-old father, and it is highly unlikely that the public needs to be protected from him. The fact that this prosecution and investigations were pursued so aggressively, and that Mr. Larmore's life is in virtual ruin as a result, should serve as an adequate deterrence to others who would be inclined to violate U.S. securities laws.

**(4)    Disparity**

As the court is aware, one of the overarching goals in federal sentencing is to avoid unwarranted sentencing disparities. 18 U.S.C. §3553(a)(6). Courts routinely review "case law submitted by defense counsel demonstrating that many similarly situated defendants had received

sentences "shorter than the guideline range applicable here"" and then impose a sentence below the Guideline range. *Sarvestani v. United States,* 2015 U.S. Dist. LEXIS 159491 (SDNY Nov. 25, 2015.)

Attached hereto as Exhibit EE is an affidavit from Mark Allenbaugh, of Sentencing Stats.com, an analytical and research firm which provides statistics on federal sentences. Mr. Allenbaugh found that 160 of 283 sentences of individuals with a Guidelines level of 23, were sentenced below the applicable Guidelines range. Of these 160 defendants, the average sentence was 21.2 months and the mean sentence was 24 months. Should the Court depart from the applicable Guidelines range based on a finding that the applicable ranges overstate the seriousness of Mr. Larmore's crime, or for any of the Section §3553 factors, the average sentence received by similarly situated offenders would be even lower.

### (5)    Need to Provide Restitution

The PSI notes that restitution is not applicable in this case. (DOC at 24, par.128), nor is the government seeking any forfeiture. *Id.*at par.127.

### (6)    The Kinds of Sentences Available

As discussed below, it is suggested that incarceration is the least effective method in achieving stated Congressional sentencing policy-----even under the determinate U.S.S.G. sentencing system. Certainly, one of the primary purposes of our national sentencing policy and the Sentencing Reform Act of 1984 is rehabilitation. However, little documentary evidence exists to support the proposition that incarceration has any effect on rehabilitation whatsoever. A May 2004 study conducted by the United States Sentencing Commission belies the critical assumption that a period of incarceration for a first-time offender had any effect on rates of recidivism. *Recidivism and the First Offender*, United States Sentencing Commission May 2004. In fact, the

conclusion of the study appears to point to the contrary - the more involvement one had in the criminal justice system and **the longer in prison sentence, the higher the rate of recidivism**. An analysis of the study suggests that recidivism risk is **lowest** for those offenders with **least experience** in the criminal justice system. To some these results are not surprising. In 2001 the Honorable Jack Weinstein of the Eastern District of New York, pre-empted these findings and noted that:

> "It is not surprising that rehabilitation continues to be linked primarily with failed attempts to reform inmates while they are incarcerated. The great shortcomings of the American rehabilitative model have taken place in the context of incarceration. See, e.g., *Powell v. Texas*, 392 U.S. 514, 530, 88 S.Ct. 2145, 2153, 20 L.Ed.2d 1254 (1968) (plurality opinion) (Marshall, J.) ("[I]t can hardly be said with assurance that incarceration serves [therapeutic or rehabilitative] purposes ... for the general run of criminals"); Matthew W. Meskell, Note, *The History of Prisons in the United States from 1777 to 1877*, 51 Stan. L.Rev. 839 (1999) (eighteenth and nineteenth-century American penal system was founded on the philosophy of Dr. Benjamin Rush, who "argued that reformation and deterrence of crime ought to be the sole goals of punishment, that the contemporary criminal codes tended to harden criminals and engender hatred towards the government, and that imprisonment should be used as the primary criminal punishment."

*United States v. K*, 160 F. Supp. 2d 421, 429 (E.D.N.Y. 2001).

