

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 25, 2025

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Street
New York, New York 10007

Re:   *United States v. Jonathan Larmore*, 24 Cr. 140 (PAE)

Dear Judge Engelmayer:

The Government respectfully submits this letter in advance of the sentencing of Jonathan Larmore ("Larmore" or the "defendant"), scheduled for Tuesday, March 4, 2025 at 10:30 a.m. A jury previously convicted Larmore of tender offer fraud and securities fraud in connection with Larmore's scheme to manipulate the price of WeWork, Inc. ("WeWork"). The Probation Office has correctly concluded that proper application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") yields a Guidelines sentencing range of 87 to 108 months' imprisonment.

The defendant treated the stock market as his own personal plaything by engaging in a brazen scheme to manipulate the stock price for WeWork just before that company filed for bankruptcy. He plotted for weeks to drive up the price of WeWork by announcing a fake tender offer for the company at an unbelievably high price, and he took steps big and small to make the offer appear legitimate to outside observers. He also took unconventional steps aimed at mobilizing social media enthusiasm to recreate the "meme-stock" rally he had seen around GameStop, all in the hopes of creating a short squeeze that would make his short-term options unbelievably valuable while leaving innocent investors in the lurch. His scheme was intricate and extensive. When lawyers warned him that it was illegal, he did not stop, but instead took efforts to shield his crimes, even going so far as to charter a yacht to do his trading in international waters. And even after his scheme failed to generate the profits he had been hoping for, he tried to cover his tracks, including by committing perjury, and even today has not accepted responsibility for his crimes. Given these extreme circumstances and other aggravating factors discussed below, the Government submits that a Guidelines sentence is appropriate here.

Hon. Paul A. Engelmayer  Page 2
February 25, 2025

## I. FACTUAL BACKGROUND

### A. The WeWork Tender Offer Scheme

In the summer of 2023, Jonathan Larmore, the defendant, was in dire financial straits and his bank accounts were unable to keep up with his extravagant spending. His bank accounts had almost no money in them. He was behind on his payments for his multi-million-dollar mortgages. In May 2023, a group of investors in Arciterra Companies, LLC ("Arciterra"), a real estate management company run by the defendant, sued the defendant and alleged a massive fraud. As a result, many of the Arciterra assets had been placed under state receivership, and the Securities and Exchange Commission ("SEC") undertook an investigation into Arciterra. Bloomberg News published an article about the allegations, including that Larmore had used investor funds on extravagances like a $100,000 birthday party for his dog, Spike. Even with his reputation in shambles and no means of income, Larmore did not curb his spending; instead, he used an Arciterra credit card to rent yachts and fund other luxuries.

It was in this context that Larmore launched his scheme to manipulate the price of WeWork stock by launching a fake tender offer. WeWork was a co-working space company that traded on the New York Stock Exchange and was on the verge of declaring bankruptcy. In October and November 2023, WeWork issued a series of negative announcements, and its stock price was on a steady downward decline. To take advantage of WeWork's situation, Larmore launched a three-part scheme: First, on October 6, 2023, Larmore created a fake company called Cole Capital Funds LLC ("Cole Capital"). Second, on November 1, 2023 and November 2, 2023, Larmore spent more than $775,000 buying tens of thousands of cheap, short-dated, out-of-the-money WeWork call options, the vast majority of which were set to expire on November 3, 2023 at 4:00 p.m. Third, on November 3, 2023, Larmore issued a false and misleading press release announcing that Cole Capital proposed to acquire 51% of all outstanding shares owned by minority shareholders of WeWork at a more-than-700% premium, in an all-cash offer worth more than $77 million. Larmore's hope was that the announcement of a tender offer would send the price of WeWork stock skyrocketing past the strike price of Larmore's stock options, at which point he stood to earn somewhere between $30 million and $50 million.

Larmore's scheme was a premeditated one, and he began plotting at least a month before putting the plan into action. His first step—the formation of a fake shell company to carry out the offer—involved registering Cole Capital and even creating a fake website that made Cole Capital look like a real company with real clients and real investments. He took steps to disguise his own involvement, likely recognizing that his own name was toxic after the Arciterra lawsuit. Instead, he incorporated Cole Capital using the name "J. Moynahan Larmore," which he had never gone by before. He also took pains to create an appearance that Cole Capital was in fact Cole Capital Advisers, a real and extremely successful real estate company founded by Christopher Cole with a $28 billion portfolio. Not only did he use the "Cole Capital" name, but he used practically the same address: 2425 E Camelback Road in Phoenix, Arizona, whereas the real Cole Capital Advisers was at 2**3**25 E Camelback Road in Phoenix, Arizona. Moreover, the website that Larmore built for Cole Capital claimed that the company's "roots trace back to the high standards established in 1979 when Christopher H. Cole founded Cole companies." Each of these details was intended to deceive investors into thinking that Larmore's tender offer for WeWork was a

legitimate offer, backed by a billion-dollar firm with extensive real estate experience, rather than a shell company with no assets or employees.

Larmore also took steps to promote his eventual offer. Some of these were conventional, such as the Cole Capital website and a press release announcing the offer. Others were less conventional, including promoting the offer through social media influencers and even paying to fly a "WeWork" banner behind planes in Miami and New York City. Larmore's text messages show that he was interested in creating a "short squeeze" by creating a frenzy similar to the GameStop short squeeze of 2021. He paid for the plane banners using his corporate credit card.

