UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x
                                          :

UNITED STATES OF AMERICA       :

                                          :

             - v. -             :                     24 Cr. 140 (PAE)

                                          :

JONATHAN MOYNAHAN LARMORE,   :

                 Defendant.       :

                                          :

--------------------------------------------------- x


**MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR BAIL PENDING APPEAL**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Justin V. Rodriguez
Adam S. Hobson
Sarah Mortazavi
Assistant United States Attorneys
     -Of Counsel-

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .....................................................................................................2

   I.    The Charges ................................................................................... 2

   II.   The Government's Evidence at Trial ................................................ 2

      A.   The Defendant, Jonathan Moynahan Larmore............................... 3

      B.   WeWork .................................................................................. 4

      C.   Larmore Creates Cole Capital Funds, LLC ................................ 5

      D.   Larmore Buys WeWork Call Options and Shares ........................ 7

      E.   Larmore Announces a False and Fraudulent Tender Offer for WeWork Stock ........... 11

      F.   Larmore's Communications with City National Bank and JP Morgan......................... 15

      G.   Larmore's Communications with Lawyers .................................. 16

      H.   Larmore's Spending and Finances in the Summer and Fall of 2023 ......................... 17

      I.    Larmore Commits Perjury to Cover Up His Use of the Plane Proceeds ..................... 19

   III.   The First Rule 29 Motion and the Verdict ..................................... 20

   IV.   The Post-Trial Motions .............................................................. 20

   V.    The Sentencing and Appeal ......................................................... 21

ARGUMENT........................................................................................................22

   I.    Applicable Law ........................................................................ 22

      A.   Bail Pending Appeal .............................................................. 22

      B.   Sufficiency of the Evidence ..................................................... 23

      C.   Tender Offer Fraud and Securities Fraud.................................... 24

      D.   Rule 403, Harmless Error Review, and Plain Error Review ........................................ 26

   II.   Larmore Does Not Raise a Substantial Question of Law or Fact About the Sufficiency of the Evidence.................................................................. 27

III.  Larmore Does Not Raise a Substantial Question of Law or Fact About Whether Any
      Evidence was Improperly Admitted. ................................................................. 31

IV.   None of Larmore's Rule 403 Arguments Are So Integral to the Merits of His Conviction
      as To Make a Contrary Ruling on Appeal Likely to Result in the New Trial. ................. 38

**CONCLUSION** ............................................................................................................**39**

## Table of Authorities

**Page(s)**

<u>**Cases**</u>

*Cavazos v. Smith,*
  565 U.S. 1 (2011) ................................................................................................. 29

*Greer v. United States,*
  141 S. Ct. 2090 (2021) ............................................................................... 26, 27, 31

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ............................................................................................. 23

*Puckett v. United States,*
  556 U.S. 129 (2009) ....................................................................................... 27, 30

*United States v. Abuhamra,*
  389 F.3d 309 (2d Cir. 2004) ............................................................................... 22

*United States v. Abu–Jihaad,*
  630 F.3d 102 (2d Cir. 2010) ......................................................................... 26, 32

*United States v. Castano,*
  999 F.2d 615 (2d Cir. 1993) ......................................................................... 26, 38

*United States v. Coonan,*
  938 F.2d 1553 (2d Cir. 1991) ............................................................................. 36

*United States v. Coplan,*
  703 F.3d 46 (2d Cir. 2012) ................................................................................. 23

*United States v. Coppola,*
  671 F.3d 220 (2d Cir. 2012) ............................................................................... 26

*United States v. Cuti,*
  720 F.3d 453 (2d Cir. 2013) ............................................................................... 23

*United States v. Dawkins,*
  999 F.3d 767 (2d Cir. 2021) ............................................................................... 29

*United States v. Delano,*
  55 F.3d 720 (2d Cir. 1995) ................................................................................. 30

*United States v. Dove,*
  884 F.3d 138 (2d Cir. 2018) ............................................................................... 26

*United States v. Espaillet,*
  380 F.3d 713 (2d Cir. 2004) ................................................................. 23

*United States v. Facen,*
  812 F.3d 280 (2d Cir. 2016) ................................................................. 24

*United States v. Figueroa,*
  618 F.2d 934 (2d Cir. 1980) ................................................................. 37

*United States v. Gelzer,*
  50 F.3d 1133 (2d Cir. 1995) ................................................................. 37

*United States v. Glenn,*
  312 F.3d 58 (2d Cir. 2002) ................................................................... 28

*United States v. Hassan,*
  578 F.3d 108 (2d Cir. 2008) ................................................................. 23

*United States v. Landesman,*
  17 F.4th 298 (2d Cir. 2021) ........................................................... 23, 24

*United States v. Marcus,*
  560 U.S. 258 (2010) ............................................................................ 27

*United States v. McPherson,*
  424 F.3d 183 (2d Cir. 2005) ................................................................. 28

*United States v. Menendez,*
  No. 23 Cr. 490 (SHS) ......................................................................... 24

*United States v. Miller,*
  753 F.2d 19 (3d Cir. 1985) ............................................................ 22, 33

*United States v. Munshani,*
  No. 22 Cr. 215 (JSR), 2023 ................................................................. 24

*United States v. Oluwanisola,*
  605 F.3d 124 (2d Cir. 2010) ................................................................. 26

*United States v. O'Sullivan,*
  No. 20 Cr. 272 (PKC) ........................................................................ 24

*United States v. Persico,*
  645 F.3d 85 (2d Cir. 2011) ............................................................ 23, 24

*United States v. Radfar,*
   No. 1 Cr. 744 (JSM) ............................................................................................ 24

*United States v. Randell,*
   761 F.2d 122 (2d Cir. 1985) ...................................................................... 22, 23, 38

*United States v. Riggi,*
   541 F.3d 94 (2d Cir. 2008) ................................................................................... 23

*United States v. Siddiqui,*
   699 F.3d 690 (2d Cir. 2012) ................................................................................. 26

*United States v. Villafuerte,*
   502 F.3d 204 (2d Cir. 2007) .......................................................................... 27, 30

*United States v. Williams,*
   998 F.3d 538 (2d Cir. 2021) ................................................................................. 26

*United States v. Yu-Leung,*
   51 F.3d 1116 (2d Cir. 1995) .......................................................................... 35, 37

## **Rules**

Federal Rule of Criminal Procedure 29 .............................................................. 20, 29

Federal Rule of Criminal Procedure 33 .............................................................. 20

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Jonathan Larmore's motion for bail pending appeal (the "Motion" or "Mot."), Dkt. 137. In the absence of intervention by the Court, Larmore must surrender on May 19, 2025 to FCI Lewisburg.

Larmore does not meet the high standard for bail pending appeal. To obtain such relief, a defendant must first identify appellate arguments that raise a "substantial question of law or fact." 18 U.S.C. § 3143(b). Larmore fails to make this threshold showing, because he has not identified any "close question" that "very well could be decided the other way" on appeal. For the most part, he rehashes the sufficiency-of-the-evidence and Rule 403 arguments that he raised in his post-trial motions. The Court has already considered these arguments and rejected them. *See* Dkt. 111 & 113. And at the Court of Appeals, Larmore will have to overcome demanding standards of appellate review, which will be highly deferential to the jury's verdicts and to this Court's evidentiary decisions.

As this Court has already found, Larmore cannot meet his heavy burden of showing that, after drawing all inferences in the Government's favor, no rational jury could have found him guilty of his two crimes of conviction. To the contrary, the Court described the evidence in the support of the jury's verdict as "way more than sufficient" and "frankly quite substantial" with "overwhelming evidence of intent to defraud and to deceive." Trial Tr. 649, 650. Furthermore, Larmore cannot establish that any of the Court's careful and well-reasoned evidentiary rulings, which were coupled with limiting instructions throughout the trial that mitigated any residual risks of unfair prejudice, were such an abuse of discretion as to be arbitrary and irrational, as he must under governing law. Even if he could, none of these evidentiary issues were so integral to the merits of Larmore's conviction to make a new trial likely. The Motion must be denied.

## BACKGROUND

### I.    The Charges

On March 12, 2024, a grand jury in this District returned Indictment 24 Cr. 140, charging Larmore with one count of tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. § 240.14e-8(a), (b), & (c), and 18 U.S.C. § 2, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (the "Indictment").

### II.    The Government's Evidence at Trial[1]

On October 15, 2024, the parties proceeded to a jury trial. The Government's evidence at trial included the testimony of 15 witnesses and approximately 196 admitted exhibits.