Indeed, it can be fairly argued that national sentencing policy is fostered not by mandating long periods of incarceration but by the partial utilization of alternatives to unduly lengthy prison sentences. The Sentencing Reform Act has provided sentencing judges with flexibility to consider which of the core sentencing principles--retribution, deterrence, incapacitation, and rehabilitation--are most important in a particular case, and to provide alternatives to incarceration where necessary in carrying out statutory goals. These four core principles have guided sentencing policy and implementation in one form or another since at least 1984. See, e.g., Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 41 (1998). Indeed, the

United States Sentencing Guidelines themselves, along with sound sentencing and penological philosophy, permits the courts to view alternatives to prisons in appropriate circumstances and to craft individual sentencing in appropriate cases.  Historically, Congress recognized that the sentencing judge must have the flexibility to emphasize one purpose of sentencing over others based upon the individual circumstances of an offender and an offense. *See*, S.Rep. No. 98-225, at 58- 9 (1983) ("The intent ... is to recognize the four purposes that sentencing in general is designed to achieve, and to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case."). "The statute (SRA) gave the U.S. Sentencing Commission ... broad authority to structure sanctions, to permit judges to individualize sentences, to be parsimonious in the use of punishment, to use non-prison sentences for nonviolent first offenders, and to avoid overcrowding federal prisons." Note, *What Did the United States Sentencing Commission Miss?* 101 Yale L.J. 1773, 1773 (1992).  In determining whether an alternative to incarceration is appropriate, courts have examined several general issues, including the risk a particular defendant poses to the public, the harm caused by the crime, the defendant's prior criminal behavior, his or her likelihood of committing another crime and potential hardship to others. *Cf.* Model Penal Code § 7.02.  Such alternatives for the Court to consider are substantial periods of probation/supervised release, community service, drug and alcohol rehabilitation programs, home confinement, electronic monitoring or any combination of the above. Thus, it is suggested that this Court, consistent with these policy goals, can and should fashion a non-advisory guideline sentence for Mr. Larmore and still protect the public and foster Congressional and constitutional sentencing policy.

**(7)      Parsimony Provision**

18 U.S.C. §3553  provides that "The court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection. (Emphasis added). *See, e.g., United States. v. Pizano-Rico*, 255 Fed. Appx. 483 (11th Cir. 2007 unpublished.)

We respectfully submit that a sentence even approaching the Guidelines range suggested by the Government would constitute overkill, particularly, in a case where the Government has not identified any individual who suffered significant loss.

For the above-stated reasons, the Mr. Larmore respectfully requests that this Court impose a non-guideline sentence. One goal of effective punishment is reformation. One of the measures of effective punishment is the position the defendant is in after he serves whatever sentence is imposed. Ultimately, reformation should go hand in hand with punishment. Punishment too severe or harsh will frustrate this goal of reassimilating a defendant into society. While this may satisfy a "lust" for punishment, an unduly harsh punishment of overly lengthy incarceration frustrates the overall purpose of the criminal justice system.

## <u>CONCLUSION</u>

For all of the reasons stated herein, the undersigned urges the Court to adjust the Presentence Report's suggested Guidelines range by 1) eliminating the proposed two-level enhancement for obstruction, 2) reducing the enhancement for loss amount from 18 levels to 14 levels, before departure; 3) reducing the enhancement for number of victims; 4) applying a substantial  downward departure from the enhancement for loss; and 5) applying the Section 3553(a) factors to grant a variance from the sentencing range as calculated under the Guidelines. We ask that the Court  fashion a non-Guidelines, non-custodial sentence, one tempered with mercy

and proportionate to the totality of the conduct in this case – a "just" sentence, one "sufficient but

not greater than necessary" to further the sentencing purposes described in 18 U.S.C. § 3553.

Dated:        New York, New York
              February 18, 2025

Respectfully submitted,

Bruce L. Udolf, P.A.
599 SW Second Avenue
Fort Lauderdale, Florida 33031
954- 415-2260
budolf@bruceudolf.com

By:/s/ Bruce L. Udolf
        Bruce L. Udolf

Litman, Asche & Gioiella, LLP
350 Central Park West Suite 10F
New York, New York 10025
917-417-6951
richardasche@lagnyc.com

By:/s/ Richard M. Asche
        Richard M. Asche

Attorneys for Defendant