Larmore also actively worked to build a cover story to try to protect himself if he were caught. Larmore knew that his plan carried risk. His Google search history shows that in late 2023, he was searching things like, "sec investigate man who did short squeeze takeover," "sec fines short squeeze tender," and "are options markets unregulated." He tried to hire multiple attorneys in an effort to put a law firm name on the tender offer to lend it more legitimacy, but no attorney would agree. One of the attorneys he spoke to told him outright, "I don't think you can do that." None of this deterred Larmore. In fact, as soon as one of the attorneys warned him that it would be illegal to launch a tender offer without having the financing locked down beforehand, Larmore created a fake paper trail by emailing a banker at a local Chase bank with a general inquiry about Chase's securities-backed lending program. Larmore later tried to use this pretextual outreach to falsely suggest that his tender offer was backed by JP Morgan.

Meanwhile, Larmore also spent hundreds of thousands of dollars purchasing short-term WeWork call options over multiple brokerage accounts. He also spent hours on the phone pressing the brokerage accounts to authorize his options trades as he became more and more pressed for time as the date for his fake tender offer approached. Ultimately, he accumulated tens of thousands of short-term call options. He also purchased shares in WeWork stock in the brokerage accounts where he could not obtain approval for options trading in time.

On the morning of November 3, 2023, Larmore launched his fake tender offer by sending a letter to the WeWork board and filing a press release that also included the contents of the letter to the board. The press release purported to announce a tender offer for 51% of the majority of WeWork's outstanding shares owned by minority shareholders for a price of $9.00 a share, which was a premium of more than $7.89 (or over 700%) over the prior day's closing price. The offer purported to be from Cole Capital and was signed by Cole Capital's CEO, "J. Moynahan Larmore," again avoiding Larmore's usual formulation of his name. The press release included the following:

> Dear [CEO of WeWork],
>
> > We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
> >
> > We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a

> lender and have a financing commitment prior to execution of a definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.

The letter and press release were riddled with falsehoods. Larmore had not received feedback on any offer from City National Bank or JP Morgan. He had no financing in place and no legitimate prospect of financing. He had no legal or financial advisers advising him on any tender offer—his attempts at getting a legal adviser had all failed, with at least one of the lawyers warning him that what he wanted to do was illegal.

When Larmore launched his tender offer, he did so from a yacht that he had rented off the coast of Miami. While on the yacht, he told his young employee, Patrick Cochran, that he was trying to navigate to international waters before executing his trades. He also told Cochran, "You don't want to be involved in the trading, the SEC is not going to be happy about this."

After accumulating his options, sending the letter to the board, and filing his initial press release, Larmore's plans hit a snag. The press release could not be immediately disseminated because it was not formatted correctly. When the formatting was eventually fixed, it still did not find wide circulation due to that wire service's scope. Larmore then had to engage with a second wire service, with the timing becoming more and more urgent as the 4:00 p.m. expiration date on his options approached. Larmore did ultimately succeed in getting his press release out to a wide distribution, but not until approximately 5:12 p.m., after his options had expired. Although Larmore stood to make no money at that point, the price of WeWork's shares did exactly what he had expected. WeWork's stock price jumped in after-hours trading from $0.85 to $1.45 and continued to rise, reaching a high of $2.14 at approximately 5:31 p.m. Millions of investors purchased WeWork stock at those inflated prices. Soon thereafter, outlets began rescinding the press release, suspecting it was illegitimate. As a result, WeWork's stock price declined and closed at $1.18 at the end of after-hours trading at 8:00 p.m. The following Monday, November 6, 2023, WeWork filed for Chapter 11 bankruptcy protection and the trading of its shares was suspended on the NYSE.

### B. The Arciterra Scheme

As discussed above, at the time Larmore plotted his fake tender offer scheme, he was under investigation by the SEC for a fraud involving Arciterra. The SEC filed a complaint against Larmore and other Arciterra entities in November 2023. *See United States Securities and Exchange Commission v. Larmore*, 23 Civ. 2470 (DLR) (D. Ariz.). The Court has previously inquired about the status of Arciterra and the relevance that scheme has for the instant prosecution. [REDACTED] we respectfully submit that the Court's sentence need not punish Larmore for any separate criminal activity that is alleged to have occurred in connection with the Arciterra scheme. It may, however, be appropriate for the Court to consider the defendant's actions involving Arciterra as relevant background and context

for his actions with the WeWork tender offer fraud, as well as to rebut the suggestion that Larmore's deceptive actions in the instant case was a one-time occurrence or aberrational. For these reasons, we are providing the Court with this factual overview of the Arciterra scheme.

In 2005, Larmore founded and became the Chief Executive Officer of Arciterra Group, LLC, a real estate and management company headquartered in Phoenix, Arizona, which was the predecessor to Arciterra Companies LLC, formed in 2007. According to its LinkedIn page, Arciterra "created 19 investment offerings, raised approximately $187 million in capital and owns approximately 83 properties in 26 states." Multiple investigations, lawsuits, and receiverships over the past two years have revealed that Larmore operated Arciterra, at best, in violation of his fiduciary duties as an investment advisor and, at worst, as a Ponzi scheme.

Arciterra's collapse began not long after it became the subject of regulatory scrutiny. Around August 2022, the SEC began investigating Arciterra for possible violation of the securities laws. During an investigative interview with the SEC in April 2023, Larmore stated that, in March 2023, he fired nearly all Arciterra's employees, closed its headquarters in Phoenix, Arizona, and moved the business operations to Florida.