The evidence showed that Larmore used a false and fraudulent tender offer to manipulate the stock price of WeWork, Inc. ("WeWork"). On November 3, 2023, Larmore issued a press release announcing that a shell company he had formed, Cole Capital Funds, LLC ("Cole Capital"), was proposing to acquire millions of WeWork shares—specifically, 51% of all minority shares—at $9 per share, for a total equity value of more than $77 million, at a time when WeWork was on the verge of bankruptcy and when its stock was trading for less than $1 per share. GX 803. Neither Larmore nor Cole Capital, however, had $77 million, and Larmore did not have the intent or the ability to carry out the tender offer on the terms he announced. Larmore announced the tender offer at an artificially inflated price to try and cause a "short squeeze" that would quickly and exponentially drive up the price of WeWork stock, because Larmore had personally purchased 72,846 short-dated, out-of-the-money, WeWork call options, which gave him the right to purchase

---

[1]  Because Larmore reasserts a sufficiency-of-the-evidence argument in the Motion, the Government includes in this Section II the summary of its evidence at trial that it included in its opposition Larmore's post-trial motions. *See* Dkt. 112 at 2-20.

more than 7.2 million WeWork shares if WeWork's price increased significantly in a matter of days. GX 1706.

Larmore's press release also contained numerous misrepresentations and misleading statements that were meant to make his offer look like a legitimate tender offer. For example, Larmore falsely claimed that he had "received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect[ed] to select a lender and have a financing commitment prior to execution of a definitive agreement." GX 803. He also falsely represented that Larmore had "consulted with…legal, financial and other advisors to assist [] with this transaction." GX 803. The testimony of bankers and lawyers at trial showed that these statements were false and misleading. In fact, Larmore never even told City National Bank or JP Morgan about "this acquisition," GX 803, and one lawyer—James Siegel—told Larmore, in response to hearing his plans, "I don't think you can do that." Trial Transcript ("Tr.") 532.

### A.  The Defendant, Jonathan Moynahan Larmore

In 2005, Larmore founded and became the chief executive officer of Arciterra Group, LLC, also known as Arciterra, a real estate and management company headquartered in Phoenix, Arizona, which was the predecessor to Arciterra Companies, LLC, formed in 2007. Tr. 262; GX 1012. Arciterra created investment offerings, raised money from investors, and owned and managed properties for the benefit of investors. *Id.*

On May 30, 2023, *Bloomberg News*, a national financial news outlet, published an online article reporting that, according to a lawsuit brought against Arciterra and Jonathan Larmore, none of the more than 2,000 investors in Arciterra offerings have received payments since 2019. Tr. 262; GX 1012. The article stated that there appeared to be an SEC investigation in process against Arciterra and Jonathan Larmore. *Id.* The article referred to "Jonathan Larmore," but not "Jonathan

Moynahan Larmore" or "Moynahan Larmore." *Id.* This evidence was presented at trial in the form of a stipulation between the parties setting forth certain facts reported in the *Bloomberg News* article (the "Bloomberg Article").

### B. WeWork

WeWork was an office space company that was headquartered in New York, New York and publicly traded on the New York Stock Exchange ("NYSE"). Tr. 71-72. WeWork's business model was to lease office space from building owners, subdivide that space, and then lease it out to users at a profit. Tr. 72. Softbank Group owned approximately 68% of WeWork and controlled the company. Tr. 74-75, 78-79; GX 404.

In the summer of 2023, WeWork's financial condition was deteriorating. Tr. 79. It had a low occupancy rate for its working spaces, and was spending more cash than it was taking in. *Id.* On August 8, 2023, WeWork announced, "As a result of the company's losses and projected cash needs, combined with increased member churn and current liquidity levels, substantial doubt exists about the company's ability to continue as a going concern." Tr. 80; GX 405.

WeWork's stock was also trading for less than $1 per share from March 2023 through August 2023 and, as a result, WeWork was in danger of being delisted from the NYSE. Tr. 82-83; GX 806. To avoid delisting, on August 18, 2023, when WeWork's stock was trading for approximately $0.12 per share, WeWork announced a 1-for-40 reverse stock split, effective September 1, 2023, which would consolidate the number of existing shares into fewer shares, to help the company regain compliance with the $1 per share minimum closing price required for continued listing on the NYSE. Tr. 83, GX 805. After the September 1, 2023, reverse stock split, WeWork's share price briefly spiked, but never reached $6 per share. Tr. 86, GX 806.

By October 2023, WeWork was not paying significant obligations. On October 2, 2023, WeWork announced that it had elected to withhold more $95 million in interest payments to bondholders. Tr. 86-88; GX 402. WeWork's stock price declined after the news from a closing price of $2.95 on October 2, 2023, to a closing price of $2.54 on October 3, 2023. GX 1706 at 2. On October 31, 2023, WeWork announced that it had entered into an agreement with its bondholders to provide the company with an additional seven days to make interest payments. Tr. 88-89; GX 403. In addition, on October 31, 2023, at approximately 5:19 p.m., the *Wall Street Journal* published an article titled, "WeWork Plans to File for Bankruptcy as Early as Next Week." GX 802. WeWork's stock price declined after the news from a closing price of $2.28 on October 31, 2023, to a closing price of $1.22 on November 1, 2023, and $1.11 on November 2, 2023. GX 1706 at 2.

### C. Larmore Creates Cole Capital Funds, LLC

On October 6, 2023, Larmore filed Articles of Organization for Cole Capital Funds, LLC, with the Arizona Corporation Commission. GX 401. Larmore listed the character of the business as "Real Estate and Rental and Leasing," and listed himself (using the name "J. Moynahan Larmore") as the statutory agent, principal, and organizer of Cole Capital Funds, LLC. GX 401.

Cole Capital was a shell company. Trial testimony by a court-appointed receiver overseeing Cole Capital established that at no time did Cole Capital ever have any assets, cash, bank accounts, brokerage accounts, real estate, investments, securities, property of any kind, employees, investors, lenders, or customers. Tr. 120-121. Nor did it ever engage in the business of "Real Estate and Rental and Leasing," as described in its Articles of Organization, or any other type of business. Tr. 121.

Nonetheless, Larmore took steps to make it look like Cole Capital was a legitimate, well-established investment company. On October 6, 2023, Larmore created and registered with GoDaddy, the domain name www.ColeCapitalFunds.com (the "Website"). Tr. 290; GX 701, 1007. On October 16, 2023, Larmore, on behalf of Cole Capital, entered into a one-month (but only one month) membership agreement with WeWork for a one-person office at 2425 East Camelback Road in Phoenix, Arizona. Tr. 104; GX 901. This office space was within blocks of a legitimate and established company that was not connected to Larmore but was also called Cole Capital (the "Real Cole Capital"), discussed below, and renting this space was one of many steps Larmore took to trick investors into thinking that Cole Capital was, in fact, associated with the Real Cole Capital, a company that would have actually been able to fund an acquisition of WeWork. On October 18, 2023, Larmore spoke to Justin Kerbo, a web designer, about designing the Website. Tr. 296-297; GX 1201. Larmore provided Kerbo with all the content for the Website. Tr. 297, 299-303. On November 2, 2023, the Website went live, *i.e.*, was accessible to the public. Tr. 301-302, 306-307. According to the Website, Cole Capital "charges ahead, introducing innovative investment strategies and providing access to best-of-class investments . . . . We venture into various markets across the United States, securing investments in properties and companies that are leaders in their fields." GX 801. Cole Capital, however, did not have any investment strategies or investments. Tr. 122. At Larmore's request, the Website also included the logos for Whole Foods Market, Amazon, Chick-fil-A, Verizon, Oracle, T-Mobile, and CVS Pharmacy. Tr. 304; GX 801. Cole Capital, however, had no affiliation or connection whatsoever to any of those companies. Tr. 123.

The Website identified "Moynahan Larmore" as the CEO of Cole Capital. GX 801. Justin Kerbo originally understood "Moynahan Larmore" to be someone other than the defendant, until the defendant corrected him and indicated that he was "Moynahan Larmore." Tr. 303.