That spring, Larmore and Arciterra were sued civilly by a group of three Arciterra investors. *See* Complaint, *B. Brad and Monica Mason TIC v. Larmore et al.*, 23 Civ. 1785 (N.D. Ill. May 27, 2023) (Doc. No. 1). The plaintiffs in that case were investors in an Arciterra entity that owned and operated Belleville Crossing, a multi-tenant retail shopping center located in Belleville, Illinois. They alleged that no investor in the Belleville project had received dividend payments since August 2019, and that Larmore, his wife, and his mother had diverted investor assets to fund their lavish lifestyle. Furthermore, Larmore and Arciterra utterly ignored and neglected the Belleville property (other than pocketing tenants' maintenance fees), ultimately resulting in the sale of the property at a tax lien sale in November 2022 due to the failure to timely pay property taxes. The plaintiffs further alleged that what happened to the Belleville property was "part of a more global fraudulent scheme perpetrated by the Defendants to defraud not hundreds, but thousands of investors who contributed to the various Arciterra investment offerings." Comp. ¶ 38. They alleged that "none of the more than 2,000 plus investors in the defendants' various offerings have received dividend payments since 2019 and that some have not received payments dating as far back as 2011." *Id.*[1]

Larmore's and Arciterra's legal troubles continued through the summer. In August 2023, a group of construction companies sought the appointment of a receiver for Arciterra Companies, LLC, after suing the company and related entities in Indiana for non-payment of hundreds of thousands of dollars owed. *See City Circle Outdoors et al. v. Arciterra Companies, LLC et al.*, No. 29D02-2305-PL-004542 (Hamilton Cnty Super. Ct. Aug. 10, 2023).

---

[1] On August 22, 2023, Larmore and Aricterra moved to dismiss the Belleville complaint for lack of personal jurisdiction. Plaintiffs in that case later voluntarily dismissed their claims, but, as discussed below, by August 2023, a receiver had been installed for Arciterra Companies LLC in Indiana.

Shortly after Larmore's WeWork scheme, on November 28, 2023, the SEC sued Larmore in the District of Arizona. *See* Complaint, *SEC v. Larmore et al.*, 23 Civ. 2470 (DWL) (D. Ariz.) (Doc No. 1) (the "SEC Complaint"). The SEC Complaint includes claims against Larmore for investment adviser fraud, securities fraud, and tender offer fraud related to his misappropriation of Arciterra investor funds and the fraudulent tender offer scheme that later became the basis for the charges in the Indictment. *Id.* According to the SEC Complaint, over the years, Arciterra has managed over a hundred related entities. Two entities Arciterra managed are private real estate investment funds called ArciTerra Note Fund II, LLC ("Note Fund II") and ArciTerra Note Fund III, LLC ("Note Fund III") (together, the "Funds"). From 2006 to 2009, the defendant and Arciterra raised approximately $45 million from approximately 1,045 investors for these two private Funds, to which Larmore owed fiduciary duties as an investment adviser. SEC Complaint ¶ 2. Larmore, through his control of Arciterra, made the ultimate decisions regarding the use of the amounts raised from both investor funds, including the acquisition and sale of real properties, investments in securities, and use of tenant proceeds.

The SEC alleges that, from at least 2017 through 2023, Larmore was engaged in a scheme by which he misappropriated approximately $17 million to fund his lavish lifestyle of private jets, yachts, and expensive residences, and to pay for other cash needs of his businesses. Larmore siphoned money from the Funds by transferring money belonging to the Funds to accounts of various Arciterra entities, then commingling the money with proceeds from other businesses, and finally funneling money to his own accounts or using it for his own personal expenses. *See* SEC Complaint ¶¶ 3, 37, 40, 44.

As part of the SEC's case, on December 21, 2023, the Honorable Douglas L. Rayes of the District of Arizona entered orders—with Larmore's consent—appointing a receiver—Allen D. Applbaum— for various Arciterra entities as well as Cole Capital (the "Receiver") and temporarily freezing Larmore's assets. SEC Dkt. 77 & 78. In his role as Receiver, Mr. Applbaum issued quarterly reports. In a November 2024 report, Mr. Applebaum revealed instances of Arciterra operating as, what amounts to, a Ponzi scheme:

> The Receiver observed that certain interest payments during the investor capital raise period in 2008 and 2009 were made from investor capital contributions. For instance, in 2008, interest payments of $767,113 were made to investors. These interest payments appear to have been paid from investor capital contribution. Likewise, in 2009, according to Note Fund III financial statements, the total interest expense per the general ledger of $2,169,830 was paid from the additional capital raised during 2009. In other words, the investor payments during that period were not made from the cash flows from properties, but rather from new Note Fund III investor capital contributions.

SEC Dkt. No. 269 at ¶ 111. Mr. Applbaum's report also concluded that Arciterra consistently "[u]sed funds from investors in one Investor Fund to repay those in other Investor Funds." *Id.* at ¶ 94. Larmore also used his Arciterra-paid American Express card as his personal piggy bank, at amounts totaling approximately $6.6 million. *See id.* at ¶ 206.

## II. APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## III. DISCUSSION

### A. The PSR Calculation

The Probation Office's Presentence Investigation Report ("PSR") correctly calculates the applicable Guidelines Range as follows:

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven.

- Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(J), because the loss resulting from the offense was $6,444,221—that is, more than $3,500,000 but not more than $9,500,000—eighteen levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved hundreds of victims, two levels are added.