On November 29, 2023, Larmore received a cease-and-desist letter from legal counsel to the successor to the Cole Companies, CCO Group, LLC—i.e., the Real Cole Capital—an affiliate of a well-established real estate investment company that had acquired in 2018 a group of companies referred to as Cole Capital (after their founder Christopher Cole). Tr. 502; GX 1317. The letter informed the defendant that he was infringing the Real Cole Capital's registered trademark on the name "Cole Capital" and its registered trademark on a logo with the same name. GX 1317. Larmore's infringing logo (which he included on the Website) and the Real Cole Capital's protected trademark are included below:



| Larmore's Infringing Logo | Real Cole Capital's Protected Trademark |
|---|---|



The letter made clear that the Real Cole Capital was not associated with Cole Capital and did not endorse Cole Capital or Cole Capital's use of its protected trademarks in any way. *Id*. Larmore did not respond to the cease-and-desist letter. Tr. 510.

### D.  Larmore Buys WeWork Call Options and Shares

On November 1 and 2, 2023, using five different trading accounts, Larmore spent $389,657.73 buying 72,846 short-dated, out-of-the-money WeWork call options: more than 70,000 of which were set to expire on November 3, 2023, at 4:00 p.m. EDT, and all of which had strike prices between $2 and $5.[2] Tr. 178-186; GX 1706 at 6. On November 2, 2023, Larmore also spent

---

[2] A call option contract grants its owner the right—but not the obligation—to buy 100 shares of stock, at a particular price (the "strike price"), until or upon the expiration date of the contract. *See generally* Tr. 141-151. A call option contract is "out of the money" if the current market value of

$387,133.95 purchasing 343,641 shares of WeWork common stock, because two of Larmore's brokerage firms, JP Morgan and Wintrust, did not allow him to purchase options. Tr. 196-197; GX 1706 at 7.

By buying these options, Larmore was effectively betting that WeWork's stock price would increase significantly in the very near term. For example, on November 2, 2023, Larmore spent $121,809.02 purchasing 22,815 WeWork call options with a strike price of $3 that expired the next day, November 3, 2023. GX 1706 at 6. The closing price of WeWork stock on November 1, 2023—the day after the *Wall Street Journal* published an article about its impending bankruptcy—was $1.22. GX 1706 at 2. Accordingly, by buying these options on November 2, 2023, Larmore was betting that WeWork's stock price would more than double by the next day.

Patrick Cochran was with Larmore aboard a 76-foot yacht called the *Quarentena*, which Larmore chartered for $85,250, when Larmore purchased these WeWork securities. Tr. 376-380; GX 1367. Larmore told Cochran, "you don't want to be involved in the trading, the SEC is not going to be happy about this." Tr. 383. When on the *Quarentena*, Cochran also heard Larmore tell the captain that he "wanted to go to international waters" because "[t]here was some type of trading he wanted to do that he had to be in international waters for." Tr. 377.

During recorded phone calls and email correspondence on November 1 and 2, 2023, Larmore discussed—sometimes in aggressive or threatening terms—his pressing, urgent desire to buy options with representatives of some of his brokerages.

---

the underlying stock is less than the strike price. In effect, a purchaser of an out-of-the-money call option is making a bet that the underlying stock will go up in value, exceeding the strike price, thereby allowing the owner of the option contract to realize as profit the difference in value of the stock between the strike price and the market price when the option is exercised or sold.

For example, on November 1, 2023, a representative from TradeStation called Larmore to discuss his newly funded account.  During that call, Larmore stated, "what I would like to do is be able to buy options right now," and "I am in front of my computer, I'm ready to buy." GX 321. Larmore noted that his attempts to buy options had been rejected, and he demanded that the representative either return the money in his trading account or approve him to buy options. GX 321. When told that it would take several days to return his money, Larmore complained "that doesn't do me any good for this week," and threatened the representative by saying, "I don't think you want to be on the bad side of you improperly holding my money." GX 321. When asked if he had access to the necessary options agreement, Larmore retorted, "No, I'm on my yacht and don't have a printer." GX 321.

Later, on the same November 1, 2023, recorded call with the TradeStation representative, Larmore accused TradeStation of "hijacking and stealing" his money and threatened to sue TradeStation. GX 321. Eventually, Larmore agreed to complete the options agreement while on the phone with the representative. GX 321. While doing so, Larmore asked, "Do you have any other stupid rules like you can only have so many contracts or you can only buy 20 at a time or anything else that I'm not aware of?" GX 321. In response, the TradeStation representative stated that the largest single order quantity was 2,000 contracts. GX 321. Larmore then asked, "But I can do several 2,000s?" and was told that he could. GX 321.

After completing the options agreement and emailing it to the TradeStation representative, on November 1, 2023, Larmore placed an order for 2,000 WeWork call options while the TradeStation representative was still on the phone. GX 321. The next day, on November 2, 2023, Larmore purchased another 11,376 WeWork call options using his TradeStation account in five increments of 2,000 contracts each and in three smaller increments. GX 321.

9

On November 2, 2023, Larmore also called a trading desk at JP Morgan. During the call, Larmore told the trader, "I want you to buy a bunch of options for me," but Larmore was advised that his account had not yet been approved for options trading. GX 311. Larmore complained, "It's 1:42 and the options" Larmore intended to purchase "expire tomorrow." GX 311. Frustrated with his inability to buy options, Larmore directed the trader to buy $75,000 worth of WeWork stock instead. GX 311. Larmore then explained, "What I had wanted to buy was $75,000 worth of options that are expiring tomorrow that are trading at five cents per contract per share." GX 311. Larmore then claimed that was "the cost" of JP Morgan's "screwup" in not approving him for options trading. GX 311.

Later during the November 2, 2023 recorded call between Larmore and the JP Morgan trader, the trader purchased 65,789 shares of WeWork stock for Larmore, at Larmore's direction. After the trade was placed, Larmore continued to complain about his account not having been approved to trade options. Larmore stated: "When this stock goes through the roof the liability of your back office for this mistake is huge." GX 313. Larmore did, in fact, believe that the price of WeWork's stock would "go through the roof," notwithstanding the stock's recent poor performance and reports that WeWork was nearing bankruptcy, because Larmore, as summarized below, had intended to announce the next day a false and fraudulent tender offer for WeStock stock that was designed to inflate WeWork's share price.

Also on November 2, 2023, Larmore directed a City National Bank representative, Destin Thomas, to purchase on his behalf $50,000 worth of WeWork call options with November 3, 2023 expiration dates. *See* Tr. 429-440; GX 301-304. Thomas, however, was not able to fulfill Larmore's order. Thomas apologized to Larmore for the inconvenience and, in response, Larmore stated, "Well it's more than an inconvenience, it's a huge, huge loss." GX 303. Thomas then asked, "I

mean, did you have any insider information on that?" and Larmore responded, "No." GX 303.Thomas then stated, "It sounds like you have some information that we're not privy to," to which, Larmore responded, "I do not." GX 303.

In total, on November 1 and 2, 2023, Larmore spent more than $775,000 buying 72,846 WeWork call options and shares a total of 343,641 shares of WeWork stock. GX 1706.

### E. Larmore Announces a False and Fraudulent Tender Offer for WeWork Stock

On November 3, 2023, at approximately 2:16 a.m. EDT, Larmore created an account with EIN Presswire, a press release distribution platform that focuses on smaller-to-midsize businesses, in contrast to *Business Wire*, which is a press release distribution service that focuses on press releases for large publicly traded companies. Tr. 273-275; GX 1405.

At approximately 9:12 a.m. EDT, Larmore sent an email to Kevin Berry and another WeWork investor relations email address. Tr. 91-93; GX 1163. Attached to the email was a two-page letter addressed to the WeWork Board of Directors and Chief Executive Officer at WeWork's Manhattan headquarters and signed by "Moynahan Larmore, CEO, Cole Capital Funds, LLC" (the "Letter to the Board of Directors"). GX 1163. The address listed for Cole Capital was 2425 East Camelback Road, the same address as the one-person WeWork office Larmore rented for Cole Capital on October 16, 2023. GX 901, 1163. The Letter to the Board of Directors began:

> Dear [CEO of WeWork],
>
> > We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
> >
> > We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.

> We have consulted with God, legal, financial and other advisors to
> assist us with this transaction. We stand ready to proceed timely.

GX 1163. Neither Larmore, Cole Capital, City National Bank, JP Morgan, nor any legal or financial advisors contacted WeWork about a potential share purchase or transaction before Larmore sent this letter. Tr. 93-94; 96-97. After Larmore sent the letter, he did not reach out to anyone at WeWork on or after November 3, 2023. Tr. 99.