Hon. Paul A. Engelmayer                                                                                                    Page 8
February 25, 2025

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means, two levels are added.

- Pursuant to U.S.S.G. § 3C1.1, because the defendant attempted to obstruct or impede the administration of justice with respect to the investigation and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, two levels are added.

- Pursuant to U.S.S.G. § 4C1.1(a), two levels are subtracted because Larmore has no criminal history points and meets the other criteria set forth in section 4C1.1(a).

In the PSR, Probation calculates an offense level of 29 and a criminal history category of I, resulting in an applicable Guidelines range of 87 to 108 months' imprisonment. PSR at pg. 32. The Government agrees with Probation's Guidelines calculation. Larmore raises three objections: (1) he argues that he should receive a 14-point enhancement based on what he calculates as the applicable loss amount, rather than an 18-point enhancement based on Probation's and the Government's calculated loss amount; (2) he argues that the two-point enhancement for an offense involving ten or more victims should not apply; and (3) he argues that the two-point enhancement for obstruction of justice, based on his perjury in Indiana, should not apply. Larmore's arguments are not persuasive.

1. The PSR Correctly Calculates the Loss Amount

Application Note 3(E)(ix) to Section 2B1.1 of the Guidelines addresses how losses should be calculated in a case "involving the fraudulent inflation or deflation in the value of a publicly traded security." In such a case, "the court in determining loss may use any method that is appropriate and practicable under the circumstances." *Id.* Application Note 3(E)(ix) continues:

> One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—
>
> (I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II) multiplying the difference in average price by the number of shares outstanding.
>
> In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances,

>changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

*Id.*

The Government agrees with Probation that the example method set forth in Application Note 3(E)(ix) "cannot reasonably be used here because WeWork filed for bankruptcy several days after the events of the instant offense." PSR ¶ 37. Specifically, WeWork filed for bankruptcy on Monday November 6, 2023, which was the next business day after Larmore announced his fraudulent tender offer on Friday November 3, 2023. Accordingly, a more "appropriate and practicable [approach] under the circumstances," Application Note 3(E)(ix), would be "to calculate the loss based on the increase in share price attributable to the fraud multiplied by the volume of shares actually traded during the duration of the fraud." PSR ¶ 37. This is the methodology that the parties proposed, and that Judge Forrest accepted, in another fraudulent tender offer case. *See* Gov't Sentencing Submission at 3, *United States v. Murray*, 17 Cr. 452 (KBF), Doc. No. 21 (S.D.N.Y. Mar. 5, 2018) ("In order to calculate the loss amount, the Government obtained data showing the volume of shares traded each minute during the period of time that the stock was affected by the defendant's fraud. The actual volume of shares traded was then multiplied by the artificial increase in share price pursuant to the fraud, resulting in a loss of approximately $7.98 million."); Sentencing Tr. at 5, *United States v. Murray*, 17 Cr. 452 (KBF), Doc. No. 25 (S.D.N.Y. Apr. 5, 2018) (adopting parties' loss calculations).

Applying this methodology, the loss amount in this case is $6,444,221. Larmore published his press release announcing his fraudulent tender offer for WeWork stock on November 3, 2023 at 5:12 p.m., and WeWork's share price shot up immediately thereafter, as reflected on page 4 of GX 1706:



The total volume of shares purchased on November 3, 2023 from 5:12 p.m. through the conclusion of after-hours trading was 9,618,226.[2] The average share price from 5:12 p.m. through the conclusion of after-hours trading that day was $1.52.[3] That is $0.67 higher than the $0.85 per share price of WeWork stock at 5:12 pm. Thus, the aggregate price of traded WeWork shares was fraudulently increased by $6,444,221 by the press release. Put differently, victims that bought WeWork shares at the elevated prices paid on average $0.67 per share, or $6,444,221, more than they should have for the stock. Pursuant to Section 2B1.1(b)(1)(J), a loss amount of $6,444,221 corresponds to an 18-point offense level increase.

The Court should reject Larmore's alternative loss calculation. To start, Larmore seems to agree with Probation and the Government that the Court should, as part of its analysis, look to see how much WeWork's stock price was fraudulently inflated from 5:12 p.m. to the conclusion of after-hours trading on November 3, 2023. *See* Doc. No. 120-1 at ¶ 66. The parties diverge, however, on the stock price to which the Court should compare the fraudulent inflation. On the one hand, Probation and the Government argue that the Court should compare the fraudulent inflation to WeWork's stock price right before Larmore's press release instantly spiked WeWork's price at 5:12 p.m. ($0.85). Larmore, on the other hand, argues that the Court should compare the fraudulent inflation to WeWork's average stock price during the 90-day period *after* the fraud ($1.4162), or to WeWork's average stock price during the 10-day period before the fraud ($1.442). *See* Doc. No. 120-2 at pg. 26.

Both of Larmore's approaches are flawed. During the 90-day period after the fraud, WeWork underwent significant changes that affected its stock price. Most obviously, it filed for bankruptcy. And, for much of the 10-day period before Larmore's fraud, WeWork's stock price had not fully incorporated the prospect of WeWork's impending collapse. For example, on October 31, 2023, WeWork's stock price closed at $2.28, but fell by nearly 50% and closed at $1.22 the next day, November 1, 2023, following a *Wall Street Journal* article on the 31st with the headline: "WeWork is planning to file for bankruptcy as early as next week." GX 1706. In contrast, Probation's and the Government's approach focuses on and recognizes the immediate and indisputable effect that Larmore's fraud had on WeWork's stock price: it caused a spike within one minute. Larmore has not identified any other market forces or news (other than his fraud) that would explain such a jump. As such, Probation's and the Government's approach appropriately isolates the actual losses caused by Larmore's fraud during the period in which investors actually overpaid for WeWork stock and should, therefore, be the approach the Court adopts.