The $9.00 per share price contained in the Letter to the Board of Directors represented a premium of more than $7.89 (more than 700%) over WeWork's closing price of $1.11 per share on November 2, 2023. Tr. 98. At $9.00 per share price, it would have cost approximately $77 million to acquire 51% of all the outstanding shares owned by minority shareholders of WeWork. Tr. 95-96.

At approximately 9:37 a.m. EDT, Larmore received an email from EIN Presswire about his recently submitted press release titled, "Cole Capital Funds Proposes to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per Share in Cash." GX 1406. EIN Presswire informed Larmore that he was using an email address not associated with Cole Capital and was told to change his email address and re-submit his draft press release, which Larmore did several minutes later. GX 1406.

At approximately 10:56 a.m., Larmore called the EIN Presswire customer service to inquire about the status of his press release. GX 331. While on the call, which was recorded, Larmore received an email at approximately 10:57 a.m., from EIN Presswire, stating that his draft press release was not in the proper format and that Larmore needed to reformat and re-submit the press release for editorial approval. GX 1141. Larmore then told the EIN Presswire representative on the phone, "since it is a legal document it has to go out in a certain form," and "due to the nature of it being a tender offer it needs to go in the form that I sent it." GX 331. The EIN Presswire

representative advised Larmore to reach out directly to the editorial department to discuss the format. *Id.* Larmore then asked to be transferred to someone in that department "because this is very time sensitive." *Id.* When told that he should contact the editorial department by email, Larmore reiterated that "this is very time sensitive such that it has to do with the stock." *Id.* The EIN Presswire representative then agreed to escalate the matter to a supervisor. *Id.*

At approximately 11:16 a.m., Larmore reached out to Justin Kerbo to seek his assistance in having a press release published. Tr. 308; GX 1307. Larmore made clear that he wanted the press release published that day. Tr. 309. In fact, at one point, Larmore told Kerbo by text message, "it is imperative that it goes today before closing bell. Please, whatever it takes." GX 1307; Tr. 354. Kerbo agreed to help Larmore and contacted *Business Wire* on his behalf. Tr. 308-309. That afternoon, Larmore sent Kerbo a draft press release titled, "Cole Capital Funds Propose to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash." GX 1207.

At approximately 11:55 a.m. EDT, a supervisor at EIN Presswire called the defendant. GX 332. During the call, which was recorded, Larmore reiterated that the press release "needs to get out right now." *Id.* The supervisor then instructed Larmore to rework the draft in a typical press release format. *Id.* Larmore reiterated again: "This is time sensitive." *Id.*

At approximately 12:20 p.m. EDT, EIN Presswire approved a revised Cole Capital press release for distribution to its publication channels. Tr. 281. EIN Presswire, however, did not distribute the press release to *Bloomberg* or *Yahoo Finance*, which are platforms that publicly traded companies use to try and reach financial media. Tr. 281-282.

At approximately 1:42 p.m., *Business Wire* informed Kerbo that it would be changing the headline of the press release to "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all

minority ownership shares of WeWork, Inc. for $9.00 per share in Cash" to avoid having the same headline as the EIN Presswire press release. Tr. 344-345; GX 1208.

On November 3, 2023, at 4:00 p.m. EDT, WeWork's stock price closed at $0.84. GX 1706 at 2. At that point, the WeWork options Larmore purchased with a November 3, 2023 expiration date (more than 70,000 of his 72,846 options), on which he had spent approximately $375,000 for the ability to purchase more than 7 million shares of WeWork stock, expired, still out of the money and worthless. Tr. 198.

If WeWork's stock had reached $7 per share before Larmore's options expired, his WeWork stock and options would have had a value of $31,058,687; if $8 per share, a value of $38,686,928; and if $9 per share, a value of $46,315,169. Tr. 202-204; GX 1706 at 9.

On November 3, 2023, at approximately 5:12 p.m. EDT, *Business Wire* ultimately published the press release Larmore wanted released before market close, with the revised title, "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash" (the "Press Release"). GX 803. The Press Release stated, among other things:

> Cole Capital Funds sent the following letter to the Board of Directors of WeWork, Inc.
>
> We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
>
> We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.
>
> . . .

14

> Cole Capital Funds, LLC www.colecapitalfunds.com is an investment company headquartered in Phoenix Arizona. Cole focuses on investing in, and acquiring companies and properties where significant shareholder value can be realized due to undervalued share price as a result of slow development progress, management issues, or outside share pressure . . . .

GX 803.

Within one minute of the Press Release's publication on November 3, 2023, at approximately 5:12 p.m. EDT, WeWork's stock price jumped in after-hours trading from $0.85 to between $1.40 and $1.50 and continued to rise, reaching a high of $2.14 at approximately 5:31 p.m. EDT on November 3, 2023. Tr. 174; GX 1706 at 4. At approximately 6:12 p.m. EDT, *Business Wire* rescinded the Press Release, at which time WeWork's stock price was approximately $1.67. GX 804, 1706 at 4. Between 5:12 p.m. and 6:12 p.m., approximately 5,607,149 WeWork shares were traded. Tr. 175; GX 1706 at 4.

On November 6, 2023, WeWork filed for bankruptcy. Tr. 102-103. Cole Capital never contacted WeWork about buying the company when it was in bankruptcy and it never offered to purchase WeWork shares while the company was in bankruptcy. Tr. 103. In fact, after November 3, 2023, WeWork did not hear anything more from Cole Capital or Larmore. Tr. 102.

### F.  Larmore's Communications with City National Bank and JP Morgan

Larmore's statement in the press release, "We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement," was false. On October 27, 2023, Larmore exchanged perfunctory text messages with a representative at City National Bank, Richard Engbrecht, writing, "I have formed a new company and am preparing to start sourcing deals. If I were able to pledge $100 million of NYSE securities, would you be able to help finance an $85 million acquisition? Assuming everything else in my world was cleaned up."

Tr. 413; GX 1308. Larmore, however, never told Engbrecht about his plans to announce a tender offer for WeWork, never mentioned WeWork at all, and never gave any indication that he actually had "$100 million of NYSE securities." Tr. 413-416. On October 27, 2023, Larmore also emailed Karl Meyer, who worked at a retail Chase banking branch in Jackson Hole, Wyoming, and asked, "If I have $100 Million of NYSE traded stock in the account how much can you lend on it?" Tr. 469, 471; GX 1122.  In response, on October 30 and 31, 2023, Meyer responded, in substance, that JP Morgan could lend at 50% of NYSE-listed securities at a specified rate, but that JP Morgan would need to examine a list of Larmore's proposed assets. GX 1123, 1126.  Larmore never provided such a list and never mentioned to Meyer that either he or Cole Capital were planning any kind of tender offer for WeWork stock, let alone a $77 million transaction. Tr. 480-481, 484, 487-490, 492, 495-496.

### G.  Larmore's Communications with Lawyers

The evidence at trial showed that, while Larmore communicated with certain lawyers before announcing his tender offer, Larmore announced his tender offer without the assistance of an attorney, was not following any legal advice, and in fact, he was acting *against* advice he had received. Larmore confirmed to Jeremy Piccini, a lawyer, days before his announcement, that he was not launching his tender offer with the assistance of legal counsel, writing: "I plan to make the offer on my own." Tr. 550; GX 1325. Larmore also told James Siegel, a lawyer, that he intended for his tender offer announcement to cause a "GameStop-like reaction to WeWork stock," *i.e.*, a short-squeeze that would cause WeWork's stock price to "increase quickly and exponentially." Tr. 530-531. That, in turn, would cause the value of Larmore's own WeWork securities to "increase exponentially" and "financing" for Larmore's tender offer "would be less of an issue." Tr. 530.  In other words, Larmore sought to manipulate the price of WeWork's stock through a tender offer

announcement designed to increase the value of his own securities. Siegel told Larmore, "I don't think you can do that." Tr. 532. Larmore responded by saying "he thought he could do that because he did not hold any securities licenses," to which Siegel said, "I don't think it works that way." Tr. 532. Siegel informed Larmore that neither he, nor another attorney who had spoken with Larmore, Richard Silfen, would assist with the tender offer. GX 1309. Siegel likewise notified Larmore of a prior tender offer for a company called Veritone that was found to be "insufficient/false," and in that context told Larmore: "I think you will need to have the funds locked down before the" tender offer. *Id.* During the text exchange with Siegel, Larmore distinguished his plan from the fraudulent tender offer Siegel had raised by falsely stating that he had "had discussions" around financing. *Id.* Only after sending that message did Larmore contact Engbrecht and Meyer to ask about hypothetical lending against $100 million of NYSE-listed securities, as discussed above.