---

[2] The data for this loss calculation was provided by Thomas Carocci of the FINRA, who testified at trial.

[3] While the Government at trial focused on the period between the publication of the press release at 5:12 p.m. and the withdrawal of the press at 6:12 p.m., the Court should consider the fraud period for the purpose of calculating losses to be from 5:12 p.m. to the conclusion of after-hours trading at 8:00 p.m. There was no corrective announcement from WeWork or other source on November 3, 2023 that Larmore's offer was fraudulent. *Business Wire* withdrew the press release at 6:12 p.m., but it did not publicly give a reason for the withdrawal. Market participants could not have easily realized that Larmore's offer was fake during the remainder of after-hours trading on November 3, 2023.

### 2. The PSR Correctly Applies the Enhancement for Ten or More Victims

While Larmore concedes that more than 10 investors bought WeWork shares during the fraud period (in fact, his expert does an analysis of the top 25 WeWork investors during the fraud period), he nonetheless argues that the 10-or-more victims enhancement does not apply. Larmore argues that "[e]ven if some investors purchased during the fraud period at inflated prices, these investors could have sold their share[s] at a substantial profit following discovery of the alleged fraud." Doc. No. 120. at 10. This argument, however, ignores the fact that *every* investor who purchased WeWork shares during the fraud period, regardless of when they sold their shares or the prices at which they bought and sold them, is a victim of the crime, because those investors overpaid for their shares due to the fraudulent inflation from Larmore's crime. As discussed above, investors overpaid for WeWork shares during the fraud period by an average of $0.67 per share. Thus, even if an investor later sold their shares at a profit, their profits should have been an average of $0.67 per share higher because the investors overpaid for their shares in the first place.[4] Accordingly, because, as Larmore concedes, more than 10 investors purchased WeWork shares during the fraud period, the 10-or-more victims enhancement applies.

### 3. The PSR Correctly Applies an Enhancement for Obstruction of Justice

Larmore offers a list of four reasons why he should not receive a two-point enhancement for obstruction of justice. Noticeably absent from that list, however, is any argument that he did not commit perjury in Indiana state court. Of course, any such argument would be meritless in light of the evidence of such perjury, which is summarized below.

On August 18, 2023, Larmore sold a Gulfstream G400 airplane that he owned through an entity called JML BC G400, LLC for a purchase price of $10.2 million. The net proceeds from the sale due to Larmore—after accounting for amounts due to creditors and others with interests in the sale proceeds—were $1,237,112.88 ("the Plane Proceeds"). On August 18, 2023, the closing agent for the sale wired the Plane Proceeds to a bank account in the name of Arciterra Companies, LLC (the "Arciterra Account"). Then, on August 21, 2023, every penny of the Plane Proceeds was wired, at Larmore's direction, from the Arciterra Account to a bank account that Larmore controlled in the name of JMMAL Investment, LLC, and further wired later that day to a bank account in Larmore's own name at Park National Bank (the "Larmore Bank Account"), which, at that time, had a balance of only $52,555.52.

Records from the Larmore Bank Account indicate that, from August 21, 2023 through November 1, 2023, Larmore spent all the Plane Proceeds and other funds, as follows:

---

[4] Larmore is also factually wrong when he claims that the Government has not been able to "identify a single investor who lost any substantial sum as a result of Mr. Larmore's activity." Doc. No. 120 at 10. As reflected in the 3500 material, the Government interviewed several retail investors who purchased WeWork stock during the fraud period. For example, one investor purchased approximately $25,000 worth of WeWork shares on Larmore's announcement and later sold his position at a 20 percent loss. *See* 3503-003. Because Larmore has these materials, his point must be that losses of $25,000 are not "substantial" for the purposes of punishment; to many retail investors, however, $25,000 would represent a meaningful loss.

- $620,000 wired to trading accounts in Larmore's name at seven brokerage firms (TDAmeritrade, JP Morgan, Apex, WeBull, TradeStation, Fidelity, and City National Bank), from September 12, 2023 to November 1, 2023.[5] This money was then used by Larmore to purchase WeWork stock and options.

- $200,000 wired to a bank account in the name of Arciterra Companies, LLC, on August 25, 2023.

- $180,000 wired to a bank account in the name of Kevin P. Cochran (the father of Larmore's fiancée), on August 21, 2023.

- $100,00 wired to a bank account in the name of B. Lane Halser, on August 25, 2023.

- $75,000 lost as a deposit to Pier One Yacht Sales, in connection with Larmore's offer to buy a 44-foot Inter Marine yacht called the "Princess Anna" for more than $5 million.

- $55,000 to charter a 76-foot San Lorenzo yacht called the "Quarentena," on October 31, 2023. This was the yacht that Lamore used on November 1 through November 3, when he attempted to sail into international waters to purchase his WeWork options and shares and launch the fraudulent tender offer.

- $50,000 to a private charter jet company, on September 7, 2023.

- $18,435 in college tuition for Larmore's son, on September 8, 2023.

- $500 in incoming and outgoing wire fees.