### H.  Larmore's Spending and Finances in the Summer and Fall of 2023

In the Summer and Fall of 2023, Larmore was spending lavishly. On August 18, 2023, Larmore sold a Gulfstream G400 airplane that he owned through an entity called JML BC G400, LLC for a purchase price of $10.2 million. *See* Tr. 240-241; GX 501; 502. The net proceeds from the sale due to Larmore—after accounting for amounts due to creditors and others with interests in the sale proceeds—were $1,237,112.88 ("the Plane Proceeds"). On August 18, 2023, the Plane Proceeds were wired to a bank account in the name of Arciterra Companies, LLC (the "Arciterra Account"). Then, on August 21, 2023, every penny of the Plane Proceeds were wired, at Larmore's direction, from the Arciterra Account to a bank account that Larmore controlled in the name of JMMAL Investment, LLC, and further wired later that day to a bank account in Larmore's own name at Park National Bank (the "Larmore Bank Account"), which, at that time, had a balance of only $52,555.52. GX 1901 at 4.

From August 21, 2023 through November 1, 2023, Larmore spent all the Plane Proceeds and other funds, as follows:

- $620,000 wired to trading accounts in Larmore's name at seven brokerage firms (TDAmeritrade, JP Morgan, Apex, WeBull, TradeStation, Fidelity, and City National Bank), from September 12, 2023 to November 1, 2023. This money was then used by Larmore to purchase WeWork stock and options. All 72,846 of the WeWork call options and 65,789 of the 343,641 WeWork shares that Larmore purchased on November 1 and 2, 2023, in furtherance of his fraudulent scheme were purchased with these funds. GX 212, 213, 1901.

- $575,000 as a deposit to Pier One Yacht Sales ($500,000 was eventually returned), in connection with Larmore's offer to buy a 44-foot Inter Marine yacht called the "Princess Anna" for more than $5 million. GX 212, 213, 1369, 1901.

- $55,000 to charter a 76-foot San Lorenzo yacht called the "Quarentena," on October 31, 2023. Larmore was on this yacht on November 1 through November 3, 2023, when he purchased his WeWork options and shares and when he launched the fraudulent tender offer. GXs 212, 213, 1367, 1901.

- $50,000 to a private charter jet company, on September 7, 2023. GX 212, 213, 1901.

Larmore also used his Arciterra American Express card to incur significant expenditures, including:

- $100,000 charged to Pier One Yacht Sales on November 2, 2023. GXs 1335, 1901.

- More than $35,000 charged to a private charter jet company in September and October 2023. GXs 601, 602, and 1901.

By the Fall of 2023, Larmore had significant financial liabilities and only modest assets. By October 2023, he owed City National Bank more than $5.2 million on mortgage loans for his home, including more than $18,000 in overdue payments. GX 1901 at 7-8; *see also* Tr. 406-407. By the end of October 2023, Larmore had only $51,583.22 in a checking account. GX 1901 at 9.

On November 15, 2023, Larmore lacked the necessary funds to cover a payment that he owed of approximately $1.2 million. Tr. 263; GX 1013. On November 16, 2023, Larmore borrowed the money from his mother to make the payment. *Id.*

### I.  Larmore Commits Perjury to Cover Up His Use of the Plane Proceeds

On November 13, 2023, a hearing was held in Indiana state court about the Plane Proceeds.

*See* GXs 502, 1005. At the hearing, Larmore lied under oath about how he spent the Plane

Proceeds. He testified on cross-examination, in relevant part, as follows:

> Q. With respect to the money that was transferred from Arciterra Companies, LLC to JMMAL Investment, LLC [i.e., the Plane Proceeds], where is that money currently?
>
> A. It has been spent.
>
> Q. Okay. What was it spent on?
>
> A. Living expenses and providing money to the company for hiring attorneys and operating expenses.
>
> Q. Okay. What company were the funds provided to?
>
> A. I provided them to Dan DeCarlo. He—you would have to—he handled it from there.
>
> ….
>
> Q. How much of the 1.2 and change was given to Dan DeCarlo as opposed to you for living expenses?
>
> A. My recollection is $250,000.
>
> Q. 250,000 was given to Dan DeCarlo, and the remaining approximately million dollars went to living expenses?
>
> A. Correct.
>
> ….
> Q. So the remainder that didn't go back to the business, that million dollars was spent on living expenses. It's November now, so from August, September, October, into November, maybe three and a half months or so, you spent a million dollars on living expenses?
>
> A. Living expenses, perhaps debt. I have not reconciled or looked at an accounting of what the money was spent on.

GX 502.

Larmore did not spend the Plane Proceeds on "living expenses" or "debt." As set forth above, Larmore spent half of the Plane Proceeds funding investment accounts to purchase tens of thousands of WeWork securities, which he had done just days before the hearing in which he testified. In addition, he also spent hundreds of thousands of dollars on family members, yachts, and private planes. GX 1901.

### III.     The First Rule 29 Motion and the Verdict

At the close of the Government's case, Larmore moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. Tr. 633. The Court denied Larmore's motion. Tr. 649-50. The Court found that "this is clearly a case where there's ample evidence to get to the jury" and "there is way more than sufficient evidence on which a jury could find guilt." Tr. 649. The Court also "note[d] the absence of any Rule 29 argument as to state of mind." Tr. 649. The Court was "unsurprised" there was no such argument, because this "case has overwhelming evidence of intent to defraud and to deceive." Tr. 649. Ultimately, the Court concluded that "[a] jury could clearly find Mr. Larmore guilty," and that the evidence was "more than sufficient," and "frankly quite substantial," for the jury to convict. Tr. 650.

On October 22, 2024, the jury convicted Larmore of both counts. Dkt. 104.

### IV.     The Post-Trial Motions

On November 5, 2024, Larmore filed a renewed motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 (the "Post-Trial Motions"). Dkt. 111. In his Post-Trial Motions, Larmore challenged the sufficiency of the evidence with respect to his intent, Dkt. 111 at 3, notwithstanding this Court's prior finding that this "case has overwhelming evidence of intent to defraud and to deceive." Tr. 649. In addition, Larmore argued that he was entitled to a new trial

because of the cumulative prejudicial effect of evidence that he "had been sued by an investor who alleged that none of his investors had been paid in five years, that [he] was being investigated by the SEC, that [he] allegedly violated Federal Trademark laws, that [he] spent prodigious sums which he charged to an Arciterra credit card, that [he] had allegedly committed perjury in the Indiana proceeding, and that he allegedly attempted to skirt U.S. law by trading Forex in international waters." Dkt. 111 at 16.

On November 25, 2024, the Court denied the Post-Trial Motions. Dkt. 113. The Court concluded:

> Larmore's memorandum [in support of the Post-Trial Motions] evaluates the Government's evidence in a pointillistic manner, setting out the inferences that the defense, largely reprising its jury arguments, contends should be drawn from particular items of testimony or exhibits. As such, Larmore's challenge flouts the foundational principles that, on a post-conviction sufficiency challenge, the evidence should be viewed in totality, in the light most favorable to, and with all permissible inferences drawn in favor of, the Government. The Court denies Larmore's motions for the reasons stated by the Government in its methodical, comprehensive, and convincing opposition, and for the reasons the Court gave in denying the Rule 29 motion that Larmore made following the close of the Government's case.

Dkt. 113 at 1-2 (citations omitted).

## V.    The Sentencing and Appeal

On March 18, 2025, the Court sentenced Larmore to 60 months' imprisonment, to be followed by three years of supervised release. Dkt. 130. The Court ordered Larmore to surrender to his designated facility before 2:00 p.m. on May 19, 2025. On April 1, 2025, Larmore filed a timely notice of appeal.  Trial counsel has since withdrawn from Larmore's case before the Second Circuit and has been replaced by Renato Mariotti, Esq., and Brad Bondi, Esq., of Paul Hastings LLP. The Motion was nonetheless filed by trial counsel, despite their no longer representing

Larmore on appeal. As of this date, no appellate brief has been filed, and Larmore requested the maximum amount of time (90 days, until July 15) to file his brief.

**ARGUMENT**

## I.    Applicable Law

### A.  Bail Pending Appeal

After a defendant has been convicted, the Bail Reform Act "establishes a presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).[3] The defendant bears the burden to "rebut this presumption with clear and convincing evidence." *Id.* That statutory presumption reflects Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985).