All 72,846 of the WeWork call options and 65,789 of the 343,641 WeWork shares that Larmore purchased on November 1 and 2, 2023, in furtherance of his fraudulent scheme, *see* Indictment ¶¶ 10-16, were purchased with funds identified in the first bullet above.

On October 10, 2023, a receiver for Arciterra Companies, LLC filed a motion for contempt and return of the Plane Proceeds to Arciterra Companies, LLC in Indiana state court. A hearing on the receiver's contempt motion was held on November 13, 2023. At the contempt hearing, Larmore lied under oath about how he spent the Plane Proceeds. He testified on cross-examination, in relevant part, as follows:

> Q. With respect to the money that was transferred from Arciterra Companies, LLC to JMMAL Investment, LLC [i.e., the Plane Proceeds], where is that money currently?
>
> A. It has been spent.

---

[5] Larmore also wired an additional $75,000 to an eighth brokerage firm (InterActive Brokers) on October 27, 2023, but it was returned on November 1, 2023.

> Q. Okay. What was it spent on?
>
> A. Living expenses and providing money to the company for hiring attorneys and operating expenses.
>
> Q. Okay. What company were the funds provided to?
>
> A. I provided them to Dan DeCarlo. He—you would have to—he handled it from there.
>
> ….
>
> Q. How much of the 1.2 and change was given to Dan DeCarlo as opposed to you for living expenses?
>
> A. My recollection is $250,000.
>
> Q. 250,000 was given to Dan DeCarlo, and the remaining approximately million dollars went to living expenses?
>
> A. Correct.
>
> ….
>
> Q. So the remainder that didn't go back to the business, that million dollars was spent on living expenses. It's November now, so from August, September, October, into November, maybe three and a half months or so, you spent a million dollars on living expenses?
>
> A. Living expenses, perhaps debt. I have not reconciled or looked at an accounting of what the money was spent on.

Larmore did not spend the Plane Proceeds on "living expenses" or "debt." As set forth above, the defendant spent half of the Plane Proceeds funding investment accounts to purchase tens of thousands of WeWork securities just days before the contempt hearing. In addition, he also spent hundreds of thousands of dollars on family members, yachts, and private planes.[6]

The Court should reject Larmore's arguments against the application of the obstruction-of-justice enhancement.

---

[6] Even if the Court concludes that the obstruction-of-justice enhancement under the Guidelines does not apply, it should nonetheless consider the fact that Larmore committed perjury, which he has not contested, when weighing the Section 3553(a) factors.

Hon. Paul A. Engelmayer                                                                                                        Page 14
February 25, 2025

First, Larmore claims he did not intend to obstruct justice with his perjury because he notified the SEC that he had purchased WeWork options before he committed perjury. *See* Doc. No. 120 at 12. This characterization is misleading. Larmore's disclosure of his options trading to the SEC was not made in response to a regulatory inquiry or self-reporting of a crime. Instead, Larmore appears to be referring to a Schedule 13D that he filed in the days following his fake tender offer, in an effort to make the tender offer look legitimate. This disclosure did not accurately reflect his ownership at the time, and did not disclose certain details that would have been relevant to a criminal investigation and which could have been gleaned from honest responses to the Indiana court's inquiries—including the timing, price, and manner of the purchases. This argument also fails to account for the full scope of Larmore's perjury and obstruction. Larmore not only lied about and concealed during his testimony his purchase of WeWork options, which was itself obstructive of the Government's investigation (regardless of what he communicated to the SEC), but he also lied about and concealed what he did spend the Plane Proceeds on—luxury expenses that were evidence of his lavish lifestyle, which, as the Government argued at trial, was powerful evidence of his motive to commit the crime.

Second, Larmore argues that his perjury was not given "with respect to" the Government's investigation, because, at the time of his perjury, he was "not aware of" the existence of any Government investigation." Doc. No.120 at 12-13. This argument is wrong on the law. Application Note 1 to Section 3C1.1 expressly provides that '[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guidelines if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *See also United States v. Valente*, 688 Fed. Appx. 76, 80 (2d Cir. 2017) (holding that defendant's obstruction of SEC civil investigation that preceded the criminal investigation for same conduct justified 3C1.1 enhancement). In addition, at the time of his perjury in Indiana, Larmore indisputably knew about the SEC investigation into the WeWork tender offer fraud, showing that he knew that government entities were investigating his illegal conduct.

Third, Larmore argues that his perjury was not material to the Government's investigation. Doc. No. 120 at 13. But, as discussed above, at a minimum, Larmore lied about the fact that he spent the Plane Proceeds on WeWork stock options, the yacht he used to commit his crime, and his lavish lifestyle, *i.e.*, his motive for committing the instant offense. Each of these facts were material to an investigation into whether Larmore committed tender offer fraud and market manipulation in order to make a large amount of money on short-term call options.

Fourth, Larmore claims that he did not act "willfully" to obstruct the Government's investigation. Doc. No. 120 at 13. Here, Larmore makes two points: (1) he perjured himself "in the context of a matrimonial proceeding" and (2) he had "no reason to believe that the testimony would ever be seen by the Government." Doc. No. 120 at 13. To start, the Indiana court proceeding was not a "matrimonial proceeding." It was in the context of litigation against Arciterra entities and in response to a motion for contempt filed by the receiver for Arciterra Companies LLC. More fundamentally, however, it was, in context, about major litigation regarding Larmore's primary business that occurred shortly after the fraud at issue in this case. It was more than reasonably foreseeable that the Government would seek out (as it did here) Larmore's sworn testimony in such a context as it sought to understand the instant offense.