Detention pending appeal is mandatory unless the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and "that the appeal . . . raises a substantial question of law or fact likely to result in" reversal, a new trial, a non-incarceratory sentence, or a reduced sentence to a term of imprisonment less than the total of time already served plus the expected duration of the appeal process. 18 U.S.C. § 3143(b). A "substantial question" is "a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985). A substantial question must have "more substance than would be necessary to a finding that it was not frivolous." *Id.* "If a court does find that a question raised on appeal is substantial, it must then consider whether that

---

[3] Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Id.* The defendant bears the burden of persuasion. *Id.*

### B.  Sufficiency of the Evidence

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021), because the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In considering the sufficiency of the evidence supporting a guilty verdict, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). A reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008). Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Cuti*, 720 F.3d 453, 462 (2d Cir. 2013).

A "court may enter a judgment of acquittal only if the evidence" of guilt "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Landesman*,

17 F.4th at 319. For that reason, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

In light of the heavy standard appellants face when challenging a conviction based on the sufficiency of the evidence, courts that have considered bail pending appeal based on challenges to the sufficiency of the evidence have held that, "regardless of whether it is a close question, it is a challenge that is unlikely to result in a reverse or a new trial." *United States v. Munshani*, No. 22 Cr. 215 (JSR), 2023 WL 5390201, at *2 (S.D.N.Y. Aug. 21, 2023); *see also United States v. Menendez*, No. 23 Cr. 490 (SHS), Slip Op. at 11; *United States v. O'Sullivan*, No. 20 Cr. 272 (PKC), 2023 WL 7110292, at *3 (E.D.N.Y. Oct. 27, 2023); *United States v. Radfar*, No. 1 Cr. 744 (JSM), 2023 WL 1908087, at *1 (S.D.N.Y. Apr. 18, 2003) (denying bail pending appeal where "principal issue that counsel will raise of appeal relates to the sufficiency of the evidence to sustain the conviction").

### C.  Tender Offer Fraud and Securities Fraud

Count One, which charged Larmore with tender offer fraud, required the Government to prove two elements beyond a reasonable doubt. Tr. 875. With respect to the first element, the Government was required to prove that the defendant, in connection with a tender offer, either, (1) "made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading;" *or* (2) "engaged in a fraudulent, deceptive, or manipulative act or practice." *Id.* (emphasis added). A "fraudulent, deceptive, or manipulative act or practice" in this context includes circumstances where (a) "the defendant made the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer;" (b) "the defendant intended, directly or indirectly, for the

announcement to manipulate the market price of the stock of WeWork;" or (c) "the defendant did not have the reasonable belief that he would have the means to purchase securities to complete the offer." Tr. 878-879. Thus, the Government had four independent ways of satisfying the first element of Count One. Tr. 879.

The second element of Count One that the Government was required to prove was that "the defendant acted knowingly, willfully, and with the intent to defraud." Tr. 875.

To prove securities fraud under Count Two, the Government was required to prove three elements beyond a reasonable doubt: First, that in connection with the purchase or sale of securities, the defendant did one or more of the following: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller of the securities; Secondly, that when he engaged in this scheme, the defendant acted knowingly, willfully, and with an intent to defraud; And, third, that in furtherance of the fraudulent conduct, there occurred at least one use of any means or instrument of transportation or communication in interstate or foreign commerce, or the use of the mails, or the use of any facility of any national securities exchange. Tr. 884-885.

### D.  Rule 403, Harmless Error Review, and Plain Error Review

The standard of review on appeal for a Rule 403 challenge is "highly deferential in recognition of the district court's superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012). When reviewing a decision to admit evidence, the Court of Appeals "generally maximize[s] its probative value and minimize[s] its prejudicial effect." *Id.* at 245. The Court of Appeals "will reverse an evidentiary ruling only for abuse of discretion," which occurs "only if the ruling was arbitrary and irrational." *United States v. Abu–Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010).

Even when a district court's evidentiary ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). Under harmless error review, the Court of Appeals asks whether it "can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133-34 (2d Cir. 2010). "The strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless." *United States v. Castano*, 999 F.2d 615, 618 (2d Cir. 1993).

Where a defendant did not raise during trial a claim of error he later makes on appeal the Court of Appeals will review that claim for plain error only. *See, e.g., United States v. Williams*, 998 F.3d 538, 540 (2d Cir. 2021); *United States v. Dove*, 884 F.3d 138, 151 (2d Cir. 2018). To establish eligibility for plain-error relief, a defendant must satisfy three threshold requirements. "First, there must be an error. Second, the error must be plain. Third, the error must affect substantial rights, which generally means that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 141

S. Ct. 2090, 2096 (2021). An error is "plain" where it is "clear or obvious, rather than subject to reasonable dispute." *United States v. Marcus*, 560 U.S. 258, 262 (2010). If those three requirements are met, an appellate court has discretion to "grant relief if it concludes that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Greer*, 141 S. Ct. at 2096-97. "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "[T]he defendant has the burden of establishing each of the four requirements for plain-error relief." *Greer*, 141 S. Ct. at 2097. "Meeting all four prongs [of the plain error standard] is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

## II.  Larmore Does Not Raise a Substantial Question of Law or Fact About the Sufficiency of the Evidence.

It is not a "close question" whether, viewing the evidence in the light most favorable to the Government, any rational jury could have found Larmore guilty. An appellate challenge to the sufficiency of the evidence in this case, where the Court has already recognized that the evidence against Larmore was "way more than sufficient" and included "overwhelming" evidence of his criminal intent is not at all likely to succeed.

Larmore's sufficiency arguments are almost all arguments that this Court has already rejected. Dkt. 137 at 4-5; *see* Tr. 649-50 (denying Rule 29 motion at the close of the Government's case and finding that "this is clearly a case where there's ample evidence to get to the jury," that "there is way more than sufficient evidence on which a jury could find guilt," that this "case has overwhelming evidence of intent to defraud and to deceive," that "[a] jury could clearly find Mr. Larmore guilty," and that the evidence was "more than sufficient," and "frankly quite substantial," for the jury to convict); Dkt. 113 at 1-2 (denying Rule 29 motion as part of Larmore's Post-Trial Motions). In the Motion, Larmore has not explained why his old arguments should now have any

greater merit than when the Court previously rejected them. Instead, Larmore concedes that his plan is to ask the Court of Appeals to usurp the role of the jury and draw his preferred inferences from the evidence, which the Court rightly recognized was in violation of the "foundational principles" that govern criminal trials. Dkt. 113 at 1-2.

Larmore claims—incorrectly and with no support—that the Government's response to his Post-Trial Motions "did not take issue with [his] assertion that . . . the inferences to be drawn suggesting guilt and those suggesting innocence were in equipoise." Dkt. 137 at 5. The Government of course challenged that contention in no uncertain terms. On the very first page of its response, the Government stated: "Contrary to [Larmore's] arguments, the Government presented overwhelming evidence of the defendant's guilt at trial, and certainly that evidence was more than sufficient to support the jury's verdict on both counts." Dkt. 112 at 1. And throughout the trial, in arguments before the jury, in response to Larmore's Rule 29 motion, and in response to the Post-Trial Motions, the Government was emphatic that the evidence of Larmore's guilt was overwhelming. The Government has never suggested in any way that the inferences to be drawn in favor of Larmore's guilt were just as strong as the inferences in favor of innocence, and the trial record bears that out.

Larmore is attempting to resuscitate the "equipoise" rule derived from *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), but the Second Circuit and the Supreme Court have since rejected that standard as being inconsistent with the jury's role in resolving competing inferences. Dkt. 137 at 5-7. After *Glenn*, the Second Circuit made clear that "[t]he possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. McPherson*, 424 F.3d 183, 190 (2d Cir. 2005). The

Supreme Court has also left no doubt that "a reviewing court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith*, 565 U.S. 1, 7 (2011). In accordance with these principles, in *United States v. White*, the Second Circuit held:

> [T]he district court's reliance on the equipoise rule derived from *United States v. Glenn* was misplaced. Citing *Glenn*, the district court wrote that it was obliged to "conclude that the evidence was insufficient for a reasonable juror to conclude that Howard committed the Shooting in order to maintain or increase his position in MBG" because it gave nearly equal circumstantial support to competing explanations. But the equipoise rule "is of 'no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences. The rule applies only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government.