### B. The Court Should Impose a Guidelines Sentence

The § 3553(a) factors applicable in this case make a serious term of imprisonment, as reflected by the Guidelines, appropriate.

1. Seriousness of the Offense and Need for Just Punishment

Larmore led an audacious and complex criminal scheme. He pursued his schemes out of the desire to make a quick fortune at the expense of innocent investors. His only motivation was to maintain a lavish lifestyle of private jets and yachts—luxuries that had fallen outside his means (if they were ever within them to begin with) but that he felt entitled to, regardless of who he hurt to obtain them. And his crimes, even if they did not result in the payday he expected, were successful in distorting the market and exposing investors to losses. A Guidelines sentence is appropriate to punish such deliberate and consequential wrongdoing.

Larmore's scheme was purposeful and persistent. Nothing about his crimes can be dismissed as a temporary error or diminished as improvident impulse. Larmore's commitment to his crime was evidenced by the many lengths he took to ensure its success: he created a Cole Capital website as a landing page for anyone who wanted to probe the sincerity of his proposed tender offer; he paid for plane banners to fly on the morning his tender offer was announced; he solicited multiple attorneys in the hopes of finding one unscrupulous or naïve enough to allow their name to be added to the press release; and he hired a yacht to take him out to international waters on the day of the tender offer announcement in a misguided attempt to avoid criminal liability. In short, Larmore deployed extraordinary efforts to accomplish his criminal ends. His conduct was unsuccessful, ultimately, not for lack of effort or desire, but due to his miscalculation as to the ease with which he could issue his press release to appropriate media outlets.

More generally, however, Larmore's submission fails to grapple with the simple truth that fraud is illegal and that Larmore engaged in fraud. Larmore, for example, pays little attention to the fact that he distorted market prices for WeWork securities in order to accomplish his criminal scheme, and thus harmed investors relying on the sincerity of his tender offer. Nor does Larmore address the mountain of evidence showing that he knew what he was doing was wrong at the time he was doing it, but he did it anyway. Larmore was warned time after time that his scheme was illegal—including not only the Google results from his own personal research, but also direct advice from counsel—and yet his response was to simply take more steps to make his crimes harder to detect. This conduct shows an unusual determination to commit his fraud, and shows that the general threat of criminal prosecution was not enough to deter him. Additionally, Larmore's reliance on impressionable youths to engage in dishonest conduct is troublesome. Larmore enlisted, at various points during his crimes, young adults in their 20s with little experience in finance and thus little ability to challenge Larmore's conduct. Larmore seduced these young people with his displays of wealth and showed no remorse about entangling them in his crimes. Larmore, for example, enlisted his romantic partner to assist in creating the Cole Capital website and relied upon her brother, also in his early 20s, to educate him as to how to trade options. These aggravating factors, none of which are reflected in the Guidelines themselves, warrant a serious term of incarceration.

2. <u>Specific Deterrence</u>

The need for specific deterrence also weighs heavily in favor of a lengthy custodial sentence. Larmore accepts no responsibility for what he did, so the Court should have no confidence that Larmore has learned any lesson from this episode that would prevent him from reoffending. A serious sentence from this Court is necessary to impress upon this defendant the importance of honesty and respecting the integrity of the markets. Nor was Larmore's scheme to launch a fake tender offer for WeWork aberrational. As discussed above, Larmore devised this scheme after the even larger Arciterra scheme began to unravel. The fact that Larmore chose to commit this crime while he was under active investigation by the SEC for a separate securities violation, even misusing assets that were under receivership to purchase some of his stock options, demonstrates an unusual level of brazenness. Investor lawsuits, regulatory inquiries, court-appointed receivers, and the advice of outside counsel did nothing to deter Larmore from launching his scheme to manipulate the price of WeWork. In fact, when the Indiana court asked Larmore what happened to the proceeds of his sale of a private jet, he perjured himself, saying that he had spent the money on "living expenses" when in fact he had used the money to buy WeWork stock options. These actions show that Larmore has no remorse for his conduct and there is every indication that, absent a lengthy term of imprisonment, he will continue to view himself as above the law.

In fact, Larmore's attempt to obstruct the investigation into his fraud underscores his persistence in carrying out his criminal scheme, and highlights the need for specific deterrence. He lied to the Indiana court, under oath, when that court asked Larmore what he did with the proceeds of his private plane sale. It is no exaggeration to say that having committed fraud once, Larmore made the calculated choice to engage in additional criminal behavior, having had months to reflect on his original crime, in order to avoid the professional and penal consequences that he knew disclosure of his conduct would incur. The defendant's obstruction of the investigation of his fraud is, by itself, a powerful reason to impose a sentence that carries a substantial period of incarceration. *See United States v. Mui*, 214 F. App'x 40, at *5 (2d Cir. Jan. 18, 2007) (approving district court's consideration of defendant's obstruction of investigation under Section 3553(a) and consequent imposition of higher sentence); *United States v. Vogler*, 763 F. App'x 18, at *19-20 (2d Cir. Feb. 26, 2019) (same); *United States v. Butters*, 588 F. App'x 12, at *13 (2d Cir. Dec. 11, 2014) (approving district court's consideration of defendant's false statements to law enforcement officials as evidence of his dishonesty which the district court viewed as discounting his after-the-fact statements of remorse). The defendant's decision to commit a second crime to cover his tracks suggests the need for additional deterrence in this case and a sentence that is sufficiently great to provide just punishment for the distinct wrong of the defendant's obstruction.