7 F.4th 90, 103 (2d Cir. 2021). In this case, the evidence was not "nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *White*, 7 F.4th at 103. To the contrary, as this Court has found, the evidence was more than sufficient to establish Larmore's guilt.

Larmore does raise one sufficiency argument that he did not raise before, which is that there was insufficient evidence of his intent to artificially manipulate the price of WeWork stock. Dkt. 137-3 at 6-7.[4] Larmore's arguments on this point were apparently set forth in a prior draft brief that he never filed. Because Larmore did not make this argument in either of his Rule 29 motions, this argument will be assessed on appeal under plain error review. *See United States v. Dawkins*, 999 F.3d 767, 780 n.12 (2d Cir. 2021) (reviewing for plain error where "[a]lthough the

---

[4] Larmore does not—and cannot—argue that any of the Court's instructions to the jury about manipulation were erroneous. Larmore raised no objections at the charge conference or in his Post-Trial Motions to any of the Court's manipulation instructions.

defendants moved for judgments of acquittal under Rule 29 … , they did not challenge the sufficiency of the evidence with respect to either of the[] points" they raised on appeal); *United States v. Delano*, 55 F.3d 720, 726 (2d Cir. 1995) (reviewing for plain error where, "in his Rule 29 motion below," the defendant "stated a ground different from what he now urges on appeal"). The prospect of plain error review makes this challenge even less likely to prevail.

Larmore's new manipulation argument does not meet the "difficult," *Puckett*, 556 U.S. at 135, plain error standard, which the Second Circuit has made clear "should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result," *Villafuerte*, 502 F.3d at 209. With respect to the first two prongs, the Court did not err (let alone plainly err) by failing to *sua sponte* conclude that no rational juror could have found Larmore guilty based on his manipulation of WeWork stock. To the contrary, a rational jury could have found that Larmore intended to send a false price signal into the market with his $9 per share tender offer—made at a time when WeWork was on the verge of bankruptcy and trading for less than $1 per share—in the hope of quickly and significantly inflating WeWork's stock price to the point where his newly acquired WeWork stock options would be in the money.  In fact, Larmore's scheme *depended* on driving the WeWork stock price up high enough to trigger his options, meaning that his plan would work only if the price traded at an artificially high level.  The evidence at trial—including Larmore's purchase of short-term options with a strike price far above the stock's current trading level, Larmore's decision to announce a tender offer at a price just above the trigger price of his options, Larmore's push to get wide dissemination of his fake press release before the market closed, and Larmore's discussions with others about his desire to affect WeWork's stock price by causing a "short squeeze"—were all evidence that he intended to artificially inflate WeWork's stock price.

With respect to the third prong, any error (and there was none) did not "affect substantial rights, because there is no reasonable probability that, but for the error, the outcome of the proceeding would have been different. *Greer v*, 141 S. Ct. at 2096. Substantial rights were not affected here because of the other, non-manipulation-based ways in which the jury could have also convicted Larmore, including (1) a finding that at the time Larmore announced the tender offer he did not have a reasonable belief that he would in fact be able to obtain the funds to consummate the offer, or (2) a finding that Larmore made material misrepresentations, half-truths, or misleading statements about Cole Capital Funds and its bona fides, his communications with City National Bank and JP Morgan, and his "consultation" with lawyers, any one of which would be sufficient to sustain the jury's guilty verdicts. Because overwhelming evidence supported these non-manipulation-based reasons for the verdicts, Larmore cannot show a reasonable probability that, but for any error, the outcome of the proceeding would have been different. These alternative bases for the jury's verdicts also belie any suggestion that any error had a serious effect on the fairness, integrity or public reputation of judicial proceedings.

In short, whether sufficient evidence supported the jury's verdict in this case is not a "close" call or an issue that "very well could be decided" in Larmore's favor on appeal.

## III. Larmore Does Not Raise a Substantial Question of Law or Fact About Whether Any Evidence was Improperly Admitted.

Larmore intends to argue on appeal that the Court erred at least half a dozen times when admitting evidence. Much of the evidence about which Larmore complains is mischaracterized in the Motion. Some of the evidence was never objected to at trial, resulting in the waiver of any objections to it now or on appeal. Moreover, throughout the trial, the Court carefully and thoughtfully balanced under Rule 403 the proffered evidence's probative value and any potential unfair prejudice. At times, the Court even constrained the Government's presentation of its

proffered proof and gave limiting instructions to the jury that mitigated any residual risks of unfair prejudice. It cannot be seriously argued that any of the Court's evidentiary decisions were such an abuse of discretion as to be "arbitrary and irrational," *Abu–Jihaad*, 630 F.3d at 131, making them substantial questions for appeal. Nonetheless, for the sake of completeness, the Government addresses Larmore's list of challenged evidentiary decisions.

First, Larmore claims that the Court erred in admitting evidence that he "had been sued for fraud in connection with a prior business endeavor in which he failed to pay more than 2,000 investors moneys due to them," and "was being investigated by the SEC." Dkt. 137 at 3. But there was in fact no evidence at trial that Larmore had been sued "for fraud" by the SEC, Arciterra investors, or anyone else. Instead, the parties avoided the term "fraud" by admitting the evidence through a carefully worded stipulation, which stated matter-of-factly and without any prejudicial characterization: "On or about May 30, 2023, Bloomberg News, a national financial news outlet, published an online article reporting that, according to a lawsuit brought against Arciterra and Jonathan Larmore, none of the more than 2,000 investors in Arciterra offerings had received payments since 2019. The article stated that there appeared to be an SEC investigation in process against Arciterra and Jonathan Larmore." GX 1012; Tr. 261-263. Before trial, the Court carefully considered and properly admitted this evidence. The Court found the evidence "highly probative" of the fact that Larmore knew he did not have the ability to fund his tender offer. Sept. 9, 2024 Pretrial Conf. Tr. at 27 ("It is a fair argument that a reasonable person in Mr. Larmore's shoes, knowing he had been publicly revealed as the subject of an SEC investigation involving non-payment of investors, could not realistically expect to raise $77 million in a tender offer, let alone within a very short timeframe. In the vernacular, Mr. Larmore was radioactive and he knew it[.]") The Court, however, found that because the article in its totality had prejudicial elements, it was

"open to permitting a tightly restricted means of putting before the jury the limited fact that, as of early November 2023, it had been publicly reported that Mr. Larmore was the subject of an SEC investigation involving the handling of investor funds" that would be introduced "ideally by means of a negotiated stipulation." *Id.* at 28. After numerous conferrals between the parties and extensive argument to the Court, *see* Oct. 7, 2024 Pretrial Conf. Tr. 59-72; Oct. 8, 2024 Pretrial Conf. 11-13, the parties agreed to an acceptable stipulation consistent with this Court's ruling, which was ultimately admitted at trial, GX 1012. At trial, the Court delivered a limiting instruction regarding this proof after the stipulation was entered into evidence. Tr. 265. The Court's admission of this evidence was reasonable, took precautions against any unfair prejudice, and was far from arbitrary and irrational.

Second, Larmore points to evidence that he made false statements under oath regarding the Plane Proceeds. Dkt. 137 at 3-4. Before trial, the Court overruled Larmore's objection to the introduction of his false testimony regarding the Plane Proceeds. *See* Sept. 9, 2024 Pretrial Conf. Tr. at 16-18. The Court found the evidence that Larmore lied about using the Plane Proceeds to fund his fake tender offer was direct evidence of Larmore's consciousness of guilt. *Id.* at 17. It found the probative value of this evidence to be "substantial," and did not find "unfair prejudice to Mr. Larmore from this evidence." *Id.* The Court ruled, however, that the Government could not refer to the hearing in which Larmore lied as a "contempt proceeding" and that there "is not to be any reference to contempt" at trial "in any way, shape or form." *Id.* at 18. The Government presented this proof at trial by stipulation, which provided in relevant part: "On November 13, 2023, a hearing was held in the Indiana Court Case about the Plane Proceeds. Government Exhibit 502 is a true and accurate copy of excerpts of a transcript of that hearing. Larmore's testimony at that hearing, portions of which are contained within Government Exhibit 502, was given under

oath and subject to the penalty of perjury." GX 1005. The Court then delivered a limiting instruction on the appropriate purpose of such evidence. Tr. 264-265.