3. <u>General Deterrence</u>

A Guidelines sentence is also necessary to afford adequate general deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). In enacting Section 3553(a), "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision

to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

Because securities fraud schemes are difficult to uncover, significant punishment is necessary to deter others from similar conduct. *See, e.g.*, *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) ("The district court's assertion that insider trading requires high sentences to alter th[e] calculus" that insider trading is "a game worth playing" given the potential for large profits "is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (citation and internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). A significant custodial sentence is critical to send a message that those who negatively impact the financial markets through market manipulation and tender offer fraud will be caught and face just punishment in Court.

General deterrence is especially important in the age of "meme stocks" and short squeezes, where potential fraudsters are attracted by the prospect of armies of unsophisticated online day-traders who can be mobilized through misleading social media posts and online conduct to massively affect a company's stock price. This phenomenon is exactly what Larmore was trying to invoke through his fraud. Some of the very same elements that defense counsel mocked in their jury addresses—plane banners, a press release that credited "God," and the recruitment of online influencers—were designed to generate frenzied online enthusiasm and propel the stock price. After trying to enlist these forces to his advantage, Larmore now cites them to suggest that his fraud was farfetched and not very serious. To the contrary, though, Larmore's use of unconventional methods made his fraud more dangerous, not less, and a serious sentence is needed to send a warning to others that the stock market is not a toy.

4. Avoiding Sentencing Disparities

In recommending a Guidelines sentence, the Government is also mindful of the need to avoid sentencing disparities, and sentences that have been imposed in similar cases. The presentence report contains a summary of sentences imposed for other defendants with the same loss amount and criminal history category, and indicates an average sentence of 65 months and a median sentence of 60 months. These sentences do not appear to have necessarily involved an enhancement for obstruction of justice, however, and we thus submit that it this range forms the lower bound of any appropriate sentence.

Case 1:24-cr-00140-PAE   Document 123   Filed 02/25/25   Page 18 of 19

Hon. Paul A. Engelmayer	Page 18
February 25, 2025

Larmore is also not the first person who has tried to cash in on a fake tender offer. The Government is aware of at least three other similar schemes that have been charged in this District, the defendant in one of which pleaded guilty and was sentenced, *see United States v. Murray*, 17 Cr 452 (KPF), and the defendants in the other two remain at large, *see United States v. Nedev*, 16 Cr. 93 (KMW) and *United States v. Ten Cate*, 22 Cr. 198 (GHW).

To avoid unwarranted sentencing disparities, Larmore should receive a sentence significantly higher than the 24-month sentence that the defendant in *Murray* received. In *Murray*, the defendant filed a fake tender offer for Fitbit, a consumer electronics company, because he owned a small amount of options in Fitbit, which he was able to sell for a profit in light of his manipulation of Fitbit's stock price. Gov't Sentencing Submission at 1, *United States v. Murray*, 17 Cr 452 (KPF) (Doc. No. 21) (S.D.N.Y. Mar. 5, 2018) ("Gov't *Murray* Sub."). Notably, in connection with his arrest, Murray agreed to be interviewed by law enforcement agent, during which he admitted to the instant offense. *Id.* at 1-2. Murray later pleaded guilty to securities fraud pursuant to a plea agreement with the Government. The Government sought a Guidelines sentence of 63 to 78 months' imprisonment. *Id.* Judge Forrest imposed a term of imprisonment of 24 months. When imposing sentence, Judge Forrest emphasized Murray's youth (23 years old at the time of the offense) and the "impulsive behavior" that one often sees with offenders at that age. *Murray* Sentencing Tr. (Doc. No. 25) at 19-20, 34.

There are aggravating factors in this case that were not present in the *Murray* case that call for a longer sentence in this case. First, in sharp contrast to *Murray*, who accepted responsibility with law enforcement during a post-arrest interview and who pleaded guilty, Larmore has never accepted responsibility for his crimes. Second, Larmore was 51 years old when he committed the instant offenses, a far cry from Murray, who was only 23 years old. Third, Larmore committed perjury and obstructed justice. For all these reasons, and the reasons discussed elsewhere in this memorandum, the Court's sentence in this case should be substantially higher than the 24-month sentence in *Murray*.

For an upper bound of comparison, the Court may look to other market manipulation contexts outside of fake and fraudulent tender offers. For example, Bill Hwang and Patrick Halligan were convicted of participating in a market manipulation conspiracy that caused the companies at the center of their trading scheme to lose approximately $100 billion in market capitalization. *See United States v Hwang et al.*, 22 Cr. 240 (AKH). For their crimes, Hwang and Halligan were sentenced to 18 years' and 8 years' imprisonment, respectively. In light of all these precedents, a Guidelines sentence for Larmore would not create an unjust disparity.

Hon. Paul A. Engelmayer  Page 19
February 25, 2025

## CONCLUSION

  For the reasons discussed above, the Government respectfully submits that a sentence of between 87 and 108 months' imprisonment is sufficient but not greater than necessary to achieve the legitimate ends of sentencing.

            Respectfully submitted,

            MATTHEW PODOLSKY
            Acting United States Attorney


        by:    /s/
            Justin V. Rodriguez
            Adam S. Hobson
            Sarah Mortazavi
            Assistant United States Attorneys
            (212) 637-2591

Cc:  Defense Counsel (via ECF)