At no point did the Government introduce any evidence or argue in any way, as the Motion contends, that "Mr. Larmore improperly diverted receipts from the sale of an airplane belonging to one of his corporations" or that "Mr. Larmore was ordered to return to the trustee for his corporation the proceeds of the sale of the airplane." Dkt. 137 at 3-4. There is simply nothing like that in the record. In fact, the Court's limiting instruction to the jury directed them "not to speculate about the nature or the outcome of that court case." Tr. 265.

Third, Larmore cites evidence introduced at trial that he copied the trademark of a well-known company, i.e., the real Cole Capital. Dkt. 137 at 4.  Before trial, the Court permitted the Government to "offer evidence of any technique that Mr. Larmore used to make his company look like the real Cole Capital" but not evidence of any arbitration decision or finding that Larmore had as a matter of law "infringed a trademark of the real Cole Capital." Sept. 9, 2024 Pretrial Conf. Tr. 25-26. The Court likewise delivered a limiting instruction regarding this proof during trial. Tr. 510-511. As the Court explained, it was permissible for the jury to consider this evidence in determining whether there was or was not a relationship between CCO Group LLC and Cole Capital Funds LLC and also in evaluating Mr. Larmore's intentions and state of mind in naming the entity Cole Capital Funds if the jury found Mr. Larmore was responsible for the choice of that name. Tr. 511. The Court's decision to introduce this highly probative evidence of Larmore's fraud scheme was correct, and its limiting instruction mitigated any potential for unfair prejudice. The decision was a far cry from arbitrary and irrational.

Fourth, Larmore objects to the Government's introduction of testimony that Larmore tried to make his tender offer while in international waters:

> Mr. Larmore sought to evade United States securities laws by attempting to have a yacht he had chartered travel to international waters in order to deprive the U.S. government of jurisdiction over his conduct in carrying out the crimes described in the indictment when the government was in possession of evidence that his reason for taking the vessel into international waters had nothing to do with the crimes for which he was charged and convicted. Dkt. 137 at 4.

This argument relates to testimony by Patrick Cochran, to which Larmore did not object at trial. Tr. 377-378 (Cochran testifying on direct examination that Larmore "told the captain he wanted to go to international waters . . . . [because] [t]here was some type of trading he wanted to do that he had to be in international waters for," without objection). Larmore made the tactical decision not to object and, instead, to cross-examine Cochran about this testimony in an effort to undermine Cochran's credibility. *See* Tr. 397-390, Tr. 402, 403 (cross-examination and recross-examination of Cochran regarding "forex" trading). Because Larmore "consciously refrain[ed] from objecting as a tactical matter," that choice "constitutes a true 'waiver,' which will negate even plain error review." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995). In any event, Cochran's testimony was plainly probative of Larmore's consciousness of guilt and not outweighed by any unfair prejudice.

Fifth, Larmore contests the admission of evidence that he was advised that his tender offer was illegal:

> Mr. Larmore was advised by an attorney that he could not legally make a tender offer unless he had funds on hand to consummate the offer. (The Government conceded during the trial, but not to the jury, that this advice was incorrect, and that the requirement to have funds on hand applied only if and when the offeror filed a form TO with the SEC, which Mr. Larmore never did). Dkt. 137 at 4.

Larmore appears to take issue with a text message that James Siegel sent to him, which said "I think you will need to have the funds locked down before the TO." GX 1309. But Larmore never objected to this evidence at trial. Thus, once again, his choice constitutes a true waiver. On

35

the merits, the Government never argued to the jury that this advice was correct. Instead, the Government argued that the evidence was probative of Larmore's intent: he was willing to blow past legal advice that conflicted with his fraudulent goals. The evidence was properly admitted (without objection) and the Court did not err by failing to *sua sponte* exclude it.

Finally, for the first time, Larmore claims that the Court erred by allowing James Siegel and Jeremy Piccini to testify at trial, because "the prejudice inherent in having two former attorneys for Mr. Larmore testify far outweighed" the relevance of their testimony. Dkt. 137 at 8. Problems abound with respect to this new claim.

To begin, Larmore has waived any wholesale objection to allowing Siegel and Piccini to testify at trial. It was after all *Larmore himself* who first stated that he intended to put his communications with Siegel and Piccini at issue in this case and to have these witnesses testify at trial. On August 16, 2024, Larmore moved *in limine* to admit evidence of his communications with—or his desire to communicate with—no fewer than nine attorneys, including Siegel and Piccini. Dkt. 44. Larmore noted in his motion *in limine* that he "expect[ed] to introduce corroborative witness testimony at trial" to back up these communications. Dkt. 44 at 10, 43. Larmore argued that evidence of his attempts to "hire lawyers to assist in the process" was evidence of his legitimate intent. Dkt. 44 at 41. In other words, as reflected in his August 16, 2014 motion *in limine*, Larmore made the tactical decision that it was in his interest to inject Siegel and Piccini into the trial. Then, when the Government made clear that it would call Siegel and Piccini in its case in chief, Larmore did not move to preclude their testimony nor did he object to the Government's calling these witnesses. Larmore is only now raising objections to their testimony, for the first time, as part of a transparent attempt "to evade the consequences of an unsuccessful tactical decision." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). While Larmore

may regret his tactical decisions, his refusal to reverse course and raise timely objections to the testimony of Siegel and Piccini "constitutes a true 'waiver,' which will negate even plain error review." *Yu-Leung*, 51 F.3d at 1122.

Next, Larmore errs when stating that Siegel and Piccini were, in fact, his former attorneys. Siegel was clear that he did not represent Larmore as his lawyer in connection with the tender offer. Tr. 523 ("Q. At this point, were you representing Mr. Larmore as his lawyer? A. No. Q. Did you ever Mr. Larmore as his lawyer in connection with the tender offer? A. No."). Piccini also made clear that he was engaged to represent Cole Capital Funds, LLC, not Larmore personally. Tr. 552 ("Q. And was that the entity [i.e., Cole Capital Funds, LLC] that you were being engaged to represent? A. That's correct, yes. Q. To be clear, were you being engaged to represent Mr. Larmore personally? A. No."). Accordingly, any concerns about the conceivable prejudice of an attorney testifying against their former client do not apply in this case.

In any event, the testimony of Siegel and Piccini was entirely proper. It was highly probative of Larmore's intent to defraud and his lack of good faith. *See, e.g.*, Tr. 532 (Siegel warned Larmore, "I don't think you can do that," and Larmore did it anyway). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). Here, there was no such unfair prejudice. Larmore has cited no authority for his position that these principles apply differently just because the witness is a lawyer.

In summary, Larmore's list of Rule 403 grievances involve garden-variety evidentiary issues. On appeal, the Second Circuit will afford this Court's evidentiary decisions great deference.

Several of them were waived. For the remaining challenges that were preserved, that they were such an abuse of discretion as to be arbitrary and irrational is not even a remotely "close question" or one that "very well could be decided the other way." *Randell*, 761 F.2d at 25. Accordingly, here too Larmore fails to identify a substantial question of law or fact.

IV.    **None of Larmore's Rule 403 Arguments Are So Integral to the Merits of His Conviction as To Make a Contrary Ruling on Appeal Likely to Result in the New Trial.**

Even if Larmore succeeded on *all* his Rule 403 arguments, that would not be enough to obtain a new trial. Any or all of the Rule 403 claims Larmore raises, even if the Court of Appeals were to find them to be the result of arbitrary and irrational decision-making by this Court, are likely to be harmless, given the strength of the Government's case and the different ways the jury could have convicted Larmore. *Castano*, 999 F.2d at 618 ("The strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless."). For example, a rational jury could have found that Larmore made material misrepresentations, half-truths, or misleading statements in his press release about his communications with City National Bank and JP Morgan, and any one such misrepresentation, half-truth, or misleading statement would be sufficient to sustain the jury's guilty verdicts on both counts. Larmore raises no claims that any of the evidence relating to his communications with City National Bank or JP Morgan was improperly admitted. Accordingly, even if Larmore had raised substantial questions of law or fact with respect to this Court's evidentiary rulings, that would be insufficient to meet the demanding standards of bail pending appeal.

## CONCLUSION

For the reasons set forth herein, the Court should deny the Motion.

Dated:        New York, New York
              May 2, 2025

                              Respectfully submitted,

                              JAY CLAYTON
                              United States Attorney
                              Southern District of New York

                          By: _____
                              Justin V. Rodriguez
                              Adam S. Hobson
                              Sarah Mortazavi
                              Assistant United States Attorneys
                              Southern District of New York